# EXHIBIT A

## FILED UNDER SEAL

**RECORD NO. 19-1287**

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

## In re: GRAND JURY SUBPOENA

------------------------------

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## CHELSEA MANNING,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

**ADDENDUM TO MEMORANDUM OF OPENING BRIEF
VOLUME I OF II (Pages 1 - 334)**

Christopher R. K. Leibig
Law Office of Christopher Leibig LLC
114 North Alfred Street, Suite 101
Alexandria, Virginia 22314
(703) 683-4310 Telephone
chris@chrisleibiglaw.com

Sandra C. Freeman
Law Office of Sandra Freeman
5023 W. 120th Ave., Suite 280
Broomfield, CO 80020
(720) 593-9004
sandra.c.freeman@protonmail.com

*Counsel for Appellant*

Moira Meltzer-Cohen
(Pro Hac Vice pending)
277 Broadway, Suite 1501
New York, N.Y. 10007
347.248.6771

Vincent J. Ward
(Pro Hac Vice pending)
Freedman Boyd Hollander Goldberg U
Urias & Ward P.A.
20 First Plaza, Suite700
Albuquerque, New Mexico 87102
(505 842-0060

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

*Volume I of II*

<u>Appendix Page</u>

District Court Docket Sheet [1:19-dm-00003-CMH-1] ............................................. 1

Chelsea Manning's Statement of Motion to Quash Grand Jury Subpoena
    Filed March 1, 2019 [dkt1] ....................................................................................... 4

United States' Response in Opposition to Manning's Motion to Quash
Grand Jury Subpoena with Exhibits A – F
    Filed March 4, 2019 [dkt5] ..................................................................................... 34

        Ex. A:    Order, 01/22/19 [dkt5-1] ........................................................ 59
        Ex. B:    Memorandum re Grant of Testimonial Immunity and Order to
                 Testify [dkt5-2] ....................................................................... 62
        Ex. C:    R.C.M. 703(f)(4)(B) [dkt5-3] ................................................. 64
        Ex. D:    Manual for Courts-Martial, US R.C.M. 901(e)(2012 ed.)
                 [dkt5-4] ................................................................................... 67
        Ex. E:    Colloquy from Manning's Providence Inquiry
                 [dkt5-5, 5-6, 5-7] .................................................................... 71
        Ex. F:    Memorandum thru Civilian Defense Counsel [dkt5-8] ............... 254

Transcript of Hearing
Before The Honorable Claude M. Hilton
    On March 5, 2019 ................................................................................................ 289

Transcript Excerpts from Open Court Proceeding
Before The Honorable Claude M. Hilton
    On March 8, 2019 ................................................................................................ 321

Notice of Appeal
    Filed March 18, 2019 .......................................................................................... 330

Government's Response to Motion to Unseal
    Filed March 18, 2019 [dkt21] .............................................................................. 331

Order to Unseal
    Entered March 20, 2019 [dkt26] ......................................................................... 334

*Volume II of II – Sealed*

Transcript of Hearing
Before The Honorable Claude M. Hilton
    On March 6, 2019 ...............................................................................335

Transcript of Contempt Hearing
Before The Honorable Claude M. Hilton
    On March 6, 2019 ...............................................................................356

    *Testimony of Chelsea Manning*
        Examination by Mr. Kromberg ....................................................... 357-364

Transcript of Contempt Jury Hearing
Before The Honorable Claude M. Hilton
    On March 8, 2019 ...............................................................................356

Declaration of Chelsea Manning
    Dated February 28, 2019 ..................................................................387

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:19-dm-00003-CMH-1

Case title: USA v. In Re: Grand Jury Subpoena for Chelsea Manning

Date Filed: 03/01/2019

---

Assigned to: District Judge Claude M. Hilton

### Defendant (1)

**In Re: Grand Jury Subpoena for Chelsea Manning**

represented by **Christopher Leibig**
The Law Office of Christopher Leibig LLC
114 North Alfred Street
Alexandria, VA 22314
(703) 683-4310
Email: Chris@chrisleibiglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Sandra Christine Freeman**
Law Office of Sandra Freeman
5023 W. 120th Ave.
Suite 280
Broomfield, CO 80020
720-593-9004
Email: sandra.c.freeman@protonmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| | |
|---|---|
| **Pending Counts** | **Disposition** |
| None | |
| **Highest Offense Level (Opening)** | |
| None | |
| **Terminated Counts** | **Disposition** |
| None | |
| **Highest Offense Level (Terminated)** | |
| None | |
| **Complaints** | **Disposition** |
| None | |

---

**Plaintiff**

**USA**                                    represented by    **Gordon D. Kromberg**
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703)299-3700
Email: gordon.kromberg@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Thomas W. Traxler**
US Attorney's Office (Alexandria-NA)
2100 Jamieson Avenue
Alexandria, VA 22314
**NA**
703-299-3700
Email: thomas.traxler@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/01/2019 | 1 | MOTION to Quash Grand Jury Subpoena filed by In Re: Grand Jury Subpoena for Chelsea Manning. (kbar) (Entered: 03/01/2019) |
| 03/04/2019 | 5 | RESPONSE in Opposition by USA as to In Re: Grand Jury Subpoena for Chelsea Manning re 1 MOTION to Quash (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E Part 1, # 6 Exhibit E Part 2, # 7 Exhibit E Part 3, # 8 Exhibit F)(kbar, ) (Entered: 03/04/2019) |
| 03/04/2019 | 9 | MOTION to Unseal Case by In Re: Grand Jury Subpoena for Chelsea Manning. (kbar) (Entered: 03/04/2019) |
| 03/18/2019 | 21 | RESPONSE to Motion by USA as to In Re: Grand Jury Subpoena for Chelsea Manning re 9 MOTION to Unseal Case (Attachments: # 1 Proposed Order)(lgue, ) (Entered: 03/18/2019) |
| 03/19/2019 | 22 | Sealed Transcript of Proceeding before District Judge Claude M. Hilton 3/5/2019. (rban, ) (Entered: 03/19/2019) |
| 03/20/2019 |  | Case unsealed as to In Re: Grand Jury Subpoena for Chelsea Manning (rban, ) (Entered: 03/20/2019) |
| 03/20/2019 | 26 | ORDERED that the Clerk's Office shall unseal the following filings: (1) the Motion to Quash filed by Chelsea Manning on 3/1/2019 (2) the Response in Opposition to the Motion to Quash filed by the Government on 3/4/2019 (3) the transcript of the 3/5/2019 hearing on the Motion to Quash (4) the Motion to Unseal filed by Chelsea Manning on 3/5/2019 (5) the Response to the Motion to Unseal filed by the Government on 3/18/2019. The Clerk's Office shall not unseal the Declaration of Chelsea Manning that was submitted as an exhibit to her Motion to Quash. All other sealed filings and transcripts shall remain under seal until further notice from the court. Signed by District Judge Claude M. Hilton on 3/20/2019. (rban, ) (Entered: 03/20/2019) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/28/2019 17:55:16 | | | |
| **PACER Login:** | lantagne92:2586058:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-dm-00003-CMH |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

In re: Grand Jury Subpoena,        )
                                   )        OMNIBUS
CHELSEA MANNING,                   )        MOTION TO QUASH
                                   )        GRAND JURY SUBPOENA
        Subpoenaed Party.          )
_____      )

*UNDER SEAL* 18-4

1:19DM3
10GJ 3793

## STATEMENT OF MOTION

Comes now Chelsea Manning, by and through counsel, and pursuant to the First, Fourth, and Fifth Amendments to the United States Constitution, hereby moves this court to quash the subpoena *ad testificandum* summoning her to testify before a federal grand jury in this district. For reasons set forth herein, if enforced the subpoena 1) will violate Ms. Manning's Fifth Amendment right against compelled self incrimination and Double Jeopardy, 2) will violate her First Amendment right to Freedom of Association and Freedom of Speech 3) is an abuse of the grand jury process and 4) is a product of illegal electronic surveillance.

Ms. Manning further requests disclosure of any ministerial documents relevant to the instant grand jury and any prior statements of Ms. Manning in the possession of the government.

Ms. Manning states the following in support of these requests:

## STATEMENT OF FACTS

The movant Chelsea Manning has been and is recognized world-wide as a champion of the Free Press and open government. In 2013, Ms. Manning, then an all-source intelligence analyst for the U.S. military, was convicted at a United States Army court martial for disclosing classified information to the public. She was sentenced to thirty-five years imprisonment and a

Page 1 of 30

4

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 9 of 211 PageID# 115
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 8 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 2 of 30 PageID# 2

dishonorable discharge. She was confined under onerous conditions, including but not limited to prolonged solitary confinement. In 2017 her sentence was commuted by then-President Barack Obama. However, her appeal from that conviction remains pending and Ms. Manning may be subject to military re-call.

Following her release Ms. Manning has continued to be outspoken in her defense of First Amendment freedoms, for the rights of transgender persons, and against some United States government policies. The current administration has made clear its views of Ms. Manning and her release. The President of the United States himself tweeted that Ms. Manning "should never have been released." The Central Intelligence Agency tweeted a letter written on CIA letterhead, in which then-CIA director, and now Secretary of State Mike Pompeo effectively convinced Harvard University to withdraw a fellowship that she had been awarded by their students. See @RealDonaldTrump tweet of January 26, 2017, and the September 14, 2017 tweet from @CIA Twitter account. Based on the explicit statements of this administration, Ms. Manning reasonably believes that the current administration is unhappy with her release, and seeks to punish her further by using any means at their disposal to incarcerate her. She reasonably fears that despite living a law-abiding life, the government is subjecting her to physical and electronic surveillance (see Declaration of Chelsea Manning) and other intrusions. The instant subpoena is part of that process.

On February 5, 2019, Chelsea Manning was served through counsel with a subpoena *ad testificandum* ordering her to appear before a grand jury empaneled in this district. The appearance is now scheduled for March 5, 2019.

Page 2 of 30

5

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 10 of 211 PageID# 116
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 9 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 3 of 30 PageID# 3

Secrecy is the defining feature of grand jury proceedings, and Federal Rule of Criminal

Procedure 6(e) mandates that information presented to this grand jury is protected against public

disclosure[1], absent a compelling need. While the subject of this grand jury's investigation is not

publicly known, it almost certainly involves a complex of people, events, and disclosures with

which Ms. Manning was briefly associated, and for her involvement with which she has been

held accountable.

While it is our understanding that an immunity order has been secured, the subpoena will

nonetheless violate Ms. Manning's Fifth Amendment rights. The appeal of her court martial

remains pending. It is unclear that the immunity order would be effective as to that proceeding,

which, as a function of the military, falls outside the jurisdiction of the Department of Justice. It

is likewise unclear whether the military might attempt to assert jurisdiction over her, and while

she would reserve the right to resist such an assertion, the jeopardy in which she might be placed

were she to cooperate with this proceeding is very real. Additionally, the threat of foreign

prosecution, unaffected by an immunity order, incentivizes disobedience with even perfectly

immunized testimony.

Ms. Manning possesses no material information not already disclosed to the government.

Ms. Manning herself gave robust testimony about her own relationship to the 2010 public

disclosures during her court martial proceeding. At that time, the military, in consultation with

the Department of Justice, cross-examined her and elicited testimony from her. Following that

testimony she was confined and monitored, and since her release she has gained no further

personal knowledge of any relevant people or events. Moreover, this constellation of digital

---

[1] Unlike attorneys and grand jurors, witnesses before grand juries are less constrained by this secrecy, as it
is intended largely for their own protection.

Page 3 of 30

6

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 11 of 211 PageID# 117
USCA4 Appeal: 19-1287     Doc: 10-2      Filed: 03/29/2019    Pg: 10 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 4 of 30 PageID# 4

media leaks and those associated with them have been obsessively studied, reported upon, and

investigated by scholars, journalists, and governments around the world since at least 2010.

Indeed, it is known that the federal investigation into these disclosures has involved information-

gathering, testimony both voluntary and compelled, and both overt and covert surveillance for

many years. There is little doubt that the prosecutor and this grand jury have access to a great

deal of both public and non-public information on these matters, including, but far exceeding

Ms. Manning's prior sworn testimony.

Ms. Manning has no knowledge of or information to offer about any other federal

offense, and therefore no relevant testimony to offer to any investigative grand jury. The

government is seeking Ms. Manning's testimony nearly a decade later despite the fact that it has

unfettered access to hundreds of thousands of pages of documentary evidence and the sworn

testimony of ninety witnesses (including Ms. Manning herself) presented in 2013 and found by a

military judge to constitute proof beyond a reasonable doubt of Ms. Manning's central role in the

2010 disclosures. Ms. Manning cannot give the government or this grand jury information

anywhere near the quality and quantity of that presented at her court martial in 2013. The

government's interest in relying on anything other than the evidence acquired closest in time to

the events purportedly under investigation gives rise to a legitimate concern that the instant

subpoena was not motivated by the government's desire to discover information concerning

possible violations of federal law.

There is a long and well-documented history of grand jury abuse. The grand jury system

is enshrouded in secrecy and is, by its very nature, susceptible to abuse and impermissible

government overreach. See, e.g., Mark Kadish, *Behind the Locked Door of An American Grand*

Page 4 of 30

7

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 12 of 211 PageID# 118
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 11 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 5 of 30 PageID# 5

*Jury: Its History, Its Secrecy, and Its Process,* 24 Fla. St. U. L. Rev. 1 (1996); Michael Deutsch,

*The Improper Use of the Federal Grand July: An Instrument for the Internment of Political*

*Activists,* 75 J. Crim. L. & Criminology 1159 (1984). As a consequence of grand jury secrecy,

neither the courts, nor Congress, nor - most importantly - the public, can gauge how the

institution is being used - or abused, as the case may be. Marvin E. Frankel & Gary P. Naftalis,

*The Grand Jury: An Institution on Trial* 125 (1977).

Given this history, Ms. Manning has reason to believe that she will be subject to

questions intended to elicit information not properly within the scope of the grand jury, and that

questioning rather will focus on activities protected by the First Amendment such as news

gathering and other forms of protected speech and associations. Indeed, the mere issuance of

this subpoena is already serving to chill her exercise of constitutional rights.

Notwithstanding the purported legitimacy of this grand jury investigation generally, Ms.

Manning fears the subpoena directed toward her may have issued in other than good faith. The

exhaustive and complex testimony in the court martial proceedings to which the government has

always had unrestricted access raises the inference that this subpoena has issued for the primary

purpose of coercing perjury or contempt, although she vigorously disputes that she has ever been

anything but truthful in her prior statements. Whether issued in violation of the first amendment

or in bad faith, whether as a means of undermining her credibility, creating a perjury trap, or

coercing contempt, the subpoena must be quashed.

The subpoena should also be quashed because Ms. Manning has reason to believe that

she and those around her have been subject to unlawful electronic surveillance in violation of her

Fourth Amendment rights and other statutory prohibitions on such surveillance. See declaration

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 13 of 211 PageID# 119
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 12 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 6 of 30 PageID# 6

of Chelsea Manning, attached. During her time in prison, Ms. Manning was of course subject to routine observation. Since her release, Ms. Manning has experienced all manner of intrusive surveillance, including surveillance vans parked outside her apartment, federal agents following her, and strangers attempting to goad her into an absurdly contrived conversation about selling dual-use technologies to foreign actors.

Given Ms. Manning's notoriety it is likely that the grand jurors themselves harbor a bias against her. Her name and face are widely recognizable, and are likely well-known to all in the pool of potential grand jurors for the Eastern District of Virginia, which includes people who are more than usually likely to be connected with the intelligence community of which she was once a part. Due to her political notoriety, as well as her recent gender transition, she fears she will be subject to harms stemming from the grand jurors' preconceived notions and prejudices.

Ms. Manning believes this entire subpoena has been propounded unnecessarily, possibly in retaliation for her recent release from prison, and in violation of her First, Fourth, Fifth, and Sixth Amendment rights, and other statutory rights, such as would excuse her grand jury testimony. These concerns are magnified given not only the history of grand jury abuses, but the degree to which she personally has been subject to political harassment, oppression and demonization by certain forces within the government.

Ms. Manning therefore moves this court to quash the subpoena; to direct the government to canvass federal agencies to determine whether any electronic surveillance has been conducted and either affirm or deny that such surveillance has taken place; for disclosure of ministerial documents; for the right to instruct the grand jury; for disclosure of any prior statements relevant

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 14 of 211 PageID# 120
USCA4 Appeal: 19-1287   Doc: 10-2       Filed: 03/29/2019   Pg: 13 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 7 of 30 PageID# 7

to the questions propounded by the prosecution, and for all other and further relief as this court

deems just and proper.

ARGUMENT

> A.    NOTWITHSTANDING ANY IMMUNITY ORDER, THE SUBPOENA
> EXPOSES MS. MANNING TO JEOPARDY WITH RESPECT TO HER ONGOING
> MILITARY CASE AND POSSIBLE FOREIGN PROSECUTION

The grand jury subpoena should be quashed because Ms. Manning is still subject to

military criminal jurisdiction. Thus any statements or testimony given in the grand jury

proceeding could subject her to a court-martial, other military discipline, or prejudice her

ongoing military appeal.[2] Accordingly the subpoena must be quashed as enforcement will violate

her Fifth Amendment right against self incrimination.

The Fifth Amendment right against self-incrimination applies to the ongoing court-

martial appeal, and obviously to any future military criminal investigations or actions. "The

privilege against self-incrimination may be invoked when a 'witness has reasonable cause to

apprehend danger' that he will implicate himself in a criminal offense by answering a question.

*United States v. Villines*, 13 M.J. 46, 52 (C.M.A. 1982) (quoting *Hoffman v. United States*, 341

U.S. 479, 486). The *Villines* case is poignant because the military defendant in that case had been

compelled to testify as a co-conspirator witness after he had already been convicted but while his

appeal was pending. The court refused to compel him to testify because of the possibility that

any statements he made as a witness could be used at a re-trial.

This logic holds true in Ms. Manning's case. Ms. Manning's case is presently on appeal.

Depending on the outcome of the appeal the case could be sent back to the lower court for

---

[2] Ms. Manning reserves the right to contest an assertion of military jurisdiction.

Page 7 of 30

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 15 of 211 PageID# 121
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 14 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 8 of 30 PageID# 8

further proceedings. In those proceedings, the military prosecutor would have access to, and likely seek to use, any testimony given by Ms. Manning before the grand jury. Alternatively, the military could drum up an entirely new prosecution since Ms. Manning may yet be subject to military jurisdiction.

The facts and circumstances of this case are unusual because of Ms. Manning's status in the military. It is well-known that Ms. Manning was convicted at an Army court-martial in 2013 for disclosing classified information the public through a number of different news sources. She was sentenced to thirty-five years imprisonment and a dishonorable discharge. In 2017 President Barack Obama commuted the sentence to time served.

Because the commutation did not affect the conviction, Ms. Manning's case is presently on appeal in the United States Court of Appeals for the Armed Forces, an Article I appellate court that hears military appeals. Under Article 76a of the Uniform Code of Military Justice (UCMJ), the military may retain jurisdiction over a servicemember while his or her appeal is pending. See 10 U.S.C. § 876a. To effectuate Article 76a, UCMJ, the military typically places servicemembers who have been punitively discharged at a court-martial (i.e., a dishonorable or bad conduct discharge) on *involuntary appellate leave* pending the conclusion of the appeal. Ms. Manning, who was dishonorably discharged, was placed on involuntary appellate leave after she was released from military prison pursuant to President Obama's commutation order.

"Although a person on involuntary appellate leave remains subject to military jurisdiction and possible recall, the individual returns to civilian life throughout the period of leave." *United States v. Pena*, 64 M.J. 259, 267 (C.A.A.F. 2007). If a servicemember violates the UCMJ while on involuntary appellate leave he or she may be court-martialed for offenses that are service-connected. See, *e.g.*, *United States v. Ray*, 24 M.J. 657 (A.F.C.M.R. 1987) (holding that a

Page 8 of 30

**11**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 16 of 211 PageID# 122
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019     Pg: 15 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 9 of 30 PageID# 9

servicemember who was on involuntary appellate leave could be prosecuted for distributing cocaine to a servicemember).

The threat of a military prosecution is real. President Obama's decision to commute Ms. Manning's sentence was not well-received by some military leaders and influencers. President Trump, in fact, tweeted on January 26, 2017 that Ms. Manning "should never have been released from prison." See https://twitter.com/realDonaldTrump/status/824573698774601729, *last visited* February 28, 2019. The prosecution has revealed very little about the nature of the grand jury or the questions Ms. Manning may be asked. At most we know that the grand jury probably relates to the 2010 disclosures, and related people and organizations. And despite repeated requests by Ms. Manning's legal team for information about the nature of the expected grand jury questions, the prosecutor has only generally revealed that he believes some of Ms. Manning's statements at the court-martial were either false or mistaken, and that the grand jury would benefit from hearing more details about Ms. Manning's contacts and communications with respect to the 2010 disclosures. Given the prosecutor's unwillingness to disclose information to Ms. Manning that would help her evaluate the risks of testifying, she must assume that the grand jury is a "perjury trap" or even worse, a subterfuge for another military prosecution.

Granting Ms. Manning immunity in the federal grand jury context will not shield her from prosecution by the military. In the military only a general court-martial convening authority (i.e., a military commander who is sufficiently high-ranking and who has command over the subject servicemember) can grant immunity from prosecution at a court-martial. See Rules for Court-Martial (RCM) 704. It would be wholly unfair to compel Ms. Manning to testify before the grand jury based on the limited protection of the grand jury immunity order.

Nor can it be argued that Ms. Manning's grand jury testimony will be kept secret from

Page 9 of 30

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 17 of 211 PageID# 123
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 16 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 10 of 30 PageID# 10

the military. Rule 6(3)(A) of the Federal Rules of Criminal Procedure permits the disclosure of

grand-jury information when a government attorney believes it is "necessary to assist in

performing that attorney's duty to enforce federal criminal law." If Ms. Manning is compelled to

testify in the grand jury proceeding it is foreseeable the prosecution could pass along her

testimony to the military to assess whether criminal charges that are otherwise precluded from

federal prosecution could be brought at a court-martial.

As a last note, Ms. Manning has reason to fear foreign prosecution, from which she is not

shielded by any U.S. issued immunity agreement. United States v Balsys, 524 US 666, (1998).

This exposes her to the dilemma of choosing between domestic contempt, or foreign prosecution.

The failure of the law to accommodate this conundrum creates a regrettable and perverse

incentive for refusal to give even immunized testimony.

For these reasons the grand jury subpoena should be quashed.

B.    THE SUBPOENA WILL IMPERMISSIBLY INTRUDE UPON CONSTITUTIONALLY
PROTECTED EXPRESSIVE AND ASSOCIATIONAL RIGHTS

During her court martial, Ms. Manning gave expansive testimony about her role in and

knowledge of events and actors relevant to disclosing information on "asymmetric warfare" to

the public. She was exhaustive and truthful in her testimony, and after her own statements, she

was subject to further questioning by the government. United States v. Manning, U.S. Army 1st

Judicial Circuit, Colonel Lind Presiding (2013), transcript at pp. 6705-6918; Appellate Exhibit

499, 34 page, single-spaced Statement of PFC Manning. Nothing further is to be gained by

compelling her to answer yet more questions about these subjects. Ms. Manning has no

undisclosed knowledge relevant or material to an investigation of any other federal offense.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 18 of 211 PageID# 124
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 17 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 11 of 30 PageID# 11

In the event that the government seeks information about which she has *not* already given testimony, Ms. Manning must assume that such questions involve her own or other peoples' lawful and constitutionally protected activities, associations, and expressions. It has long been held that the First Amendment *does* apply to grand jury proceedings. Compelled disclosure "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Hispanic Leadership Fund, Inc. v Fed. Election Com'n, 897 F Supp. 2d 407, 420 (E.D. Va. 2012); Buckley v. Valeo, 424 U.S. 1, 64 (1976); Gibson v. Florida Legislative Comm., 372 U.S. 539 (1963); N.A.A.C.P. v. Button, 371 U.S. 415 (1963); Shelton v. Tucker, 364 U.S. 479 (1960); N.A.A.C.P. v. Alabama, 357 U.S. 449 (1957). Because of the possible "chilling effect" such compelled disclosure may have on protected rights, the government's request for such disclosure must survive "exacting scrutiny." Buckley v. Valeo, *supra*, N.A.A.C.P. v. Alabama, at 463; Weiman v. Updegraff, 344 U.S. 183 (1952). In the event that a viable First Amendment claim is made, it is the government's burden to show that its interests in disclosure are both legitimate and compelling, and that there is a "relevant correlation" between the government's interest and the precise information to be disclosed. "The public's undoubted "right to every man's evidence," does not give government, for example, 'an unlimited right of access to [private parties'] papers with reference to the possible existence of [illegal] practices.'." In re Grand Jury Subpoena: Subpoena Duces Tecum, 829 F2d 1291, 1297 (4th Cir 1987) internal citations omitted; Brown v. Hartlage, 456 U.S. 45 (1982); Buckley v. Valeo, *supra*, at 64; DeGregory v. Attorney General, 383 U.S. 825 (1966); Gibson v. Florida Legislative Comm., *supra*; In re First National Bank, Englewood, Colo., 701 F.2d 115 (10th Cir. 1983) (grand jury proceedings); Smilow v.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 19 of 211 PageID# 125
USCA4 Appeal: 19-1287      Doc: 10-2           Filed: 03/29/2019      Pg: 18 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 12 of 30 PageID# 12

United States, 465 F.2d 802 (2d Cir. 1973); Bursey v. United States, 466 F.2d 1059 (9th Cir.

1972).

First, there is a likelihood that this grand jury to be used expressly to disrupt the integrity

of the journalistic process by exposing journalists to a kind of accessorial liability for leaks

attributable to independently-acting journalistic sources. This administration has been quite

publicly hostile to the press, and there is reason to believe that this grand jury may function to

interfere profoundly with the operation of a free press. As the Court stated in Branzburg v.

Hayes, "Official harassment of the press undertaken not for purposes of law enforcement, but to

disrupt a reporter's relationship with his news sources would have no justification." 408 U.S.

665, 707-08 (1973).

In addition to concerns about the implications of this subpoena for journalism generally if

Ms. Manning testifies, she fears that she may be compelled to disclose protected information

about lawful First Amendment protected associations and activities. This is particularly troubling

where, as here, she might be called upon to divulge names and political affiliations, despite

having no information legitimately necessary for purposes of investigating crime. Ms. Manning

objects on First Amendment grounds to the subpoena in its entirety, and in any event reserves the

right to object to individual questions on the same grounds.

While this circuit has left the "First Amendment versus Grand Jury dilemma" for another

day, the Ninth Circuit's test for objecting to potential First Amendment violations in the context

of specific grand jury questions is instructive. See In re Grand Jury 87-3 Subpoena Duces Tecum,

955 F2d 229, 234 (4th Cir 1992); Bursey v. United States, *supra*. According to Bursey, where

First Amendment interests are threatened by grand jury questions, the government must establish

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 20 of 211 PageID# 126
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 19 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 13 of 30 PageID# 13

that their interest is "immediate, substantial, and subordinating;" that there is a "substantial

connection between the information it seeks... and the overriding government interest in the

subject matter;" and that the use of the grand jury to compel the desired testimony is "not more

drastic than necessary to forward the asserted governmental interest." Bursey at 1083.

     This test will likely be relevant for Ms. Manning, in the event that the government wishes

to inquire into her recent, lawful, and constitutionally protected political activities. Since her

release, Ms. Manning has been an active and public participant in lawful community organizing

against prosecutorial overreach, and rising neofascism, as well as running as a candidate for

elected office. Ms. Manning is acutely aware that her public political activity has displeased the

current government, including those holding immense executive power. She is aware that the

community activities in which she has been involved have been subject to physical and

electronic surveillance. She is also aware that as a result of her participation in this activity, she

herself has been subject to physical and electronic surveillance. She believes one goal of this

surveillance is to chill her exercise of constitutionally protected activity.

     While the first amendment imposes constraints on the state's exercise of power to punish

a person for their political ideals or associations, the subpoena power has in the past been used as

an end run around the first amendment's promise. Gibson v. Florida Legislative Comm., supra;

N.A.A.C.P. v. Alabama, supra; Bursey, supra, at 1084; In re Verplank, 329 F.Supp. 433 (C.D.

Cal. 1971). By issuing a grand jury subpoena, the government may inquire into aspects of a

witness' knowledge, life, beliefs, and associations, in ways that would not otherwise be

permissible. The subpoena may not be issued in bad faith, with the primary intent to go on a

"fishing expedition." A subpoena issued for purposes of gathering information about protected

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 21 of 211 PageID# 127
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 20 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 14 of 30 PageID# 14

activities and associations, or for purposes of discouraging protected activities and associations,

is infirm, and must be quashed. Furthermore, individual questions that are clearly irrelevant to

the investigation being conducted, and that infringe upon specifically political associational

rights, fall afoul of the First Amendment, and must be disallowed. Ealy v. Littlejohn, 569 F.2d

219 (5th Cir. 1978), United States v (Under Seal), (stating that "practices which do not aid the

grand jury in its quest for information bearing on the decision to indict are forbidden") 714 F2d

347, 349 (4th Cir. 1983).

Ms. Manning's concerns about the use of this particular Grand Jury subpoena as a

mechanism for fishing into her protected political activity or simply to harass her are not the

narcissistic paranoia of a naive activist. The history of the use of grand juries to gather

intelligence on or quell political dissent is well-documented, and grand juries are particularly

susceptible to overreach.

Almost none of the procedural protections guaranteed to defendants in criminal trials are

available during grand jury proceedings, a practice that runs counter to the purpose of the grand

jury to act as a check on the executive's prosecutorial power. The enormous discretion held by

prosecuting authorities in the United States allows them to use the law for political and other

ends. Norman Dorsen & Leon Friedman, *Disorder in the Court: Report of the Association of the*

*Bar of the City of New York Special Committee on Courtroom Conduct,* 170 (1973). Historically,

the grand jury system was used to indict outspoken opponents of slavery for sedition, and then to

harass and indict black people and Reconstruction officials attempting to gain suffrage. Richard

D. Younger, *The People's Panel: The Grand Jury in the United States,* 163-1974, 85-133 (1963).

In the mid-20th century, the grand jury system was improperly used to frame labor

organizers and union leaders. Deutsch, *supra,* at 1171-73, 1175-78. During the Nixon

Page 14 of 30

**17**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 22 of 211 PageID# 128
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019      Pg: 21 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 15 of 30 PageID# 15

administration, over one thousand political activists were subpoenaed to more than one hundred

grand juries investigating lawful anti-war, women's rights, and black activist movements. *Id.* at

1179.

In 2012, the FBI issued 14 grand jury subpoenas to activists after the 2008 Republican

National Convention in Minneapolis, MN, and proceeded to question them without ever issuing

any indictments. The same year, a grand jury ostensibly investigating property damage at a

demonstration asked activist Katherine Olejnik more than 50 questions about people's political

beliefs and their relationships. The government did not question her about criminal conduct *as*

*they knew she had no knowledge of the crimes they were supposed to be investigating.* In 2013,

23 year old Gerald Koch was summoned before a grand jury on the purported basis that he might

have overheard a discussion in 2009 about some high profile property damage that had occurred

in 2008. This culminated in his eight-month confinement on civil contempt, and cast a palpable

chill over the political activities of New York City activists. In 2017, anti-pipeline activist Steve

Martinez was subpoenaed to appear before a grand jury in North Dakota to testify about an

injury law enforcement had caused to a young activist. The prosecution asked no questions at all

about unlawful conduct or the relevant injury.

The government, and especially this administration, has shown unambiguously their

hostility to political dissidents, and their willingness to treat certain political beliefs and

associations as functionally criminal. In sum, there is a clear and uninterrupted history of the

government misusing and abusing the grand jury apparatus. From COINTELPRO to the

PATRIOT ACT, and the revelations of the scope and nature of the NSA's data collection on

ordinary citizens, the history of government intrusion into activities that are not only

constitutionally protected, but politically *valuable*, is historically consistent, and demonstrably

true. There is no reasonable dispute that this kind of targeted retaliation occurs; it is in fact so

Page 15 of 30

USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 22 of 337
Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 23 of 211 PageID# 129
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 16 of 30 PageID# 16

relevant to this particular witness that to fail to raise it as a possibility would be a dereliction of counsel's professional obligations.

Ms. Manning is not simply aware of surveillance, she is in fact, and as the government well knows, uniquely equipped to identify it. There is simply no doubt that she has been the subject of keen and intrusive observation efforts by the government. Her belief that this subpoena could be used to investigate constitutionally protected activity is consistent not only with the long history of grand jury abuse detailed above, but her own experience of government surveillance and disruption.

Furthermore, such intrusion, rather than being based on a reasonable belief that Ms. Manning is engaging in unlawful conduct, is likely a retaliatory move stemming from the government's publicly expressed frustration at her release. While the government may not have any good faith belief that she has knowledge of a federal crime, they may well be interested in inquiring into whether she has any knowledge of people, relationships, and strategies relative to political and activist communities. Relief from this subpoena is therefore justified, inasmuch as it has issued with the knowledge that it will chill political speech and association among Ms. Mannings community members and intrude upon the ability of this nation to maintain a free and open press.

Investigations or individual subpoenas that concern matters of journalism and political activities and associations, are subject to First Amendment limitations. Given that Ms. Manning is not possessed of any information not already disclosed during her trial that could be of use to any federal criminal investigation, any information she is in a position to give would likely touch on first amendment protected activities and associations. Such information is protected by the

USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 23 of 337
Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 24 of 211 PageID# 130
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 17 of 30 PageID# 17

first amendment so as to excuse her from answering questions related to those subjects. The case

before Your Honor is highly suspect and should be put to the utmost judicial scrutiny. ·

C.   THE SUBPOENA IMPERMISSIBLY SEEKS TO COMPEL TESTIMONY FOR
AN IMPROPER PURPOSE, AND IS AN ABUSE OF THE GRAND JURY
PROCESS

The grand jury satisfies an investigative function, specifically to investigate federal

crimes. While this grand jury has presumably convened to investigate a possible federal offense,

Given Ms. Manning's history, discussed *supra*, she reasonably fears that the reason she

specifically has been summoned falls outside the recognized boundaries of the grand jury's

legitimate investigative function.

Ms. Manning, having already given thorough and truthful testimony about the subjects

that might be properly investigated by this grand jury, fears that this subpoena will instead be

used to compel testimony about other subjects, including subjects unrelated to any federal crime.

As detailed above, there is a distinct possibility that her testimony before this grand jury could be

used to harass her, intimidate her or chill her political speech and associations.

Additionally, in light of the vitriol directed at her by arguably the most powerful human

being on Earth, it is not unreasonable for her to fear that this subpoena may be motivated by the

government's desire to find a way to manufacture a case against her, by coercing perjury or

contempt, neither of which are forestalled by an immunity order. Because she has already given

exhaustive testimony, it is entirely possible that efforts at repeated questioning  are intended or

designed to "coax [her] into the commission of perjury or contempt, [and] such conduct would

be an abuse of the grand jury process." Bursey v. United States, 466 F.2d 1059, 1080 n.10 (9th

Cir. 1972); United States v. Caputo, 633 F.Supp 1479 (E.D. Pa. 1986); United States v. Simone,

Page 17 of 30

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 25 of 211 PageID# 131
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 24 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 18 of 30 PageID# 18

627 F. Supp. 1264 (D.N.J. 1986); People v. Tyler, 413 N.Y.S.2d 295 (1978). See also Gershman,

The "Perjury Trap" 192 U. Pa. L. Rev. 624 (1981).

Furthermore, it is possible that this subpoena represents an effort on the part of the FBI or

another investigative agency in collaboration with government prosecutors to compel by grand

jury process testimony that would otherwise be inaccessible. United States v. Ryan, 455 F.2d 728

(9th Cir. 1972). In the years leading up to the issuance of this subpoena, the intelligence

community expended enormous time, energy, and resources investigating unauthorized

disclosures of government information, including but not limited to those in which Ms. Manning

was involved in 2010. Evidence adduced at Ms. Manning's court martial was the source of some

of this information. She is of the opinion that while her testimony was truthful and complete, it

did not function to corroborate the narrative proposed by the government, or to serve the

government's goals. Therefore, it would be in the interest of the government to elicit more

statements from her, either to discredit her, or to extract from her a set of statements that are

more in line with their own theory.

The FBI attempted unsuccessfully to speak with Ms. Manning in late 2010, while she was

at Quantico, despite the fact that she was represented by counsel. As her military case is ongoing,

and she remains represented, they are yet unable to access and question her. The US Attorney,

however, may use his power to compel her to appear, and may thus gain access otherwise

unavailable to the agencies. To acquire access in this manner and for this purpose would also be

an improper use of subpoena power, but by no means would it represent a unique instance of

such conduct. In re September 1971 Grand Jury (Mara v. United States), 454 F.2d 580, 585 (7th

Page 18 of 30

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 26 of 211 PageID# 132
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 25 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 19 of 30 PageID# 19

Cir. 1971) (rev'd on other grounds by <u>United States v Mara</u>, 410 U.S. 19 (1973)), <u>In re Sylvia</u>

<u>Brown</u>, No. 14-72-H-2 (W.D. Wash., May 17, 1972).

It is axiomatic that "the grand jury is not meant to be the private tool of the prosecutor."

<u>United States v. Fisher</u>, 455 F.2d 1101, 1105 (2d Cir. 1972), <u>United States v (Under Seal)</u>, 714

F2d 347, 349 (4th Cir 1983). Nor is it proper for the government to use its subpoena power to

conduct "a general fishing expedition," for the prosecution or any other government office. In the

event that the grand jury or its subpoena power is being used in any manner that exceeds it

legitimate scope, the Court must excuse Ms. Manning's testimony. As the Court stated in <u>United</u>

<u>States v. Dionisio</u>, 410 U.S. 1 (1973), "The Constitution could not tolerate the transformation of

the grand jury into an instrument of oppression."

In any case, the prosecution knows or should know that Ms. Manning has no further

information to disclose. They know, moreover, that Ms. Manning's previous testimony at her

own court martial may undercut their agenda. This suggests then that their purpose in calling her

before the grand jury is not to discover further and more helpful information (which she does not

have). It suggests rather that they will attempt to elicit statements that could be construed as

inconsistent with her prior statements. Doing so would enable them to undermine her credibility

as a potential defense witness, while also creating the possibility of a criminal case against her

for perjury. To do so with this intent would constitute an absolutely improper use of the grand

jury, and the court must exercise its oversight to ensure such abuse is not allowed to occur under

its supervision.

While there may be a legal presumption of regularity as to grand jury proceedings, this

presumption disappears once evidence of abuse has been introduced, and the prosecution bears

Page 19 of 30

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 27 of 211 PageID# 133
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 26 of 337
Case 1:19-dm-00003-CMH  Document 1  Filed 03/01/19  Page 20 of 30 PageID# 20

the burden of demonstrating regularity. Mullaney v. Wilbur, 421 U.S. 684, 702 ns. 30 and 31

(1975). Given the secrecy in which grand juries are shrouded, and the extreme discretion granted

the prosecution in the exercise of subpoena power, the burden of showing this regularity must lie

with the prosecution. The only information available to Ms. Manning is that the most powerful

actors in the federal government are greatly displeased at her release and have made efforts to

undermine and harass her. Regardless of the general purpose of this grand jury, it is completely

reasonable to harbor concerns about the purpose of this particular subpoena.

> **D.    MS. MANNING BELIEVES THE SUBPOENA WAS PROPOUNDED ON THE BASIS OF UNLAWFUL ELECTRONIC SURVEILLANCE, SUCH AS WOULD CONSTITUTE "JUST CAUSE" FOR REFUSING TO TESTIFY**

Attached hereto and made a part thereof, please find Chelsea Manning's declaration,

setting forth with specificity facts tending to suggest that she and others have been subjected to

unlawful electronic surveillance.

These facts set forth in the Manning declaration include phone numbers and email

addresses that she has reason to believe were subject to surveillance, and the range of dates on

which such surveillance may have occurred; various places that may have been subject to

surveillance, and the names of the lessees/licensees of those premises.

There can be little doubt that local police, federal agencies, and possibly the military have

been involved in surveilling and communicating about Ms. Manning, people with whom she is

lawfully associated, and the entirely lawful activities in which they engage. Likewise, there is

reason to believe that non-state actors may have enabled the state to circumvent legal constraints

on electronic surveillance, by surveilling Ms. Manning, and then conveying their intelligence to

state actors. Unfortunately, this is not unheard of. Such a thing happened, for example, during

Page 20 of 30

**23**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 28 of 211 PageID# 134
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 27 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 21 of 30 PageID# 21

the prosecution of the 230 people arrested at the inauguration on January 20, 2017, where individuals from the disingenuously named Project Veritas secretly taped a community meeting and conveyed the footage to prosecutors. As Ms. Manning has encountered at least one individual who appeared to tape her while attempting to goad her into conversations about unlawful uses of technology, she reasonably fears that this or something similar is happening to her.

The information provided by Ms. Manning in her declaration constitutes at the very least a colorable basis supporting her belief that she has been subject to unlawful electronic surveillance. Such surveillance violates the Fourth Amendment, as well as her statutory rights under 18 U.S.C. §§2515 and 3504. Such surveillance constitutes a complete defense to contempt, and should trigger an obligation of the part of the government to either affirm or deny that such surveillance occurred. 28 U.S.C. §1826(a) (stating that a witness may refuse to testify for "just cause.").

Also well-documented is a history of suspicious electronic activity and widespread surveillance of Ms. Manning, her friends, political associates, professional contacts, and technologist peers. For example, technologists at riseup.net and May First/People Link have been subject to surveillance, despite never having been charged with a crime. Technologists at Boston University's BUILDS space were summoned before at least one grand jury despite having no material information about federal offenses. It would be difficult to deny that a great deal of electronic surveillance has taken place and been directed at Ms. Manning. It is likely that at least some of it was relevant to the propounding of this subpoena. Ms. Manning is not in a position to know whether any of it occurred in the absence of a warrant or other legal authority.

Page 21 of 30

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 29 of 211 PageID# 135
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 28 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 22 of 30 PageID# 22

Finally, after Ms. Manning gave thorough, accurate, and complete testimony about the matters presumably being investigated by this grand jury, she thereafter made it a policy not to speak about the substance of those matters. In preliminary discussions, the prosecution indicated that they had reason to believe that Ms. Manning may have made statements inconsistent with her prior testimony. It is incumbent upon the court to direct the government to disclose not only electronic surveillance of Ms. Manning, but whether they intercepted communications authored and sent by third parties, as there are no such statements by Ms. Manning herself that would be at variance with her previous testimony. See Manning Dec. at Para.14. The concern here is that the subpoena as a whole is the product of unlawful - and possibly misunderstood - electronic surveillance.

This showing creates a colorable claim of electronic surveillance and requires that the government review not only the evidence gathered by their own actors and actually in the possession of the US Attorney's Office, but canvass all other agencies that may have engaged in such surveillance. They must then either issue an unequivocal and specific denial that such surveillance took place, or they must affirm that it did, in which case an expanded hearing on the issue of possible taint to the propounding of the subpoena and questions must be held. The government's representation ought to be in a sworn writing, and must be "responsive, factual, unambiguous, and unequivocal." United States v. Alter, 482 F.2d 1016 (9th Cir. 1973) note 110, at 1027; United States v Apple, 915 F2d 899, 908 (4th Cir. 1990) (finding that where "there was no question that a state wiretap was involved ... a check of only federal agencies was not an adequate response."). The government's response must furthermore include an "explicit assurance indicating that all agencies providing information relevant to the inquiry were

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 30 of 211 PageID# 136
USCA4 Appeal: 19-1287     Doc: 10-2     Filed: 03/29/2019     Pg: 29 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 23 of 30 PageID# 23

canvassed." In re Quinn, 525 F.2d 222 (1st Cir. 1975), United States v. Apple, *supra*, ("The

government's denial ... is usually based on inquiries to the relevant government agencies :... [t]he

predicate for acceptance of the government's denial is that the government official making the

denial have sufficient information upon which a reasonable response can be based.").

As it is well-settled that electronic surveillance is relevant to a grand jury proceeding only

where it is unlawful, and directly connected to subpoena or questions, it is not at this time

necessary to request such a hearing. The Court, now, must hold the government to its minimal

responsibility, simply to determine whether, and unambiguously affirm or deny, that there has

been such surveillance.

It is by no means settled in this circuit that a witness must do more than make a mere

assertion in order to trigger the government's obligations. In re Grand Jury Subpoena (T-112),

597 F3d 189, 200 (4th Cir. 2010), finding that the government satisfied its obligation by denying

that *any* electronic surveillance was conducted; Wikimedia Found. v Natl. Sec. Agency/Cent.

Sec. Serv., 335 F Supp 3d 772, 786 (D.Md. 2018) (affirming that a claim of unlawful electronic

surveillance automatically triggers an obligation to render a simple affirmation or denial by the

government). Nevertheless, the facts recited in the annexed declaration of Ms. Manning, even by

the most stringent standard, set forth a colorable claim sufficient to require that the government

unequivocally either affirm or deny that such surveillance took place. Critically, because a

witness is not in position to know the details of a governmental investigation, the claim need

only be "colorable," and not "particularized." The existence of unlawful electronic surveillance

constitutes "just cause" excusing the appearance of a witness before a grand jury. Gelbard v.

U.S., 408 U.S. 41, 51, 92 (1972), see 28 U.S.C. §1826(a), which contemplates "just cause" for

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 31 of 211 PageID# 137
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 30 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 24 of 30 PageID# 24

refusal to testify, as well as 18 U.S.C. §2515, mandating that "no part of the contents of

[unlawfully intercepted] communication and no evidence derived therefrom may be received in

evidence... before any ... grand jury."

Furthermore the evidentiary prohibitions of 18 U.S.C. §2515 are not only intended to

protect individuals' privacy, but to ensure that the court itself does not become a party to illegal

conduct on the part of the government. Because of the heightened secrecy of the grand jury, the

need for the court to forestall even the appearance of impropriety becomes yet more acute. Thus,

upon a colorable claim, it is absolutely incumbent upon the court to ensure that the government

satisfies its obligation to either affirm or deny the allegations, in a sufficient form, and to make

all necessary disclosures. United States v. James, In re Quinn, 525 F.2d 222, 225 (1st Cir. 1975).

Failure to do so will constitute a fatal defect in procedure.

Judge Learned Hand stated in United States v. Coplon, "few weapons in the arsenal of

freedom are more useful than the power to compel a government to disclose the evidence on

which it seeks to forfeit the liberty of its citizens." Id. 185 F.2d 629, 638 (2d Cir. 1950)., cert.

denied, 342 U.S. 920 (1952). Nowhere is this so true as it is in the context of the grand jury,

shrouded as it is in secrecy. If in fact Ms. Manning has been subject to the practices that Justice

Holmes pointedly described as "dirty business" - and there is little doubt that she has been - the

government must disclose that fact, and the Court must itself assiduously avoid complicity by

insisting upon that prompt and full disclosure. In the event that the prosecution is unwilling to

make the necessary disclosures, they must withdraw the subpoena, or the court must quash it.

Page 24 of 30

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 32 of 211 PageID# 138
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 31 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 25 of 30 PageID# 25

## MOTION FOR DISCLOSURE OF MINISTERIAL DOCUMENTS

Federal Rule of Criminal Procedure 6(e) makes quite clear that information about what occurs in the presence of the grand jury is protected against public disclosure, absent a compelling need. Information, however, regarding the empanelment of the grand jury, its term, and its mechanical operation, is beyond the scope of Rule 6(e)'s protections. In re Special Grand Jury(for Anchorage, Alaska), 674 F.2d 778 (9th, Cir. 1982); United States v. Alter, 482 F.2d 1016, 1028-29 (9th Cir. 1973) ("Alter was entitled to know the content of the court's charge to the grand jury. The proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.") See, Judicial Conference of the United States, Administrative Office of the U.S. Courts, Handbook for Federal Grand Jurors, HB 101 Rev 4/12.

Disclosure of ministerial information does not violate the freedom and integrity of the deliberative process of the grand jurors. Furthermore, American courts have long recognized a general right of access to court records." In re Grand Jury Investigation, 903 F.2d 180, 182 (3rd Cir. 1990)(citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 8 S.Ct. 1306, 55 L.Ed.2d 570 (1978)); Washington v Bruraker, 3:02-CV-00106, 2015 WL 6673177, at *1 (WD Va Mar. 29, 2015) (reiterating that the common law and the First Amendment presume a right to inspect and copy judicial records and documents); Reporters Comm. for Freedom of Press to Unseal Criminal Prosecution of Assange, 1:18-MC-37 (LMB/JFA), 2019 WL 366869, at 2 (ED Va Jan. 30, 2019), (confirming that "the public and the press share a qualified right to access civil and criminal proceedings and the judicial records filed therein.")

Page 25 of 30

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 33 of 211 PageID# 139
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 32 of 337
Case 1:19-dm-00003-CMH  Document 1  Filed 03/01/19  Page 26 of 30 PageID# 26

Orders reflecting 1) the beginning or extension of the terms of a grand jury, 2) the

instructions even a grand jury upon empanelment, and 3) records setting forth the method by

which the grand jury was empaneled (including the manual of forms, procedures, and checklists

uses to compile the master and qualified jury wheels) are to be disclosed upon request for the

reason that such records 'would not reveal the substance or essence of the grand jury

proceedings," "pose no security threat to past, current, or prospective jurors," and "do not

infringe upon the freedom and integrity of the deliberative process." United States v. Diaz, 236

F.R.D. 470, 477-478 (N.D. California 2006).

The ministerial records of the grand jury requested by Ms. Manning and her counsel do

not in any manner violate the principle of grand jury secrecy.

Ms. Manning here requests all such ministerial information with respect to the following

categories of documents be disclosed. To wit:

1) documents reflecting the commencement and termination dates of the current grand

jury,

2) any orders extending the term of the current grand jury,

3) all written instructions given to the current grand jury at the time of empaneling,

4) attendance roles of each session of the current grand jury with names of the grand

jurors redacted, and

5) the oath of the current grand jury, and 6) records setting forth the method by which the

grand jury was empaneled (including the manual of forms, procedures, and checklists used to

compile the master and qualified jury wheels but excluding any names of individuals summoned

for the grand jury).

Page 26 of 30

**29**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 34 of 211 PageID# 140
USCA4 Appeal: 19-1287   Doc: 10-2       Filed: 03/29/2019   Pg: 33 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 27 of 30 PageID# 27

Should the Court decline to sign the attached order, counsel respectfully advises the

Court that such a discovery denial is appealable by way of mandamus, prior to any contempt

proceedings, and requests that all further proceedings be stayed pending interlocutory challenge.

## MOTION TO INSTRUCT THE GRAND JURY

There is no question but that the grand jury is an appendage to the Court, and is not a

"mere tool of the prosecutor." In re Grand Jury Subpoena to Cent. States, Se. & Sw. Areas

Pension Fund, Aug. Term, 1963, 225 F. Supp. 923, 925 (N.D. Ill. 1964). Although a grand jury is

a hybrid proceeding, because the possibility of civil contempt looms over Ms. Manning, certain

precautions must be taken to ensure that the grand jurors understand their power and purpose. It

is critical that they are made aware of the Constitutional and testimonial privileges enjoyed by

the witness, in particular (a) the power and authority of the grand jury to question witnesses and

hear evidence as emanating from the court;(b) the nature and extent of this power; (c) the role of

the United States Attorney as an assistant to the grand jury; (d) a witness' right to assert the Fifth

Amendment prior to the grant of immunity, the lack of counsel in the grand jury room, and the

legal effect of an immunity grant. United States v. Alter, 482 F.2d 1016, 1029 (9th Cir. 1973).

Furthermore, the grand jurors must be made aware that they are not to draw adverse inferences

from the invocation of those rights and privileges. Finally, they ought to be advised of their own

power to decline to continue to question the witness.

Annexed hereto, please find a set of proposed supplementary grand jury instructions. It is

beyond question that the Court has the authority to instruct the grand jury as to their powers, and

as to the rights of the witness. Should the Court decline to do so, and should the existing

Page 27 of 30

30

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 35 of 211 PageID# 141
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 34 of 337
Case 1:19-dm-00003-CMH Document 1 Filed 03/01/19 Page 28 of 30 PageID# 28

instructions to the grand jury be found inadequate according to established law, counsel

respectfully advises the Court that the inadequate instruction will be challenged.

## MOTION TO DISCLOSE PRIOR STATEMENTS

When an individual is asked the same question repeatedly, there is "always the hovering

possibility that inconsistency in his answer may expose him to prosecution for perjury." Bursey

v. United States, 466 F.2d 1059 (9th Cir. 1972), Matter of Ferris, 512 F.Supp 91 (D. Nev. 1981).

Courts have therefore ruled that transcripts of previous testimony, including secret grand jury

testimony, and sometimes even 302 material produced in interviews with the FBI, should be

produced even to an immunized to a witness at least 72 hours prior to their scheduled

appearance. In re Sealed Motion, 880 F2d 1367, 1370-71 (D.C. Cir. 1989), (holding that

"because the right to secrecy in grand jury proceedings belongs to the grand jury witness, a grand

jury witness ... is entitled to a transcript of his own testimony absent a clear showing by the

government that other interests outweigh the witness' right to such transcript"); In re Grand Jury,

490 F3d 978, 986 (D.C. Cir. 2007) (affirming that "federal courts have the authority under Rule

6(e)(3)(E)(i) to order disclosure to grand jury witnesses of their own transcripts.") See also In re:

Russo, 52 F.R.D. 564 (C.D. Cal 1971); Gebhard v. United States, 422 F.2d 281 (9th Cir. 1970),

United States v. Nicoletti, 310 F.2d 359 (7th Cir. 1962). Since it is unlawful for a prosecutor to

ask a witness questions with the purpose of enticing them into committing perjury, providing

such prior statements may go far in guarding against this possible misuse of the grand jury.

## CONCLUSION

Based upon the foregoing facts, and the application of relevant law thereto, Ms. Manning

brings this motion to quash on the basis that the subpoena represents an abuse of grand jury

Page 28 of 30

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 36 of 211 PageID# 142
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 35 of 337
Case 1:19-dm-00003-CMH  Document 1  Filed 03/01/19  Page 29 of 30 PageID# 29

process, may intrude upon First and Fifth Amendment protections and privileges, and if

applicable, on the basis that the subpoena was propounded on the basis of unlawful electronic

surveillance in violation of the Fourth, and possible Sixth Amendments, and related statutory

prohibitions against warrantless electronic surveillance. Ms. Manning furthermore proffers her

declaration and other evidence in support of her motion to quash on the basis of unlawful

electronic surveillance, requiring here, at the very least, a thorough canvass of relevant agencies

to determine whether there has been any electronic surveillance, lawful or otherwise; affirmation

or denial on the part of the government, and any relevant disclosures; and if necessary, an

expanded hearing on the issue.

   Ms. Manning furthermore demands production of all ministerial documents related to

this grand jury, suggests a set of supplemental grand jury instructions, and requests disclosure of

any prior statements she has made. In all events, Ms. Manning, through counsel, requests a full

stay of all proceedings until the above questions are fully resolved through any necessary

litigation, including , where permissible, collateral appeals and extraordinary writs.


Respectfully Submitted,
By Counsel


Dated: March 1, 2019


                              /s/ Sandra Freeman
                              SANDRA C. FREEMAN (VSB# 78499)
                              5023 W. 120th Avenue, #280
                              Broomfield, Colorado 80020
                              720-593-9004
                              sandra.c.freeman@protonmail.com


                                                  Page 29 of 30

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 37 of 211 PageID# 143
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 36 of 337
Case 1:19-dm-00003-CMH   Document 1   Filed 03/01/19   Page 30 of 30 PageID# 30

/s/ Chris Leibig
CHRISTOPHER LEIBIG (VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-4310
chris@chrisleibiglaw.com

/s/ Moira Meltzer-Cohen
MOIRA MELTZER-COHEN
*(pro hac vice pending)*
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

/s/ Vincent J. Ward
VINCENT J. WARD
*(pro hac vice pending)*
Freedman Boyd Hollander Goldberg Urias & Ward,
P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 38 of 211 PageID# 144
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 37 of 337
Case 1:19-dm-00003-CMH Document 5 Filed 03/04/19 Page 1 of 25 PageID# 40

FILED

### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA

P 2: 05

Alexandria Division

DISTRICT COURT
ALEXANDRIA

|  |  |  |
|---|---|---|
| IN RE: | ) | **UNDER SEAL** |
|  | ) | (Pursuant to Local Criminal Rule 49 and |
| GRAND JURY CASE NO. 10-GJ-3793 | ) | Fed. R. Crim. P. 6(e)) |
|  | ) |  |
|  | ) | Case No. 1:19-DM-3 |
|  | ) |  |
|  | ) | GRAND JURY NO. 18-4 |
|  | ) |  |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO
### CHELSEA MANNING'S MOTION TO QUASH GRAND JURY SUBPOENA

A grand jury of the Eastern District of Virginia has lawfully subpoenaed Chelsea

Manning to testify in connection with an ongoing criminal investigation. The Court has ordered

Manning to testify in front of the grand jury. The Court and a convening authority within the

Department of the Army have also granted Manning full use and derivative use immunity to

ensure that her testimony cannot be used against her. After a one-month postponement at her

request, Manning has been directed to appear in front of the grand jury on March 5, 2019. Four

days before her scheduled appearance, she filed the pending motion to quash the subpoena,

speculating that the questioning will violate her constitutional, common-law, and statutory rights.

The motion should be denied. As a general matter, it is premature. The nature of

Manning's claims requires that she hear the questioning before determining whether it violates

her rights. Until then, she can rely only on conjecture, which is an inadequate basis for a motion

to quash. In addition to being premature, Manning's claims fail on their merits. The subpoena

was lawfully issued in the normal course of the grand jury proceedings. Manning was

subpoenaed because her testimony is highly relevant to an ongoing criminal investigation. Like

**34**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 39 of 211 PageID# 145
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 38 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 2 of 25 PageID# 41

any other citizen, Manning must appear before the grand jury as scheduled, and she must testify

fully and truthfully as this Court has ordered her to do.

## BACKGROUND

Manning is a former all-source intelligence analyst in the United States Army who may

remain subject to military jurisdiction, despite her dishonorable discharge, because of an ongoing

appeal relating to the following. In the 2009 to 2010 timeframe, Manning illegally leaked

hundreds of thousands of classified documents of the United States Government. She provided

the classified documents to one or more agents of WikiLeaks for public disclosure on its website.

Manning was arrested for these crimes in May 2010. She was convicted of Espionage Act and

other related offenses in a military court-martial. In 2013, Manning was sentenced to 35 years of

imprisonment. In January 2017, however, President Barack Obama commuted Manning's

sentence so that she would be released in May 2017, after serving approximately 7 years in

prison.

In January 2019, Manning was served through counsel with a subpoena to testify on

February 5 before a grand jury empaneled in the Eastern District of Virginia. Manning has been

further ordered to testify in front of the grand jury by this Court and a general court-martial

convening authority.[1] *See* Ex. A; Ex. B. In the compulsion orders, both authorities have granted

her full use and derivative use immunity. *See* Ex. A; Ex. B.

At the request of Manning's counsel, the original appearance date was moved back

approximately one month. Manning is now scheduled to appear in front of the grand jury on

---

[1] The Court's original immunity order dated January 22, 2019, erroneously referenced "Grand
Jury 19-1" in the caption. On February 25, 2019, the Court signed an identical immunity order
that simply corrected the caption to reference "Grand Jury 18-4."

2

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 40 of 211 PageID# 146
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 39 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 3 of 25 PageID# 42

March 5. Manning filed the pending Motion to Quash on March 1, four days before her

scheduled appearance.

## DISCUSSION

The Court "may quash or modify [a] subpoena if compliance would be unreasonable or

oppressive." Fed. R. Crim. P. 17(c). While the Court oversees that the grand jury uses its

powers for legitimate purposes, the Court "should not intervene in the grand jury process absent

a compelling reason." *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir. 1983). "The

investigative power of the grand jury is necessarily broad if its public responsibility is to be

adequately discharged." *Branzburg v. Hayes*, 408 U.S. 665, 700 (1972). As the Fourth Circuit

has explained, "in the context of a grand jury subpoena, the longstanding principle that the public

has a right to each person's evidence is particularly strong." *In re Grand Jury Subpoena*, 646

F.3d 159, 164 (4th Cir. 2011) (quoting *In re Grand Jury Proceedings #5 Empanelled Jan. 28,

2004*, 401 F.3d 247, 250 (4th Cir. 2005)). "[T]he grand jury's authority to subpoena witnesses is

not only historic, but essential to its task." *Branzburg*, 408 U.S. at 688.

A party faces a heavy burden in moving to quash a grand jury subpoena. "[A] grand jury

subpoena issued through normal channels is presumed to be reasonable, and the burden of

showing unreasonableness must be on the recipient who seeks to avoid compliance." *United

States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991). A "presumption of regularity" attaches to

the grand jury's proceedings, including its issuance of subpoenas. *See Grand Jury Subpoena*,

646 F.3d at 164. To prevail on a motion to quash, the subpoena recipient "bears the burden of

rebutting th[at] 'presumption of regularity.'" *Id.* For the reasons explained below, Manning has

failed to carry that burden.

3

**36**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 41 of 211 PageID# 147
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 40 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 4 of 25 PageID# 43

I.    **The Grand Jury Subpoena Does Not Infringe on Manning's Fifth Amendment Rights**

The Fifth Amendment right against self-incrimination applies to grand jury proceedings.

*See Kastigar v. United States*, 406 U.S. 441, 444 (1972).  Federal law, however, allows district

courts to immunize witnesses and compel them to testify before a grand jury.  *See* 18 U.S.C.

§ 6003(a).  Under those circumstances, the witness's testimony cannot be used, or derivatively

used, against the witness "in any criminal case, except a prosecution for perjury, giving a false

statement, or otherwise failing to comply with the order." *Id.* § 6002.  In the military courts, the

Rules for Court-Martial (R.C.M.) likewise allow a general court-martial convening authority to

grant such use and derivative use immunity.  *See* Manual for Courts-Martial, United States,

R.C.M. 704 (2016 ed.) (Ex. C.)

It is well established that, where such immunity has been conferred, the government may

compel the immunized witness to testify in front of the grand jury, even if her testimony would

otherwise incriminate her.  *See Kastigar*, 406 U.S. at 462.  As the Supreme Court has explained,

"the immunity . . . leaves the witness and the prosecutorial authorities in substantially the same

position as if the witness had claimed the Fifth Amendment privilege." *Id.*  "The immunity

therefore is coextensive with the privilege and suffices to supplant it." *Id.*

In light of this precedent, Manning's Fifth Amendment claim fails.  Both the Court and a

general court-martial convening authority have issued orders compelling her to testify before the

grand jury.  *See* Ex. A; Ex. B.  Both orders expressly grant Manning use and derivative use

immunity in connection with her testimony.  *See* Ex. A; Ex. B.  Under *Kastigar*, those orders

eliminate any Fifth Amendment concerns.

4

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 42 of 211 PageID# 148
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 41 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 5 of 25 PageID# 44

Manning's primary argument is that she is still subject to military criminal jurisdiction,

where she claims that her grand jury testimony could be used against her. *See* Mot. to Quash 7-

10 (Mar. 1, 2019). But the Army's immunity order definitively resolves that issue. It explicitly

extends the immunity to court-martial proceedings: "no testimony or other information given by

you pursuant to this order or any information directly or indirectly derived from such testimony

or other information shall be used against you in a criminal case, *to include any courts-martial*,

except as permitted by 18 U.S.C. § 6002." Ex. B (emphasis added). There is no question that

Manning's grand jury testimony cannot be used against her in a court-martial proceeding.

Accordingly, the alleged threat of military prosecution does not present Fifth Amendment

concerns.

The case relied on by Manning, *United States v. Villines*, 13 M.J. 46 (C.M.A. 1982), is

distinguishable on that basis. In that case, unlike here, the court refused to immunize the

potential witness. *See id.* at 50. In fact, a primary issue on appeal was whether the court erred in

refusing to immunize the potential witness so he could testify without Fifth Amendment

concerns. *See id.* at 54. Manning, however, has been immunized so she can testify. *Villines* is

therefore inapplicable.

Manning also urges (at 3) the Court to quash the subpoena based on "the threat of foreign

prosecution" that is "unaffected by an immunity order." But the Supreme Court squarely

rejected this argument in *United States v. Balsys*, 524 U.S. 666 (1998). There, the defendant was

administratively subpoenaed to testify "about his wartime activities between 1940 and 1944."

*Id.* at 669. He refused "to answer such questions, claiming the Fifth Amendment privilege

against self-incrimination, based on his fear of prosecution by a foreign nation." *Id.* In ruling

that the defendant had to testify, the Supreme Court held that "concern with foreign prosecution

5

**38**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 43 of 211 PageID# 149
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 42 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 6 of 25 PageID# 45

is beyond the scope of the Self-Incrimination Clause." *Id.* Manning's concern about potential

foreign prosecution, therefore, is no defense to her obligation to comply with the grand jury

subpoena. *See, e.g., In re Grand Jury Proceedings of the Special April 2002 Grand Jury*, 347

F.3d 197, 208 (7th Cir. 2003) (holding that "any Fifth Amendment claim based on fear of

prosecution by a foreign government would provide no defense to contempt in a grand jury

proceeding"); *In re Grand Jury Investigation John Doe*, 542 F. Supp. 2d 467, 469 (E.D. Va.

2008) ("The Fourth Circuit has also held that a witness is required to testify under a grant of

immunity in the United States even if that witness's testimony would result in a possible criminal

conviction in a foreign country.").

In addition to being meritless, Manning's Fifth Amendment claim is premature. A

person subpoenaed to testify before the grand jury may not claim the Fifth Amendment "as a

blanket defense." *In re Grand Jury Subpoena*, 739 F.2d 1354, 1359 (8th Cir. 1984). "Rather,

the witness must make specific objections in response to specific questions." *Id.* Because

Manning has not yet appeared before the grand jury, the Fifth Amendment provides no grounds

for quashing the subpoena.

## II.    Manning's First Amendment Claims Are Premature and Lack Merit

Even though Manning has not yet appeared before the grand jury, she asserts that the

grand jury questioning will infringe upon her First Amendment rights. Specifically, Manning

speculates that she may be questioned about her prior disclosures of classified information, for

which she was convicted. *See* Mot. to Quash 9-10; Manning Aff. ¶ 4 (Mar. 1, 2019). Manning

claims "that questioning . . . will focus on activities protected by the First Amendment such as

news gathering." Mot. to Quash 5. According to Manning, such questioning would "disrupt the

integrity of the journalistic process by exposing journalists to a kind of accessorial liability for

6

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 44 of 211 PageID# 150
USCA4 Appeal: 19-1287     Doc: 10-2       Filed: 03/29/2019     Pg: 43 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 7 of 25 PageID# 46

leaks attributable to independently-acting journalist sources." *Id.* at 12. In addition, Manning

speculates that the grand jury may ask her questions about her political associations and

activities. *See id.* at 12-13. These claims are wholly without merit.

As a threshold matter, Manning's arguments are premature, and the Court should deny

the motion on that basis alone. As Justice Powell explained in *Branzburg v. Hayes*, district

courts should address First Amendment concerns only after the witness appears and is subject to

"improper or prejudicial questioning." 408 U.S 665, 710 n.* (1972) (Powell, J., concurring).

The Fourth Circuit has adopted Justice Powell's concurrence, reaffirming "that witnesses cannot

litigate the state's authority to subpoena them 'at the threshold'" based on First Amendment

concerns. *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 233 (4th Cir. 1992).

Manning must therefore appear before the grand jury and subject herself to questioning before

challenging it on First Amendment grounds. The time for her to raise a First Amendment

defense is only in response to a particular question.[2] Until that time, her First Amendment

claims are premature. *See In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 592 (E.D. Va.

2006) (holding that an assertion of marital privilege was "premature" and that the witness "must

appear and testify, but may assert the privilege in response to specific questions").

Moreover, even assuming the grand jury were to inquire about Manning's prior

disclosures of classified information, any motion to quash such inquiry would fail on its merits.

Questions about those disclosures would not affect her First Amendment rights. Manning was

---

[2] If Manning asserts a First Amendment challenge to a particular question, the Court should
reject her invitation (at 12) to adopt the "substantial relationship" test from *Bursey v. United
States*, 466 F.2d 1059 (9th Cir. 1972). The Fourth Circuit previously recognized that "the
Supreme Court has twice declined to apply the substantial relationship test in cases involving
subpoenas challenged on First Amendment grounds." *Grand Jury 87-3 Subpoena Duces Tecum*,
955 F.2d at 232. Instead, the Fourth Circuit has adopted a simple balancing test that does not
place "any special burden on the government." *Id.* at 234.

7

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 45 of 211 PageID# 151
USCA4 Appeal: 19-1287   Doc: 10-2       Filed: 03/29/2019    Pg: 44 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 8 of 25 PageID# 47

an intelligence analyst in the U.S. Army—a government insider who signed a nondisclosure agreement—when she disclosed the classified information. As such, the law is clear that Manning had no First Amendment protections in disclosing the information. *See Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980); *Wilson v. CIA*, 586 F.3d 171, 183-84 (2d Cir. 2009); *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003); *United States v. Morison*, 844 F.2d 1057, 1069-70 (4th Cir. 1988); *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975); *United States v. Rosen*, 445 F. Supp. 2d 602, 635-36 (E.D. Va. 2006). Her successful prosecution at the court-martial evidences that she had no First Amendment protections. Quite simply, Manning broke the law in disclosing classified information, and therefore, the grand jury properly could inquire about that offense, just as it properly could inquire about any other potential offense that Manning committed or witnessed.

Similarly, Manning's speculation about the need for her to protect the concerns of journalists would not preclude questioning about her illegal disclosures. It is unclear how any questioning on this topic alone, within the confines of the secrecy of the grand jury proceeding, would "disrupt the integrity of the journalistic process." Mot. to Quash 12. Manning fails to explain how it would. *See Branzburg*, 408 U.S. at 693-94 (emphasizing that the asserted "inhibiting effect" that subpoenas to reporters would have in recruiting sources was "to a great extent speculative"). Regardless, Manning does not have standing to raise the First Amendment rights of journalists.

Even if Manning did have standing, her argument would fail. Reporters enjoy no special solicitude vis-à-vis the grand jury. *See id.* at 690; *United States v. Sterling*, 724 F.3d 482, 499, 505 (4th Cir. 2013). The First Amendment does not "relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 46 of 211 PageID# 152
USCA4 Appeal: 19-1287   Doc: 10-2       Filed: 03/29/2019   Pg: 45 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 9 of 25 PageID# 48

relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991). It is "the duty of a citizen, whether reporter or informer, to respond to [a] grand jury subpoena and answer relevant questions put to him." *Branzburg*, 408 U.S at 697; *see also Citizens United v. FEC*, 558 U.S. 310, 352 (2010) ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers."); *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946 (7th Cir. 2015) (recognizing that "the First Amendment provides no special solicitude for members of the press"); *In re Greensboro News Co.*, 727 F.2d 1320, 1322 (4th Cir. 1984) (recognizing that "the rights of the news media . . . are co-extensive with and do not exceed those rights of members of the public in general").

Nor is the topic of newsgathering immune from criminal investigation, as Manning's argument suggests (at 5). It is well settled that journalists cannot break the law to obtain information. *See, e.g., Bartnicki v. Vopper*, 532 U.S. 514, 532 n.19 (2001) ("It would be frivolous to assert—and no one does in these cases—that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.   Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news." (quoting *Branzburg*, 408 U.S. at 691)); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering.  The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office."). Criminal acts committed by citizens and journalists alike in obtaining information is a proper subject of inquiry by a grand

9

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 47 of 211 PageID# 153
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 46 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 10 of 25 PageID# 49

jury. For all of these reasons, even assuming that Manning were asked about her disclosure of classified information, the First Amendment would not preclude the inquiry.

In the end, the government is confident that its questioning will pose no legitimate First Amendment concerns. As will become clear during the questioning, Manning's testimony is highly relevant to an ongoing criminal investigation. The questioning will be properly tailored to that investigation. Under the Supreme Court's and Fourth Circuit's precedent, it will not violate Manning's First Amendment rights.

## III.    The Grand Jury Subpoena Is Not Improper or Abusive

In addition to her constitutional claims, Manning alleges that the grand jury subpoena was issued for improper purposes. Throughout her papers, she offers a series of theories maligning the government's motives: that the purpose of the subpoena is to harass her, to retaliate against her, to set up a perjury trap for her, or to obtain otherwise "inaccessible" information. *See* Mot. to Quash 17-20. She has no evidence, however, of any foul play at the grand jury. Her arguments are pure conjecture.

Manning's allegations fail to rebut the presumption of regularity that attaches to grand jury subpoenas. "[T]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority." *United States v. R. Enters., Inc.*, 498 U.S. 292, 300-01 (1991). The "recipient who seeks to avoid compliance" bears the burden of showing otherwise, *id.* at 301, and has the "initial task of demonstrating . . . some valid objection to compliance," *In re Grand Jury Matter (Special Grand Jury Narcotics December Term, 1988, Motion to Quash Subpoena)*, 926 F.2d 348, 350 (4th Cir. 1991) (quoting *R. Enters.*, 498 U.S. at 305 (Stevens, J., concurring in part and concurring in the judgment)). It is well established that mere conjecture and speculation about the government's motives do not satisfy that burden. *See*

10

**43**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 48 of 211 PageID# 154
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 47 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 11 of 25 PageID# 50

*United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) (holding that "speculations about possible irregularities in the grand jury investigation were insufficient to overcome the presumption that this investigation was for a proper purpose"); *United States v. Bellomo*, No. 02-CR-140 (ILG), 2002 WL 1267996, at *2 (E.D.N.Y. Apr. 10, 2002) (rejecting a motion to quash a subpoena because there was no "particularized proof that the government acted arbitrarily and for an improper purpose"); *United States v. Bin Laden*, 116 F. Supp. 2d 489, 493 (S.D.N.Y. 2000) (recognizing that "speculations about the Government's motives are insufficient to overcome the presumption of regularity"); *United States v. McVeigh*, 896 F. Supp. 1549, 1557-58 (W.D. Okla. 1995) ("Such rank speculation or supposition is insufficient to overcome the presumption of regularity that attaches to the grand jury's acts or to raise a substantial factual issue as to the purpose for which the subpoena and directive were issued."). Since that is all she offers, Manning has failed to carry her burden.

On the contrary, the circumstances reflect that the issuance of the subpoena to Manning was for a legitimate purpose. Manning was validly convicted of high-profile unauthorized disclosure offenses after she committed one of the largest leaks of classified information in American history. Even assuming that Manning is correct that she will be asked about those offenses, such activity would fall squarely within the purview of a legitimate grand jury investigation.

The fact that the Department of Justice requested immunity for Manning further reinforces that the subpoena was for a legitimate purpose. The decision to grant a witness immunity is not taken lightly. Under federal law, the Department must request use and derivative use immunity before the court can grant it. *See* 18 U.S.C. § 6003(a). Such an application must be approved by statutorily designated leadership within the Department, and it

11

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 49 of 211 PageID# 155
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 48 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 12 of 25 PageID# 51

can be approved only when "the testimony or other information from such individual *may be necessary to the public interest.*" *Id.* § 6003(b) (emphasis added). All of those steps were followed here. In fact, the Court's immunity order reflects that it was "satisfied that the testimony or other information from [Manning] may be necessary in the public interest." Ex. A. The solemn decision to provide Manning with immunity reflects the importance of her testimony to an ongoing investigation.

The government, moreover, offered to meet Manning in advance of the grand jury to ask the questions and obtain answers in the presence of her attorneys. This would have given Manning insight into the proper purpose of the subpoena. While Manning had the right to decline that voluntary meeting, her effort to quash the subpoena on the basis of conjectured improprieties and ulterior motives is nothing more than an attempt to unnecessarily "saddle [the] grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enters.*, 498 U.S. at 298-99 (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973)).

It is worth noting that Manning's primary arguments are premised on a false and misleading factual premise. In her papers, Manning suggests that she "has already given exhaustive testimony" at her court-martial proceeding. Mot. to Quash 17. Manning further represents that, "[a]t that time, the military, in consultation with the Department of Justice, cross-examined her and elicited testimony from her." *Id.* at 3.

These representations do not withstand scrutiny. During her court-martial, Manning pleaded guilty to some of the charges. In connection with her guilty plea, the military judge conducted a "providence inquiry"—"a more elaborate relative of the Rule 11 proceeding under

12

**45**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 50 of 211 PageID# 156
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 49 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 13 of 25 PageID# 52

the Federal Rules of Criminal Procedure" that serves to "ensure that a plea is voluntary and that

there is a factual basis for the plea." *Partington v. Houck*, 723 F.3d 280, 282-83 (D.C. Cir.

2013). The Rules for Courts-Martial provided that "[t]he military judge shall not accept a plea

of guilty without making such inquiry of the accused as shall satisfy the military judge that there

is a factual basis for the plea." Manual for Courts-Martial, United States, R.C.M. 910(e) (2012

ed.) (Ex. D). As the notes to the rule explain, "[t]he accused need not describe from personal

recollection all the circumstances necessary to establish a factual basis for the plea. Nevertheless

the accused must be convinced of, and able to describe all the facts necessary to establish guilt."

*Id.*

The government has attached the colloquy from Manning's providence inquiry. *See* Ex.

E. As it reflects, Manning first read a voluntary statement providing a factual basis for her plea.

*See* Ex. E, at 6739-85. That statement was also entered as an exhibit in the record. *See* Ex. F.

Then, the court questioned her specifically about the factual basis for certain elements to which

she was pleading guilty. *See id.* Ex. E, at 6786-916.

Thus, Manning's representation that she gave exhaustive testimony and was "cross-

examined" is misleading. Manning chose what facts to admit to support her guilty pleas. And

the military court engaged in a limited inquiry to ensure the factual basis for the pleas. There is

no evidence that the Department of Justice was involved in the military court's questioning of

her.

**IV.    Manning Has Failed to Demonstrate that She May Have Been Subjected to
         Unlawful Electronic Surveillance**

Manning claims that she may have been subjected to unlawful electronic surveillance.

While Manning recognizes that it is premature to request a hearing to determine whether it

13

**46**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 51 of 211 PageID# 157
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 50 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 14 of 25 PageID# 53

affected the grand jury subpoena or any questioning, she insists that the government must affirm

or deny that such surveillance occurred. *See* Mot. to Quash 21, 23.  As explained below,

Manning's claim is meritless.

Upon a claim of a party aggrieved by unlawful electronic surveillance under Title III of

the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 ("Title III"),

the government is required by 18 U.S.C. § 3504(a)(1) to affirm or deny the occurrence of the

alleged unlawful act.  Specifically, the statute provides as follows:

> (a) In any trial, hearing, or other proceeding in or before any court [or] grand jury
> . . . of the United States—
>
> (1) upon a claim by a party aggrieved that evidence is inadmissible because it
> is the primary product of an unlawful act or because it was obtained by the
> exploitation of an unlawful act, the opponent of the claim shall affirm or deny
> the occurrence of the alleged unlawful act.

18 U.S.C. § 3504(a)(1).  An "unlawful act" includes the use of electronic surveillance—as

defined in Title III—in violation of the Constitution or the laws of the United States.  *Id.*

§ 3504(b).

Under this statute, Manning must satisfy a two-part test.  First, to establish standing, she

must make a "claim" that there actually was electronic surveillance and that she was a party

"aggrieved" by its use.  *See United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990).  Second,

she must show a plausible causal link between the electronic surveillance she alleges to have

occurred and the evidence that the government intends to use against her in the grand jury.  *See*

*In re Grand Jury Investigation, 2003R01576*, 437 F.3d 855, 858 (9th Cir. 2006); *United States v.*

*Robins*, 978 F.2d 881, 887 (5th Cir. 1992).  Only if she satisfies both conditions may the

government be required to affirm or deny any surveillance.  Manning has failed to satisfy either.

14

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 52 of 211 PageID# 158
USCA4 Appeal: 19-1287   Doc: 10-2        Filed: 03/29/2019   Pg: 51 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 15 of 25 PageID# 54

### A.   Manning Does Not Have Standing.

As the Fourth Circuit has explained, "a party claiming to be the victim of illegal electronic surveillance must first demonstrate that his interests were affected before the government's obligation to affirm or deny is triggered." *Apple*, 915 F.2d at 905. "This 'standing' requirement is met if a definite 'claim' is made by an 'aggrieved party.'" *Id.* Manning has failed to make a definite claim or demonstrate that she is an aggrieved party.

#### 1.   *Manning has not made a sufficient "claim" under § 3504.*

To satisfy the "claim" requirement under § 3504, the Fourth Circuit has held that a party must make "a positive statement that illegal surveillance has taken place." *Id.* Equivocal statements are insufficient. The "mere allegation that such surveillance 'may' have occurred does not warrant any response from the government." *In re Grand Jury Proceedings*, 831 F.2d 228, 230 (11th Cir. 1987). Similarly, "a motion alleging only a 'suspicion' of such surveillance, or that the movant has 'reason to believe' that someone has eavesdropped on his conversations, does not constitute a positive representation giving rise to the government's obligation to respond." *Robins*, 978 F.2d at 886.

Manning never positively states in her papers that illegal electronic surveillance took place. Instead, Manning makes only equivocal assertions. She consistently qualifies her statements with language that she "believed" or had "reason to believe" that illegal surveillance occurred. *See, e.g.*, Mot. to Quash 5 (asserting Manning "has reason to believe" that she was subject to unlawful electronic surveillance); *id.* at 20 (asserting that the "facts tend[] to suggest that she . . . ha[s] been subjected to unlawful electronic surveillance"); *id.* (asserting a "reason to believe" she was subject to electronic surveillance); *id.* at 21 ("It would be difficult to deny that a great deal of electronic surveillance has taken place and been directed at Ms. Manning.");

15

**48**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 53 of 211 PageID# 159
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 52 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 16 of 25 PageID# 55

Manning Aff. ¶¶ 16-17 (stating she "believ[ed]" and had "reason to believe" unlawful electronic surveillance had taken place). In the absence of a positive statement that unlawful electronic surveillance actually occurred, Manning's motion under § 3504 must be denied.

### 2. *Manning has not sufficiently alleged that she was an aggrieved party.*

The standard for establishing that she is an aggrieved party is even "more demanding" than the requirements for making a claim. *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 590 (E.D. Va. 2006). To satisfy this requirement, Manning must "make a prima facie showing that [s]he was 'aggrieved' by the surveillance; that is, that [s]he was a party to an intercepted communication, that the government's efforts were directed at [her], or that the intercepted communications took place on [her] premises." *Apple*, 915 F.2d at 905. "This critical showing may not be based on mere suspicion; it must have at least a 'colorable basis.'" *Id.*

Manning's allegations fall decidedly short of satisfying this "demanding standard." *Grand Jury Investigation*, 431 F. Supp. 2d at 591 n.14. Her allegations, at most, suggest that she was subjected to *physical* surveillance (i.e., the alleged van outside of her house and the alleged men on the Amtrak). None of the allegations provides a colorable basis that the government was intercepting her communications. In that regard, Manning has not offered anything more than "mere suspicion" to suggest that she was subjected to illegal electronic surveillance.

The Fourth Circuit's decision in *United States v. Apple* demonstrates how far short Manning's allegations fall. There, a defendant stated that he called a third party whose phone was tapped. *See Apple*, 915 F.2d at 906. The defendant specified where he called the third party—in Fluvanna County, Virginia. *See id.* The defendant approximated when he called the third party—in May, June, or July 1985. *See id.* And the defendant stated that he "spoke 'regularly' on the telephone" with the third party. *Id.* The Fourth Circuit held that this showing

16

**49**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 54 of 211 PageID# 160
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 53 of 337
Case 1:19-dm-00003-CMH  Document 5  Filed 03/04/19  Page 17 of 25 PageID# 56

was nevertheless insufficient to establish that the defendant was an aggrieved party because the defendant "never averred that he completed telephone calls to the number known to have been tapped during the period that surveillance took place." *Id.* at 907. The defendant's "failure to aver that he was involved in telephone conversations on the tapped line [was] . . . fatal to his claim." *Id.*

Manning's allegations are less compelling than the *Apple* defendant's claim. Unlike the *Apple* defendant, Manning cannot clarify when, where, and on what medium her communications were allegedly intercepted. Whereas the *Apple* defendant specified that the intercepts involved telephone communications, Manning speculates that she was intercepted on two cell phones and an email address. *See* Manning Aff. ¶ 18. Whereas the *Apple* defendant pinpointed the area in which the wiretap occurred, Manning claims that she thought she was intercepted in New York, Maryland, and San Francisco. *See id.* Whereas the *Apple* defendant specified that the intercepts occurred during a three-month timeframe, Manning broadly states that the intercepts of her various devices occurred over nine months. *See id.* Manning's kitchen-sink allegations underscore that she has no idea whether electronic surveillance occurred and, if so, whether she was subjected to it. As a result, the Court has even less of a basis to conclude that she is an aggrieved party than the Fourth Circuit had in *Apple*.

**B.  Manning Has Failed to Show a Connection Between the Grand Jury Proceedings and Any Intercepted Electronic Communications.**

Section 3504 also contains an express requirement that there be a connection between the unlawful surveillance and the questions asked or evidence used at a grand jury proceeding. *See* 18 U.S.C. § 3504(a)(1) (requiring a "claim . . . that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful

17

**50**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 55 of 211 PageID# 161
USCA4 Appeal: 19-1287      Doc: 10-2       Filed: 03/29/2019     Pg: 54 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 18 of 25 PageID# 57

act"). The statute, after all, is meant "to provide procedures by which a witness may attempt to demonstrate that the questions posed to him fail to comply with the mandate of section 2515," a provision that "proscribes the use in an official proceeding of evidence tainted by illegal surveillance." *In re Grand Jury Matter*, 906 F.2d 78, 91 (3d Cir. 1990). It "is not a discovery tool to be used to determine the existence or validity of wiretaps completely unrelated in time or substance to the on-going proceeding." *Id.* at 93.

The Ninth Circuit's decision in *In re Grand Jury Investigation, 2003R01576*, 437 F.3d 855 (9th Cir. 2006), is instructive. There, a district court held a grand jury witness in contempt after he refused to answer questions posed to him. *Id.* at 857. The witness asserted § 3504 as a defense, claiming that "the government did not meet its burden of proof in responding to his allegations that he ha[d] been the subject of illegal surveillance." *Id.* The Ninth Circuit disagreed. While it concluded that he sufficiently showed he was an aggrieved party, the court determined that he did not demonstrate "that the government's questions were the 'primary product' of unlawful surveillance or were 'obtained by the exploitation' of any unlawful surveillance." *Id.* at 858 (quoting § 3504(a)(1)). The Ninth Circuit emphasized that there must be at least "an arguable causal connection between the questions being posed to the grand jury witness and the alleged unlawful surveillance." *Id.* The court noted that "[t]he nature of the questions posed to [the witness] before the grand jury [was] so generic that the questions d[id] not suggest any reliance on surveillance of any sort." *Id.*

In her papers, Manning recognizes that she cannot demonstrate that the subpoena or any questioning will be based on unlawful electronic surveillance. In fact, she recognizes that "it is well-settled that electronic surveillance is relevant to a grand jury proceeding only where it is unlawful, and directly connected to [the] subpoena or questions." Mot. to Quash 23. And she

18

**51**

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 56 of 211 PageID# 162
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 55 of 337
Case 1:19-dm-00003-CMH Document 5 Filed 03/04/19 Page 19 of 25 PageID# 58

acknowledges that "it is not at this time necessary to request such a hearing." *Id.* Instead, she

asks the Court to compel the government to affirm or deny any such surveillance. *Id.*

The text of the statute undermines Manning's request. Under the clear language of the

statute, the government does not have to affirm or deny until Manning shows that the subpoena

or questioning was a "primary product" of unlawful surveillance or "was obtained by the

exploitation" of unlawful surveillance. § 3504(a)(1). She has offered nothing to suggest that the

subpoena was the product of unlawful surveillance. And, given that Manning has not appeared

before the grand jury, she has no basis for arguing that the questioning is a product of unlawful

surveillance. In short, Manning has failed to assert a connection between the alleged unlawful

surveillance and the grand jury proceedings. As a result, her motion must be denied. *See also In

re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 196-200 (4th Cir. 2010) (holding that a grand

jury enforcement action is not the proper forum for litigating whether surveillance violated the

Fourth Amendment or FISA).

## V.    Manning Has No Right to Disclosure of "Ministerial" Grand Jury Records

Manning is not entitled to so-called "ministerial" records of the grand jury. Federal Rule

of Criminal Procedure 6(e) codifies the "long-established policy of maintaining the secrecy of

grand jury proceedings." *United States v. Penrod*, 609 F.2d 1092, 1098 (4th Cir. 1979). The

rule sets forth the exceptions under which the Court may "lift the veil of secrecy." *See* Fed. R.

Crim. P. 6(e)(3)(E); *United States v. Loc Tien Nguyen*, 314 F. Supp. 2d 612, 615 (E.D. Va. 2004)

(addressing exceptions under prior version of Rule 6(e)).

Manning does not point to any of Rule 6(e)'s exceptions as allowing for a right to the

purportedly "ministerial" records she seeks. Instead, she cites (at 25) the Ninth Circuit's opinion

in *In re Special Grand Jury (for Anchorage, Alaska)*, 674 F.2d 778 (9th Cir. 1982), where the

19

**52**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 57 of 211 PageID# 163
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 56 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 20 of 25 PageID# 59

court held that members of the public "have a right, subject to the rule of grand jury secrecy, of access to the ministerial records" of the grand jury. *Id.* at 781. Courts in this district, however, have rejected that holding. "[T]here is no rule in the Fourth Circuit that some grand jury records may be labeled as ministerial and disclosed to the public if they do not fall within the bounds of Rule 6(e) or otherwise offend the goals of the grand jury secrecy doctrine." *Nguyen*, 314 F. Supp. 2d at 618.

Manning's attempt to invoke (at 25) cases involving the public's "general right of access to court records" fares no better. Even the court in *In re Special Grand Jury* recognized that the common-law right of access to court records was "subject to the rule of grand jury secrecy." 674 F.2d at 781; *see also Douglas Oil Co. of Cal. v. Petrol Stops N.W.*, 441 U.S. 211, 218 n.9 (1979) (describing grand jury secrecy as dating to the 17th century and "imported into our federal common law" as "an integral part of our criminal justice system").

Moreover, Manning has not even attempted to meet the standard required for disclosure of grand jury records under Rule 6(e)(3)(E)(i)—the only exception even potentially applicable to someone in Manning's shoes. *See* Fed. R. Crim. P. 6(e)(3)(E)(i) (allowing disclosure of grand jury matter "preliminary to or in connection with a judicial proceeding"). A party seeking to lift the veil of secrecy under that rule must make a "strong showing of a particularized need for grand jury materials." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983). Specifically, a party "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas*, 441 U.S. at 222. Manning has not identified any other relevant judicial proceeding, or otherwise addressed any element of the *Douglas* test. *See also Nguyen*, 314 F. Supp. 2d at 616 n.6 ("Invocation of

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 58 of 211 PageID# 164
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019     Pg: 57 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 21 of 25 PageID# 60

general constitutional rights does not qualify as a particularized need justifying disclosure.").

She is therefore not entitled to any records of the grand jury in this case.

**VI.     Manning Has No Right to Have the Court Instruct the Grand Jury as She Demands**

"Traditionally the grand jury has been accorded wide latitude to inquire into violations of

criminal law.  No judge presides to monitor its proceedings.  It deliberates in secret and may

determine alone the course of its inquiry." *United States v. Calandra*, 414 U.S. 338, 343 (1974).

The Fourth Circuit has thus "repeatedly recognized that district courts should refrain from

intervening in the grand jury process absent compelling evidence of grand jury abuse" and in

light of the "presumption of regularity" attached to grand jury proceedings.  *United States v.*

*Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016).  Motions to instruct the grand jury "have uniformly

met with no success." *In re Balistrieri*, 503 F. Supp. 1112, 1114 (E.D. Wis. 1980); *see also*

*United States v. Zangger*, 848 F.2d 923, 935 (8th Cir. 1988) ("The prosecutor is under no

obligation to give the grand jury legal instructions.").

Despite the presumption of regularity, Manning proposes (at 27) that the Court provide a

novel set of grand jury instructions related to, among other things, "the power and authority of

the grand jury," Manning's purported Fifth Amendment rights, "and the legal effect of an

immunity grant."  Manning, however, fails to cite a single case in the Fourth Circuit that

supports the Court instructing the grand jury about such matter, because no such case exists.  Nor

has Manning offered a shred of evidence of grand jury abuse that would rebut the presumption of

regularity.  *See Alvarado*, 840 F.3d at 189.  Manning asserts (at 27) that her proposed

instructions are necessary "because the possibility of civil contempt looms over Ms. Manning."

But that possibility hangs over every grand jury witness and, therefore, does nothing to rebut the

presumption of regularity or counsel in favor of Manning's proposed instructions.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 59 of 211 PageID# 165
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019      Pg: 58 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 22 of 25 PageID# 61

Manning's sole support for her proposed instruction is the Ninth Circuit's opinion in

*United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973). The court in *Alter,* however, did not

consider the propriety of the grand jury witness's proposed instructions. Indeed, the court stated

that the proposed instructions were not even given by the district court. *See id.* at 1029 ("The

record supplies no basis for us to infer that he was prejudiced . . . by the refusal to give his

requested instructions to the grand jury.")

## VII.   Manning Has No Right to Discovery from the Government Prior to Her Grand Jury Testimony

There is no rule of criminal procedure that obligates the government to produce discovery

to a grand jury witness prior to her testimony. Manning cites (at 28) out-of-circuit cases

supporting the proposition that, in some circumstances, a grand jury witness may be entitled to

the transcript of her grand jury testimony after she testifies. But as expressly acknowledged in

the cases Manning cites, that is *not* the law in the Fourth Circuit. *See In re Grand Jury*, 490 F.3d

978, 987 (D.C. Cir. 2007) (describing circuit split and that the Fourth Circuit "held that grand

jury witnesses are not entitled to obtain copies of their transcripts"). In the Fourth Circuit,

witnesses are not entitled to their own grand jury transcripts absent a showing that a

"particularized need" outweighs the policy of grand jury secrecy. *Bast v. United States*, 542 F.2d

893, 896-97 (4th Cir. 1976). Other than speculating that she might commit perjury if she

testifies, Manning does not event attempt to make such a showing.

In any event, the out-of-circuit cases Manning cites address disclosure of a grand jury

transcript *after* a witness testifies before the grand jury. Contrary to Manning's suggestion, those

cases do not provide a general right to discovery of a witness's prior statements before the

witness appears. *See In re Sealed Motion*, 880 F.2d 1367, 1370-73 (D.C. Cir. 1989) (finding

22

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 60 of 211 PageID# 166
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 59 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 23 of 25 PageID# 62

general right to transcript of a witness's own testimony absent countervailing interests); *In re Grand Jury*, 490 F.3d at 990 (grand jury witness entitled to review transcript of his own testimony "in private at the U.S. Attorney's Office or a place agreed to by the parties or designated by the district court"); *In re Russo*, 53 F.R.D. 564, 569 (C.D. Cal. 1971) ("The question . . . is the extent to which providing a witness with a transcript of his own grand jury testimony would be inconsistent with valid reasons for secrecy."); *Gebhard v. United States*, 422 F.2d 281, 289 (9th Cir. 1970) (considering whether it was error for petit jury in perjury case "to hear the complete transcript of the defendant's testimony before the grand jury"); *United States v. Nicoletti*, 310 F.2d 359 (7th Cir. 1962) (holding that the "two witness" rule was not applicable in a perjury case).

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to quash.

23

56

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 61 of 211 PageID# 167
USCA4 Appeal: 19-1287      Doc: 10-2      Filed: 03/29/2019      Pg: 60 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 24 of 25 PageID# 63

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:

Tracy Doherty-McCormick
First Assistant United States Attorney

Gordon D. Kromberg
Kellen S. Dwyer
Thomas W. Traxler
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3700
Facsimile (703) 299-3980
Thomas.traxler@usdoj.gov

Matthew R. Walczewski
Nicholas Hunter
Trial Attorneys, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone (202) 233-0986
Facsimile (202) 532-4251
Matthew.walczewski@usdoj.gov

24

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 62 of 211 PageID# 168
USCA4 Appeal: 19-1287      Doc: 10-2           Filed: 03/29/2019      Pg: 61 of 337
Case 1:19-dm-00003-CMH   Document 5   Filed 03/04/19   Page 25 of 25 PageID# 64

### CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March, 2019, I caused the foregoing document to

be sent to the following via electronic mail:

Moira Meltzer-Cohen
Attorney at Law
Mo_at_Law@protonmail.com

Thomas W. Traxler
Assistant United States Attorney

25

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 63 of 211 PageID# 169
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 62 of 337
Case 1:19-dm-00003-CMH   Document 5-1   Filed 03/04/19   Page 1 of 3 PageID# 65

# EXHIBIT A

# FILED UNDER SEAL

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 64 of 211 PageID# 170
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 63 of 337
Case 1:19-dm-00003-CMH Document 5-1 Filed 03/04/19 Page 2 of 3 PageID# 66

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

**UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | GRAND JURY 19-1 |
| | ) | |
| JOHN DOE 2010R03793 | ) | |

<u>O R D E R</u>

The United States of America, by its attorneys, G. Zachary Terwilliger, United States

Attorney for the Eastern District of Virginia, and Gordon D. Kromberg, Assistant United States

Attorney, having requested that this Court issue an Order pursuant to 18 U.S.C. § 6003

compelling CHELSEA MANNING, formerly known as BRADLEY MANNING (hereinafter

referred to as "the witness") to testify and to provide other information in the above-captioned

proceeding and in any other proceedings ancillary thereto;

AND being advised that the request was approved by John C. Demers, Assistant Attorney

General, U.S. Department of Justice, pursuant to his authority under 18 U.S.C. § 6003(b) and 28

C.F.R. § 0.175(a);

AND the Court being satisfied that the testimony or other information from the witness

may be necessary in the public interest, and that the witness is likely to refuse to testify or

provide other information on the basis of the witness' privilege against self-incrimination;

IT IS ORDERED that the witness shall testify fully, completely and truthfully before the

above-captioned proceeding;

IT IS FURTHER ORDERED that the witness shall provide full, complete and truthful

information in regard to any other proceedings ancillary to the above-captioned proceeding;

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 65 of 211 PageID# 171
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 64 of 337
Case 1:19-dm-00003-CMH   Document 5-1   Filed 03/04/19   Page 3 of 3 PageID# 67

IT IS FURTHER ORDERED that no testimony or other information compelled under

this Order (or any information directly or indirectly derived from such testimony or other

information) may be used against the witness in any criminal case, except as permitted by 18

U.S.C. § 6002.

*Claude M. Hilton*
USDJ

Date: Jan. 22, 2019
Alexandria, Virginia


WE ASK FOR THIS:

G. Zachary Terwilliger
United States Attorney

By: _____
Gordon D. Kromberg
Assistant United States Attorney

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 66 of 211 PageID# 172
USCA4 Appeal: 19-1287     Doc: 10-2       Filed: 03/29/2019     Pg: 65 of 337
Case 1:19-dm-00003-CMH   Document 5-2   Filed 03/04/19   Page 1 of 2 PageID# 68

# EXHIBIT B

# FILED UNDER SEAL

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 67 of 211 PageID# 173
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 66 of 337

Case 1:19-dm-00003-CMH   Document 5-2   Filed 03/04/19   Page 2 of 2 PageID# 69



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, UNITED STATES ARMY FIRES CENTER OF EXCELLANCE AND FORT SILL
455 MCNAIR AVE, SUITE 100
FORT SILL, OKLAHOMA 73530

ATZR-C

0 1 MAR 1 9

MEMORANDUM FOR Private Bradley Manning, aka, Chelsea Manning

SUBJECT:  Grant of Testimonial Immunity and Order to Testify

1.  As an officer empowered to convene general courts-martial, and pursuant to the provisions of sections 6002 and 6004, Title 18, United States Code, and Rule for Courts-Martial 704, I make the following findings:

    a.  You possess information relevant to a pending Grand Jury investigation of <u>United States v. John Doe 2010R03793,</u> in the United States District Court for the Eastern District of Virginia.

    b.  On 22 January 2019, a United States District Judge in the Eastern District of Virginia found that the presentation of evidence by you in this case is necessary to the public interest.

    c.  It is likely that you would refuse to testify on the basis of your privilege against self-incrimination if ordered to appear as a witness without testimonial immunity.

2.  Pursuant to Rule for Courts-Martial 704 and section 6004, Title 18, United States Code, I order you to cooperate fully with the order issued by the United States District Court for the Eastern District of Virginia, to appear and testify fully, completely and truthfully before the aforementioned Grand Jury proceedings, and you shall provide full, complete and truthful information in regard to any other proceedings ancillary to the above-captioned proceeding.

3.  As provided in R.C.M. 704 and section 6002, Title 18, United States Code, it is further ordered that no testimony or other information given by you pursuant to this order or any information directly or indirectly derived from such testimony or other information shall be used against you in a criminal case, to include any courts-martial, except as permitted by 18 U.S.C. § 6002.

WILSON A. SHOFFNER
Major General, USA
Commanding

# EXHIBIT C

# FILED UNDER SEAL

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 69 of 211 PageID# 175
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 68 of 337
Case 1:19-dm-00003-CMH Document 5-3 Filed 03/04/19 Page 2 of 3 PageID# 71

**R.C.M. 703(f)(4)(B)**

*ernment.* Evidence not under the control of the government may be obtained by a subpoena issued in accordance with subsection (e)(2) of this rule. A *subpoena duces tecum* to produce books, papers, documents, data, or other objects or electronically stored information for a preliminary hearing pursuant to Article 32 may be issued, following the convening authority's order directing such preliminary hearing, by counsel for the government. A person in receipt of a *subpoena duces tecum* for an Article 32 hearing need not personally appear in order to comply with the subpoena.

### Discussion

The National Defense Authorization Act for Fiscal Year 2012, P.L. 112-81, § 542, amended Article 47 to allow the issuance of *subpoenas duces tecum* for Article 32 hearings. Although the amended language cites Article 32(b), this new subpoena power extends to documents subpoenaed by counsel representing the United States, whether or not requested by the defense.

(C) *Relief.* If the person having custody of evidence requests relief on grounds that compliance with the subpoena or order of production is unreasonable or oppressive, the convening authority or, after referral, the military judge may direct that the subpoena or order of production be withdrawn or modified. Subject to Mil. R. Evid. 505 and 506, the military judge may direct that the evidence be submitted to the military judge for an in camera inspection in order to determine whether such relief should be granted.

### Rule 704. Immunity

(a) *Types of immunity.* Two types of immunity may be granted under this rule.

(1) *Transactional immunity.* A person may be granted transactional immunity from trial by court-martial for one or more offenses under the code.

(2) *Testimonial immunity.* A person may be granted immunity from the use of testimony, statements, and any information directly or indirectly derived from such testimony or statements by that person in a later court-martial.

### Discussion

"Testimonial" immunity is also called "use" immunity.

Immunity ordinarily should be granted only when testimony or other information from the person is necessary to the public interest, including the needs of good order and discipline, and

II-70

when the person has refused or is likely to refuse to testify or provide other information on the basis of the privilege against self-incrimination.

Testimonial immunity is preferred because it does not bar prosecution of the person for the offenses about which testimony or information is given under the grant of immunity.

In any trial of a person granted testimonial immunity after the testimony or information is given, the Government must meet a heavy burden to show that it has not used in any way for the prosecution of that person the person's statements, testimony, or information derived from them. In many cases this burden makes difficult a later prosecution of such a person for any offense that was the subject of that person's testimony or statements. Therefore, if it is intended to prosecute a person to whom testimonial immunity has been or will be granted for offenses about which that person may testify or make statements, it may be necessary to try that person before the testimony or statements are given.

(b) *Scope.* Nothing in this rule bars:

(1) A later court-martial for perjury, false swearing, making a false official statement, or failure to comply with an order to testify; or

(2) Use in a court-martial under subsection (b)(1) of this rule of testimony or statements derived from such testimony or statements.

(c) *Authority to grant immunity.* Only a general court-martial convening authority may grant immunity, and may do so only in accordance with this rule.

### Discussion

Only general court-martial convening authorities are authorized to grant immunity. However, in some circumstances, when a person testifies or makes statements pursuant to a promise of immunity, or a similar promise, by a person with apparent authority to make it, such testimony or statements and evidence derived from them may be inadmissible in a later trial. Under some circumstances a promise of immunity by someone other than a general court-martial convening authority may bar prosecution altogether. Persons not authorized to grant immunity should exercise care when dealing with accused or suspects to avoid inadvertently causing statements to be inadmissible or prosecution to be barred.

A convening authority who grants immunity to a prosecution witness in a court-martial may be disqualified from taking post-trial action in the case under some circumstances.

(1) *Persons subject to the code.* A general court-martial convening authority may grant immunity to any person subject to the code. However, a general court-martial convening authority may grant immunity to a person subject to the code extending to a prosecution in a United States District Court only when specifically authorized to do so by the Attor-

R.C.M. 705(a)

ney General of the United States or other authority designated under 18 U.S.C. § 6004.

### Discussion

When testimony or a statement for which a person subject to the code may be granted immunity may relate to an offense for which that person could be prosecuted in a United States District Court, immunity should not be granted without prior coordination with the Department of Justice. Ordinarily coordination with the local United States Attorney is appropriate. Unless the Department of Justice indicates it has no interest in the case, authorization for the grant of immunity should be sought from the Attorney General. A request for such authorization should be forwarded through the office of the Judge Advocate General concerned. Service regulations may provide additional guidance. Even if the Department of Justice expresses no interest in the case, authorization by the Attorney General for the grant of immunity may be necessary to compel the person to testify or make a statement if such testimony or statement would make the person liable for a Federal civilian offense.

(2) *Persons not subject to the code.* A general court-martial convening authority may grant immunity to persons not subject to the code only when specifically authorized to do so by the Attorney General of the United States or other authority designated under 18 U.S.C. § 6004.

### Discussion

*See* the discussion under subsection (c)(1) of this rule concerning forwarding a request for authorization to grant immunity to the Attorney General.

(3) *Other limitations.* The authority to grant immunity under this rule may not be delegated. The authority to grant immunity may be limited by superior authority.

### Discussion

Department of Defense Directive 1355.1 (21 July 1981) provides: "A proposed grant of immunity in a case involving espionage, subversion, aiding the enemy, sabotage, spying, or violation of rules or statutes concerning classified information or the foreign relations of the United States, shall be forwarded to the General Counsel of the Department of Defense for the purpose of consultation with the Department of Justice. The General Counsel shall obtain the view of other appropriate elements of the Department of defense in furtherance of such consultation."

(d) *Procedure.* A grant of immunity shall be written and signed by the convening authority who issues it. The grant shall include a statement of the authority

under which it is made and shall identify the matters to which it extends.

### Discussion

A person who has received a valid grant of immunity from a proper authority may be ordered to testify. In addition, a servicemember who has received a valid grant of immunity may be ordered to answer questions by investigators or counsel pursuant to that grant. *See* Mil. R. Evid. 301(c). A person who refuses to testify despite a valid grant of immunity may be prosecuted for such refusal. Persons subject to the code may be charged under Article 134. *See* paragraph 108, Part IV. A grant of immunity removes the right to refuse to testify or make a statement on self-incrimination grounds. It does not, however, remove other privileges against disclosure of information. *See* Mil. R. Evid., Section V.

An immunity order or grant must not specify the contents of the testimony it is expected the witness will give.

When immunity is granted to a prosecution witness, the accused must be notified in accordance with Mil. R. Evid. 301(c)(2).

(e) *Decision to grant immunity.* Unless limited by superior competent authority, the decision to grant immunity is a matter within the sole discretion of the appropriate general court-martial convening authority. However, if a defense request to immunize a witness has been denied, the military judge may, upon motion by the defense, grant appropriate relief directing that either an appropriate convening authority grant testimonial immunity to a defense witness or, as to the affected charges and specifications, the proceedings against the accused be abated, upon findings that:

(1) The witness intends to invoke the right against self-incrimination to the extent permitted by law if called to testify; and

(2) The Government has engaged in discriminatory use of immunity to obtain a tactical advantage, or the Government, through its own overreaching, has forced the witness to invoke the privilege against self-incrimination; and

(3) The witness' testimony is material, clearly exculpatory, not cumulative, not obtainable from any other source and does more than merely affect the credibility of other witnesses.

### Rule 705. Pretrial agreements

(a) *In general.* Subject to such limitations as the Secretary concerned may prescribe, an accused and

II-71

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 71 of 211 PageID# 177
USCA4 Appeal: 19-1287     Doc: 10-2     Filed: 03/29/2019     Pg: 70 of 337
Case 1:19-dm-00003-CMH   Document 5-4   Filed 03/04/19   Page 1 of 4 PageID# 73

# EXHIBIT D

# FILED UNDER SEAL

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 72 of 211 PageID# 178
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 71 of 337
Case 1:19-dm-00003-CMH  Document 5-4  Filed 03/04/19  Page 2 of 4 PageID# 74

**R.C.M. 910(c)(5)**

begin anew on the date the general court-martial convening authority takes custody of the accused at the end of any period of commitment.

### Rule 910. Pleas

(a) *Alternatives.*

(1) *In general.* An accused may plead as follows: guilty; not guilty to an offense as charged, but guilty of a named lesser included offense; guilty with exceptions, with or without substitutions, not guilty of the exceptions, but guilty of the substitutions, if any; or, not guilty. A plea of guilty may not be received as to an offense for which the death penalty may be adjudged by the court-martial.

### Discussion

*See* paragraph 2, Part IV, concerning lesser included offenses. When the plea is to a lesser included offense without the use of exceptions and substitutions, the defense counsel should provide a written revised specification accurately reflecting the plea and request that the revised specification be included in the record as an appellate exhibit. In 2010, the court held in *United States v. Jones*, 68 M.J. 465 (C.A.A.F. 2010), that the elements test is the proper method of determining lesser included offenses. As a result, "named" lesser included offenses listed in the Manual are not binding and must be analyzed on a case-by-case basis in conformity with *Jones. See* discussion following paragraph 3b(1)(e) in Part IV of this Manual and the related analysis in Appendix 23.

A plea of guilty to a lesser included offense does not bar the prosecution from proceeding on the offense as charged. *See* also subsection (g) of this rule.

A plea of guilty does not prevent the introduction of evidence, either in support of the factual basis for the plea, or, after findings are entered, in aggravation. *See* R.C.M. 1001(b)(4).

(2) *Conditional pleas.* With the approval of the military judge and the consent of the Government, an accused may enter a conditional plea of guilty, reserving the right, on further review or appeal, to review of the adverse determination of any specified pretrial motion. If the accused prevails on further review or appeal, the accused shall be allowed to withdraw the plea of guilty. The Secretary concerned may prescribe who may consent for Government; unless otherwise prescribed by the Secretary concerned, the trial counsel may consent on behalf of the Government.

(b) *Refusal to plead; irregular plea.* If an accused fails or refuses to plead, or makes an irregular plea,

the military judge shall enter a plea of not guilty for the accused.

### Discussion

An irregular plea includes pleas such as guilty without criminality or guilty to a charge but not guilty to all specifications thereunder. When a plea is ambiguous, the military judge should have it clarified before proceeding further.

(c) *Advice to accused.* Before accepting a plea of guilty, the military judge shall address the accused personally and inform the accused of, and determine that the accused understands, the following:

(1) The nature of the offense to which the plea is offered, the mandatory minimum penalty, if any, provided by law, and the maximum possible penalty provided by law;

### Discussion

The elements of each offense to which the accused has pleaded guilty should be described to the accused. *See also* subsection (e) of this rule.

(2) In a general or special court-martial, if the accused is not represented by counsel, that the accused has the right to be represented by counsel at every stage of the proceedings;

### Discussion

In a general or special court-martial, if the accused is not represented by counsel, a plea of guilty should not be accepted.

(3) That the accused has the right to plead not guilty or to persist in that plea if already made, and that the accused has the right to be tried by a court-martial, and that at such trial the accused has the right to confront and cross-examine witnesses against the accused, and the right against self-incrimination;

(4) That if the accused pleads guilty, there will not be a trial of any kind as to those offenses to which the accused has so pleaded, so that by pleading guilty the accused waives the rights described in subsection (c)(3) of this Rule; and

(5) That if the accused pleads guilty, the military judge will question the accused about the offenses to which the accused has pleaded guilty, and, if the accused answers these questions under oath, on the record, and in the presence of counsel, the accused's

II-101

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 73 of 211 PageID# 179
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 72 of 337
Case 1:19-dm-00003-CMH   Document 5-4   Filed 03/04/19   Page 3 of 4 PageID# 75

**R.C.M. 910(c)(5)**

answers may later be used against the accused in a prosecution for perjury or false statement.

### Discussion

The advice in subsection (5) is inapplicable in a court-martial in which the accused is not represented by counsel.

(d) *Ensuring that the plea is voluntary.* The military judge shall not accept a plea of guilty without first, by addressing the accused personally, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement under R.C.M. 705. The military judge shall also inquire whether the accused's willingness to plead guilty results from prior discussions between the convening authority, a representative of the convening authority, or trial counsel, and the accused or defense counsel.

(e) *Determining accuracy of plea.* The military judge shall not accept a plea of guilty without making such inquiry of the accused as shall satisfy the military judge that there is a factual basis for the plea. The accused shall be questioned under oath about the offenses.

### Discussion ·

A plea of guilty must be in accord with the truth. Before the plea is accepted, the accused must admit every element of the offense(s) to which the accused pleaded guilty. Ordinarily, the elements should be explained to the accused. If any potential defense is raised by the accused's account of the offense or by other matter presented to the military judge, the military judge should explain such a defense to the accused and should not accept the plea unless the accused admits facts which negate the defense. If the statute of limitations would otherwise bar trial for the offense, the military judge should not accept a plea of guilty to it without an affirmative waiver by the accused. *See* R.C.M. 907(b)(2)(B).

The accused need not describe from personal recollection all the circumstances necessary to establish a factual basis for the plea. Nevertheless the accused must be convinced of, and able to describe all the facts necessary to establish guilt. For example, an accused may be unable to recall certain events in an offense, but may still be able to adequately describe the offense based on witness statements or similar sources which the accused believes to be true.

The accused should remain at the counsel table during questioning by the military judge.

(f) *Plea agreement inquiry.*

(1) *In general.* A plea agreement may not be accepted if it does not comply with R.C.M. 705.

II-102

(2) *Notice.* The parties shall inform the military judge if a plea agreement exists.

### Discussion

The military judge should ask whether a plea agreement exists. *See* subsection (d) of this rule. Even if the military judge fails to so inquire or the accused answers incorrectly, counsel have an obligation to bring any agreements or understandings in connection with the plea to the attention of the military judge.

(3) *Disclosure.* If a plea agreement exists, the military judge shall require disclosure of the entire agreement before the plea is accepted, provided that in trial before military judge alone the military judge ordinarily shall not examine any sentence limitation contained in the agreement until after the sentence of the court-martial has been announced.

(4) *Inquiry.* The military judge shall inquire to ensure:

(A) That the accused understands the agreement; and

(B) That the parties agree to the terms of the agreement.

### Discussion

If the plea agreement contains any unclear or ambiguous terms, the military judge should obtain clarification from the parties. If there is doubt about the accused's understanding of any terms in the agreement, the military judge should explain those terms to the accused.

(g) *Findings.* Findings based on a plea of guilty may be entered immediately upon acceptance of the plea at an Article 39(a) session unless:

(1) Such action is not permitted by regulations of the Secretary concerned;

(2) The plea is to a lesser included offense and the prosecution intends to proceed to trial on the offense as charged; or

(3) Trial is by a special court-martial without a military judge, in which case the president of the court-martial may enter findings based on the pleas without a formal vote except when subsection (g)(2) of this rule applies.

### Discussion

If the accused has pleaded guilty to some offenses but not to others, the military judge should ordinarily defer informing the members of the offenses to which the accused has pleaded guilty until after findings on the remaining offenses have been entered.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 74 of 211 PageID# 180
USCA4 Appeal: 19-1287     Doc: 10-2       Filed: 03/29/2019     Pg: 73 of 337
Case 1:19-dm-00003-CMH   Document 5-4   Filed 03/04/19   Page 4 of 4 PageID# 76

*See* R.C.M. 913(a), Discussion and R.C.M. 920(e), Discussion, paragraph 3.

_____

(h) *Later action.*

(1) *Withdrawal by the accused.* If after acceptance of the plea but before the sentence is announced the accused requests to withdraw a plea of guilty and substitute a plea of not guilty or a plea of guilty to a lesser included offense, the military judge may as a matter of discretion permit the accused to do so.

(2) *Statements by accused inconsistent with plea.* If after findings but before the sentence is announced the accused makes a statement to the court-martial, in testimony or otherwise, or presents evidence which is inconsistent with a plea of guilty on which a finding is based, the military judge shall inquire into the providence of the plea. If, following such inquiry, it appears that the accused entered the plea improvidently or through lack of understanding of its meaning and effect a plea of not guilty shall be entered as to the affected charges and specifications.

### Discussion

When the accused withdraws a previously accepted plea for guilty or a plea of guilty is set aside, the court should be given a reasonable time to prepare to proceed. In a trial by military judge alone, recusal of the military judge or disapproval of the request for trial by military judge alone will ordinarily be necessary when a plea is rejected or withdrawn after findings; in trial with members, a mistrial will ordinarily be necessary.

_____

(3) *Pretrial agreement inquiry.* After sentence is announced the military judge shall inquire into any parts of a pretrial agreement which were not previously examined by the military judge. If the military judge determines that the accused does not understand the material terms of the agreement, or that the parties disagree as to such terms, the military judge shall conform, with the consent of the Government, the agreement to the accused's understanding or permit the accused to withdraw the plea.

### Discussion

*See* subsection (f)(3) of this rule.

_____

(i) *Record of proceedings.* A verbatim record of the guilty plea proceedings shall be made in cases in which a verbatim record is required under R.C.M. 1103. In other special courts-martial, a summary of the explanation and replies shall be included in the record of trial. As to summary courts-martial, *see* R.C.M. 1305.

(j) *Waiver.* Except as provided in subsection (a)(2) of this rule, a plea of guilty which results in a finding of guilty waives any objection, whether or not previously raised, insofar as the objection relates to the factual issue of guilt of the offense(s) to which the plea was made.

## Rule 911. Assembly of the court-martial

The military judge shall announce the assembly of the court-martial.

### Discussion

When trial is by a court-martial with members, the court-martial is ordinarily assembled immediately after the members are sworn. The members are ordinarily sworn at the first session at which they appear, as soon as all parties and personnel have been announced. The members are seated with the president, who is the senior member, in the center, and the other members alternately to the president's right and left according to rank. If the rank of a member is changed, or if the membership of the court-martial changes, the members should be reseated accordingly.

When trial is by military judge alone, the court-martial is ordinarily assembled immediately following approval of the request for trial by military judge alone.

Assembly of the court-martial is significant because it marks the point after which: substitution of the members and military judge may no longer take place without good cause (*see* Article 29; R.C.M. 505; 902; 912); the accused may no longer, as a matter of right, request trial by military judge alone or withdraw such a request previously approved (*see* Article 16; R.C.M. 903(a)(2)(d)); and the accused may no longer request, even with the permission of the military judge, or withdraw from a request for, enlisted members (*see* Article 25(c)(1); R.C.M. 903(a)(1)(d)).

_____

## Rule 912. Challenge of selection of members; examination and challenges of members

(a) *Pretrial matters.*

(1) *Questionnaires.* Before trial the trial counsel may, and shall upon request of the defense counsel, submit to each member written questions requesting the following information:

(A) Date of birth;

(B) Sex;

(C) Race;

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 75 of 211 PageID# 181
USCA4 Appeal: 19-1287     Doc: 10-2     Filed: 03/29/2019     Pg: 74 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 1 of 57 PageID# 77

# EXHIBIT E

# FILED UNDER SEAL

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 76 of 211 PageID# 182
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 75 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 2 of 57 PageID# 78

10569

＊　＊　＊

1    MJ:  Now, you do understand if you do read the statement and you

2    tell me something that's not true, that the statement can be used

3    against you later for charges of perjury or making false statements?

4        ACC: Yes, Your Honor.

5    MJ:  Your counsel has asked for a brief recess.  What we're

6    going to do is we'll take that brief recess, we'll come back, you can

7    read your statement, and then we'll go over -- I'll be oriented to

8    the facts, we'll go over each of the specifications that you're

9    pleading guilty to at that time.

10        How long would you like for a recess?

11        CDC[MR.COOMBS]:  Just 10 minutes, Your Honor.

12        MJ:  All right.

13        TC[MAJ FEIN]:  Ma'am, if we can just make it 15 because of the

14    number of spectators?

15        MJ:  Why don't we just do that?  We'll just reconvene here at 11

16    o'clock.  Court is in recess.

17    **[The Article 39(a) session recess at 1050, 28 February 2013.]**

18    **[The Article 39(a) session was called to order at 1109, 28 February**

19    **2013.]**

20        MJ:  This Article 39(a) session is called to order.  Let the

21    record reflect all parties present when the court last recessed are

22    again present in court.  PFC Manning, you may read your statement.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 77 of 211 PageID# 183
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 76 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 3 of 57 PageID# 79

10570

1       ACC: Yes, Your Honor.  I wrote this statement in confinement, so

2   I'll start now.  The following facts are provided in support of the

3   providence inquiry for my court-martial, <u>United States v. PFC Bradley</u>

4   <u>E. Manning</u>.

5           Personal facts:  I'm a 25 year-old Private First Class in

6   the United States Army currently assigned to Headquarters and

7   Headquarters Company (HHC), U.S. Army Garrison (USAG), Joint Base

8   Myer-Henderson Hall, Fort Myer, Virginia.  Prior to this assignment,

9   I was assigned to HHC, 2nd Brigade Combat Team, 10th Mountain

10  Division at Fort Drum, New York.  My Primary Military Occupational

11  Specialty or PMOS is 35F, Intelligence Analyst.  I entered active

12  duty status on 2 October 2007.  I enlisted with the hope of obtaining

13  both real-world experience and earning benefits under the G.I. Bill

14  for college opportunities.

15          Facts regarding my position as an intelligence analyst:  In

16  order to enlist in the Army, I took the Standard Armed Services

17  Aptitude Battery or ASVAB.  My score on this battery was high enough

18  for me to qualify for any enlisted MOS position.  My recruiter

19  informed me that I should select an MOS that complemented my

20  interests outside the military.  In response, I told him that I was

21  interested in geopolitical matters and information technology.  He

22  suggested that I consider becoming an intelligence analyst.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 78 of 211 PageID# 184
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 77 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 4 of 57 PageID# 80

10571

1          After researching the intelligence analyst position, I

2     agreed that this would be a good fit for me.  In particular, I

3     enjoyed the fact that an analyst would use information derived from a

4     variety of sources to create work products that informed the command

5     of its available choices for determining the best course of action or

6     COAs.  Although the MOS required a working knowledge of computers, it

7     primarily required me to consider how raw information could be

8     combined with other available intelligence sources in order to create

9     products that assist in the command and its situational awareness or

10    SA.

11         I assessed that my natural interest in geopolitical affairs

12    and my computer skills would make me an excellent intelligence

13    analyst.  After enlisting, I reported to the Fort Meade Military

14    Entrance Processing Station on 1 October 2007.  I then traveled to

15    and reported at Fort Leonard Wood, Missouri on 2 October 2007 to

16    begin Basic Combat Training or BCT.

17         Once at Fort Leonard Wood, I quickly realized that I was

18    neither physically nor mentally prepared for the requirements of

19    basic training.  My BCT experience lasted 6 months instead of the

20    normal 10 weeks.  Due to medical issues, I was placed on a hold

21    status.  A physical examination indicated that I sustained injuries

22    to my right shoulder and left foot.  Due to those injuries, I was

23    unable to continue Basic.  During medical hold, I was informed that I

6740 .

**74**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 79 of 211 PageID# 185
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 78 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 5 of 57 PageID# 81

10572

1  may be out processed from the Army, however, I resisted being

2  chaptered out because I felt I could overcome my medical issues and

3  continue to serve.

4          On 20 January 2008, I returned to Basic Combat Training.

5  This time, I was better prepared and I completed training on 2 April

6  2008.  I then reported for the MOS-specific Advanced Individual

7  Training or AIT on 7 April 2008.

8          AIT was an enjoyable experience for me.  Unlike Basic

9  Training where I felt different from the other Soldiers, I fit in and

10  did well.  I preferred the mental challenges of reviewing a large

11  amount of information from various sources and trying to create

12  useful or actionable products.  I especially enjoyed the practice of

13  analysis through the use of computer applications and methods I was

14  familiar with.

15          I graduated from AIT on 16 August 2008 and reported to my

16  first duty station, Fort Drum, New York on 28 August 2008.  As an

17  analyst, Significant Activities or SIGACTs were a frequent source of

18  information for me to use in creating work products.

19          I started working extensively with SIGACTS early after my

20  arrival at Fort Drum.  My computer background allowed me to use the

21  tools organic to the Distributed Common Ground System-Army or DCGS-A

22  computers to create polished work products for the 2nd Brigade Combat

23  Team chain of command.

6741

**75**

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 80 of 211 PageID# 186
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 79 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 6 of 57 PageID# 82

10573

1          The noncommissioned officer in charge, or NCOIC, of the S-2

2    section, then Master Sergeant David P. Adkins, recognized my skills

3    and potential and tasked me to work on a tool abandoned by a

4    previously assigned analyst, the incident tracker.  The incident

5    tracker was viewed as a backup to the Combined Information Data

6    Network Exchange or CIDNE and as a unit historical reference tool.

7          In the months preceding my upcoming deployment, I worked on

8    creating a new version of the incident tracker and used SIGACTS to

9    populate it.  The SIGACTs I used were from Afghanistan because, at

10   the time, our unit was scheduled to deploy to the Logar and Wardak

11   Provinces of Afghanistan.  Later, our unit was reassigned to deploy

12   to Eastern Baghdad, Iraq.  At that point, I removed the Afghanistan

13   SIGACTs switch to Iraq SIGACTs.

14         As an analyst, I viewed the SIGACTs as historical data.  I

15   believe this view is shared by other all-source analysts as well.

16   SIGACTs give a first-look impression of a specific or isolated event.

17   This event can be an Improvised Explosive Device attack, or IED;

18   Small Arms Fire engagement, or SAF; engagement with a hostile force

19   or any other event a specific unit documented and reported in real

20   time.  In my perspective, the information contained within a single

21   SIGACT or group of SIGACTs is not very sensitive.  The events

22   encapsulated within most SIGACTs involve either enemy engagements or

23   casualties.  Most of this information is publicly reported by the

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 81 of 211 PageID# 187
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 80 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 7 of 57 PageID# 83

10574

1  public affairs office or PAO, embedded media pools, or host nation

2  (HN) media.

3        As I started working with SIGACTs, I felt they were similar

4  to a daily journal or log that a person may keep.  They capture what

5  happens on a particular date and time.  They are created immediately

6  after the events and are potentially updated over a period of hours

7  until a final version is published on the CIDNE -- on the Combined

8  Information Data Network Exchange.  Each unit has its own Standard

9  Operating Procedure or SOP for reporting and recording SIGACTs.  The

10  SOP may differ between reporting in a particular deployment and

11  reporting in garrison.  In garrison, a SIGACT normally involves

12  personnel issues such as driving under the influence or DUI incidents

13  or an automobile involving the death or serious injury of a Soldier.

14  The report starts at the company level and goes up to the battalion,

15  brigade, and even up to the division level.

16        In a deployed environment, a unit may observe or

17  participate in an event and a platoon leader or platoon sergeant may

18  report the event to a SIGACT -- as a SIGACT to the company

19  headquarters through the Radio Transmission Operator or RTO.  The

20  commander or RTO will then forward the report to the battalion battle

21  captain or battle noncommissioned officer or NCO.  Once the battalion

22  battle captain or battle NCO receives the report, they will either,

23  one, notify the battalion operations officer or S-3, two, conduct an

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 82 of 211 PageID# 188
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 81 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 8 of 57 PageID# 84

10575

1   action such as launching the quick reaction force or, three, record

2   the event and report -- and further report it up the chain of command

3   to the brigade.  The recording of each event is done by radio or over

4   the Secret Internet Protocol Router Network or SIPRNET, normally by

5   an assigned Soldier, usually junior-enlisted, E4 and below.  Once the

6   SIGACT is reported, the SIGACT is further sent up the chain of

7   command.  At each level, additional information can either be added

8   or corrected as needed.  Normally, within 24 to 48 hours, the

9   updating or recording of a particular SIGACT is complete.

10  Eventually, all reports and SIGACTs go through the chain of command

11  from brigade to division and division to corps.  At corps level, the

12  SIGACT is finalized and published.

13          The CIDNE system contains a database that is used by

14  thousands of Department of Defense (DoD) personnel, including

15  Soldiers, civilians, and contractor support.  It was the United

16  States Central Command or CENTCOM reporting tool for operational

17  reporting in Iraq and Afghanistan.  Two separate but similar

18  databases were maintained for each theater:  CIDNE-I for Iraq and

19  CIDNE-A for Afghanistan.  Each database encompasses over 100 types of

20  reports and other historical information for access.  They contain

21  millions of vetted and finalized records including operational

22  intelligence reporting.  CIDNE was created to collect and analyze

23  battle space data to provide daily operational and Intelligence

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 83 of 211 PageID# 189
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 82 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 9 of 57 PageID# 85

10576

1  Community (IC) reporting relevant to a commander's daily decision-

2  making process.  The CIDNE-I and CIDNE-A databases contain reporting

3  and analysis fields from multiple disciplines including Human

4  Intelligence or HUMINT Reports, Psychological Operations or PYSOP

5  reports, engagement reports, Counter-Improvised Explosion Device or

6  CIED reports, SIGACT reports, targeting reports, social and cultural

7  reports, civil affairs reports, and human terrain reporting.

8        As an intelligence analyst, I had unlimited access to the

9  CIDNE-I and CIDNE-A databases and the information contained within

10  them.  Although each table within the database is important, I

11  primarily dealt with HUMINT reports, SIGACT reports, and Counter-IED

12  reports because these reports were used to create the work product I

13  was required to publish as any analyst.

14        When working on an assignment, I looked anywhere and

15  everywhere for information.  As an all-source analyst, this was

16  something that was expected.  The DCGS-A systems had databases built

17  in and I utilized them on any daily basis.  This includes the search

18  tools available on DCGS-A systems on SIPRNET such as Query Tree, and

19  the DOD and Intelink search engines.  Primarily, I utilized the CIDNE

20  database using the historical and HUMINT reporting to conduct my

21  analysis and provide back-up for my end work product.  I did

22  statistical analysis on historical data including SIGACTs to backup

23  analyses that were based on HUMINT reporting and produced charts,

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 84 of 211 PageID# 190
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 83 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 10 of 57 PageID# 86

10577

1   graphs, and tables.  I also created maps and charts to conduct

2   predictive analysis based on statistical trends.  The SIGACT

3   reporting provided a reference point for what occurred and provided

4   myself and other analysts with the information to conclude possible

5   outcomes.

6           Although SIGACT reporting is sensitive at the time of their

7   creation, their sensitivity normally dissipates within 48 to 72 hours

8   as the information is either publicly released, the unit involved is

9   no longer in the area and not in danger -- or the unit involved is no

10  longer in the area and not in danger.  It is my understanding that

11  the SIGACT reports remain classified only because they are maintained

12  within CIDNE because it is only accessible on SIPRNET.  Everything on

13  CIDNE-I and CIDNE-A, to include SIGACT reporting, was treated as

14  classified information.

15          Facts regarding the storage of SIGACT reports.  As part of

16  my training at Fort Drum, I was instructed to ensure that I create

17  backups of my work product.  The need to create backups was

18  particularly acute given the relative instability and reliability of

19  the computer systems we used in the field during the deployment.

20  These computer systems included both organic and theater-provided

21  equipment (TPE) DCGS-A machines.

22          The organic DCGS-A machines we brought with us into the

23  field on our deployment were Dell M90 laptops and the TPE DCGS-A

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 85 of 211 PageID# 191
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 84 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 11 of 57 PageID# 87

10578

1   machines were Alienware brand laptops.  The M90 DCGS-A laptops were

2   the preferred machine to use as they were slightly faster and had

3   fewer problems with dust and temperature than the theater-provided

4   Alienware laptops.  I used several DCGS-A machines during the

5   deployment due to various technical problems with laptops.

6         With these issues, several analysts lost information, but I

7   never lost information due to the multiple backups I created.  I

8   attempted to backup as much relevant information as possible.  I

9   would save the information so that I, or another analyst, could

10  quickly access it whenever a machine crashed, SIPRNET connectivity

11  was down, or I forgot where the data was stored.  When backing up

12  information, I would do one or all of the following things based on

13  my training:

14        Physical backup.  I tried to keep physical backup copies of

15  information on paper so that the information could be grabbed

16  quickly.  Also, it was easier to brief from hard copies of research

17  in HUMINT reports.

18        Two, local drive backup.  I tried to sort out information I

19  deemed relevant and keep complete copies of the information on each

20  of the computers I used in the Temporary Sensitive Compartmentalized

21  -- Compartmented Information Facility, or T-SCIF, including my

22  primary and secondary DCGS-A machines.  This was stored under my user

23  profile on the desktop.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 86 of 211 PageID# 192
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 85 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 12 of 57 PageID# 88

10579

1        Share drive -- or share drive backup.  Each analyst had

2   access to a T-drive -- what we called a "T-drive" -- shared across

3   the SIPRNET.  It allowed others to access information that was stored

4   on it; S-6 operated the T-drive.

5        Compact Disc-Rewritable or CD-RW back up.  For larger data

6   sets, I saved the information onto a re-writable disc, labeled the

7   discs, and stored them in the conference room of the T-SCIF.  This

8   redundancy permitted us the ability to not worry about information

9   loss.  If a system crashed, I could easily pull the information from

10  a secondary computer, the T-drive, or one of the CD-RWs.  If another

11  analyst wanted to access my data but I was unavailable, she could

12  find my published products directory on the T-drive or on the CD-RWs.

13  I sorted all of my products and research by date, time, and group and

14  updated the information on each of the storage methods to ensure that

15  the latest information was available to them.

16       During the deployment, I had several of the DCGS-A machines

17  crash on me.  Whenever a computer crashed, I usually lost information

18  but the redundancy method ensured my ability to quickly restore old

19  backup data and add my current information to the machine when it was

20  repaired or replaced.

21       I stored the backup CD-RWs of larger data sets in the

22  conference room of the T-SCIF or next my workstations.  I marked the

23  CD-RWs based on the classification level and its content.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 87 of 211 PageID# 193
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019    Pg: 86 of 337

Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 13 of 57 PageID# 89

10580

1   Unclassified CD-RWs were only labeled with content type and not

2   marked with classification markings.  Early on in the deployment, I

3   only saved and stored the SIGACTs that were within or near our

4   operational environment.  Later, I thought it would be easier just to

5   save all the SIGACTs on to a CD-RW.  The process would not take very

6   long to complete and so I downloaded the SIGACTs from CIDNE-I onto a

7   -- onto a DCGS-on to a CD-RW.  After finishing with CIDNE-I, I did

8   the same with CIDNE-A.  By retrieving the CIDNE-I and CIDNE-A

9   SIGACTs, I was able to retrieve the information whenever I needed it

10  and not rely upon the unreliable and slow SIPRNET connectivity needed

11  to pull them.  Instead, I could just find the CD-RW and open the pre-

12  loaded spreadsheet.  This process began in late December 2009 and

13  continued through early January 2010.  I could quickly export one

14  month of the SIGACT data at a time and download in the background as

15  I did other tasks.  The process took approximately a week for each

16  table.

17          After downloading the SIGACT tables, I periodically updated

18  them by pulling only the most recent SIGACTs and simply copying them

19  and pasting them into the database saved on the CD-RW.  I never hid

20  the fact that I had downloaded copies of both the SIGACT tables from

21  CIDNE-I and CIDNE-A.  They were stored on appropriately labeled and

22  marked CD-RWs, stored in the open.  I viewed the saved copies of the

23  CIDNE-I and CIDNE-A SIGACT tables as being both for my use and the

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 88 of 211 PageID# 194
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 87 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 14 of 57 PageID# 90

10581

1  use of anyone within S-2 section during the SIPRNET connectivity

2  issues.

3      In addition to the SIGACT tables, I had a large repository

4  of HUMINT reports and counter-IED reports downloaded from CIDNE-I.

5  These contained reports that were relevant to the area in and around

6  our operational environment in Eastern Baghdad and the Diyala

7  Province of Iraq.

8      In order to compress the data to fit onto a CD-RW, I use a

9  compression algorithm called "BZIP2." The program used to compress

10  the data is called "WinRar." WinRar is an application that is free

11  and can be easily downloaded from the internet via the Nonsecure

12  Internet Relay Protocol Network, or NIPRNET. I downloaded WinRar on

13  NIPRNET and transferred it to the DCGS-A machine user profile desktop

14  using the CD-RW. I did not try to hide the fact that I was

15  downloading WinRar onto my SIPRNET DCGS-A machine or computer. With

16  the assistance of the BZIP2 compression algorithm, using the WinRar

17  program, I was able to fit all the SIGACTs onto a single CD-RW and

18  the relevant HUMINT and Counter-IED reports onto a separate CD-RW.

19      Facts regarding my knowledge of the WikiLeaks Organization

20  or WLO: I first became vaguely aware of the WLO during my AIT at

21  Fort Huachuca, Arizona, though I did not fully pay attention until

22  WLO -- until the WLO released purported Short Messaging System or SMS

23  messages from 11 September 2001 on 25 November 2009. At that time,

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 89 of 211 PageID# 195
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 88 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 15 of 57 PageID# 91

10582

1   references to the release and the WLO website showed up in my daily

2   Google News open-source search for information related to U.S.

3   foreign policy.  The stories were about how WLO published

4   approximately 500,000 messages.  I then reviewed the messages myself

5   and realized that the posted messages were very likely real, given

6   the sheer volume and detail of the content.

7          After this, I began conducting research on WLO.  I

8   conducted searches on both NIPRNET and SIPRNET on WLO beginning in

9   late November 2009 and early 2000 -- early December 2009.  At this

10  time, I also began to routinely monitor the WLO website.  In response

11  to one of my searches in December 2009, I found the United States

12  Army Counterintelligence Center or USACIC report on the WikiLeaks

13  Organization.  After reviewing the report, I believe that this report

14  was one of the -- was possibly the one that my AIT instructor

15  referenced in early 2008.  I may or may not have saved the report on

16  my DCGS-A workstation.  I know I reviewed the document on other

17  occasions throughout early 2010 and saved it on both my primary and

18  secondary laptops.

19         After reviewing the report, I continued doing research on

20  WLO, however, based upon my open-source collection, I discovered

21  information that contradicted the 2008 USACIC report including

22  information indicating that, similar to other press agencies, WLO

23  seemed to be dedicated to exposing illegal activities and corruption.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 90 of 211 PageID# 196
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 89 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 16 of 57 PageID# 92

10583

1   WLO received numerous awards and recognition for its reporting

2   activities.

3           Also, in reviewing the WLO website, I found information

4   regarding U.S. military SOPs for Camp Delta at Guantánamo Bay, Cuba

5   and information on the, then, outdated rules of engagement or ROE in

6   Iraq for cross-border pursuits of former members of Saddam Hussein's

7   al-Tikiriti's government.

8           After seeing the information available on the WLO website,

9   I continued following it and collecting open-source information from

10  it.  During this time period, I followed several organizations and

11  groups including wire press agencies such as the Associated Press and

12  Reuters and private intelligence agencies including Strategic

13  Forecasting or STRATFOR.  This practice was something I was trained

14  to do during AIT and was something that good analysts are expected to

15  do.

16          During the searches of WLO, I found several pieces of

17  information that I found useful in my work product -- in my work as

18  an analyst, specifically, I recall WLO publishing documents related

19  to weapons trafficking between two nations that affected my OE.  I

20  integrated this information into one or more of my work products.  In

21  addition to visiting the WLO website, I began following WLO using and

22  Instant Relay Chat or IRC client called "XChat" sometime in early

23  January 2010.

6752

**86**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 91 of 211 PageID# 197
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 90 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 17 of 57 PageID# 93

10584

1              IRC is a protocol for real-time Internet communications by

2      messaging and conferencing, colloquially referred to as chat rooms or

3      chats.   The IRC chat rooms are designed for group communication

4      discussion forums.  Each IRC chat room is called a channel.   Similar

5      to a television, you can tune in or follow it -- follow a channel so

6      long as it is open and does not require an invite.  Once joining a

7      specific IRC conversation, other users in the conversation can see

8      that you have joined the room.  On the Internet, there are millions

9      of different IRC channels across several services.  Channel topics

10     span a range of topics covering all kinds of interests and hobbies.

11             The primary reason for following WLO on IRC was curiosity,

12     particularly in regards to how and why they obtained the SMS messages

13     referenced above.  I believed that -- I believed that collecting

14     information on the WLO would assist me in this goal.

15             Initially, I simply observed the IRC conversations.   I

16     wanted to know how the organization was structured and how they

17     obtained their data.  The conversations I viewed were usually

18     technical in nature, but sometimes switched to a lively debate on

19     issues a particular individual may have felt strongly about.

20             Over a period of time, I became more involved in these

21     discussions, especially when conversations turned to geopolitical

22     events and information topics -- information technology topics such

6753

**87**

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 92 of 211 PageID# 198
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 91 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 18 of 57 PageID# 94

10585

1   as networking and encryption methods.  Based on these observations, I

2   would describe the WL organization as almost academic in nature.

3         In addition to the WLO conversations, I participated in

4   numerous other IRC channels across at least three different networks.

5   The other IRC channels I participated in normally dealt with

6   technical topics including the LINUX and Berkley Security

7   Distribution (BSD) operating systems or OSs, networking, encryption

8   algorithms and techniques, and other more political topics such as

9   politics and queer rights.

10        I normally engaged in multiple IRC conversations

11   simultaneously; mostly publicly but often privately.  The XChat

12   client enabled me to manage these multiple conversations across

13   different channels and servers.  The screen for XChat was often busy,

14   but experience enabled me to see when something was interesting.  I

15   would then select conversation and either observe or participate.

16        I really enjoyed the IRC conversations pertaining to and

17   involving the WLO.  However, at some point in late February or early

18   March of 2010, the WLO IRC channel was no longer accessible.

19   Instead, the regular participants of this channel switched to using a

20   Jabber server.

21        Jabber is another Internet communication tool similar, but

22   more sophisticated than IRC.  The IRC and Jabber conversations

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 93 of 211 PageID# 199
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 92 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 19 of 57 PageID# 95

10586

1    allowed me to feel connected to others, even when alone.  They helped

2    me pass the time and keep motivated throughout the deployment.

3           Facts regarding the unauthorized storage and disclosure of

4    the SIGACTs:  As indicated above, I created copies of the CIDNE-I and

5    CIDNE-A SIGACT tables as part of the process of backing up

6    information.  At the time I did so, I did not intend to use this

7    information for any purpose other than for backup.  However, I later

8    decided to release this information publicly.  At that time, I

9    believed and still believe that these tables are two of the most

10   significant documents of our time.

11          On 8 January 2010, I collected the CD-RW I stored in the

12   conference room of the T-SCIF and placed into the cargo pocket of my

13   ACU or Army Combat Uniform.  At the end of my shift, I took the CD-RW

14   out of the T-SCIF and brought it to my Containerized Housing Unit or

15   CHU.  I copied the data onto my personal laptop.  Later, at the

16   beginning of my shift, I returned to -- I returned the CD-RW back to

17   the conference room of the T-SCIF.

18          At the time I saved the SIGACTs to my laptop, I planned to

19   take them -- I planned to take them with me on mid-tour leave and

20   decide what to do with them.  At some point prior to my mid-tour

21   leave, I transferred the information from my computer to a Secure

22   Digital memory card for my digital camera.  The SD card for the

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 94 of 211 PageID# 200
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 93 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 20 of 57 PageID# 96

10587

1  camera also worked on my computer and allowed me to store the SIGACT

2  tables in a secure manner for transport.

3        I began mid-tour leave on 23 January 2010, flying from

4  Atlanta, Georgia to Reagan National Airport in Virginia.  I arrived

5  at the home of my aunt, Debra M. Van Alstyne in Potomac, Maryland and

6  quickly got in contact with my then boyfriend, Tyler R. Watkins.

7        Tyler, then a student at Brandeis University in Waltham,

8  Massachusetts, and I made plans to -- for me to visit him in Boston,

9  Massachusetts area.  I was excited to see Tyler and planned on

10  talking to Tyler about where our relationship was going and about my

11  time in Iraq.  However, when arrived in the Boston area, Tyler and I

12  seem to become distant.  He did not seem very excited about my return

13  from Iraq.  I tried talking to him about our relationship, but he

14  refused to make any plans.  I also tried raising the topic of

15  releasing the CIDNE-I and CIDNE-A SIGACT tables to the public.

16        I asked Tyler hypothetical questions about what he would do

17  if he had documents that he thought the public needed -- that the

18  public needed access to.  Tyler didn't really have a specific answer

19  for me.  He tried to answer the question and be supportive, but

20  seemed confused by the question and its context.  I then tried to be

21  more specific, but he asked too many questions.  Rather than try to

22  explain my dilemma, I decided just to drop the conversation.  After a

23  few days in Waltham, I began feeling that I was overstaying my

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 95 of 211 PageID# 201
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 94 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 21 of 57 PageID# 97

10588

1   welcome and I returned to Maryland.  I spent the remainder of my time

2   on leave in the Washington, D.C. area.

3          During this time, a blizzard bombarded the Mid-Atlantic and

4   I spent a significant time period of time, essentially, stuck at my

5   aunt's house in Maryland.  I began to think about what I knew and the

6   information I still had in my possession.  For me, the SIGACTs

7   represented the on-the-ground reality of both the conflicts -- both

8   the conflicts in Iraq and Afghanistan.  I felt we were risking so

9   much for -- risking so much for people that seemed unwilling to

10  cooperate with us leading to frustration and hatred on both sides.

11         I began to become depressed with the situation that we

12  found ourselves increasingly mired in year after year.  The SIGACTs

13  documented this in great detail and provided context to what we were

14  seeing on the ground.  In attempting to conduct counterterrorism or

15  CT and counterinsurgency (COIN) operations, we became obsessed with

16  capturing/killing human targets on lists and on being suspicious and

17  avoiding cooperation with our host nation partners and ignoring the

18  second and third order effects of accomplishing short-term goals and

19  missions.

20         I believe that if the general public, especially the

21  American public, had access to the information contained within the

22  CIDNE-I and CIDNE-A tables, this could spark a domestic debate on the

23  role of the military and our foreign policy, in general, as well as

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 96 of 211 PageID# 202
USCA4 Appeal: 19-1287      Doc: 10-2           Filed: 03/29/2019      Pg: 95 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 22 of 57 PageID# 98

10589

1   it related to Iraq and Afghanistan.  I also believe the detailed

2   analysis of the data over a long period of time by different sectors

3   of society might cause society to reevaluate the need or even the

4   desire to engage in counterterrorism and counterinsurgency operations

5   that ignore the complex dynamics of the people living in the affected

6   environment every day.

7           At my aunt's house, I debated what I should do with the

8   SIGACTs; in particular, whether I should hold onto them or disclose

9   them through a press agency.  At this point, I decided it made sense

10  to try and disclose the SIGACT tables to an American newspaper.  I

11  first called my local newspaper, the *Washington Post*, and spoke with

12  a woman saying that she was a reporter.  I asked her if the

13  *Washington Post* would be interested in receiving information that

14  would have enormous value to the American public.  Although we spoke

15  for about 5 minutes concerning the general nature of what I

16  possessed, I do not believe she took me seriously.  She informed me

17  that the *Washington Post* would possibly be interested, but that such

18  decisions were made only after seeing the information I was referring

19  to and after consideration by the senior editors.

20          I then decided to contact the largest and most popular

21  newspaper, the *New York Times*.  I called the public editor number on

22  the *New York Times* website.  The phone rang and was answered by a

23  machine.  I went through the menu to the section for news tips and

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 97 of 211 PageID# 203
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 96 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 23 of 57 PageID# 99

10590

1    was routed to an answering machine.  I left a message stating that I

2    had access to information about Iraq and Afghanistan that I believed

3    was very important.  However, despite leaving my Skype phone number

4    and personal e-mail address, I never received a reply from the *New*

5    *York Times*.

6          I also briefly considered dropping into the office for the

7    political commentary blog, *Politico*, however, the weather conditions

8    during my leave hampered my efforts to travel.  After these failed

9    efforts, I ultimately decided to submit the materials to the WLO.  I

10    was not sure if the WLO would actually publish the SIGACT tables or

11    even if they would publish.  I was concerned that they might -- I was

12    also concerned that they might not be noticed by the American media.

13    However, based upon what I read about the WLO through my research

14    described above, they seemed to be the best medium for publishing

15    this information to the world within my reach.

16          At my aunt's house, I joined in on an IRC conversation and

17    stated I had information that needed to be shared with the world.  I

18    wrote that the information would help document the true costs of the

19    wars in Iraq and Afghanistan.  One of individuals in the IRC asked me

20    to describe the information.  However, before I could describe

21    information, another individual pointed me to the link for the WLO

22    website's online submission system.  After ending my IRC connection,

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 98 of 211 PageID# 204
USCA4 Appeal: 19-1287   Doc: 10-2       Filed: 03/29/2019   Pg: 97 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 24 of 57 PageID# 100

10591

1  I considered my options one more time.  Ultimately, I felt that the

2  right thing to do was to release the SIGACTs.

3        On 3 February 2010, I visited the WLO website on my

4  computer and clicked on the "submit documents" link.  Next, I found

5  the "Submit Your Information Online" link and elected to submit the

6  SIGACTs via the Onion Router or TOR (T-O-R) anonymizing network by a

7  special link.

8        TOR is a system intended to provide anonymity online.

9  Software routes Internet traffic through a network of servers and

10  other TOR clients in order to conceal a user's location and identity.

11  I was familiar with TOR and had it previously installed on my

12  computer to anonymously monitor the social media websites and militia

13  groups operating within central Iraq.

14        I follow the prompts and attached the compressed data files

15  of CIDNE-I and CIDNE-A SIGACTs.  I attached the text file I drafted

16  while preparing to provide documents to the *Washington Post*.  It

17  provided rough guideline saying, "It's already been sanitized of any

18  source-identifying information.  You might need to sit on this

19  information, perhaps 90 to 100 days, to figure out how to best

20  release such a large amount of data and to protect the source.  This

21  is possibly one of the more significant documents of our time,

22  removing the fog of war and revealing the true nature of 21st-century

23  asymmetric warfare.  Have a good day."

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 99 of 211 PageID# 205
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 98 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 25 of 57 PageID# 101

10592

1         After sending this, I left the SD card in a camera case at

2   my aunt's house in the event I needed it again in the future.

3         I returned from mid-tour leave on 11 February 2010.

4   Although the information had not yet been publicly -- had not yet

5   been published by the WLO, I felt a sense of relief by them having

6   it.  I felt I had accomplished something that allowed me to have a

7   clear conscience based upon what I had seen and read about and knew

8   were happening in both Iraq and Afghanistan every day.

9         Facts regarding the unauthorized storage and disclosure of

10  10 Reykjavik 13.  I first became aware of the diplomatic cables

11  during my training period in AIT.  I later learned about the

12  Department of State, or DoS, Net-Centric Diplomacy (NCD) portal from

13  the 2/10 Brigade Combat Team S-2, Captain Steven Lim.

14        Captain Lim sent a section-wide e-mail to the other

15  analysts and officers in late December 2009 containing the SIPRNET

16  link to the portal along with the instructions to look at the cables

17  contained within them and to incorporate them into our work product.

18  Shortly after this, I also noticed the diplomatic cables were being

19  referred to in products from the corps level, U.S. Forces Iraq or

20  USF-I.  Based upon Captain Lim's direction to become familiar with

21  its contents, I read virtually every published cable concerning Iraq.

22  I also began scanning database and other -- and reading other random

23  cables that piqued my curiosity.

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 100 of 211 PageID# 206
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 99 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 26 of 57 PageID# 102

10593

1          It was around this time in early to mid-January 2010 that I

2    began searching the database for information on Iceland.  I became

3    interested in Iceland due to the IRC conversations I viewed in the

4    WLO channel discussing an issue called "Icesave."  At this time, was

5    not very familiar with the topic, but it seemed to be a big issue for

6    those participating in the conversation.  This is when I decided to

7    investigate and conduct a few searches on Iceland and find out more.

8          At the time, did not find anything -- I did not find

9    anything discussing the Icesave issue, either directly or indirectly.

10   I then conducted an open source search for Icesave.  I then learned

11   that Iceland was involved in the dispute with the United Kingdom and

12   the Netherlands concerning the financial collapse of one or more of

13   Iceland's banks.  According to open source reporting, much of the

14   public controversy involved the United Kingdom's use of anti-

15   terrorism legislation against Iceland in order to freeze Icelandic

16   assets for payments of the guarantees for UK depositors that lost

17   money.

18          Shortly after returning from mid-tour leave, I returned to

19   the Net-Centric Diplomacy portal to search for information on Iceland

20   and Icesave as the topic had not abated on the WLO IRC channel.  To

21   my surprise, on 14 February 2010, I found the cable 10 Reykjavík 13

22   which referenced the Icesave issue directly.  The cable, published on

23   13 January 2010, was just over two pages in length.  I read the cable

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 101 of 211 PageID# 207
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 100 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 27 of 57 PageID# 103

10594

1    and quickly concluded that Iceland was, essentially, being bullied,

2    diplomatically, by two larger European powers.  It appeared to me

3    that Iceland was out of viable options and was coming to the U.S. for

4    assistance.  Despite their quiet request for assistance, it did not

5    appear that we were going to do anything.  From my perspective, it

6    appeared that we were not getting involved due to the lack of long-

7    term geopolitical benefit to do so.

8          After digesting the contents of 10 Reykjavík 13, I debated

9    on whether this was something I should send to the WLO.  At this

10   point, the WLO had not published nor acknowledged receipt of the

11   CIDNE-I and CIDNE-A SIGACTs tables.  Despite not knowing if the

12   SIGACTs were a priority for the WLO, I decided the cable was

13   something that would be important and I felt I might be able to right

14   a wrong by having them publish this document.

15          I burned the document -- or I burned the information onto a

16   CD-RW on 15 February 2010, took it to my CHU, and saved it onto my

17   personal laptop.  I navigated to the WLO website via TOR connection,

18   like before, and uploaded the document via the secure form.

19   Amazingly, the WLO published 10 Reykjavík 13 within hours, proving

20   that the form worked and that they must have received the SIGACT

21   tables.

22          Facts regarding the unauthorized disclosure -- unauthorized

23   storage and disclosure of the 12 July 2007 aerial weapons team or AWT

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 102 of 211 PageID# 208
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 101 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 28 of 57 PageID# 104

10595

1  video.  During the mid-tour -- or mid-February time frame, the 2nd

2  Brigade Combat Team, 10th Mountain Division targeting analyst, then

3  Specialist Jihrleah W. Showman and others discussed a video that Ms.

4  Showman had found on the T-drive.  The video depicted several

5  individuals being engaged by an aerial weapons team.  At first, I did

6  not consider the video very special as I have viewed the countless

7  other war-tore -- war war-porn type videos depicting combat.

8  However, the recording of audio comments by the aerial weapons team

9  and crew and the second engagement in the video of an unarmed bongo

10  truck troubled me.

11        Ms. Showman and a few other analysts and officers in the T-

12  SCIF commented on the video and debated whether the crew violated the

13  rules of engagement or ROE in the second engagement.  I shied away

14  from this debate, instead conducted some research on the event.  I

15  wanted to learn about what happened and whether there was any

16  background to the events of the day that the event occurred, 12 July

17  2007.

18        Using Google, I searched for the event by its date and

19  general location.  I found several news accounts involving two

20  Reuters employees who were killed during the aerial weapon team's

21  engagement.  Another story explained that Reuters had requested for a

22  video -- requested for a copy of the video under the Freedom of

23  Information Act or FOIA.  Reuters wanted to view the video in order

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 103 of 211 PageID# 209
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 102 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 29 of 57 PageID# 105

10598

1    to be able to understand what had happened and to improve their

2    safety practices in combat zones.  A spokesperson for Reuters was

3    quoted saying that the video might help avoid a reoccurrence of the

4    tragedy and believed there was a compelling need for the immediate

5    release of the video.

6              Despite the submission of the FOIA request, the news

7    account explained that CENTCOM replied to Reuters stating that they

8    could not give a timeframe for considering a FOIA request and that

9    the video may no longer -- might no longer exist.  Another story I

10   found, written a year later, said that, even though Reuters was still

11   pursuing their request, they still do not receive a formal response

12   or written determination in accordance with FOIA.

13             The fact that neither CENTCOM nor Multi-National Forces,

14   Iraq or MNF-I, would not voluntarily release the video troubled me

15   further.  It was clear to me that the event happened because the

16   aerial weapons team mistakenly identified the Reuters employees as a

17   potential threat and that the people in the bongo truck were merely

18   attempting to assist the wounded.  The people in the van were not a

19   threat, but were merely good Samaritans.

20             The most alarming aspect of the video, to me, however, was

21   the seemingly delightful bloodlust the aerial weapons -- they

22   appeared to have.  They dehumanized the individuals they were

23   engaging and seemed to not value human life by referring to them as

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 104 of 211 PageID# 210
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 103 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 30 of 57 PageID# 106

10597

1    "dead bastards" and congratulating each other on the ability to kill

2    in large numbers.  At one point in the video, there's an individual

3    on the ground attempting to crawl to safety; the individual is

4    seriously wounded.  Instead of calling for medical attention to the

5    location, one of the aerial weapons team crew members verbally asks

6    for the wounded person to pick up a weapon so that he can have a

7    reason to engage.  For me, this seems similar to a child torturing

8    ants with a magnifying glass.

9        While saddened by the aerial weapons teams crew -- or the

10   aerial weapon teams crew's lack of concern about human life, I was

11   disturbed by the response the discovery of injured children at the

12   scene.  In the video, you can see that the bongo truck driving up to

13   assist the wounded individual.  In response, the aerial weapons team

14   crew assumes the individuals are a threat.  They repeatedly request

15   for authorization to fire on the bongo truck and, once granted -- and

16   once granted, they engage the vehicle at least six times.

17       Shortly after the second engagement, a mechanized infantry

18   unit arrives at the scene.  Within minutes, the aerial weapons team

19   crew learns that the children -- that children were in the van and,

20   despite the injuries, the crew exhibits no remorse.  Instead, they

21   downplay the significance of their actions saying, "Well, it's their

22   fault for bringing their kids into a battle."  The aerial weapons

23   team crew members sound like they lack sympathy for the children or

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 105 of 211 PageID# 211
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 104 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 31 of 57 PageID# 107

10598

1  the parents.  Later, in a particularly disturbing manner, the aerial

2  weapons team crew verbalizes enjoyment at the sight of one of the

3  ground vehicles driving over a body -- or one of the bodies.

4        As I continued my research, I found an article discussing a

5  book, *The Good Soldiers*, written by *Washington Post* writer David

6  Finkel.  In Mr. Finkel's book, he writes about the aerial weapons

7  team attack.  As I read an online excerpt on Google Books, I followed

8  Mr. Finkel's account of the event along with the video.  I quickly

9  realized that Mr. Finkel was quoting, I feel, in verbatim, the audio

10 communications of the aerial weapons team crew.  It is clear to me

11 that Mr. Finkel obtained access and a copy of the video during his

12 tenure as an embedded journalist.

13       I was aghast at Mr. Finkel's portrayal of the incident.

14 Reading his account, one would believe the engagement was somehow

15 justified as payback for an earlier attack that led to the death of a

16 Soldier.

17       Mr. Finkel -- Mr. Finkel ends his account of the engagement

18 by discussing how a Soldier finds an individual still alive from the

19 attack.  He writes that the Soldier finds him and sees him gesture

20 with his two forefingers together, a common method in the Middle East

21 to communicate that they are friendly.  However, instead of assisting

22 him, the Soldier makes an obscene gesture extending his middle

23 finger.  The individual apparently dies shortly thereafter.  Reading

6767

**101**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 106 of 211 PageID# 212
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 105 of 337

Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 32 of 57 PageID# 108

10599

1   this, I can only think of how this person was simply trying to help

2   others and then quickly finds he needs help as well.  To make matters

3   worse, in the last moments of his life, he continues to express his

4   friendly -- this -- his friendly intent, only to find himself

5   receiving this well-known gesture of unfriendliness.  For me, it's

6   all a big mess and I'm left wondering what these things mean and how

7   it all fits together and it burdens me emotionally.

8            I saved a copy of the video on my workstation.  I searched

9   for and found the rules of engagement, the rules of engagement

10  annexes, and a flow chart from the 2007 time period as well as an

11  unclassified rules of engagement smart card from 2006.

12           On 15 February 2010, I burned these documents onto a CD-RW

13  the same time I burned the 10 Reykjavik 13 cable onto a CD-RW.  At

14  the time, I placed the video and rules of engagement information onto

15  my personal laptop in my CHU.  I planned to keep this information

16  there until I redeployed in summer of 2010.  I planned on providing

17  this to the Reuters office in London to assist them in preventing

18  events such as this in the future.  However, after the WLO published

19  10 Reykjavik 13, I altered my plans.  I decided to provide the video

20  and rules of engagement to them so that the -- so that Reuters would

21  have this information before I redeployed from Iraq.

22           On about 21 February 2010, as described above, I used the

23  WLO submission form and uploaded the documents.  The WLO released the

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 107 of 211 PageID# 213
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 106 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 33 of 57 PageID# 109

10600

1   video on 5 April 2010.  After the release, I was concerned about the

2   impact of the video and how it would be perceived by the general

3   public.  I hoped that the video would be -- I hoped that the public

4   would be as alarmed as me about the conduct of the aerial weapons

5   team members.  I wanted the American public to know that not everyone

6   in Iraq and Afghanistan were targets that needed to be neutralized,

7   but rather people who were struggling to live in the pressure cooker

8   environment of what we call asymmetric warfare.

9           After the release, I was encouraged by the response in the

10  media and general public who observed the aerial weapons team video.

11  As I hoped, others were just as troubled, if not more troubled than

12  me, by what they saw.

13          At this time, I began seeing reports claiming that the

14  Department of Defense and CENTCOM could not conform -- cannot confirm

15  the authenticity of the video.  Additionally, one of my supervisors,

16  Captain Casey Fulton, stated her belief that the video was not

17  authentic.  In her response, I decided to ensure that the

18  authenticity of the video would not be questioned in the future.

19          On 25 February 2010, I emailed Captain Fulton a link to the

20  video that was on our T-drive and a copy of the video published by

21  WLO that was collected by the open source Center so she could compare

22  them herself.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 108 of 211 PageID# 214
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 107 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 34 of 57 PageID# 110

10801

1      Around this time frame, I burned a second CD-RW containing

2    the aerial weapons team video.  In order to make it appear authentic,

3    I placed a classification sticker and wrote "Reuters FOIA REQ" on its

4    face.  I placed the CD-RW in one of my personal CD cases containing a

5    set of "Starting Out in Arabic" CDs.  I planned on mailing the CD-RW

6    to Reuters after I redeployed so that they could have a copy that was

7    unquestionably authentic.

8      Almost immediately after submitting the aerial weapons team

9    video and the rules of engagement documents, I notified the

10   individuals in the WLO IRC to expect an important submission.  I

11   received a response from an individual going by the handle of

12   "Office."  At first, our conversations were general in nature but

13   over time, as our conversations progressed, I assessed this

14   individual to be an important part of the WLO.

15     Due to the strict adherence of anonymity by the WLO, we

16   never exchanged identifying information.  However, I believe the

17   individual was likely Mr. Julian Assange, Mr. Daniel Schmidt, or a

18   proxy representative of Mr. Assange and Schmidt.

19     As the communications transferred from IRC to the Jabber

20   client, I gave "Office" and later "Press Association" the name of

21   Nathaniel Frank in my address book, after the author of -- after the

22   author of a book I read in 2009.  After a period of time, I developed

23   what I felt was a friendly relationship with Nathaniel.  Our mutual

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 109 of 211 PageID# 215
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 108 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 35 of 57 PageID# 111

10802

1  interest in information technology and politics made our

2  conversations enjoyable. We engaged in conversation often, sometimes

3  as long as an hour or more. I often looked forward to my

4  conversations with Nathaniel after work.

5      The anonymity that was provided by TOR, the Jabber client,

6  and the WLO's policy allowed me to feel I could just be myself, free

7  of the concerns of social labeling and perceptions that are often

8  placed upon me in real life. In real life, I lacked a close

9  friendship with the people I worked with in my section, the S-2

10 section, the S-2 sections in subordinate battalions, and the 2nd

11 Brigade Combat Team as a whole. For instance, I lacked close ties to

12 my roommate due to his discomfort regarding my perceived sexual

13 orientation.

14      Over the next few months, I stayed in frequent contact with

15 Nathaniel. We conversed on nearly a daily basis and I felt that we

16 were developing a friendship. The conversations covered many topics

17 and I enjoyed the ability to talk about pretty much anything and not

18 just the publications that the WLO was working on.

19      In retrospect, I realize that these dynamics were

20 artificial and were valued more by myself than Nathaniel. For me,

21 these conversations represented an opportunity to escape from the

22 immense pressures and anxiety that I experienced and built up

23 throughout the deployment. It seems that as I tried harder to fit in

6771

**105**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 110 of 211 PageID# 216
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 109 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 36 of 57 PageID# 112

10603

1   at work, the more I seemed to alienate my peers and lose respect,

2   trust, and the support I needed.

3          Facts regarding the unauthorized disclosure -- or

4   unauthorized storage and disclosure of documents related to the

5   detainments by the Iraqi Federal Police or FP and the Detainee

6   Assessment Briefs, and the USACIC -- United States Army

7   Counterintelligence Center report.  On 27 February 2010, a report was

8   received -- a report was received from a subordinate battalion.  The

9   report described an event in which the Federal Police detained, or

10  FP, detained 15 individuals for printing anti-Iraqi literature.

11          By 2 March 2010, I received instructions from an S-3

12  section officer in the 2nd Brigade Combat Team, 10th Mountain

13  Division Tactical Operations Center or TOC to investigate the matter

14  and figure out who these "bad guys" were and how significant this

15  event was for the Federal Police.

16          Over the course of my research, I found that none of the

17  individuals had previous ties to anti-Iraqi actions or suspected

18  terrorist militia groups.  A few hours later, I received several

19  photos from the scene from the subordinate battalion.  They were

20  accidentally sent to an officer on a different team than the S-2

21  section and she forwarded them to me.  These photos included pictures

22  of the individuals, pallets of unprinted paper, and seized copies of

23  the final printed material -- or printed document and a high-

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 111 of 211 PageID# 217
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 110 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 37 of 57 PageID# 113

10604

1    resolution photo of the printed material itself.  I printed a blown

2    up copy of the high-resolution photo, I laminated it for ease of use

3    and transfer, I then walked to the TOC, and delivered the laminated

4    copy to our category two interpreter.  She reviewed the information

5    and, about a half an hour later, delivered a rough, written

6    transcript in English to the S-2 section.  I read the transcript and

7    followed up with her asking her for her take on the contents.  She

8    said it was easy for her to transcribe verbatim since I blew up the

9    photograph and laminated it.  She said the general nature of the

10   document was benign.

11          The documentation, as I assessed as well, was merely a

12   scholarly critique of the, then, current Iraqi prime minister, Nouri

13   al-Maliki.  It detailed corruption with the cabinet of al-Maliki's

14   government and the financial impact of his corruption on the Iraqi

15   people.

16          After discovering this discrepancy between the Federal

17   Police's report and the interpreter's transcript, I forwarded this

18   discovery to the TOC OIC and the Battle NCOIC.  The TOC OIC and the

19   overhearing Battle Captain informed me that they didn't want -- or

20   that they didn't need or want to know this information any more.

21   They told me to "drop it" and to just assist them and the Federal

22   Police in finding out where more of these print shops creating "anti-

23   Iraqi literature" might be.  I couldn't believe what I heard -- or I

6773

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 112 of 211 PageID# 218
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 111 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 38 of 57 PageID# 114

10605

1  couldn't believe what I heard and I returned to the T-SCIF and

2  complained to the other analysts and my section NCOIC about what

3  happened.  Some were sympathetic, but none wanted to do anything

4  about it.  I'm the type of person who likes to know how things work,

5  and, as an analyst, this means I always want to figure out the truth.

6  Unlike other analysts in my section or other sections within the 2nd

7  Brigade Combat Team, I was not satisfied with just scratching the

8  surface of producing canned or cookie-cutter assessments.  I wanted

9  to know why something was the way it was and what we could do to

10  correct or mitigate a situation.

11        I knew that if I continue to assist the Baghdad Federal

12  Police in identifying the political opponents of Prime Minister al-

13  Maliki, those people would be arrested and in the custody of the

14  Special Unit of the Baghdad Federal Police, very likely tortured and

15  not seen again for a very long time, if ever.

16        Instead of assisting the Special Unit of the Baghdad

17  Federal Police, I had decided to take the information and disclose it

18  to the WLO in the hope that, before the upcoming 7 March 2010

19  election, they could generate some immediate press on the issue and

20  prevent this unit of the Federal Police from continuing to crack down

21  on political opponents of al-Maliki.

22        On 4 March 2010, I burned the report, the photos, the high-

23  resolution copy of the pamphlet, and the interpreter's hand-written

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 113 of 211 PageID# 219
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 112 of 337

Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 39 of 57 PageID# 115

10606

1    transcript onto a CD-RW.  I took the CD-RW to my CHU and copied the

2    data onto my personal computer.  Unlike the times before, instead of

3    uploading the information through the WLO website's submission form,

4    I made a Secure File Transfer Protocol or SFTP connection to a Cloud

5    drop box operated by the WLO.  The drop box contained a folder that

6    allowed me to upload directly into it.  Saving files into this

7    directory allowed me -- allowed anyone with log in access to the

8    server to view and download them.  After downloading these file -- or

9    after uploading these files to the WLO on 5 March 2010, I notified

10   Nathaniel over Jabber.

11           Although sympathetic, he said that the WLO needed more

12   information to confirm the event in order for it to be published or

13   to gain interest in the international media.  I attempted to provide

14   these specifics, but, to my disappointment, the WLO website chose not

15   to publish this information.  At the same time, I began sifting

16   through information from the U.S. SOUTHCOM -- or U.S. Southern

17   Command or SOUTHCOM and Joint Task Force Guantánamo, Cuba or JTF-

18   GTMO.  The thought occurred to me, although unlikely -- that I

19   wouldn't be surprised if the -- although unlikely -- that I wouldn't

20   be surprised if the individuals detained by the Federal Police might

21   be turned over back into U.S. custody and ending up in the custody of

22   Joint Task Force Guantánamo.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 114 of 211 PageID# 220
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 113 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19·  Page 40 of 57 PageID# 116

10607

1    As I digested -- as I digested through the information on

2    Joint Task Force Guantánamo, I quickly found the Detainee Assessment

3    Briefs or DABs.  I previously came across these documents before in

4    2009 but did not think much of them.  However, this time, I was more

5    curious during this search and I found them again.

6    The DABs were written in standard DoD memorandum format and

7    addressed the Commander, U.S. SOUTHCOM.  Each memorandum gave basic

8    and background information about a specific detainee held, at some

9    point, by Joint Task Force Guantánamo.  I have always been interested

10   on the issue of the moral efficacy of our actions surrounding Joint

11   Task Force Guantánamo.  On the one hand, I've always understood the

12   need to detain and interrogate individuals who might wish to harm the

13   United States and our allies, however, I felt that there -- that that

14   was -- however, I felt that's what we were doing -- what we were

15   trying to do at Joint Task Force Guantánamo.  However, the more I

16   became educated on the topic, it seemed that we found ourselves

17   holding an increasing number of individuals indefinitely that we

18   believed, or knew, to be innocent, low-level foot support -- low-

19   level foot soldiers that we didn't -- that did not have useful

20   intelligence and would be released if they were still in theater --

21   if they were still held in theater.

22   I also recall that, in early 2009, the then newly elected

23   president, Barack Obama, stated that he would close Joint Task Force

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 115 of 211 PageID# 221
USCA4 Appeal: 19-1287     Doc: 10-2         Filed: 03/29/2019     Pg: 114 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 41 of 57 PageID# 117

10608

1   Guantánamo and that the facility compromised our standing in the

2   world and diminished our "moral authority." After familiarizing

3   myself with the Detainee Assessment Briefs, I agreed. Reading

4   through the Detainee Assessment Briefs, I noticed that they were not

5   analytical products. Instead, they contained summaries of tear-line

6   versions of interim intelligence reports that were old or

7   unclassified. None of the DABs contained names of sources or quotes

8   from a Tactical Interrogation Reports or TIRs. Since the DABs were

9   being sent to the U.S. SOUTHCOM Commander, I assessed that they were

10   intended to provide very general background information on each

11   detainee and not a detailed assessment.

12        In addition to the manner in which DABs were written, I

13   recognized that they were at least several years old and discussed

14   detainees that were already released from Joint Task Force

15   Guantánamo. Based on this, I determined that the DABs were not very

16   important from either an intelligence or national security

17   standpoint.

18        On 7 March 2010, during my Jabber conversations with

19   Nathaniel, I asked him if he thought the DABs were of any use to

20   anyone. Nathaniel indicated, although he didn't -- did not believe

21   that they were of political significance, he did not believe -- he

22   did believe that they could be used to merge into the general,

23   historical account of what occurred at Joint Task Force Guantánamo.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 116 of 211 PageID# 222
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 115 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 42 of 57 PageID# 118

10609

1   He also thought that the DABs might be helpful to a legal counsel of

2   those currently and previously held at JTF-GTMO.

3           After this discussion, I decided to download the DABs.  I

4   used an application called Wget to download the DABs.  I downloaded

5   Wget off of the NIPRNET laptop in the T-SCIF like other programs.  I

6   saved that onto a CD-RW and placed the executable in my My Documents

7   directory of my user profile on the DCGS-A SIPRNET workstation.

8           On 7 March 2010, I took the list of four link -- I took the

9   list of links for the Detainee Assessment Briefs and Wget downloaded

10  them sequentially.  I burned the DABs onto a CD-RW and took it into

11  my CHU and copied them to my personal computer.

12          On 8 March 2010, I combined the Detainee Assessment Briefs

13  with the United States Army Counterintelligence Center Report on the

14  -- on the WLO into a compressed zip file.  Zip files contain multiple

15  files which are compressed to reduce their size.  After creating the

16  zip file, I uploaded the file onto their Cloud drop box via Secure

17  File Transfer Protocol.  Once these were uploaded, I notified

18  Nathaniel that the information was in the X directory which had been

19  designated for my use.

20          Earlier that day, I downloaded the USACIC report on WLO.

21  As discussed above, I previously reviewed the report on numerous

22  occasions and, although I saved the document onto the workstation

23  before, I could not locate it.  After I found the document again, I

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 117 of 211 PageID# 223
USCA4 Appeal: 19-1287   Doc: 10-2        Filed: 03/29/2019     Pg: 116 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 43 of 57 PageID# 119

10610

1   downloaded it to my workstation and saved it onto the same CD-RW as

2   the Detainee Assessment Briefs described above.

3        Although my access included a great deal of information, I

4   decided I had nothing else to send the WLO after sending the Detainee

5   Assessment Briefs and the USACIC report.  Up to this point, I had

6   sent them the following:  the CIDNE-I and CIDNE-A SIGACT tables; the

7   Reykjavík 13 Department of State cable; the 12 July 2007 aerial

8   weapons team video and the 2006-2007 rules of engagement documents;

9   the SIGACT report and supporting documents concerning the 15

10  individuals detained by the Baghdad Federal Police; the U.S. SOUTHCOM

11  and Joint Task Force Guantánamo Detainee Assessment Briefs; the

12  USACIC report on the WikiLeaks website -- on the WikiLeaks

13  organization and website.

14        Over the next -- over the next few weeks, I did not find --

15  or I did not send any additional information to the WLO.  I

16  considered -- I continued to converse with Nathaniel over the Jabber

17  client and in the WLO IRC channel.  Although I stopped sending

18  documents to WLO, no one associated with the WLO pressured me into

19  giving more information.  The decisions that I made to send documents

20  and information to the WLO and website were my own decisions and I

21  take full responsibility for my actions.

22        Facts regarding the unauthorized storage and disclosure of

23  other government documents.  On 22 March 2010, I downloaded two

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 118 of 211 PageID# 224
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 117 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 44 of 57 PageID# 120

10611

1    documents.  I found these documents over the course of my normal

2    duties as an analyst.  Based on my training and the guidance of my

3    superiors, I looked at as much information as possible.  Doing so

4    provided me with the ability to make connections others might miss.

5    On several occasions during the month of March, I accessed

6    information from a government entity.  I read several documents from

7    a section within this government entity.  The content of two of these

8    documents upset me greatly.  I have difficulty believing what this

9    section was doing.

10           On 22 March 2010, I downloaded the two documents that I

11   found troubling, I compressed them into a zip file named "blah.zip"

12   and burned them onto a CD-RW.  I took the CD-RW to my CHU and saved

13   the file to my personal computer.  I uploaded the information to the

14   WLO website using the designated drop box.

15           Facts regarding the unauthorized storage and disclosure of

16   the Net-Centric Diplomacy Department Of State cables.  In late March

17   of 2010, I received a warning over Jabber from Nathaniel that the WLO

18   website would be publishing the aerial weapons team video.  He

19   indicated that the WLO would very likely -- would be very busy and

20   the frequency and intensity of our Jabber conversations decreased

21   significantly.

22           During this time, I had nothing but work to distract me.  I

23   read more of the diplomatic cables published on the Department of

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 119 of 211 PageID# 225
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 118 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 45 of 57 PageID# 121

10812

1  State Net-Centric Diplomacy server.  With my insatiable curiosity and

2  interest in geopolitics, I became fascinated with them.  I read not

3  only the cables on Iraq, but also about countries and events I found

4  interesting.  The more I read, the more I was fascinated by the way

5  we dealt with other nations and organizations.  I also began to think

6  that they documented backdoor deals and seemingly criminal activity

7  that didn't seem characteristic of the de facto leader of the free

8  world.

9         Up to this point, during deployment, I had issues that I

10  struggled with and difficulty at work.  Of the documents released,

11  the cables were the only ones I was not absolutely certain wouldn't -

12  - couldn't harm the United States.  I conducted research on the

13  cables published on the net -- on Net-Centric Diplomacy, as well as

14  how Department of State cables work in general.  In particular, I

15  wanted to know how each cable was published on SIPRNET via the Net-

16  Centric Diplomacy.

17         As part of my open-source research, I found a document

18  published by the Department of State on its official website.  The

19  document provided guidance on caption markings for individual cables

20  and handling instructions for their distribution.  I quickly learned

21  that the caption markings clearly detailed the sensitivity level of a

22  Department of State cable.  For example, "NODIS," or "No

23  Distribution," was used for messages of the highest sensitivity and

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 120 of 211 PageID# 226
USCA4 Appeal: 19-1287 . Doc: 10-2 Filed: 03/29/2019 Pg: 119 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 46 of 57 PageID# 122

10613

1   were only distributed to the authorized recipients. The SIPDIS or

2   SIPRNET Distribution caption was applied only to reporting at other

3   information messages that were deemed appropriate for a release of a

4   wide number -- to a wide number of individuals.

5        According to the Department of State guidance for a cable

6   to have the SIPDIS -- that caption, it could not include other

7   captions that were intended to limit distribution. The SIPDIS

8   caption was only for information that could be shared with anyone

9   with access to SIPRNET. I was aware that thousands of military

10  personnel, DoD, Department of State, and other civilian agencies have

11  easy access to the cables and the fact that the SIPDIS caption was

12  only for wide distribution made sense to me, given that the vast

13  majority of the Net-Centric Diplomacy cables were not classified.

14  The more I read the cables, the more I came to the conclusions that

15  this was the type of information that should be -- that this type of

16  information should become public. I once read and used a quote on

17  open diplomacy written after the First World War and how the world

18  would be a better place if states would avoid making secret pacts and

19  deals with and against each other.

20       I thought these cables were a prime example of a need for a

21  more open diplomacy. Given all the Department of State information I

22  read, the fact that most of the cables were unclassified and that all

23  the cables had the SIPDIS caption, I believed that the public release

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 121 of 211 PageID# 227
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 120 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 47 of 57 PageID# 123

10814

1   of these cables would not damage the United States.  However, I did

2   believe the cables might be embarrassing, since they represented very

3   honest opinions and assessments behind or statements behind the backs

4   of other nations and organizations.

5          In many ways, these cables are a catalog of cliques and

6   gossip.  I believe exposing this information might make some within

7   the Department of State and other government entities unhappy.  On 22

8   March 2010, I began downloading a copy of the SIPDIS cables using the

9   program Wget described above.  I used instances of the Wget

10  application to download the Net-Centric Diplomacy cables in the

11  background.  As I worked on my daily tasks, the Net-Centric Diplomacy

12  cables were downloaded from 28 March 2010 to 9 April 2010.  After

13  downloading the cables, I saved them onto a CD-RW.  These cables went

14  from the earliest dates in Net-Centric Diplomacy to 28 February 2010.

15  I took the CD-RW to my CHU on 10 April 2010.  I sorted the cables on

16  my personal computer, compressed them using the bzip2 compression

17  algorithm described above and uploaded them to the WLO via the

18  designated drop box described above.

19         On 3 May 2010, I used Wget to download an update of the

20  cables for the months of 20 -- for the months of March 2010 and April

21  2010 and saved the information onto a zip file and burn it to a CD-

22  RW.  I took -- I then took the information--I then took the CD-RW to

23  my CHU and saved them to my computer.  I later found that the file

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 122 of 211 PageID# 228
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 121 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 48 of 57 PageID# 124

10615

1  was corrupted during the transfer. Although I intended to re-save

2  another copy of these cables, I was removed from the T-SCIF on 8 May

3  2010 after an altercation.

4       Facts regarding the unauthorized storage and disclosure of

5  the Garani Farah Province, Afghanistan 15-6 investigation and videos.

6  In late March 2010, I discovered a U.S. CENTCOM directory only 2009

7  airstrike in Afghanistan. I was searching CENTCOM for information I

8  could use as an analyst. As described above, this was something that

9  myself and other analysts and officers did on a frequent basis. As I

10 reviewed the documents, I recalled the incident and what happened.

11 The airstrike occurred in the Garani Village of the Farah Province in

12 northwestern Afghanistan. They receive worldwide press and --

13 worldwide press coverage during the time as it was reported that up

14 to 100 to 150 Afghan civilians, mostly women and children, were

15 accidentally killed during the airstrike.

16      After going through the report and its annexes, I began to

17 review the incident as being similar to the 12 July 2007 aerial

18 weapons team engagements in Iraq. However, this event was noticeably

19 different in that it involved a significantly higher number of

20 individuals, larger aircraft, and much heavier munitions. Also, the

21 conclusion of the report are even more disturbing than those of the

22 12 July 2007 incident. I did not see anything in the 15-6 report or

23 its annexes that give away sensitive information. Rather, the

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 123 of 211 PageID# 229
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 122 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 49 of 57 PageID# 125

10816

1  investigation and its conclusions help explain how this incident

2  occurred and what those involved should have done and how to avoid an

3  event like this from occurring again.

4          After investigating the report and its annexes, I

5  downloaded the 15-6 investigation, PowerPoint presentations, and

6  several other supporting documents to my DCGS-A workstation.  I also

7  downloaded three zip files containing the videos of the incident.  I

8  burned this information onto a CD-RW and transferred it to the

9  personal computer in my CHU.  Either later that day or the next day I

10  uploaded the information to the WLO website, this time using a new

11  version of the WLO website submission form.  Unlike other times using

12  the submission form above, I did not activate the TOR annonymizer.

13          Your Honor, this concludes my statement and facts for this

14  providence inquiry.

15      MJ:  All right.  Looking at the time, my proposal for the way

16  forward would be to take the recess that we were discussing earlier,

17  go over the charged documents briefly, and then recess for lunch and

18  then begin the rest of the providence inquiry.  Is that acceptable to

19  both sides or would you prefer something different?

20      CDC[MR.COOMBS]:  That's fine with the defense, Your Honor.

21      TC[MAJ FEIN]:  Yes, ma'am, the United States asks for 10 minutes

22  for that recess.

23      MJ:  All right.  Court is in recess until 25 minutes after 12.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 124 of 211 PageID# 230
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 123 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 50 of 57 PageID# 126

10817

1   [The Article 39(a) session recessed at 1217, 28 February 2013.]

2   [The Article 39(a) session was called to order at 1231, 28 February

3   2013.]

4       MJ:   This Article 39(a) session is called to order.  Let the

5   record reflect that all parties present when the court last recessed

6   are again present in court.

7           Now, Major Fein, I understand there has been an additional

8   appellate exhibit marked.  Would you like to describe it for the

9   record?

10      TC[MAJ FEIN]:  Yes, ma'am, Appellate Exhibit -- what has been

11  marked as Appellate Exhibit 501 is a compilation -- two different

12  binders combined all the different charged documents for which

13  Private First Class Manning is pleading guilty today to.  And, also,

14  for the record, Private First Class Manning is currently located at

15  the panel box in the back row with a copy of Appellate Exhibit 501

16  and a charge sheet in front of him.  Another copy of the Appellate

17  Exhibit 501 -- the record copy is excuse me, the record copy is in

18  front of Private First Class Manning and the Court has a copy in

19  front of her as well.

20      MJ:  All right.  Thank you.  All right, PFC Manning, what I'd

21  like to do is go through -- there are two binders; do you have a copy

22  of them in front of you?

23      ACC:  Yes, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 125 of 211 PageID# 231
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 124 of 337
Case 1:19-dm-00003-CMH   Document 5-5   Filed 03/04/19   Page 51 of 57 PageID# 127

10818

1        MJ:  All right.  I like to go through Appellate Exhibit 501 and

2   have you looked through the binder with me when we go through this to

3   make sure that you either identify or don't -- whether these

4   documents are the actual charged documents that your pleading guilty

5   to.

6            Let's look at tab one ----

7        ACC: Yes, Your Honor.

8        MJ:  ---- which would be the charged documents for Charge II,

9   Specification 2, which would be a video file named "12 July 07 CZ

10   Engagement Zone 30 GC Anyone.avi".  Now, you're looking at a video.

11   Have you had an opportunity to look at this video?

12       ACC: Yes, Your Honor.

13       MJ:  And is it the video that has been charged in the -- in

14   Specification 2 of Charge II?

15       ACC: Yes, Your Honor.

16       MJ:  All right.  Now, unlike the rest of the charges, this one

17   says, "a video file."  So, is it classified or not classified?

18       ACC: It is not, Your Honor.

19       MJ:  All right.  Thank you.  Let's look at tab two.  Please take

20   a look at the documents through tab two and let me know when you're

21   finished.

22   [The accused did as directed.]

23       ACC: I'm finished, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 126 of 211 PageID# 232
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 125 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 52 of 57 PageID# 128

10819

1    MJ:  Are the pages on tab -- enclosed in tab two the charged

2    documents in Specification 3 of Charge II which would be more than

3    one classified memorandum produced by a United States Government

4    agency?

5        ACC:  Yes, Your Honor.

6        MJ:  All right.  And are they, in fact, classified?

7        ACC:  They are, Your Honor, yes.

8        MJ:  Let's look at tab three.  Once again, same procedure for

9    all these tabs, just take a look through them and let me know when

10   you're finished.

11   **[The accused did as directed.]**

12       ACC:  I'm finished, Your Honor.

13       MJ:  All right.  Are the pages at tab three the charged

14   documents in Specification 15 which would be a classified record

15   produced by a United States Army intelligence organization?

16       ACC:  Yes, Your Honor.

17       MJ:  Okay.  And are  they, in fact, classified as well?

18       ACC:  Yes, Your Honor.

19       TC[MAJ FEIN]:  Your Honor, I'm sorry to interrupt, but is it

20   possible that Private First Class Manning put the binder in his lap

21   just while he's flipping the pages?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 127 of 211 PageID# 233
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 126 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 53 of 57 PageID# 129

10820

1     MJ:  All right.  I think the goal is -- yeah, just keep it down.

2  Thank you PFC Manning.  I know this is making it a little bit more

3  difficult.  Let's look at tab four.

4     ACC: Yes, Your Honor.

5     MJ:  All right.  Are you finished with the documents in tab

6  four?

7     ACC: I am, Your Honor.

8     MJ:  Are those the charge documents for Specification 5 of

9  Charge II which would be more than 20 classified records from the

10  Combined Information Data Network Exchange-Iraq database?

11    ACC: They are, Your Honor.

12    MJ:  And are they classified as well?

13    ACC: Yes.

14    MJ:  All right.  Let's look at tab five.

15    ACC: Yes, Your Honor.

16    MJ:  All right.  Are these documents at tab five the charged

17  documents for Specification 7 of Charge II that would be more than 20

18  classified records from the Combined Information Data Network

19  Exchange-Afghanistan database?

20    ACC: They are, Your Honor.

21    MJ:  All right.  And there they classified as well?

22    ACC: Yes, Your Honor.

23    MJ:  Let's look at tab six.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 128 of 211 PageID# 234
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 127 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 54 of 57 PageID# 130

10621

1      ACC: Yes, Your Honor.

2      MJ:  All right.  Are the documents at tab six the charged

3   documents for Specification 9 of Charge II, that is, more than three

4   classified records from the United States Southern Command database?

5      ACC: It is, Your Honor.

6      MJ:  Are they classified as well?

7      ACC: Yes, Your Honor, they are.

8      MJ:  All right.  Let's look at tab seven.

9      ACC: I'm finished, Your Honor.

10      MJ:  Are the documents at enclosure seven the charged documents

11   in Specification 10 of Charge II that would be more than five

12   classified records relating to the military operation in Farah

13   Province, Afghanistan occurring on or about 4 May 2009?

14      ACC: They are, Your Honor.

15      MJ:  And are they classified as well?

16      ACC: Most of it is, Your Honor.

17      MJ:  Let's look at tab eight.

18      ACC: Yes, Your Honor.

19      MJ:  Is this the document that is charged in Specification 14 of

20   Charge II which would be a classified Department of State cable

21   entitled Reykjavik 13?

22      ACC: It is, Your Honor.

23      MJ:  Is a classified?

6790

1        ACC: Yes, ma'am.

2        MJ:  All right.  Let's look at enclosure nine.

3        ACC: I am finished, Your Honor.

4        MJ:  All right.  Are the documents at tab nine the charged

5     documents in Specification 13 of Charge II which would be more than

6     75 classified United States Department of State cables?

7        ACC: Yes, ma'am.

8        MJ:  Are they class -- you testified earlier that most of the

9     Department of State cables were not classified.  Are these documents

10    in enclosure nine classified?

11       ACC: These ones, yes, Your Honor.

12       MJ:  And are you convinced there's over 70 -- more than 75 of

13    them?

14       ACC: Yes, Your Honor, definitely.

15       MJ:  Does either side desire any further inquiry with respect to

16    Appellate Exhibit 501?

17       TC[MAJ FEIN]:  No, Your Honor.

18       CDC[MR.COOMBS]:  No, Your Honor.

19       MJ:  All right.  This appears to be a good time to break for

20    lunch.  How long would the parties like?

21       CDC[MR.COOMBS]:  1400.

22       MJ:  Does that work for the government?

23       TC[MAJ FEIN]:  Yes, ma'am.

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 130 of 211 PageID# 236
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 129 of 337
Case 1:19-dm-00003-CMH Document 5-5 Filed 03/04/19 Page 56 of 57 PageID# 132

10623

1    MJ:  All right.  Court is in recess until 1400.

2    [The Article 39(a) session recessed at 1244, 28 February 2013.]

3    [The Article 39(a) session was called to order at 1408, 28 February

4    2013.]

5    MJ:  This Article 39(a) session is called to order.  Let the

6    record reflect all parties present when the court last recessed are

7    again present in court.

8    TC[MAJ FEIN]:  Ma'am, for the record, Private First Class

9    Manning is back at counsel's table.

10    MJ:  All right.  Okay, PFC Manning, let's continue on, then,

11    with your providence inquiry.

12    ACC:  Yes, ma'am.

13    MJ:  All right.  I'm going to explain the elements of the

14    offenses for which you've pled guilty.

15    By "elements," I mean those facts which the prosecution

16    would have to prove beyond a reasonable doubt before you could be

17    found guilty if you have pled not guilty.  When I state each element,

18    ask yourself two things:  first, is the element true and, second,

19    whether you want to admit that it's true.  After I list the elements

20    for you, be prepared to talk to me about the facts regarding the

21    offenses.

22    I want you to take a look at Specifications 2, 3, 5, 7, 9,

23    10, and 15 of Charge II as you pled them.  These specifications

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 131 of 211 PageID# 237
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 130 of 337
Case 1:19-dm-00003-CMH  Document 5-5  Filed 03/04/19  Page 57 of 57 PageID# 133

10624

1   allege the offense of -- as originally charged, alleged the offense

2   of transmitting defense information in violation of Title 18, United

3   States Code section 793(e) and Article 134, UCMJ.  Your counsel has

4   entered a plea of guilty by exceptions and substitutions for you to

5   the lesser included offense of conduct prejudicial to good order and

6   discipline and service discrediting conduct under Article 134,

7   clauses one and two.  By pleading guilty to this offense, you're

8   admitting that the following elements are true and accurately

9   describe what you did:

10           Element one:  that, at or near Contingency Operating

11   Station Hammer, Iraq;

12           Specification two:  between on or about 14 February 2010

13   and 21 February 2010, you, without authorization, had possession of,

14   access to, or control over a video named "12 July 07 CZ Engagement

15   Zone 30 GC Anyone.avi".

16           Specification 3:  between on or about 17 March and 22 March

17   2010, you, without authorization, had possession of, access to, or

18   control over more than one classified memorandum produced by a United

19   States Government agency.

20           Specification 5:  between on or about 5 January 2010 and 3

21   February 2010, you, without authorization, had possession of, access

22   to, or control over more than 20 classified records from the Combined

23   Information Data Network Exchange-Iraq database.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 132 of 211 PageID# 238
USCA4 Appeal: 19-1287     Doc: 10-2         Filed: 03/29/2019    Pg: 131 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 1 of 79 PageID# 134

10625

1         Specification 7:  between on or about 5 January 2010 and 3

2  February 2010, you, without authorization, had possession of, access

3  to, or control over more than 20 classified records from the Combined

4  Information Data Network Exchange-Afghanistan database.

5         Specification 9:  on or about 8 March 2010, you, without

6  authorization, had possession of, access to, or control over more

7  than three classified records from a United States Southern Command

8  database.

9         Specification 10:  between on or about 10 April 2010 and 12

10  April 2010, you, without authorization, had possession of, access to,

11  or control over more than five classified records relating to a

12  military operation in Farah Province, Afghanistan, occurring on or

13  about 4 May 2009.

14         And Specification 15:  on or about 8 March 2010, you,

15  without authorization, had possession of, access to, or control over

16  a classified record produced by a United States Army intelligence

17  organization, dated 18 March 2008.

18         Elements common to all specifications, element two:

19         That you willfully communicated the classified records,

20  classified memorandum, videos, and files described for each

21  specification in element one to a person not authorized to receive

22  it; and

6794

**128**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 133 of 211 PageID# 239
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 132 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 2 of 79 PageID# 135

10826

1           Three:  that under the circumstances, your conduct was to

2    the prejudice of good order and discipline in the armed forces or was

3    of a nature to bring discredit upon the armed forces.

4           All right.  Some definitions that apply to these offenses

5    are:

6           "Conduct prejudicial to good order and discipline" is

7    conduct which causes a reasonably direct and obvious injury to good

8    order and discipline.

9           "Service discrediting conduct" is conduct which tends to

10   harm the reputation of the service or lower it in public esteem.

11          With respect to good order and discipline, the law

12   recognizes that almost any irregular or improper act on the part of a

13   service member could be regarded as prejudicial in some indirect or

14   remote sense.  However, only those acts in which the prejudice is

15   reasonably direct and palpable is punishable under this article.

16          With respect to service discrediting, the law recognizes

17   that almost any irregular or improper act on the part of a

18   Servicemember could be regarded as service discrediting in some

19   indirect or remote sense.  However, only those acts which would have

20   a tendency to bring the service into disrepute or which tend to lower

21   it in public esteem are punishable under this article.  Under some

22   circumstances, your conduct may not be prejudicial to good order and

23   discipline, but, nonetheless, be service discrediting as I've

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 134 of 211 PageID# 240
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 133 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 3 of 79 PageID# 136

10627

1  explained those terms.  Likewise, depending on the circumstances,

2  your conduct could be prejudicial to good order and discipline but

3  not be service discrediting.

4        An act is done willfully if it is done voluntarily and

5  intentionally and with the specific intent to do something the law

6  forbids, that is, with a bad purpose to disobey or disregard the law.

7        "Possession" means the act of having or holding property or

8  the detention of property in one's power or command.  Possession may

9  mean actual, physical possession or constructive possession.

10  "Constructive possession" means having the ability to exercise

11  dominion or control over an item.  Possession inherently includes the

12  power or authority to preclude control by others.  It is possible for

13  more than one person to possess an item simultaneously as when

14  several people share control of an item.

15        A person has unauthorized possession of documents,

16  photographs, videos, or computer files when he possesses such

17  information under circumstances or in a location which is contrary to

18  law or regulation for the conditions of his employment.

19        If this was before a trier of fact, whether the person

20  received the information was entitled to have it, the trier of fact

21  would consider all the evidence introduced at trial, to include any

22  evidence concerning the classification status of the information, any

23  evidence relating to the laws and regulations governing

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 135 of 211 PageID# 241
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019     Pg: 134 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 4 of 79 PageID# 137

10628

1    classification and declassification of national security information,

2    its handling and distribution, as well as any evidence relating to

3    regulations governing the handling, use, and distribution of

4    information obtained from classification systems.

5          The term "person" means any individual, firm, corporation,

6    education institution, financial institution, government entity, or

7    legal or other entity.

8          Do you understand the elements and the definitions as I've

9    read them to you?

10    ACC: Yes, Your Honor.

11    MJ:  Do you have any questions about them?

12    ACC: No, ma'am.

13    MJ:  You understand that your plea of guilty admits that these

14    elements accurately describe what you did?

15    ACC: Yes, Your Honor.

16    MJ:  Do you believe and admit that the elements and definitions,

17    taken together, correctly describe what you did?

18    ACC: Yes, Your Honor.

19    MJ:  All right.  Now, do you understand that, as we talked about

20    before, that you're -- If I accept your plea to these lesser included

21    offenses and the government decides to go forward with the greater

22    offenses, your plea is going to establish some -- the elements we

23    talked about earlier -- some of the elements for the greater offense.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 136 of 211 PageID# 242
USCA4 Appeal: 19-1287     Doc: 10-2         Filed: 03/29/2019     Pg: 135 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 5 of 79 PageID# 138

10629

1          Do you understand that?

2      ACC: Yes, Your Honor.

3      MJ:  Okay.  All right.  Why don't we go -- we'll just go in

4  order, here.  Why don't we start with Specification 2 of Charge II?

5  But, before we get there, let's just talk in generalities.  You went

6  over some of this in your statement and, as we go through this, I may

7  be asking you just to orient me in your statement where you talked

8  about the particular specifications involved.

9      ACC: Yes, Your Honor.

10      MJ:  But, just in the beginning, you told me earlier -- you

11  testified earlier that you were in the Army for about 5 1/2 years, is

12  that accurate?

13      ACC: Just under, yes, ma'am.

14      MJ:  Okay.  And were you in -- at -- stationed at Fort Drum, New

15  York before you deployed?

16      ACC: I was in training before I deployed -- well -- yes, Your

17  Honor.

18      MJ:  Okay.  Well, just briefly walk me through, then.  You came

19  into the Army and you said your basic training lasted a little bit

20  longer than usual?

21      ACC: Yes, Your Honor.

22      MJ:  And then when did you go to AIT?

23      ACC: That would've been April of 2008, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 137 of 211 PageID# 243
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 136 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 6 of 79 PageID# 139

10630

1    MJ:  Okay.  And you were an intelligence analyst?

2    ACC: Yes, Your Honor.

3    MJ:  And, just in a nutshell, what do intelligence analysts --

4  what do they train you to do with classified information?

5    ACC: Well, one of the first things that they teach at -- or

6  whenever I went through training was -- one of the first things that

7  they teach us -- is information security which is mostly talking

8  about classified information, specifically, Your Honor.

9    MJ:  In your training, did they tell you -- who gets to classify

10  information in the United States?

11    ACC: The original classification authorities, they have the

12  actual authority, although they can delegate that authority from my

13  understanding, Your Honor.

14    MJ:  Okay.  And if a person isn't an original classification

15  authority or delegate, do they have the authority to classify

16  information?  At the original level?

17    ACC: At the original level, no, Your Honor.

18    MJ:  What about to declassify information?

19    ACC: I don't know that, Your Honor.  I think it requires the

20  original classification authority's approval, Your Honor.

21    MJ:  Okay.  So, you went to AIT and you learned about

22  information security?

23    ACC: Yes, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 138 of 211 PageID# 244
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 137 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 7 of 79 PageID# 140

10631

1        MJ:  And then what happened?  Where did you go after AIT?

2        ACC: I went -- I traveled to Fort Drum and then I stayed there

3    until I deployed, Your Honor.

4        MJ:  And you were still on a training status at that time?

5        ACC: We weren't officially -- I mean, I was in garrison, Your

6    Honor, but we spent most of our time -- I spent most of my time at

7    Fort Drum in some kind of training, Your Honor.

8        MJ:  You mean like Soldierly training as opposed to intelligence

9    class training?

10       ACC: Yes, Your Honor.

11       MJ:  Okay.

12       ACC: So we had TDY to different locations and we went to Fort

13   Polk for 2 months, Your Honor.

14       MJ:  Okay.  So your unit was gearing up to deploy, then, is that

15   right?

16       ACC: Yes, Your Honor.

17       MJ:  Okay.  And when did you deploy?

18       ACC: We deployed October of 2009, Your Honor.

19       MJ:  Okay.  And when you deployed, you said -- you testified you

20   were on FOB Hammer and that's in Iraq?

21       ACC: Yes, Your Honor.

22       MJ:  Okay.  What was your job there?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 139 of 211 PageID# 245
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 138 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 8 of 79 PageID# 141

10632

1    ACC: I was an analyst that had -- I had a particular problem set

2    as my assigned thing that I did.  It was -- we were militia -- I was

3    a militia expert -- there's a different name for it, but we didn't go

4    by that publicly, Your Honor.

5    MJ:  Okay.  And -- I'm not trying to elicit any classified

6    information, so if I'm heading that way, please stop me.

7    ACC: Yes, Your Honor.

8    TC[MAJ FEIN]:  Yes, ma'am.

9    MJ:  All right.  So, you are in Iraq -- where do you -- when

10   you're doing this intelligence analyst work, where are you doing it?

11   ACC: We were doing it in the temporary SCIF -- the temporary

12   Sensitive Compartmentalized Information Facility at the brigade

13   headquarters building that we had at FOB Hammer, Your Honor.

14   MJ:  So that's called a "SCIF"?

15   ACC: A T-SCIF, Your Honor.

16   MJ:  T-SCIF?  What's a SCIF?

17   ACC: A SCIF is a Sensitive Compartmentalized Information

18   Facility where information at higher -- there is a higher level of

19   sensitivity that the government has authorized these particular

20   locations to hold this information, Your Honor.

21   MJ:  Can anybody go into a SCIF?

22   ACC: No, Your Honor.

23   MJ:  What's a -- what are the requirements to go into a SCIF?

6801

**135**

10833

1    ACC: Generally, a -- you need to have an SCI or -- you have to

2    have an SCI clearance -- caveat to your security clearance or an

3    escort and they can lower -- you can make a SCIF clean -- you can

4    clean a SCIF for temporary visitors, Your Honor.

5    MJ:  Okay.  But you worked there permanently, is that correct?

6    ACC: Yes, Your Honor.

7    MJ:  And what was your clearance level at the time?

8    ACC: Top Secret, Your Honor.

9    MJ:  And what's the difference between a SCIF and -- you said

10   you worked in a T-SCIF?

11   ACC: Yes, Your Honor.

12   MJ:  What's the difference between a SCIF and a T-SCIF?

13   ACC: T-SCIF are locations that are assigned by a government

14   agency to hold this information temporarily, so they're not designed

15   to be permanent structure locations so they have some -- they don't

16   always meet all the requirements that a full SCIF has because of --

17   because it's in the field or something.

18   MJ:  Okay.  So, when you are in the SCIF and you are working,

19   what kind of automation do you use?  Do you have just a regular

20   computer or is it something different?

21   ACC: We have lots of computers, Your Honor.

22   MJ:  Okay.  If you have -- well -- what is a -- let's go to

23   SIPRNET.  What is SIPRNET?

6802

**136**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 141 of 211 PageID# 247
USCA4 Appeal: 19-1287   Doc: 10-2      Filed: 03/29/2019    Pg: 140 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 10 of 79 PageID# 143

10634

1      ACC: SIPRNET is Internet protocol system that we have at the

2  Secret level where we can transfer information up to that level of

3  information, Your Honor.

4      MJ:  Okay.  Do the charged documents that we're talking about at

5  issue, were they all on SIPRNET?

6      ACC: Yes, Your Honor.

7      MJ:  Okay.  So, they didn't come from any other -- SIPRNET is a

8  system on a particular computer, is that right?

9      ACC: Yes, Your Honor, the ----

10     MJ:  I mean, you can't have your regular computer and access

11 SIPR through that, can you?

12     ACC: No, no, Your Honor.

13     MJ:  Okay.  So, it's a separate computer, basically -- is it to

14 hold Secret-level classified information?

15     ACC: Up to that level, yes, Your Honor.

16     MJ:  Okay.

17     ACC: It can be lower, but ----

18     MJ:  Can it be unclassified?

19     ACC: You can hold unclassified information on there, yes, Your

20 Honor.

21     MJ:  Okay.  So, if you're working with SCIF and you have

22 unclassified information -- or working in a SCIF and you're using

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 142 of 211 PageID# 248
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 141 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 11 of 79 PageID# 144

10635

1   SIPRNET and you have unclassified information that's on SIPRNET, are

2   you allowed to print that off and take it with you?

3        ACC: If it's unclassified ----

4        MJ:  Yes.

5        ACC: ---- and the paper has "Unclassified" on the top and

6   bottom, then yes, Your Honor.

7        MJ:  Okay.  Now, what if it has -- or there's a paragraph in it

8   that has the Secret classification or a -- but first of all, before

9   we get there, can you explain to me the difference between

10  classification levels at the Confidential level, at the Secret level,

11  and the Top Secret level?

12       ACC: Generally, yes, Your Honor, so the -- information at the

13  Confidential level, which the military -- we don't usually use

14  Confidential, but Confidential usually involves a lower sensitivity

15  of documents and I think that you don't have to, necessarily, always

16  have it in a -- you don't always have to lock it up; you can leave

17  some of it on your desk and things like that, Your Honor.  But for

18  Secret, you can -- you have to lock it up and there always has to be

19  somebody that has control over that level and then, at the TS level,

20  there is so many -- there's a lot of different types of handling

21  instructions, Your Honor.

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 143 of 211 PageID# 249
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 142 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 12 of 79 PageID# 145

10636

1    MJ: Okay. Well, with Secret level, if you're working in the T-

2    SCIF like you were and you have -- you're working with Secret level

3    documents that, I guess, there are -- hard copy ----

4    ACC: Yes, Your Honor.

5    MJ: ---- and you finish work or you leave the SCIF to go for

6    dinner or something like that, do you have to store those in a

7    particular place or the fact that they're in a SCIF is enough?

8    ACC: Yes, yes, Your Honor. Secret information -- it's called a

9    Secret Collateral Area, you can keep up to Secret information -- just

10   as a habit, sitting around, Your Honor, as long as it's in a SCIF or

11   a certified T-SCIF.

12   MJ: Okay. So, just to make sure I'm -- clear me up if I'm

13   wrong, if you have information that's classified at the Secret level

14   and you're some place other than a SCIF, does it have to be in a safe

15   or some locked place?

16   ACC: Normally, yes, Your Honor, or as long as you -- as long as

17   it's in a container, you can have -- as long as it contained within

18   two ----

19   MJ: Like one of those carry bags?

20   ACC: The courier bags and -- or, again, you could -- sometimes

21   you have -- there are certain circumstances where you could have a

22   Secret collateral area outdoors, but it's very -- that's only a field

23   situation, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 144 of 211 PageID# 250
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 143 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 13 of 79 PageID# 146

10637

1      MJ:  Okay.  But would such an area have to be designated by

2   someone with authority to do that?

3      ACC: Yes, Your Honor.

4      MJ:  I mean, you can't just decide -- can you just decide,

5   "Okay, I'm going to designate this an area where I'm putting all

6   Secret documents out in the open"?

7      ACC: Correct, you need to have authority for that, Your Honor.

8      MJ:  Okay.  So, when you're, then, in your -- so, if I'm

9   understanding you, when you're working in your T-SCIF, it's --

10  because it's a SCIF in and of itself, you can come and go and leave

11  the documents or the CD-ROMs, or anything that you just discussed,

12  basically out for other people working in the SCIF to see and use, is

13  that correct?

14     ACC: Yes, Your Honor.

15     MJ:  Okay.  Now, let's move on, then, to Specification 2 of

16  Charge II.  Can you show me where in your statement that you're

17  talking about that

18     ACC: Your Honor, we start talking about Charge -- or

19  Specification 2 at -- pretty much, closer to the middle.  It's the --

20  --

21     MJ:  Let me ask you a question ----

22     ACC: ---- Paragraph 8 at ----

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 145 of 211 PageID# 251
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 144 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 14 of 79 PageID# 147

10838

1    MJ: ---- PFC Manning, do you think it would be easier to get

2    through this if we go chronologically by, you know -- as you sort of

3    did in your statement; the first things that you downloaded and how

4    it evolved?  Would that be easier for you or ----

5    ACC: Oh, we can go by specification.

6    MJ: ---- would specification by specification?  All right.  So,

7    just then tell me where Specification 2 is.

8    ACC: Specification 2 is at Page 19.

9    MJ: Okay.  All right, now, we talked about -- earlier, when I

10   asked you, with respect to the video at Specification 2 of Charge II,

11   you told me that that was not classified, is that correct?

12   ACC: Yes, Your Honor.

13   MJ: Where did you access that video?  How did you have access

14   to it?

15   ACC: Well, it was on our shared T-drive, Your Honor, that S-6

16   operated on SIPR.

17   MJ: Okay.  So, it was on SIPR?  So, tell me about how -- so,

18   you had access to that video.  Now, were you authorized to give that

19   video to anyone outside of the service who didn't have a clearance?

20   ACC: No, Your Honor.

21   MJ: Why not?  It wasn't classified.

22   ACC: I thought it was classified.  I looked at the

23   classification matrix for -- at the corps level whenever I was

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 146 of 211 PageID# 252
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 145 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 15 of 79 PageID# 148

10839

1  reviewing the video and I thought it would -- I thought that the OCA

2  would have said the same thing -- that it would have been classified

3  at the Secret level, Your Honor.

4      MJ:  Was it marked in any way?

5      ACC: It didn't have markings, Your Honor, but it -- going by the

6  matrix, you can -- because it didn't have markings, that's why I went

7  to the classification matrix, Your Honor.

8      MJ:  And what is a classification matrix?

9      ACC: It's sort of a quick-hand -- a short-hand guide for

10  derivative classification -- for people with derivative

11  classification to classify documents within the guidelines of the

12  original classification authority when you don't have an OCA there to

13  determine, specifically, what it is at that time.

14      MJ:  Just to make sure I understand this, we talked earlier

15  about if you're doing an original classification, it has to be by an

16  OCA or his delegee, right?

17      ACC: Yes, Your Honor.

18      MJ:  And then if you -- I guess you create your own -- you

19  create products down the road using some of that originally

20  classified information?  Is that what derivative classification is?

21      ACC: Yes, Your Honor.

22      MJ:  Okay.  And who has authority to derivatively classify?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 147 of 211 PageID# 253
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 146 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 16 of 79 PageID# 149

10640

1     ACC: Anybody with that level of security clearance and as long

2  as you can point to where you're getting the authority from the

3  original classification authority, then you can do that, Your Honor.

4     MJ:  And the matrix is where you would look to see that?

5     ACC: Yes, in the Army, or in the -- downrange, in the DoD

6  environment, we have matrices --I t's a table that tells you what the

7  classification level is for this particular type of information, Your

8  Honor.

9     MJ:  Okay.  So what did you do -- when did you first see the

10  video?

11     ACC: This would have been in January or late February -- it was

12  mid-February of 2010, Your Honor.

13     MJ:  Okay.  And what did you -- you said you originally saw the

14  video and ----

15     ACC: Yes, Your Honor.

16     MJ:  ---- some people in your office were talking about it?

17     ACC: Yes, Your Honor.

18     MJ:  Okay.  And this was the video that you described as "war

19  porn"?

20     ACC: Yes, Your Honor.

21     MJ:  Okay.  And what was going on in the video that you can talk

22  about?

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 148 of 211 PageID# 254
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 147 of 337

Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 17 of 79 PageID# 150

10641

1    ACC: It was aerial weapons team -- it was from the camera

2   onboard of an aerial team aircraft that also record the flight crew

3   audio, Your Honor, and they're just -- in the course of duties,

4   they're engaging some -- engaging some targets and then there's two

5   separate engagements and then there's a third section to the video

6   for a third one, later.

7    MJ: Okay. And you testified when you were reading your

8   statement that some news organizations were interested in getting

9   that video from the Freedom of Information Act?

10   ACC: Yes, Your Honor.

11   MJ: And did you know why they were interested in getting that

12  video?

13   ACC: Just based upon what I could see online on some open source

14  reporting that I was looking up, Your Honor.

15   MJ: And what did that say?

16   ACC: It said that the company, Reuters, had made the request and

17  that those requests were not necessarily being denied, but they were

18  being -- they were receiving responses to that, but not getting the

19  video, Your Honor.

20   MJ: Okay. And what did you do with the video? You said you

21  did some research here to find out what the facts were with respect

22  to the video and that caused you to reach some conclusions -- and

23  what were those conclusions that you reached?

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 149 of 211 PageID# 255
USCA4 Appeal: 19-1287     Doc: 10-2       Filed: 03/29/2019     Pg: 148 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 18 of 79 PageID# 151

10842

1      ACC: Conclusions -- I mean -- conclusions about?

2      MJ: Well, about -- you made a decision -- did you make a

3   decision, at some point, then you needed to give that video to the

4   news media?

5      ACC: Yes, Your Honor, probably about a week or so after first

6   viewing it, Your Honor.

7      MJ: Okay. And did you, at some point, give that video -- I

8   mean, what did you do -- did you take it out of the T-SCIF? Let's

9   start there.

10     ACC: Yes, Your Honor, I burned the video to a CD-RW and then I

11  took that out of the T-SCIF put it onto my personal computer, Your

12  Honor.

13     MJ: Okay. Now, is a CD-RW ----

14     ACC: Or it could have been ----

15     MJ: ---- a CD-ROM?

16     ACC: Yes, Your Honor.

17     MJ: It's just a disc?

18     ACC: Some of them might be DVD-RWs, but I'm just using compact

19  discs in general, Your Honor.

20     MJ: Okay. And so you took it out and put it on your own

21  personal computer?

22     ACC: Yes, Your Honor.

23     MJ: Now, were you authorized to do that?

6811

**145**

10643

1      ACC: No, Your Honor.

2      MJ:  What is the guidance given to people like you working in a

3   T-SCIF with regard to information that comes from SIPRNET?

4      ACC: If it's coming from a CD -- if it's on a CD, there's -- I

5   mean, there are two thoughts on how it's done, Your Honor.  Some

6   people think that if you just burn only unclassified information onto

7   the CD and then you mark the CD as unclassified, then you can do

8   whatever with it, but then there's a lot of -- but the more proper

9   way of doing it would be to verify and there are some technical

10  personnel that can verify that nothing -- no other digital,

11  potentially Secret information might be inside of that first before

12  you transfer it over, Your Honor.

13     MJ:  So, if I'm understanding you correctly, if you have

14  completely unclassified information, it's okay to -- and it's

15  verified, it's okay to take it out of the T-SCIF and put it on your

16  own personal computer?

17     ACC: Yes, Your Honor, but it's -- there's different ways --

18  there's different ideas on how it's verified.  Some -- I've seen

19  where you need a memorandum sometimes and I've seen where you just

20  needed somebody to -- with the right rank to say it's okay, Your

21  Honor.

22     MJ:  What rank were you at the time?

23     ACC: I was a specialist, Your Honor.

6812

**146**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 151 of 211 PageID# 257
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 150 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 20 of 79 PageID# 153

10844

1     MJ:  Were you, as a specialist, at that time, authorized to

2    verify?

3     ACC: No, Your Honor.

4     MJ:  So, if you wanted to take information, even unclassified

5    information, out of the SCIF and put it on your personal computer,

6    you would've had to go to somebody higher in the chain?  Is that what

7    I'm understanding that, at a minimum, to get verification?

8     ACC: Yes, Your Honor, I would've had -- I think the S-2 would

9    have been the person that I would have gotten guidance from, Your

10   Honor.

11    MJ:  Did you do that with respect to this video before you took

12   it?

13    ACC: No, Your Honor.

14    MJ:  Okay.  So, did you have any authorization to take the video

15   out of the T-SCIF?

16    ACC: No, Your Honor.

17    MJ:  Did you have any authorization to put it on your personal

18   computer?

19    ACC: No, Your Honor.

20    MJ:  All right.  Once it was there, what did you do with it?

21    ACC: It was -- I kept it on -- I left it on the computer for a

22   few days, Your Honor.  I wasn't sure what I was going to do with it.

23   I thought -- I mean, I think I had just come back off mid-tour leave,

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 152 of 211 PageID# 258
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 151 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 21 of 79 PageID# 154

10845

1 Your Honor, and I wasn't -- I thought I would just keep it and I

2 intended on giving -- on somehow getting it to Reuters at some point

3 so they can see it, but I didn't know how. It took me a few days

4 until I decided to upload it to the website, Your Honor.

5    MJ: Okay. I believe you testified earlier how you did that,

6 but just briefly go -- recount that once again -- how you uploaded

7 it.

8    ACC: I just went to the website -- the WikiLeaks website, in

9 this case, and I went -- and I clicked around and I found a

10 submission form and I uploaded the video using the submission form,

11 Your Honor.

12    MJ: And to your knowledge -- I mean, you were submitting at

13 that point, were you submitting it to a particular person or to the

14 organization of WikiLeaks?

15    ACC: Just the organization, Your Honor.

16    MJ: Now, did you -- were any of those people cleared, to your

17 knowledge, to receive this?

18    ACC: No, Your Honor.

19    MJ: Did anybody from WikiLeaks have a need to know, as defined

20 by the United States government ----

21    ACC: No, Your Honor.

22    MJ: ---- for classified information?

23    ACC: Not to my knowledge, Your Honor, no.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 153 of 211 PageID# 259
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 152 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 22 of 79 PageID# 155

10646

1    . MJ:  Okay.  And you believed, actually, that this video was

2   classified at the time?

3       ACC:  Yes, Your Honor, I did.

4       MJ:  Now, as I understand from both parties, the video actually

5   wasn't classified, is that correct?  Government?

6       TC[MAJ FEIN]:  Yes, ma'am, after a classification review was

7   conducted it was determined not to be classified.

8       CDC[MR.COOMBS]:  That's correct, ma'am.

9       MJ:  Then if it ultimately was determined not to be classified,

10  why was it wrong for you to take -- why was it unauthorized for you

11  to take it out of the SCIF and to send it to WikiLeaks?

12      ACC: Well, first, Your Honor, it -- at the time, I thought it

13  was -- I believed it was classified and then, also, the digital

14  method -- you're supposed to have verification and I didn't have

15  anybody to verify and ensure that that information was okay to put

16  onto a -- to downgrade its level to an unclassified network, Your

17  Honor.

18      MJ:  And you had to have that authority to do that?

19      ACC:  Yes, Your Honor.

20      MJ:  Even if it wasn't classified, ultimately, you still had to

21  have the authority to do that with that information at the SCIF at

22  that time, is that correct?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 154 of 211 PageID# 260
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 153 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 23 of 79 PageID# 156

10647

1      ACC: Yes, Your Honor, whether verbal or on paper, Your Honor,

2    yes.

3      MJ:  Okay.  Now, here, your element two is that you willfully

4    communicated the video to a person not entitled to receive it.  Was

5    WikiLeaks entitled to receive the video?

6      ACC: No, Your Honor.

7      MJ:  In your statement, you talk about, on Page 20, that you

8    transfered the video because you were disturbed, basically, by its

9    contents and you thought it should be out in the public because

10   people were killing kids -- or killed kids, is that correct or do you

11   want to articulate that for a little bit better?

12     ACC: Just to -- I found it -- I mean, I find it trouble -- I

13   found the video troubling at the time, Your Honor, and I still do,

14   but it's just my opinion, Your Honor.

15     MJ:  Okay.  Going to go over this little bit with you all the

16   way through, but let's start here.  There's certain potential

17   defenses and when we get into -- that may or may not be raised by the

18   evidence if this case actually went into trial, but -- and it goes a

19   little bit with your willfulness element because you have to be --

20   willfulness has -- if you're acting willfully, you have to act

21   intentionally with the bad purpose to disobey the law.  Now, in your

22   case, did you know it was not lawful to -- were you intending to

23   violate the law when you said that video to WikiLeaks?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 155 of 211 PageID# 261
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 154 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 24 of 79 PageID# 157

10848

1      ACC: Yes, Your Honor, I knew that, yes Your Honor.

2      MJ:  Okay.  Now, there is also a potential defense -- well,

3   there is two of them.  One of them is called "justification" and what

4   that is -- is it excuses a crime if it's done in the proper

5   performance of a legal duty.  Did you believe you had a legal duty to

6   transmit that video -- take it to your personal computer and give it

7   to WikiLeaks?

8      ACC: No, Your Honor.

9      MJ:  Okay.  So, do you believe the defense of justification

10  applies in your case?

11     ACC: I do not, Your Honor, no.

12     MJ:  All right.  And, lastly, I want to talk to you about the

13  necessity defense and what that is -- is it's not formally recognized

14  in the Uniform Code of Military Justice, but the appellate courts

15  have said it's a form of a duress defense.  What a duress defense is

16  -- is when a third party -- where there's a threat of serious,

17  imminent harm to you or somebody else caused by a third-party.

18  Necessity is a little bit different because it's the circumstances --

19  it's the choice of evils defense.  The typical example that's given

20  for necessity is if you have to trespass over -- if there's somebody

21  who is drowning in a pond and you have to trespass over somebody's

22  yard to get to that pond to save that person and there's nobody else

23  around to save that person so if you don't trespass over that

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 156 of 211 PageID# 262
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 155 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 25 of 79 PageID# 158

10849

1   person's yard, that person -- the other person in the pond drowns.

2   So, that's the defense of necessity, basically; it's a choice of

3   evils defense.  So, you have to commit your crime to -- because of

4   the threat of serious, imminent harm to somebody else.

5          In your case, do you believe the necessity defense applies

6   when you transferred that video?

7       ACC: No.  No, Your Honor, I don't believe it applies in this

8   case, Your Honor.

9       MJ:  Okay.  Now, the third element to this offense is that the

10  conduct has to be prejudicial to good order and discipline or service

11  discrediting conduct.  Do you believe that your transmission of this

12  video to WikiLeaks was prejudicial to good order and discipline?

13      ACC: Yes, Your Honor.

14      MJ:  Why?

15      ACC: Well, in the military we have rules and regulations and

16  structures designed to safeguard sensitive information, whether it be

17  classified or unclassified and I circumvented those and, thereby --

18  you know, by circumventing them on my own authority without -- I'm

19  not the right pay grade to make these decisions or anything, so, by

20  doing that, I violated some orders and regulations and that's

21  prejudicial to good order and discipline.

22      MJ:  Okay.  So, what you're telling me is sometimes referred

23  into the law as "Self-help."  And so, if somebody else has the

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 157 of 211 PageID# 263
USCA4 Appeal: 19-1287     Doc: 10-2       Filed: 03/29/2019     Pg: 156 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 26 of 79 PageID# 159

10650

1   authority to make the rules and you don't agree with them, you elect

2   a self-help remedy to basically do -- go against the law because you

3   believe, personally, it's for a greater good.  Is that kind of

4   describing what you did a little bit?

5       ACC: Yes, Your Honor.

6       MJ:  Okay.  You just told me that that kind of conduct is

7   prejudicial to good order and discipline because the military has a

8   command structure that's established to make those rules and people

9   in the military need to follow them, is that what you're telling me?

10      ACC: Yes, Your Honor.

11      MJ:  Okay.  Now, what about service discrediting?  Do you think

12  that your conduct in giving the video to WikiLeaks is service

13  discrediting?

14      ACC: Yes, Your Honor.

15      MJ:  Why?

16      ACC: Well, there's -- for the service discrediting, it's about

17  public perception of the military and the services and our ability to

18  -- and their trust and their perception that we can safeguard our

19  sensitive information for their protection.  So, by not abiding by

20  those -- by the system, it undermines our -- our service, Your Honor,

21  and their perception of how we operate, Your Honor.

22      MJ:  Okay.  So, basically, if I'm understanding what you're

23  saying correctly, people should -- the military would hope that

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 158 of 211 PageID# 264
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 157 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 27 of 79 PageID# 160

10861

1    people have confidence in the system and the people in it to follow

2    the rules and, basically, if you don't have any rules or people

3    aren't following the rules -- I mean, if there is more than one

4    person that's doing what you're doing then the whole system crashes?

5        ACC: Yes, Your Honor.

6        MJ: And I don't want to put words in your mouth, I mean, I'm

7    just sort of paraphrasing what I thought you told me. Is that a

8    little ----

9        ACC: You got it.

10       MJ: ---- bit, in essence, of what you're telling me?

11       ACC: Yes, Your Honor.

12       MJ: Okay. How do you know WikiLeaks wasn't entitled to receive

13    the video?

14       ACC: Well, Your Honor, it wasn't over an -- to start off with,

15    it wasn't using an authorized means of--for transferring this

16    information as far as I was aware. I mean, this was over a non-

17    secure network, so I have no guarantees that anybody is authorized to

18    receive it on the other end and I'm not aware that -- I mean, I know

19    that they're -- I'm not aware of them being a U.S organization -- or

20    U.S. government entity, so -- and then, also, I'm not aware of any of

21    them having any type of security clearances or anything, Your Honor.

22       MJ: Okay. And I know you talked about it earlier in your

23    statement not going to try to get you to rehash your entire

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 159 of 211 PageID# 265
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 158 of 337

Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 28 of 79 PageID# 161

10852

1   statement, but, just briefly, what's your understanding of WikiLeaks?

2   What kind of -- what's -- how did you discover it and what did you

3   come to think of it?

4       ACC: I discovered it in November -- around the Thanksgiving

5   timeframe of 2009 when they published some SMS text -- or text

6   messages or -- and then I did some research into them after that

7   based upon the fact that I had heard of the website before, but never

8   visited it prior to that, but I was interested -- I became interested

9   in it after that and I became familiar with the organization and how

10  it operated and what they were publishing and all the rest of it

11  after a few weeks of going through it -- going through stuff, both on

12  the open-source Google site on my personal computer and using my

13  access to Secret documents, Your Honor.

14      MJ:  Okay.  You said an "SMS text."  What's that?

15      ACC: It's a Short Messaging System -- it's basically -- whenever

16  you text message on cell phones, those are -- that's the kind of

17  message.  But, before hand, it used to be pagers -- it's the same

18  standard that they still haven't updated for modern phones, yet, Your

19  Honor.

20      MJ:  Okay.  And you said you did some intelligence and you came

21  to learn about WikiLeaks and its organization.  What did you learn?

22      ACC: I learned about how -- I learned -- I was trying to learn

23  how it was structured, where their servers were, who operated it,

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 160 of 211 PageID# 266
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 159 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 29 of 79 PageID# 162

10653

1   just for my -- because it -- they're not as open about that stuff as

2   normal -- or as normal websites and publishers are so I found that

3   interesting, Your Honor.  I don't know if I missed the question, Your

4   Honor?

5       MJ:  No, no, you answered it.  Did WikiLeaks ultimately release

6   the video?

7       ACC: Yes, Your Honor.

8       MJ:  Okay, is that what you said in your ----

9       ACC: In April.

10      MJ:  ---- statement, here, in 5 April of 2010 ----

11      ACC: Yes, Your Honor.

12      MJ:  Okay, I believe you've already answered this, but let me

13  just ask one more time, did you willfully communicate that video to

14  WikiLeaks?

15      ACC: Yes, Your Honor.

16      MJ:  Does either side believe any further inquiry is required

17  with respect to Specification 2 of Charge II?

18      CDC[MR.COOMBS]:  Nothing from the defense, Your Honor.

19      TC[MAJ FEIN]:  One moment please, Your Honor.

20      MJ:  Uh-huh.

21      TC[MAJ FEIN]:  No, just a factual clarification for the record.

22  It might be worth the Court asking if there's a difference between

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 161 of 211 PageID# 267
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 160 of 337

Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 30 of 79 PageID# 163

10854

1   COS Hammer and FOB Hammer because the two terms are being used

2   interchangeably.

3       MJ:  What Hammer?  What's the first one you said?

4       TC[MAJ FEIN]:  Forward Operating Base Hammer, ma'am, or Combined

5   Operating Station -- Contingency Operating Station; FOB and COS

6   Hammer.

7       MJ:  Okay.  PFC Manning, what is the difference between FOB and

8   COS Hammer?

9       ACC: They are the same location, Your Honor, but -- and we never

10  really understood what -- when the change was, but it was used

11  interchangeably while we were there as well, Your Honor.

12      MJ:  So they're both the same place?

13      ACC: Yes, Your Honor.

14      MJ:  Just have different names at different times?

15      ACC: I believe Corps came down with the change, but we didn't

16  adopt it, Your Honor.

17      MJ:  Okay.  So, in your -- the charges and specifications at

18  issue here, they're all charged with happening at F-O-B Hammer, I

19  believe.

20      ACC: Combined Operating Station, Your Honor.

21      MJ:  Oh -- that's -- hold on.  I'm sorry, Contingency Operation

22  -- was it Combined Operating Station or Contingency Operating

23  Station?

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 162 of 211 PageID# 268
USCA4 Appeal: 19-1287    Doc: 10-2          Filed: 03/29/2019    Pg: 161 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 31 of 79 PageID# 164

10655

1       ACC: I don't -- it's Contingency Operating Station, Your Honor.

2       MJ:  Okay, and is that what it was called when you were there?

3       ACC: There was a lot of different names for it, Your Honor.

4       MJ:  Okay, was that one of them?

5       ACC: That was one of them, yes, Your Honor.

6       MJ:  When you look at that, when it says -- look at the -- when

7  it says, "that, at or near Contingency Operating Station Hammer,

8  Iraq," does that mean to you where you were in Iraq or does that mean

9  to you that that's someplace else?

10      ACC: That's where I was, Your Honor.

11      MJ:  Okay.  And Specification 2, did you actually -- when you

12  transferred the video, what was base that you did that?

13      ACC: That was at Contingency Operating Station Hammer, Your

14  Honor.

15      MJ:  Okay.  And was that between 14 February of 2010 and 21

16  February 2010 when you transferred the video?

17      ACC: Yes, Your Honor.

18      MJ:  Does other side believe any further inquiries required?

19      TC[MAJ FEIN]:  No, ma'am.

20      CDC[MR.COOMBS]:  No, Your Honor.

21      MJ:  Okay.  Let me just ask you one thing, PFC Manning, I should

22  have asked you a little bit earlier, are you on any medications

23  today?

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 163 of 211 PageID# 269
USCA4 Appeal: 19-1287   Doc: 10-2   Filed: 03/29/2019   Pg: 162 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 32 of 79 PageID# 165

10656

1       ACC: No, Your Honor.

2       MJ:   Is there anything preventing you and I from having an

3   intelligent back-and-forth dialogue?

4       ACC: No, Your Honor.

5       MJ:   Let's move on Specification 3 of Charge II.   Specification

6   3 addresses the classified memoranda produced by a United States

7   government intelligence agency.   Can you orient me to where in your

8   statement that we talk about that?

9       ACC: It's Paragraph 10 at Page 5, Your Honor.   I'm sorry, 29.

10      MJ:   Page 29?

11      ACC: Yes, Your Honor.

12      MJ:   So, this is -- this document that we're talking about,

13   here, for Specification 3, where did you come across that?

14      ACC: I don't know if I can say, Your Honor.

15      MJ:   Oh, okay, well, let's not.   Was it in the T-SCIF?

16      ACC: It was, Your Honor.

17      MJ:   Okay.   Was it something that you were authorized to take

18   out of the T-SCIF?

19      ACC: It was not, Your Honor.

20      MJ:   Okay.   Did you take it out of the T-SCIF?

21      ACC: Yes, Your Honor.

22      MJ:   How did you do that?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 164 of 211 PageID# 270
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 163 of 337

Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 33 of 79 PageID# 166

10857

1       ACC: Using the same method -- a CD-RW or it might have been a

2   DVD-RW -- or a DVD-W, sorry -- RW.

3       MJ:  Okay.  And where -- when you took it out of the SCIF, where

4   did you take it?

5       ACC: To my -- to the Compartmentalized Housing Unit -- to my

6   personal area.

7       MJ:  And what did you do with it?

8       ACC: I put it onto a computer -- my personal computer and I

9   uploaded it using the submission form, Your Honor -- no, the drop --

10  I used the drop box, as I ----

11      MJ:  And where did you -- you used the drop box to do what?

12      ACC: To upload, Your Honor, the documents.

13      MJ:  And whose drop box was it?

14      ACC: It was somebody within the WikiLeaks organization.  I never

15  got a full identification as to who, but pointed me to that and it

16  resolved -- the IP address resolved to that website, Your Honor.

17      MJ:  Okay.  What does that mean?

18      ACC: It means that -- it -- well, the IP address that was

19  attached to that, wasn't attached to the domain name wikileaks.org if

20  I used the IP address, Your Honor.

21      MJ:  Okay.  So, this drop box, would that be a place where, if

22  someone wanted to send something to WikiLeaks, they would send it

23   there?

1      ACC: Yes, Your Honor, during ----

2      MJ: And then WikiLeaks would retrieve it?

3      ACC: Yes, Your Honor, they -- as they were changing something, I

4      think, they were changing how they were doing it, Your Honor.

5      MJ: Okay, because you were talking to me, before, about some of

6      the ways that you transmitted these documents was anonymous and some

7      wasn't, is that what I heard you say earlier?

8      ACC: Yes, Your Honor, well, I was -- I would -- I received over

9      the IRC and then later the Jabber -- I would ask for how do I send

10     something and then they would give me directions to where I needed to

11     send it, although I wouldn't say what it was, Your Honor ----

12     MJ: And that was the drop box ----

13     ACC: ---- that I was sending.

14     MJ: ---- that you were talking about, right?

15     ACC: Yes, Your Honor.

16     MJ: Okay. So, rather than repeat my questions for each of

17     these specifications, was -- when we talk about all of the

18     specifications, was -- when we talk about all of the specifications

19     that you're pleading guilty to today, was WikiLeaks authorized to

20     receive anything that you sent?

21     ACC: No, Your Honor.

1      MJ:  Okay.  And were you authorized to send anything you sent in

2  these specifications that we're talking about, that you're pleading

3  guilty to, to WikiLeaks?

4      ACC: No, Your Honor.

5      MJ:  And other than the video in Specification 2, was everything

6  else classified?

7      ACC: Yes, Your Honor.  Well, not everything -- for the charged

8  documents, yes, Your Honor.

9      MJ:  For the charged documents?

10      ACC: Yes, Your Honor.

11      MJ:  But some of the Department of State cables, I believe in

12  Specification 13 of Charge II, you testified earlier, not all of them

13  were classified, right?

14      ACC: Yes, Your Honor.

15      MJ:  But the charged documents that we are talking about were?

16      ACC: Yes, Your Honor.

17      MJ:  Now, with Specification 3, when you sent that -- the

18  document that we're talking about for that specification -- or the

19  two documents, did you willfully transmit those documents to

20  WikiLeaks?

21      ACC: Yes, Your Honor.

22      MJ:  So you did it intentionally?

23      ACC: Yes, Your Honor.

1    MJ:  Okay.  And we talked earlier, you didn't have any authority

2    to do it, is that correct?

3    ACC: that is correct, Your Honor.

4    MJ:  Okay.  Now, I asked you about conduct -- was your conduct

5    prejudicial to good order and discipline, earlier, with respect to

6    Specification 2 of Charge II.  Is your answer any different for this

7    specification?

8    ACC: Not really, Your Honor; it's a blanket statement for all of

9    the specifications under the charge.

10    MJ:  So, for all the specification you are pleading guilty to,

11    the reasons that you gave me that -- so you believe -- first of all,

12    do you believe all the specifications that you're pleading guilty to,

13    that your conduct was prejudicial to good order and discipline in the

14    armed forces?

15    ACC: Yes, Your Honor.

16    MJ:  And was that for the reasons we discussed when we talked

17    about Specification 2 of Charge II?

18    ACC: Yes, Your Honor.

19    MJ:  Now, do you believe all of the conduct that you're pleading

20    guilty to is prejudicial -- was service discrediting?

21    ACC: Yes, Your Honor.

22    MJ:  And is that for the same reason we talked about for

23    Specification 2 of Charge II?

6829

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 168 of 211 PageID# 274
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 167 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 37 of 79 PageID# 170

10661

1    ACC: Yes, Your Honor, I mean ----

2    MJ: Okay, so, if I ask you these questions for each

3    specification, are you going to give me an answer that's any

4    different than you gave me for that?

5    ACC: No, Your Honor, they're all going to be along the same

6    lines, Your Honor.

7    MJ: Okay. Was there more than one classified memorandum in

8    Specification 3 that you transmitted?

9    ACC: There were two, your Honor.

10   M: Okay. And when did you transmit that?

11   ACC: That would have been ----

12   MJ: You can look at your statement.

13   ACC: Okay. 22 March, your Honor.

14   MJ: Of what year?

15   ACC: 2010, Your Honor.

16   MJ: Okay. And for all these specifications, these

17   transmissions are -- at least for Specification 3 is also -- is it

18   Contingency Operations Station Hammer?

19   ACC: Yes, Your Honor.

20   MJ: Does either side believe any further inquiry is required

21   with respect to Specification 3 of Charge II?

22   ATC[CPT MORROW]: Your Honor, the accused stated earlier that

23   "the content of two of these documents upset me greatly. I had

6830

**164**

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 169 of 211 PageID# 275
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 168 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 38 of 79 PageID# 171

10662

1  difficulty believing what the session was discussing." It may be

2  helpful to the Court just to explore the defenses again with respect

3  to these documents.

4       MJ:  Okay.  Now, you looked at these documents -- your statement

5  says that the contents upset you greatly.  We talked earlier about,

6  you know, to willfully communicate something, you have to be doing it

7  with a bad purpose to violate the law.

8       ACC: Correct.

9       MJ:  And you talked to me earlier about that you intentionally

10  communicated these two documents.  Did you know you were violating

11  the law when you did that?

12       ACC: Yes, Your Honor.

13       MJ:  Okay.  We also talked about, earlier, justification is

14  something that is in the proper performance of a legal duty.  Did you

15  believe that you were acting in the proper performance of a legal

16  duty?

17       ACC: No, Your Honor.

18       MJ:  We also talked about necessity.  Do you believe, in your

19  case, that your conduct was necessary -- basically your choice of

20  evils, there, that you had to believe that your actions were

21  necessary, they must have been -- your belief must've been reasonable

22  in their must've been no other alternative to committing your crime

23  to prevent death or imminent injury.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 170 of 211 PageID# 276
USCA4 Appeal: 19-1287     Doc: 10-2         Filed: 03/29/2019     Pg: 169 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 39 of 79 PageID# 172

10663

1          Do believe that the necessity defense applies in your case?

2          ACC: Yes, Your Honor, I had a lot of alternatives.

3          MJ:  Okay.  Let me ask -- maybe my question was bad.  Do you

4     believe the defense of necessity applies in your case?

5          ACC: No, Your Honor.

6          MJ:  Okay.  And you said you believed you had a lot of

7     alternatives.  What other -- describe some of them for me.

8          ACC: Well, not necessarily for this-that specification, but

9     speaking generally for the other -- for two, as well, Your Honor.

10         MJ:  Okay.  Why don't you speak generally and just tell me what

11    alternatives you could have ----

12         ACC: Well, for -- I had the chain of command as a first

13    alternative.  I could've went to the chain of command and asked for

14    guidance on how to release certain information.  I had -- the public

15    affairs office was -- I knew where the public affairs office was and

16    they actually have the authority to officially release sensitive

17    information and -- I mean, there is also the Freedom of Information

18    Request -- Freedom of Information Act and other -- there were other

19    avenues to approach, Your Honor.

20         MJ:  Okay.  And you didn't exercise those?

21         ACC: No, Your Honor.

22         MJ:  Any further inquiry?

23         TC[CPT MORROW]:  No, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 171 of 211 PageID# 277
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 170 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 40 of 79 PageID# 173

10684

1        CDC[MR.COOMBS]:  No, Your Honor.

2        MJ:  All right.  Let's move on, then, to Specification -- it's

3    were jumping, now, to Specification 15 of Charge II.  And where in

4    your statement is that discussed?

5        ACC: Page 24, Your Honor.

6        MJ:  Okay.  Maybe I am confused, I thought that was

7    Specification 9?  Specification 15 -- we're talking about ----

8        ACC: There was a mix-up, here, Your Honor.  It's in this

9    paragraph, yes, Your Honor; Paragraph 9 -- Section 9.

10       MJ:  Oh, it's in Section 9?  Okay.

11       ACC: Yes, Your Honor.  But its first talked about earlier on in

12   there, as well, like the contents of it Your Honor.

13       MJ:  Okay where you -- where do you first begin to address it --

14   and that would be the -- it would be a classified record produced by

15   United States Army intelligence agency, dated 18 March 2008.  Is that

16   the information we're talking about that specification?

17       ACC: Yes, Your Honor.

18       MJ:  Okay.  And where do you first address in your statement?

19       ACC: It's Section 5, Paragraph Delta, on Page 10.

20       MJ:  On Page 10?  Okay.  All right, so were you working at the

21   T-SCIF when you were -- it says you were conducting a search to look

22   for information and you found this?  Were you working in the T-SCIF?

23       ACC: Yes, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 172 of 211 PageID# 278
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 171 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 41 of 79 PageID# 174

10665

1    MJ:  Okay.  And did you -- was this information classified?

2    ACC: Yes, Your Honor, it is.

3    MJ:  Okay.  Did you take that information -- did you take it off

4  of where you found it and put it on a CD like you did the last two

5  pieces of information that we talked about?

6    ACC: It was a CD, yes, Your Honor.

7    MJ:  Okay.  And did you take it out of the T-SCIF?

8    ACC: Yes, Your Honor.

9    MJ:  And where did you bring it?

10    ACC: Again to my personal housing -- my housing area and then to

11  -- LSA Dragon and then onto my personal computer, Your Honor.

12    MJ:  And what did you do with it?

13    ACC: Then, I uploaded it using the drop box, again, as I

14  described, Your Honor.

15    MJ:  Okay.  Did you willfully and intentionally do that?

16    ACC: Yes, Your Honor.

17    MJ:  Did you have authority to do it?

18    ACC: I did not.

19    MJ:  And we already talked about -- you said for all of these

20  specifications WikiLeaks was not an authorized receiver of any of

21  this information.  Does that apply to this too?

22    ACC: Yes, Your Honor.

1    MJ:  And as we talked about earlier, was your conduct

2    prejudicial to good order and discipline and service discrediting?

3        ACC:  Yes, Your Honor.

4        MJ:  And for the reasons we earlier discussed or for some other

5    reason?

6        ACC:  Same reasons, Your Honor.

7        MJ:  And that was, once again -- was that at Contingency

8    Operating Station Hammer?

9        ACC:  Yes, Your Honor.

10       MJ:  And was that where you did the transmission to the drop box

11       ACC:  Correct, Your Honor.

12       MJ:  And that was over the Internet?

13       ACC:  Yes, Your Honor.

14       MJ:  What were the dates that you did that?

15       ACC:  That would have been 7th through 8th of March, Your Honor.

16       MJ:  So, on or about 8 March of 2010?

17       ACC:  Yes, Your Honor.

18       MJ:  Okay.  Does either side believe any further inquiry is

19    required?

20       TC[MAJ FEIN]:  May we have a moment, Your Honor?

21       MJ:  Yes.  Mr. Coombs, while they're having their moment, does

22    the defense believe any further inquiry is required?

23       CDC[MR.COOMBS]:  No, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 174 of 211 PageID# 280
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 173 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 43 of 79 PageID# 176

10667

1        MJ:  Okay.

2        TC[MAJ FEIN]:  Ma'am, the only question the government has is if

3    the Court needed to explore the willful component for this

4    specification.  I guess we still don't remember if he did it for all

5    specifications or not when you were questioning him.

6        MJ:  Okay.  Well, PFC Manning, let's cover that again.  The -- I

7    asked you earlier if your conduct was willful, that is, intentional

8    with an intent to violate the law.  Was it in this case?

9        ACC: Yes, Your Honor.

10       MJ:  Okay.  Did you know you are violating the law when you

11   transmitted that information?

12       ACC: Yes, Your Honor.

13       MJ:  Now, is that correct for all of these specifications that

14   were going to discuss today?  Did you act willfully and intentionally

15   when you transmitted all of these -- this information?

16       ACC: Yes, Your Honor, I was familiar with how we were supposed

17   to be doing -- safeguarding this information and the channels and the

18   authorities that are in place for it, yes.

19       MJ:  So, for all of this information in Specifications 2, 3, 5,

20   7, 9, 10, 13, 14, and 15, did you willfully and intentionally

21   transfer this information to WikiLeaks?

22       ACC: Yes, Your Honor.

10668

1    MJ:  Did you know you were violating the law when you

2    transferred all of the information in these specifications?

3       ACC:  Yes, Your Honor.

4       MJ:  Okay.  And when you transferred all of these -- this

5    information in these specifications I mean, we already asked this

6    question, but I'm going to ask it again:  was WikiLeaks entitled to

7    receive any of it?

8       ACC:  No, ma'am.

9       MJ:  And for any of these specifications, was your conduct not

10   prejudicial to good order and discipline?

11      ACC:  No, ma'am.

12      MJ:  It was prejudicial to good order and discipline?

13      ACC:  It was all prejudicial to good order and discipline, Your

14   Honor.

15      MJ:  If I asked you why, what would you tell me?

16      ACC:  It's prejudicial to good order and discipline, again,

17   because of the rules and regulations that were in place to safeguard

18   sensitive information, whether it be classified or not.

19      MJ:  All right.  Same question for service discrediting -- for

20   any of these specifications, was -- were any of these specifications

21   not service discrediting -- your conduct in transmitting these

22   documents WikiLeaks?

23      ACC:  No, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 176 of 211 PageID# 282
USCA4 Appeal: 19-1287   Doc: 10-2      Filed: 03/29/2019   Pg: 175 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 45 of 79 PageID# 178

10869

1    MJ:  And why would that be?  So, it was service discrediting is

2    what you're telling me ----

3    ACC: Yes, Your Honor.

4    MJ:  ---- for each of these specifications.  And why would that

5    be?

6    ACC: Well, I -- again, just service discrediting -- for

7    something to be service discrediting, it has to undermine the public

8    perception as well as the service's perception of itself, Your Honor,

9    and that -- misconduct undermines that, Your Honor.

10   MJ:  Okay.  I guess where I'm going with this, Government -- I

11   can ask the same question for each specification, if I'm going to get

12   the same answer that we just got, I don't really see the point unless

13   you do?

14   TC[MAJ FEIN]:  No, no, ma'am, not at all.

15   MJ:  Okay.  So, your conduct through all of these specifications

16   was -- you willfully acted to -- and you knew you were in violation

17   of the law, is that what you're telling me?

18   ACC: Yes, Your Honor.

19   MJ:  And you're telling me for all of these specifications, your

20   conduct was prejudicial to good order and discipline and service

21   discrediting for the reasons you told me when we first discussed

22   Specification 2 of Charge II?  Is that right?

23   ACC: That is correct, Your Honor.

6838

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 177 of 211 PageID# 283
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 176 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 46 of 79 PageID# 179

10870

1      MJ:  Okay.  Does either side see any need for me to ask any more

2  of those willfulness or service discrediting or prejudice to good

3  order and discipline questions with respect -- when I'm going through

4  the factual predicate for the other offenses?

5      TC[MAJ FEIN]:  No, ma'am, not the general questions.  The

6  government might have specific ones based off of prior -- what was

7  said in the statement per spec, but that will come up later ma'am.

8      MJ:  No, my intent, now -- and this is where I want to explore

9  it with the parties -- is to go over with PFC Manning the facts

10  regarding each of the additional transmissions, but I don't intend --

11  you know, I'll ask just the leading question, "was it willful, was it

12  service discrediting, and prejudice to good order and discipline,"

13  but what I'm understanding what PFC Manning has told me is the same

14  reasons apply.  All of the conduct was willful and the same reasons

15  apply for prejudice to good order and discipline and service

16  discrediting conduct as he first described to me for Specification 2

17  of Charge II.

18      TC[MAJ FEIN]:  Sounds good, ma'am.

19      CDC[MR.COOMBS]:  That's correct, ma'am.

20      MJ:  All right.  I guess now we are moving on, then, to

21  Specification 5 of Charge II.  Where would I find that?

22      ACC:  It's first mentioned on Page 3 and then again on Page 5,

23  Your Honor.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 178 of 211 PageID# 284
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 177 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 47 of 79 PageID# 180

10871

1    MJ:  All right.  And for Specification 5, we are talking about

2    more than 20 classified records from the Combined Information Data

3    Network Exchange-Iraq.  Now, you spent some time talking about that

4    when you read your statement earlier in the day.  Can you just

5    briefly describe what that database is?

6        ACC: Again, Your Honor, it's a database that exists -- have the

7    -- on SIPR -- on SIPRNET and it -- there's two -- I mean there's two

8    separate ones.  There was one for each theater, at the time, for both

9    Iraq and Afghanistan and it holds a large amount of data that is

10   exchanged between the -- between different units within DoD and the

11   different sections of the different branches of the military -- or

12   different branches of government -- or different agencies within the

13   government, Your Honor.

14       MJ:  All right.  And were -- was this information found on the

15   SIPRNET computer?

16       ACC: Yes, Your Honor.

17       MJ:  Was it classified?

18       ACC: Yes, Your Honor.

19       MJ:  At what level?

20       ACC: Not all the information in -- contained within CIDNE is

21   classified, but the information within was often classified up to

22   Secret, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 179 of 211 PageID# 285
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 178 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 48 of 79 PageID# 181

10672

1       MJ:  Okay.  Was that information you are authorized to take out

2    of the T-SCIF?

3       ACC: No, Your Honor.

4       MJ:  All right.  Did you take it out of the T-SCIF?

5       ACC: Yes, Your Honor.

6       MJ:  And how did you do that?

7       ACC: I -- it was -- I had already created a back-up of the

8    entire -- for both -- for a particular section of that database, the

9    Significant Activities tables and I placed them onto two separate

10   DVD-RWs -- I believe -- yeah, DVD-RWs and stored them in to the

11   conference area of the SCIF and I physically took that from the SCIF,

12   Your Honor.

13      MJ:  Okay.  Were there more than 20 records that you physically

14   took out the SCIF?

15      ACC: Yes, Your Honor, there were about 100,  Your Honor.

16      MJ:  Were there more than 20 classified records?

17      ACC: Charged records, yes, Your Honor.

18      MJ:  Okay.  So, the number in the charge in specification is

19   accurate, then?  More than 20?

20      ACC: Yes, Your Honor.

21      MJ:  Okay.  And you took it out of the CD and brought it -- did

22   you bring it back to your personal computer?

23      ACC: I did, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 180 of 211 PageID# 286
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 179 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 49 of 79 PageID# 182

10673

1    MJ:  Okay.  And what did you do with it?

2    ACC: I took the information and I uploaded it, again -- I mean,

3    this was the first thing that I ever uploaded to the WikiLeaks

4    website.  I uploaded it using their submission form.

5    MJ:  So, this was -- out of all of these specifications, even

6    though it's in middle in Specification 5, this was the first time you

7    uploaded to WikiLeaks, is that correct?

8    ACC: Correct, Your Honor.

9    MJ:  Okay.  Did you do the Afghanistan database at the same time

10   or a different time?

11   ACC: They were -- yes, they -- I -- they were on -- they were

12   both on the same DVD-RW that I took from the conference room of the

13   SCIF.

14   MJ:  Okay.  Well, let's talk about Specification 5 and

15   Specification 7 together, then.  Did you -- you downloaded the

16   Afghanistan and Iraq CIDNE databases at the same time or ----

17   ACC: It was sequential.  So, I got Iraq first and then I

18   downloaded Afghanistan, Your Honor.

19   MJ:  Okay.  Was it on the same CD?

20   ACC: Yes, it should have been on the -- I labeled the CD "CIDNE

21   SIGACTs," Your Honor.

22   MJ:  Okay.  Now, Specification 7 also says "more than 20

23   classified records."  Are the records -- did you download more than

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 181 of 211 PageID# 287
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 180 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 50 of 79 PageID# 183

10874

1   20 classified -- or is it more than 20 records from the Afghanistan

2   database to your CD also?

3        ACC: Yes, Your Honor.

4        MJ: Were there more than 20 classified records?

5        ACC: Yes, Your Honor.

6        MJ: Okay. So, did you take the Afghanistan records and the

7   Iraq database records out of the T-SCIF together on one CD?

8        ACC: Yes, Your Honor.

9        MJ: Okay. And you said -- you testified you went back to your

10  personal computer and uploaded it?

11       ACC: Well, I copied -- this wasn't immediately, no.

12       MJ: Okay.

13       ACC: This was -- I copied it onto -- I copied it onto my

14  personal computer and then I put it onto -- it's like a little SD

15  card for cameras. So, I didn't have it on the laptop anymore, but I

16  could put it on there. And then I took the actual CD that I took it

17  from back into the SCIF and I set it back in the conference room.

18       MJ: Okay. So, once you have this on that -- what did you call

19  it? The ----

20       ACC: SD card.

21       MJ: The SD card -- you said in your camera?

22       ACC: Yes, Your Honor. Digital camera.

23       MJ: All right. What did you do with it then?

10675

1      ACC: I took it with me on my mid-tour leave to my ----

2      MJ:  And this is when you went to your aunt's house and then you

3  went up to Massachusetts and then you came back and got stuck in the

4  blizzard?

5      ACC: Yes, Your Honor, but I didn't bring my camera case with me

6  to Massachusetts.

7      MJ:  Okay.  So, you -- but you did bring your camera case with

8  that SD card to your aunt's house?

9      ACC: Yes, Your Honor.

10      MJ:  And that was in Maryland?

11      ACC: Yes, Your Honor.

12      MJ:  And did you -- what did you do with that information -- or

13  SD card at your aunt's house?

14      ACC: I -- after deciding what I was going to do with it, I

15  eventually put it on to a -- put it on -- back on to my laptop and I

16  uploaded it -- I uploaded it to the WikiLeaks website at some point

17  during my mid-tour leave, Your Honor.

18      MJ:  So, when you were ----

19      ACC: At the end -- towards the end.

20      MJ:  When you uploaded the Iraq and Afghanistan databases to the

21  WikiLeaks website, were you in Contingency Operating Station Hammer,

22  Iraq or were you at your aunt's house in Maryland?

23      ACC: I think I was actually at a Barnes & Nobles, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 183 of 211 PageID# 289
USCA4 Appeal: 19-1287     Doc: 10-2         Filed: 03/29/2019     Pg: 182 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 52 of 79 PageID# 185

10676

1    MJ:  In -- I assume there's no Barnes & Nobles in Contingency

2   Operating Station Hammer, Iraq, so would this be in Maryland?

3    ACC: Yes, Your Honor, this was Rockville, Maryland.

4    MJ:  Rockville, Maryland?

5    ACC: Or it could have been North Bethesda; it's right between

6   the two, Your Honor.

7    MJ:  All right.  Mr. Coombs, I don't believe that the plea by

8   exceptions and substitutions changed the location, did it?

9    CDC[MR.COOMBS]:  The way that it -- and I covered this with my

10  client -- the way we looked at the location, ma'am, was that's where

11  he had the unauthorized possession of it and the actual disclosure of

12  it was in the United States.  However, the way the specification is,

13  he has the unauthorized possession at or near Contingency Operation

14  Station Hammer, Iraq.  I've discussed with him that the actual

15  disclosure was in the United States.  Looking at it, I did not

16  believe that would require us to do exceptions and substitutions for

17  the location, however I have covered that with my client and the

18  defense is prepared to enter, by exceptions and substitutions, if the

19  Court believes that's warranted.

20   MJ:  Well, reading it here that Contingency Hammer Station,

21  Iraq, that you had unauthorized possession.  Just to make the --

22  Specification 5 and 7 clear -- are those -- first of all, PFC

23  Manning, are those the only specifications -- Specifications 5 and 7

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 184 of 211 PageID# 290
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 183 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 53 of 79 PageID# 186

10877

1    of Charge II, where you transmitted the data from Barnes & Noble in

2    Maryland or anywhere in Maryland?

3        ACC: Yes, Your Honor.

4        MJ:  Okay.  So all of the other transmission were done from

5    Contingency Operating Hammer, Iraq?

6        ACC: Correct, Your Honor.

7        MJ:  Well, I'm thinking it might just be prudent to say ----

8        CDC[MR.COOMBS]:  Just put an "and" in ----

9        MJ:  For the -- well, you're not really excepting words, though,

10   there, you're adding words.

11       CDC[MR.COOMBS]:  Correct, Your Honor, so we would not object to

12   adding -- when you look at "at or near Contingency Operation Station

13   Hammer, Iraq" and just putting the "and" -- conjunction "and

14   Maryland" -- in this case, it would be Rockville, Maryland, United

15   States adding that to both Specifications 5 and 7.

16       MJ:  All right.  Government, do you have any objection if the

17   defense modifies their plea?

18       TC[MAJ FEIN]:  Ma'am, it might be even easier -- we could just

19   amend it also -- the actual charge sheet for those two specs.

20       MJ:  All right.  So, I assume if the government is going forward

21   with the greater offense, that the government is going forward with

22   those locations as well, is that correct?

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 185 of 211 PageID# 291
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019      Pg: 184 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 54 of 79 PageID# 187

10678

1       TC[MAJ FEIN]:  Well, the greater offense -- it would be a common

2   element of a greater offense anyways, Your Honor, so, yes.

3       MJ:  Okay.  Well, this is a good time for a brief recess anyway,

4   so why don't we go ahead and take a recess and then you all discuss

5   how you want to move ahead and just come see me before we call the

6   court back to session and let me know what you decide to do.

7       TC[MAJ FEIN]:  Yes, Your Honor.

8       MJ:  How long would you like?

9       TC[MAJ FEIN]:  Can we go at 1530, ma'am?

10      MJ:  All right.  The court is in recess until 1530.

11  **[The Article 39(a) session recessed at 1515, 28 February 2013.]**

12  **[The Article 39(a) session was called to order at 1542, 28 February**

13  **2013.]**

14      MJ:  This Article 39(a) session is called to order.  Let the

15  record reflect that all parties present when the court last recessed

16  are again present in court.

17          Government has what has happened with the charge sheet?

18      TC[MAJ FEIN]:  Yes, ma'am, the parties discussed this issue,

19  ma'am, and the United States, I guess, has amended, with the

20  concurrence of the defense, the two charges, Specification 5 and 7,

21  of a copy of the original charge sheet which will now become the new

22  original.  Specification 5 has been amended to say, "In that Private

23  First Class Bradley E. Manning, U.S. Army, did, at or near

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 186 of 211 PageID# 292
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 185 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 55 of 79 PageID# 188

10679

1   Contingency Operating Station Hammer, Iraq and at or near Rockville,

2   Maryland," and then the remaining portion.  And then the same

3   amendment has occurred in Specification 7, Your Honor.

4       MJ:  All right.  Defense, do you have any objection to this

5   amendment?

6       CDC[MR.COOMBS]:  No, Your Honor.

7       MJ:  PFC Manning, have you had an opportunity to look at the

8   amended charge sheet?

9       ACC: Yes, Your Honor.

10      MJ:  Do you have any objections to it?

11      ACC: No, Your Honor.

12      MJ:  Okay.  It was amended, basically, based on yours and my

13  dialogue and what you have in your statement to be factually correct.

14      ACC: Yes, Your Honor.

15      MJ:  Okay.  Now, Government, normally, after someone has been

16  arraigned, we don't normally -- the original charge sheet is supposed

17  to stay the same.  So, do it one of two ways:  either put the

18  original charge sheet back in the record somehow ----

19      TC[MAJ FEIN]:  Ma'am, it was fortuitous that we did not have the

20  original charge sheet, so it will remain in the record with this

21  amended charge sheet on top of it.

22      MJ:  Okay.  Great.  And the amended words are "at or near

23  Contingency Hammer Station [sic], Iraq and at or near Rockville,

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 187 of 211 PageID# 293
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 186 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 56 of 79 PageID# 189

10680

1   Maryland," for Specifications 5 and 7 of Charge II. Is that the

2   parties' understanding?

3        CDC[MR.COOMBS]:  Yes, Your Honor.

4        TC[MAJ FEIN]:  Yes, Your Honor.

5        MJ:  All right.  Is there anything else I need to address with

6   this issue?

7        CDC[MR.COOMBS]:  No, Your Honor.

8        TC[MAJ FEIN]:  No, Your Honor.

9        MJ:  Okay.  PFC Manning, as we discussed, the charge sheet was

10   amended based on yours and my discussion with respect to these two

11   specifications and, as I understand what you told me on what's in

12   your statement, you got the Iraq and Afghanistan databases from the

13   T-SCIF at Contingency Operating Base Hammer in Iraq ----

14        ACC: Yes, Your Honor.

15        MJ:  ---- you put them on your CDs -- or your CD, brought it

16   home -- brought it back to your CHU -- your personal computer ----

17        ACC: CHU.

18        MJ:  ---- at the CHU and then you -- Containerized Housing?

19   What's the ----

20        ACC: Containerized Housing.

21        MJ:  Containerized Housing Unit?  Okay.  It's been a while.

22   Okay.  So, then, you uploaded that onto the CD -- or the SD card in

23   your camera and then you brought that back to Maryland?  Is that my

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 188 of 211 PageID# 294
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019     Pg: 187 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 57 of 79 PageID# 190

10681

1    understanding of your testimony?  And then in a Barnes & Noble

2    somewhere near Rockville, Maryland, you transmitted that data to

3    WikiLeaks?

4        ACC:  Yes, Your Honor.

5        MJ:  Okay.  And, once again, you've already been asked the

6    willful questions, did you do -- did you transmit that data -- the

7    Iraq and Afghanistan databases to WikiLeaks willfully as well?

8        ACC:  Yes, Your Honor.

9        MJ:  And was your conduct prejudicial to good order and

10   discipline and service discrediting?

11       ACC:  Yes, Your Honor.

12       MJ:  And would that be for the same reasons you told me before

13   or something different?

14       ACC:  Yes, Your Honor, the same reasons, Your Honor.

15       MJ:  Okay.  Does either side believe any further inquiry is

16   required with respect to Specifications 5 or 7?

17       TC[MAJ FEIN]:  Yes, ma'am, based off of Page 14, what has been -

18   - it is based off Private First Class Manning's statement, but Page

19   14, Paragraph J, at the bottom.  The United States believes that

20   further inquiry into the potential defenses of necessity and

21   justification for these specific specifications, Your Honor.

22       MJ:  Okay.  Look at Page 14, there, at -- Paragraphs I and J.

23   It talks about -- that you began to get depressed with the situation.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 189 of 211 PageID# 295
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 188 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 58 of 79 PageID# 191

10882

1  Now, was it -- when you got depressed with the situation, that was

2  when you were in Maryland after you'd already taken these databases,

3  is that correct?

4      ACC: It's more of a general, broad feeling that I had over a

5  period of time, Your Honor.

6      MJ:  Okay.  Now, was that -- when you took these databases out

7  of Iraq and you took them back home with you on leave, as I

8  understand your statement, were you still deciding what you were

9  going to do with them?

10     ACC: Yes, Your Honor, I was looking at different -- and trying

11  to figure out different people that I could possibly give this to,

12  Your Honor.

13     MJ:  Did you plan to ----

14     ACC: I didn't know how ----

15     MJ:  ---- give it to somebody or -- had you already made that

16  decision that you were going to give it to somebody?

17     ACC: Yes, Your Honor.  Before I left Iraq, I knew I was going to

18  probably give it to some news organization, Your Honor.

19     MJ:  You just -- at that point -- so, you left Iraq, did you

20  know which news organization you're going to give it to?

21     ACC: My preference would have been the Washington Post, Your

22  Honor.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 190 of 211 PageID# 296
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 189 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 59 of 79 PageID# 192

10683

1      MJ:  Okay.  And I remember your statement, earlier -- I think --

2    were these the -- was this the information you were trying to give to

3    the Washington Post?

4      ACC: Yes.

5      MJ:  Or was that something different?

6      ACC: Yes, Your Honor, that was the way it started out, Your

7    Honor.

8      MJ:  Okay.  So, that's what's on 15 of your statement, then?

9    You just tried to do it -- to give it to the Washington Post, you

10   talked to somebody there and they said, well, they might be

11   interested but they have to see it first?

12     ACC: Yes, Your Honor, and I never went down, physically, to

13   there but I thought of -- I considered actually going to the

14   Washington Post downtown, Your Honor.

15     MJ:  And, at some point, did you make a decision that that

16   wasn't a good idea?

17     ACC: I was nervous, Your Honor, yes.

18     MJ:  Okay.  And then did you -- what was the next thing you were

19   thinking about doing?

20     ACC: I thought about -- well, after, I made a phone call -- I

21   made a few phone calls -- I made at least one phone call to the

22   Washington Post and then I called the New York Times and sort of got

23   the same response.  And then I also thought about going -- there's

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 191 of 211 PageID# 297
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 190 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 60 of 79 PageID# 193

10684

1   Allbritton Communications Office where Politico operates and I

2   thought about going down there, Your Honor.

3       MJ:  Okay.  And, ultimately, what decision did you make?

4       ACC: By -- with time running out on my mid-tour leave, I decided

5   that I was going to upload it to the WikiLeaks website before I lost

6   a good Internet connection -- before I lost a really strong broadband

7   Internet connection, Your Honor.

8       MJ:  Did you need a really strong broadband to transmit that

9   data?

10      ACC: Yes, Your Honor.

11      MJ:  Okay.  And is that why you went to Barnes & Noble?

12      ACC: There was a blizzard as well, so we lost our -- at the

13  house, we lost our heating and our Internet access.  We still had

14  some power, though, Your Honor.

15      MJ:  Okay.  So, you -- did you actually transmit those -- the

16  Iraq and Afghanistan databases from Maryland to WikiLeaks?

17      ACC: Yes, Your Honor.

18      MJ:  Okay.  Now let's go back to Page 14 where it says you

19  became depressed at the situation.  What situation -- are you talking

20  about the situation in Iraq and Afghanistan?

21      ACC: Yes, Your Honor.

22      MJ:  Okay.  And remember we talked earlier about -- I believe

23  that you're--also, here, in Paragraph J, you said you released this

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 192 of 211 PageID# 298
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 191 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 61 of 79 PageID# 194

10885

1    information to spark a debate.  Were you authorized to release this

2    information to spark a debate?

3        ACC: No, Your Honor, I was not.

4        MJ:  Okay.  When it talks about you being depressed about this –

5    – we went over the defenses of justification and necessity.  Earlier,

6    I defined them for you.  Do you want me to redefine them for you?

7        ACC: No, Your Honor.

8        MJ:  Okay.  Do you believe that either justification or

9    necessity –– those defenses apply in your case?

10       ACC: No, Your Honor, not for that.

11       MJ:  Why not?

12       ACC: It's just a general feeling; it wasn't a depression

13   depressed, it was just a general feeling of what was going on was not

14   good, generally so.

15       MJ:  Well, if –– even if –– and remember, we talked about self-

16   help, before, and ––––

17       ACC: Right.

18       MJ:  –––– even if you, personally, believed maybe you weren't in

19   favor of some of the policies that were going on for some of the

20   things that were happening in Iraq and Afghanistan, do you believe

21   that that gave you the authority to go ahead and download these

22   databases and then bring them to Maryland and transmit them to

23   WikiLeaks?

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 193 of 211 PageID# 299
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 192 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 62 of 79 PageID# 195

10686

1       ACC: Correct, Your Honor.

2       MJ:  Do you believe it gave you authority to do that?

3       ACC: No, Your Honor.

4       MJ:  Okay.  So, in the military, in the chain of command

5   structure, if -- or in the government structure in general, if

6   someone disagrees with policies that are made by senior people more

7   senior to them in charge of making those policies, are you allowed

8   just to take self-help and violate the rules and give somebody

9   classified information?

10      ACC: No, Your Honor.

11      MJ:  Okay.  Now, let's talk a little bit about -- you said you

12  became depressed -- you said you weren't -- you were depressed, but

13  not "depressed" depressed.  Tell me what that means?

14      ACC: I wasn't like -- for -- that general feeling I'm describing

15  is not attached to depression as a mental issue, although -- so I'm

16  not raising that for that portion, Your Honor.  For that paragraph.

17      MJ:  Okay.  Well, let's talk a little bit about that because

18  this is during the period of time when you were in Contingency

19  Operating Station Hammer and back at Fort Drum, too, you had received

20  some mental health treatment for anxiety issues ----

21      ACC: Yes.

22      MJ:  ---- is that correct?

23      ACC: Yes, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 194 of 211 PageID# 300
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 193 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 63 of 79 PageID# 196

10687

1    MJ:  And that's come through when we talked about the Article 13

2    motion and a little bit in the speedy trial even.  Have you gone over

3    with Mr. Coombs the defense of lack mental responsibility or lack of

4    *mens rea* due to partial mental responsibility?

5    ACC:  Yes, Your Honor, we have.

6    MJ:  Okay.  Mr. Coombs, have you gone over that with PFC

7    Manning?

8    CDC[MR.COOMBS]:  I have, Your Honor.

9    MJ:  There has been an R.C.M. 706 board in this case, right?

10   CDC[MR.COOMBS]:  That is correct, Your Honor.

11   MJ:  And actually a pretty extensive one?

12   CDC[MR.COOMBS]:  Yes, Your Honor.

13   MJ:  When the board came back, what were the short-form results?

14   CDC[MR.COOMBS]:  The short form indicated that he was not

15   suffering from a lack of mental responsibility, either at the time of

16   the incident or presently.

17   MJ:  Was he suffering from a serious mental disease or defect at

18   that time?

19   CDC[MR.COOMBS]:  No, Your Honor.

20   MJ:  Okay.  These offenses all require a willful intent.  So,

21   before we -- so, Mr. Coombs, am I hearing from you, then, you fully

22   explored the issue of lack of mental responsibility?

23   CDC[MR.COOMBS]:  That is correct, Your Honor.


6856

**190**

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 195 of 211 PageID# 301
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 194 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 64 of 79 PageID# 197

10688

1      MJ:  Okay.  And do you believe there's anything else left to

2  explore with respect to that issue?

3      CDC[MR.COOMBS]:  No, Your Honor.

4      MJ:  All right.  PFC Manning, do you agree with that?

5      ACC: I agree, Your Honor.

6      MJ:  Okay.  Now, let's talk about the willful aspect of these

7  specifications.  Mr. Coombs, have you fully investigated the issue of

8  whether PFC Manning suffered from a mental disease or defect or

9  impairment or condition or character behavior disorder that prevented

10  him from forming -- or basically willfully acting in this case?

11      CDC[MR.COOMBS]:  I have, Your Honor.

12      MJ:  Okay.  And what were your conclusions from ----

13      CDC[MR.COOMBS]:  That he was not, Your Honor.

14      MJ:  All right.  PFC Manning, do you agree with that?

15      ACC: Yes, Your Honor.

16      MJ:  Okay.  Now, did Mr. Coombs -- or did your defense team

17  explain to you that partial lack of mental responsibility can negate

18  the intent required for offenses we call "specific-intent" or

19  "knowledge" offenses?

20      ACC: Yes, Your Honor, we have.

21      MJ:  Okay.  So, this willful intent falls within that?  Okay.

22  So, at the time you made these transmissions, were you seeing mental

23  health professionals at that time?

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 196 of 211 PageID# 302
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 195 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 65 of 79 PageID# 198

10689

1     ACC: I had seen one a few weeks before, yes, Your Honor.

2     MJ:  Okay.  Were you on any medications?

3     ACC: No, Your Honor.

4     MJ:  So, was there any -- so you were not on any medications at

5   the time?

6     ACC: That is correct.

7     MJ:  And did you continue to perform your military -- was there

8   anything about your state of mind that made you unable to perform

9   your military duties at that time?

10    ACC: No, Your Honor.

11    MJ:  So, you're going to work and going home just like everybody

12  else?

13    ACC: Yes, Your Honor.

14    MJ:  Were you acting differently than you normally act during

15  that period of time?  I mean, was there anything strange that you

16  noticed about your mental health behavior?

17    ACC: Trouble sleeping, that's it, Your Honor.

18    MJ:  So, do you believe that you were fully capable of acting

19  willfully in making these communications?

20    ACC: Yes, Your Honor.

21    MJ:  Do you believe you were of sound mind when you did that?

22    ACC: Yes, Your Honor.

6858

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 197 of 211 PageID# 303
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 196 of 337
Case 1:19-dm-00003-CMH  Document 5-6  Filed 03/04/19  Page 66 of 79 PageID# 199

10690

1      MJ:  Does either side believe any further inquiry is required

2  with respect to mental responsibility or partial mental

3  responsibility?

4      TC[MAJ FEIN]:  Yes, ma'am, just maybe a little bit more -- and

5  if the Court remembers and we can get these for the Court if needed -

6  - the Master Sergeant Adkins memos, they used some pretty specific

7  details -- I'm not asking the Court to go through that, but some

8  behaviors that were going on concurrent with the charged misconduct

9  that might just be -- they're already on the record to be explored

10  and make sure that doesn't necessarily go to the willful aspect

11  either.

12      MJ:  I don't ----

13      TC[MAJ FEIN]:  I'm sorry, Your Honor, the question, just now, to

14  Private First Class Manning was:  "Was there any mental condition at

15  the time that would have affected the *mens rea*, essentially" -- that

16  -- there's documentation that there could have been, so just

17  exploring whether that mental -- his state of mind at that time would

18  have affected the charged misconduct.

19      MJ:  All right, I don't have the Adkins documents in front of

20  me.  What we can do is -- can someone make a Xerox copy of them and

21  give them to me and ----

22      TC[MAJ FEIN]:  We can keep going, Your Honor, and we'll get

23  that.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 198 of 211 PageID# 304
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019      Pg: 197 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 67 of 79 PageID# 200

10691

1     MJ:  ---- we'll keep going and if you can make that happen,

2     we'll come back to that.

3     TC[MAJ FEIN]:  Yes, ma'am.

4     MJ:  Okay.  So, PFC Manning, we're going to put that piece of

5     the discussion -- table it for a little while and then continue on,

6     here.

7     ACC:  Yes, Your Honor.

8     MJ:  All right.  So any further questions with respect to

9     Specifications 5 and 7 of Charge II?

10    TC[MAJ FEIN]:  No, ma'am.

11    CDC[MR.COOMBS]:  No, Your Honor.

12    MJ:  All right.  Let's move on to Specification 9 of Charge II.

13    Where would I find that in your statement?

14    ACC:  Page 24, Your Honor.

15    MJ:  Now, Specification 9 of Charge II involves more than three

16    classified records from the United States Southern Command database.

17    What are those records?

18    ACC:  They are Detainee Assessment Briefs, Your Honor.

19    MJ:  Okay.  And what is that?

20    ACC:  They are documents that, generally, outline and describe

21    detainees that were held at Joint -- Joint Task Force Guantánamo,

22    Your Honor.

23    MJ:  Okay.

6860

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 199 of 211 PageID# 305
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 198 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 68 of 79 PageID# 201

10892

1       ACC: Held under.

2       MJ:  Where did you find these documents?

3       ACC: These were on a U.S. Southern Command portal, Your Honor.

4       MJ:  And was that portal on SIPRNET?

5       ACC: Yes, Your Honor.

6       MJ:  Where they -- where these documents classified?

7       ACC: Yes, Your Honor.

8       MJ:  Okay.  And what did you do with these documents -- and were

9  there more than three of them?

10      ACC: There were five, I think, Your Honor -- or charged, Your

11  Honor.

12      MJ:  All right.  And what did you do with them?

13      ACC: I -- as I was downloading I mean, as I was going through

14  some things, I segregated them some of them and went through them and

15  then I downloaded them -- or I downloaded all of them that I could

16  and then I put them onto a CD and they took them to my housing unit

17  and put it into -- put it onto my personal laptop and uploaded it

18  using the drop box that I described, Your Honor.

19      MJ:  Okay.  Now, your statement talks about getting an

20  interpreter and all of that -- what happened there?

21      ACC: That was a separate -- that's a separate incident that

22  happened, but it made me sort of look into detainments as a whole

23  after some detainees were found at -- down in the Karada Peninsula of

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 200 of 211 PageID# 306
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 199 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 69 of 79 PageID# 202

10893

1   Baghdad -- the Federal Police -- it was a joint operation in which 15

2   detainees were, basically, taken into the -- and they were turned

3   over to the FPs and -- at the -- and going -- and I was assigned to

4   do some research into this matter and it got me thinking about

5   detainments and things, Your Honor.

6      MJ:  Okay.  So you said it got you thinking about detainments

7   and is that why you took those records out of the SCIF?

8      ACC: Is one of the reasons that I found them and -- I found them

9   again and then, after reviewing them, then I took them, Your Honor.

10      MJ:  All right.  In this particular case, with these records, do

11   you think that there was -- was your conduct willful?

12      ACC: Yes, Your Honor.

13      MJ:  Did you know you are violating the law when you gave those

14   records -- when you took them out -- the classified records out of

15   the T-SCIF, put them on your personal computer, and transmitted them

16   to WikiLeaks?

17      ACC: Yes, Your Honor.

18      MJ:  And you did transmit those to WikiLeaks, too?

19      ACC: To the drop box that was associated with them, yes, Your

20   Honor.

21      MJ:  Okay.  We talked about justification and necessity before.

22   Do you think that you had any -- you have any justification or

23   necessity defense with respect to these records?

6862

10694

1      ACC: No, Your Honor.

2      MJ:  Okay.  Why not?

3      ACC: I knew that I was -- I knew I was doing and I knew that I

4   was breaking the rules and not going by the regulations, Your Honor.

5      MJ:  When you are submitting these detainee assessments -- I

6   mean, you weren't doing -- were you doing that to save somebody in

7   imminent danger at that time?

8      ACC: No, Your Honor, nobody was in imminent danger.

9      MJ:  And was it a part of your official military duties?

10      ACC: No, Your Honor, it was not.

11      MJ:  Does either side believe any further -- well, first of all,

12   was it -- was your conduct prejudicial to good order and discipline

13   and service discrediting?

14      ACC: Yes, Your Honor.

15      MJ:  And was that for the same reasons we talked about before or

16   different reasons?

17      ACC: The same reasons, Your Honor.

18      MJ:  And when did you make this transmission to WikiLeaks of

19   these documents?

20      ACC: This was 8 -- it was -- I downloaded them and took them on

21   the 7th of March; it was the election for Iraq and then the day after

22   is whenever I uploaded them, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 202 of 211 PageID# 308
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019    Pg: 201 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 71 of 79 PageID# 204

10695

1    MJ:  And then were you authorized to transmit those documents to

2    WikiLeaks?

3    ACC: No, Your Honor.

4    MJ:  And were they entitled to receive them?

5    ACC: No, Your Honor.

6    MJ:  All right.  Does either side believe any further inquiries

7    required with respect to Specification ----

8    TC[MAJ FEIN]:  Can we have a moment, Your Honor?

9    MJ:  Yes.

10   CDC[MR.COOMBS]:  Nothing from the defense, Your Honor.

11   ATC[CPT MORROW]:  Your Honor, I just refer the parties and the

12   Court to Page 26, Paragraphs M and N.  It may be beneficial for the

13   Court to explore the answers with respect to prejudicial to good

14   order and discipline with the statement made in those two paragraphs.

15   MJ:  All right.  Look at page -- Paragraphs M and N in your

16   statement.

17   ACC: Yes, Your Honor.

18   MJ:  When it talks about, here, that you'd always been

19   interested in the moral efficacy of the actions in JTF-GTMO and you

20   always understood the need to detain and interrogate individuals who

21   might harm the United States and allies, and you felt that that's

22   what we're trying to do at JTF-GTMO, but then, as you became educated

23   on the topic, you believed that the United States was holding an

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 203 of 211 PageID# 309
USCA4 Appeal: 19-1287   Doc: 10-2        Filed: 03/29/2019     Pg: 202 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 72 of 79 PageID# 205

10898

1    increasing number of individuals indefinitely that we -- that you

2    believed were innocent, low-level foot Soldiers that didn't have

3    useful intelligence who would be released if they were still held in

4    theater and, then, that you remember back in early 2009, the newly

5    elected president, Barack Obama, said he would close JTF-GTMO and the

6    facility compromised our standing in the world and diminished our

7    moral authority and after you familiarized yourself with the DABs,

8    that you agreed.

9            Now, even if -- this is kind of -- what you're saying is

10   that you had your own personal, noble motive in doing what you did.

11   Do you believe -- and you also testified that you believed that this

12   conduct is service discrediting in prejudicial to good order and

13   discipline.  How can that coexist?

14   ACC: Your Honor, it's -- regardless of my opinion on -- or my

15   assessment on documents such as this -- you know it's beyond my pay

16   grade, it's not my authority to make these decisions and there are --

17   again, there are channels that you are supposed to go through and I

18   didn't even look at the possible channels of doing -- having this

19   information released properly.  So, that's not how we do business

20   Your Honor, and it's so ----

21   MJ:  So, my understanding -- your testimony -- are you telling

22   me that even though you, personally, have a disagreement with how

23   policy was being formed and implemented, that your conduct, to

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 204 of 211 PageID# 310
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 203 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 73 of 79 PageID# 206

10697

1   further your personal goals, could still be prejudicial to good order

2   and discipline and service discrediting conduct?

3      ACC: Yes, Your Honor, and, just clarify, I mean -- for the

4   policy standpoint, it's not necessarily my issues with the policies

5   that were the driver, it was my concerns about not -- about the lack

6   of openness about the policies, Your Honor. But, regardless my

7   opinions on those, again, I don't have the authority.

8      MJ: Okay. It was the fact that you acted without that

9   authority -- is that what made your conduct prejudicial to good order

10   and discipline?

11      ACC: Yes, Your Honor.

12      MJ: Was that when made your conduct service discrediting?

13      ACC: What made my service discrediting is the fact that these --

14   the public sees this -- sees that these documents have been released

15   and then you know, it damages their perception and their feeling

16   about whether the armed services, as a whole, can safeguard

17   information at all.

18      MJ: All right. Does the government have any -- desire any

19   further inquiry?

20      TC[MAJ FEIN]: No, Your Honor.

21      MJ: All right. Let's move on to Specification 10. Where am I

22   in your statement?

23      ACC: Page 33, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 205 of 211 PageID# 311
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019    Pg: 204 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 74 of 79 PageID# 207

10698

1      MJ:  All right, Specification 10 involves more than five

2   classified records relating to a military operation in Farah

3   Province, Afghanistan occurring on or about 4 May of 2009.  Now, did

4   you have -- acquire unauthorized possession of, access to, or control

5   over more than five classified records relating to that military

6   operation?

7      ACC: Yes, Your Honor.

8      MJ:  And where did those records come from?

9      ACC: Those records came from the U.S CENTCOM portal under their

10  Judge Advocate General folder.

11     MJ:  Was that from the SIPRNET computer too?

12     ACC: Yes, Your Honor.

13     MJ:  And were those more than five records classified?

14     ACC: Yes, Your Honor.

15     MJ:  Okay.  And what did you do -- what did they involve ----

16     ACC: They ----

17     MJ:  ---- that you can tell me?

18     ACC: They reference an event that occurred in 2009, Your Honor,

19  in which they were -- there are reports of civilian casualties at an

20  event.

21     MJ:  Okay.  And when you came across this information, was it a

22  15-6 investigation or did that include a 15-6 investigation?

10699

1      ACC: It might have been 15-6 -- I think it was DoD that -- it

2    was under DoD, but I don't remember if -- whether it was the Army

3    regulation that they went by or not, Your Honor.

4      MJ:  Was there some kind of investigation into this incident

5    that you're talking about?

6      ACC: It was at least a 15-6-type investigation, Your Honor.

7      MJ:  Are those the records that you took, or did you take some

8    different ones?

9      ACC: And the supporting annexes and supplements and things like

10   that, Your Honor.

11     MJ:  Okay.  So, that's what you -- did you download that from

12   the SIPRNET onto something?

13     ACC: Yes, Your Honor.

14     MJ:  What something was it?

15     ACC: First, my work computer, then a CD-RW and then I uploaded -

16   - and then I placed that onto my personal computer in the CHU and

17   uploaded that sometime later, Your Honor, a few days later at least.

18     MJ:  So, the specification has the time frames of between on or

19   about 10 April 2012 and 12 April -- 10 April 2010, excuse me, and 12

20   April 2010.  Are those the accurate dates?

21     ACC: Yes, Your Honor.

22     MJ:  Those are the dates that you downloaded that information

23   and then you gave it to WikiLeaks?

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 207 of 211 PageID# 313
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 206 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 76 of 79 PageID# 209

10700

1    ACC: Yes, Your Honor, so it would have been 11 April of 2010.

2    MJ: You talked about something -- you didn't use the TOR

3 anonymizer? I think I'm pronouncing this right.

4    ACC: It's anonymizer.

5    MJ: Anonymizer? Okay, we'll get there. So, what did you use?

6    ACC: I used a new version of the form that was up on the website

7 because they changed the website -- how they had the website set up

8 and I just used a new version of that and it had like a bar in which

9 you could see how far it was downloaded and you didn't have to use

10 the annoymizer, Your Honor.

11    MJ: Okay. Did you act willfully?

12    ACC: I did, Your Honor.

13    MJ: Did you know you were violating the law?

14    ACC: Yes, Your Honor.

15    MJ: Did you -- was your conduct prejudicial to good order and

16 discipline?

17    ACC: Yes, Your Honor.

18    MJ: Was it service discrediting?

19    ACC: Yes, Your Honor.

20    MJ: For the same reasons we talked about before, or for

21 different reasons?

22    ACC: For the same reasons, Your Honor.

Case 1:19-dm-00012-AJT Document 4-1 Filed 05/15/19 Page 208 of 211 PageID# 314
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 207 of 337
Case 1:19-dm-00003-CMH Document 5-6 Filed 03/04/19 Page 77 of 79 PageID 210

10701

1      MJ: Does either side believe any further inquiry is required

2   with respect to Specification 10?

3      TC[MAJ FEIN]: Could we have a moment, Your Honor?

4      MJ: Yes.

5      CDC[MR.COOMBS]: The defense does not, Your Honor.

6      ATC[CPT MORROW]: Your Honor, just briefly, I think, but on Page

7   33, Paragraph B. Again, it might be helpful for the Court to explore

8   service discrediting and PGOD aspect to this as compared to what's in

9   the statement.

10     MJ: All right. PFC Manning, well, first of all, just before we

11  even get there, you weren't authorized to take any of this

12  information out of the SCIF, were you?

13     ACC: No, I was not, Your Honor.

14     MJ: Okay. So, were you authorized to load it on your personal

15  computer?

16     ACC: No, Your Honor.

17     MJ: Were you authorized to transmit it to WikiLeaks?

18     ACC: No, Your Honor.

19     MJ: Were they cleared to receive it?

20     ACC: No, Your Honor.

21     MJ: Now, looking at Page 33, here, it talks about, in

22  Paragraphs A and B that this information -- you said it was reported

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 209 of 211 PageID# 315
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019      Pg: 208 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 78 of 79 PageID# 211

10702

1    in the press, here, that's up to 100 to 150 Afghan civilians were

2    accidentally killed?

3        ACC: That was just the press, Your Honor.

4        MJ:  Okay.  So, you transmit this information to WikiLeaks --

5    why?

6        ACC: What was that, Your Honor?

7        MJ:  Why did you transmit this information to WikiLeaks?

8        ACC: I felt -- I mean -- I just felt that the report was

9    different than -- I felt that there were things within the report

10   that might help enlighten the general public of what happened and how

11   it happened.

12       MJ:  Okay.  And this report was classified at the time, is that

13   correct?

14       ACC: Yes, Your Honor, it was, Your Honor.

15       MJ:  All right.  And, at least in accordance with the people

16   that had authority to classify this report, nobody with authority to

17   classify this report had made a determination that it should be

18   unclassified and disseminated to the general public, is that correct?

19       ACC: That is correct, Your Honor.

20       MJ:  Okay.  Now, we talked earlier about, sort of, the

21   difference that even though you think something is a good idea, that

22   the people who are authorized to make those choices don't think

23   that's a good idea, and you act in accordance with your personal

Case 1:19-dm-00012-AJT   Document 4-1   Filed 05/15/19   Page 210 of 211 PageID# 316
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 209 of 337
Case 1:19-dm-00003-CMH   Document 5-6   Filed 03/04/19   Page 79 of 79 PageID# 212

10703

1   idea, that that conduct can be prejudicial to good order and

2   discipline.

3       ACC: Certainly, Your Honor, yes.

4       MJ:  Do you think, in this case, that that's true?

5       ACC: Yes, Your Honor.

6       MJ:  Okay.  And for the same reasons we talked about before?

7       ACC: Yes, Your Honor.

8       MJ:  And what about service discrediting conduct?  If you

9   personally think that you're doing something for the greater good,

10  but the people with the authority to make those decisions hadn't made

11  the same decision you did, do you think that your conduct can still

12  be service discrediting?

13      ACC: Yes, Your Honor.

14      MJ:  Do you think it was service discrediting in this case?

15      ACC: Yes, Your Honor it was.

16      MJ:  And for this specification as well?

17      ACC: For this specification, yes.

18      MJ:  Okay.  And for different reasons or reasons we talked about

19  earlier?

20      ACC: For the same reasons.

21      MJ:  All right.  Government, anything else?

22      TC[MAJ FEIN]:  No, Your Honor.  Also, Your Honor, the government

23  has a copy of the Adkins memos, although, after reviewing the memos,

Case 1:19-dm-00012-AJT  Document 4-1  Filed 05/15/19  Page 211 of 211 PageID# 317
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 210 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 1 of 47 PageID# 213

10704

1   the inquiry that the Court already had about the extensive R.C.M. 706

2   board and findings the board should cover this material; it's

3   probably not needed.

4        MJ:  All right.  I'm just going to do -- I don't need to see the

5   material, but, PFC Manning, there were a couple of incidents around

6   the time you were making these disclosures where there was maybe a

7   little bit of outburst behavior.  How did that impact your -- did

8   that impact your mental state, in any way, when you were making these

9   decisions to willfully disclose this classified information?

10       ACC: No, Your Honor.

11       MJ:  Okay.  Were you of -- I mean, was your mind clear when you

12   are making these decisions?

13       ACC: Yes, Your Honor.

14       MJ:  Okay.  Do you think that there was anything that was

15   influence -- that was of any kind of mental health issue or mental

16   condition that was influencing your decisions to transmit these

17   documents willfully?

18       ACC: I think I had some issues, but I don't think it would

19   impact my performance or my ability to perform my duties, Your Honor,

20   so, no.

21       MJ:  All right.  Any further inquiry?

22       TC[MAJ FEIN]:  No, ma'am.

23       MJ:  Okay.  Mr. Coombs?