Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 1 of 127 PageID# 318
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 211 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 2 of 47 PageID# 214

10705

1        CDC[MR.COOMBS]:  No, Your Honor.

2        MJ:  All right.  Lastly, for this charge and specification,

3    let's talk about -- oh, we already talked about Specification 15,

4    didn't we?  All right.

5        ACC: Yes, Your Honor.

6        MJ:  Any other remaining specifications for charges under 18 --

7    the lesser included offenses for 18 United States Code, Section

8    793(e)?

9        TC[MAJ FEIN]:  No, ma'am.

10       CDC[MR.COOMBS]:  No, Your Honor.

11       MJ:  All right.  PFC Manning, do you admit that, at or near

12   Contingency Operation Station Hammer, Iraq, and for Specifications 5

13   and 7, also, at or near Rockville, Maryland, for Specification 2,

14   between on or about February 2010 [sic] and 21 February 2010, you,

15   without authorization, had possession of, access to, or control over

16   a video file named, "12 Jul 07 CZ Engagement Zone 30GC anyone.avi"?

17       ACC: Yes, Your Honor.

18       MJ:  Do admit, for Specification 3 of Charge II, that between on

19   or about 17 March 2010 and 22 March 2010, you, without authorization,

20   had possession of, access to, or control over more than one

21   classified memorandum produced by a United States government

22   intelligence agency?

23       ACC: Yes, ma'am.

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 2 of 127 PageID# 319
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 212 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 3 of 47 PageID# 215

10706

1       MJ:   For Specification 5, to admit that, at or near Contingency

2   Operation Station Hammer, Iraq and at or near Rockville, Maryland

3   that you, without authorization, had possession of, access to, or

4   control over more than 20 classified records from the Combined

5   Information Data Network Exchange-Iraq database?

6       ACC: Yes, ma'am.

7       MJ:   Do admit, for Specification 7, that, at or near Contingency

8   Operation Station Hammer, Iraq, and at or near Rockville, Maryland,

9   between on or about 5 February -- or 5 January 2010 and 3 February

10  2010, you, without authorization, had possession of, access to, or

11  control over more than 20 classified records from the Combined

12  Information Data Network Exchange-Afghanistan database?

13      ACC: Yes, ma'am.

14      MJ:   For Specification 9, do admit that, at or near Contingency

15  Hammer Station, Iraq [sic], that on or about 8 March 2010, you,

16  without authorization, had possession of, access to, or control over

17  more than three classified records from the United States Southern

18  Command database?

19      ACC: Yes, ma'am.

20      MJ:   For Specification 10, do admit that, at or near Contingency

21  Operating Station Hammer, Iraq, between on or about 10 April 2010 and

22  12 April 2010, you, without authorization, had possession of, access

23  to, or control over more than five classified records relating to a

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 3 of 127 PageID# 320
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 213 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 4 of 47 PageID# 216

10707

1   military operation in Farah Province, Afghanistan occurring on or

2   about 4 May 2009?

3        ACC: Yes, ma'am.

4        MJ:  For Specification 15, do you admit that, at or near

5   Contingency Hammer -- Operating Station Hammer, Iraq, on or about 8

6   March 2010, you, without authorization, had possession of, access to,

7   or control over a classified record produced by a United States Army

8   intelligence organization, dated 18 March 2008?

9        ACC: Yes, ma'am.

10       MJ:  All right.  For all of the specifications, do you admit

11   that you willfully communicated the classified records, classified

12   memorandum, videos, and files described for each specification

13   described in element one to a person not entitled to receive it?

14       ACC: Yes, Your Honor.

15       MJ:  And do you admit that, under the circumstances, your

16   conduct was to the prejudice of good order and discipline in the

17   armed forces or the nature to bring discredit upon the armed forces?

18       ACC: Yes, Your Honor.

19       MJ:  All right.  Let's move into Specifications 13 and 14 of

20   Charge II which are the lesser included offenses to the offenses

21   charged as a violation of 18 United States Code, Section 1030(a)(1),

22   and Article 134.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 4 of 127 PageID# 321
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 214 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 5 of 47 PageID# 217

10708

1           All right, Specifications 13 and 14 of Charge II allege the

2    offense of fraud and related activity in connection with computers in

3    violation of Title 18, United States Code, Section 1030(a)(1) and

4    Article 134, UCMJ.  Your counsel has entered a plea of guilty by

5    exceptions and substitutions for you to the lesser included offense

6    of conduct prejudicial to good order and discipline and service

7    discrediting conduct in violation of Article 134, UCMJ, clauses one

8    and two.

9           Now, your plea of guilty admits that the following elements

10   are true and accurately describe what you did:

11          One, that at or near Contingency Operation Station Hammer,

12   Iraq, for Specification 13 between on or about 28 March 2010 and on

13   or about 4 May 2010; for Specification 14, between on or about 14

14   February 2010 and 15 February 2010, you knowingly accessed a computer

15   on a Secret Internet Protocol Router Network.

16          Element two, that you obtained information that has been

17   determined by the United States government, by executive order or

18   statute, to require protection against unauthorized disclosure for

19   reasons of national defense or foreign relations, to wit:

20   Specification 13, more than 75 classified United States Department of

21   State cables; in Specification 14, a classified Department of State

22   cable titled "Reykjavik 13."

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 5 of 127 PageID# 322
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 215 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 6 of 47 PageID# 218

10709

1        Element three, that you communicated, delivered,

2   transmitted, or caused to be communicated, delivered, or transmitted

3   the information to a person not entitled to receive it.

4        Element four, that you acted willfully.

5        And element five, that under the circumstances, your

6   conduct was to the prejudice of good order and discipline in the

7   armed forces or was of a nature to bring discredit upon the armed

8   forces.

9        The same definitions for "prejudice to good order and

10  discipline in the armed forces" and "of a nature to bring discredit

11  upon the armed forces" that I read for you for the offenses charged

12  in Specifications 2, 3, 5, 7, 9, 10, and 15 of Charge II also apply

13  to this offense.

14       Would you like me to read them to you again?

15    ACC: No, Your Honor, that's not necessary.

16    MJ:  An act is done willfully if it is done voluntarily and

17  intentionally with a specific intent to do something the law forbids,

18  that is, with a bad purpose to disobey or disregard the law.

19       An act is done knowingly if it's done voluntarily and

20  intentionally and not because of a mistake or accident or other

21  innocent reason.

22       The term "computer" means an electronic, magnetic, optical,

23  electrochemical, or other high-speed data processing device

6878

**212**

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 6 of 127 PageID# 323
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 216 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 7 of 47 PageID# 219

10710

1   performing logical, arithmetic, or storage functions and includes any

2   data storage facility or communications facility directly related to,

3   or operating in conjunction with such device, but the term does not

4   include an automatic typewriter or typesetter, portable handheld

5   calculator, or a similar device.

6       All right.  Once again, in -- I defined "person" for you,

7   earlier; the same definitions apply.  Would you like me to read that

8   again?

9       ACC: No, Your Honor.

10      MJ:  All right.  And if this was going to a trier of fact, in

11  determining whether the person who received the information was

12  entitled to receive it, the trier of fact may consider all the

13  evidence introduced at trial, including any evidence concerning the

14  classification status of the information, any evidence relating to

15  law or regulations governing classification and declassification of

16  national security information, its handling use and distribution, as

17  well as any evidence relating to regulations governing the handling,

18  use, and distribution of the information obtained from the classified

19  systems.

20      Do you understand the elements and definitions as I read

21  them to you?

22      ACC: Yes, ma'am.

23      MJ:  Do you have any questions about them?

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 7 of 127 PageID# 324
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019     Pg: 217 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 8 of 47 PageID# 220

10711

1       ACC: No, ma'am.

2       MJ:  Do you understand that your plea of guilty admits that

3    these elements accurately describe what you did?

4       ACC: Yes, Your Honor.

5       MJ:  Do you believe and admit that the elements and definitions,

6    taken together, correctly describe what you did?

7       ACC: Yes, Your Honor.

8       MJ:  Now, do you understand -- also, same for this offense as

9    the other offenses, that -- if -- your plea·to the lesser included

10   offenses I just read is going to establish some of the elements for

11   the government if they intend to proceed with the greater offenses?

12      ACC: Yes, Your Honor.

13      MJ:  I just want to stop here and make sure both sides agree

14   with this.  Even though -- I distinguished the elements that -- what

15   your plea would establish and what the government had left to prove.

16   What I neglected to say is there is some discrepancy in the dates.

17   You pled by exceptions and substitutions to dates, so if the

18   government has a broader date range, even in an element you

19   established by your plea, the government still has to prove that

20   broader date range.  Okay?  Do you understand that?

21      ACC: Yes, Your Honor.

22      MJ:  Do both sides agree with that?

23      CDC[MR.COOMBS]:  Yes, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 8 of 127 PageID# 325
USCA4 Appeal: 19-1287    Doc: 10-2    . Filed: 03/29/2019    Pg: 218 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 9 of 47 PageID# 221

10712

1      TC[MAJ FEIN]:  Yes, Your Honor.

2      MJ:  All right.  Let's talk about Specification -- well, let's

3  talk about Specification 14 first.  That's the Reykjavik cable?

4      ACC: Yes, Your Honor.

5      MJ:  All right.  Where is that in your ----

6      ACC: Its Page 17, Your Honor.

7      MJ:  Okay.  This was the cable where I believe you were talking

8  about you were beginning in -- to get interested in this Icesave?

9      ACC: Yes, Your Honor.

10      MJ:  Okay.  Now, what -- this cable entitled "Reykjavik," it's

11  from the Department of State Net-Centric Diplomacy portal.  What is

12  that?

13      ACC: It is the -- or was the SIPR -- one of the SIPR portals

14  that the Department of State had that published -- I guess their wide

15  distribution tables, Your Honor.

16      MJ:  So, did -- you had access to SIPRNET as part of your

17  duties?

18      ACC: Yes, Your Honor.

19      MJ:  And you were cleared to have access to that level of

20  information?

21      ACC: Yes, Your Honor.

22      MJ:  Now, you testified earlier that you had gone to SIPRNET to

23  get CENTCOM and SOUTHCOM and other database information.  Was this

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 9 of 127 PageID# 326
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 219 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 10 of 47 PageID# 222

10713

1    Department of State site on the same SIPRNET -- you know -- could you

2    go to the Department of State just like you could go to CENTCOM or

3    SOUTHCOM?

4         ACC: Yes, Your Honor, you just change the address that you go

5    to, yes.

6         MJ:  So, were you authorized to go and get that Department of

7    State -- to access that portal?

8         ACC: Yes, Your Honor, I was actually told to go there, Your

9    Honor.

10        MJ:  And were you told by this Captain Lim to go there?

11        ACC: Yes, Your Honor.

12        MJ:  Okay.  Who is Captain Lim?

13        ACC: Captain Lim was originally the Assistant S-2 and after our

14   full-time S-2 shifted to a different position, he became -- he

15   covered down and became the brigade S-2, Your Honor.

16        MJ:  All right.  So, were you and the other analysts all

17   authorized to go to this database?

18        ACC: Yes, Your Honor.

19        MJ:  And did you use it in your intelligence analyst duties?

20        ACC: I did, Your Honor, yes.

21        MJ:  The information from it?

22        ACC: Yes, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 10 of 127 PageID# 327
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 220 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 11 of 47 PageID# 223

10714

1      MJ:  Okay.  Now, was this information -- you testified earlier

2  that not all of it was classified, but was this Reykjavík cable

3  classified?

4      ACC: It was, Your Honor.

5      MJ:  Now, what did you do -- so, then, were you authorized from

6  that portal to download it onto a portable medium and take it to your

7  house -- or your CHU?

8      ACC: No, Your Honor.

9      MJ:  Okay.  What did you do -- did you download that cable?

10     ACC: I did, Your Honor.

11     MJ:  On what?

12     ACC: I took the web page and I copied and pasted the data onto a

13  text file which I then burned to a CD containing some other things --

14  I don't remember what -- and then I took that to my CHU, Your Honor.

15     MJ:  And what did you do with that when you went -- when you got

16  to your CHU?

17     ACC: I put that onto my personal computer and then uploaded it

18  using the form, Your Honor.

19     MJ:  Using what form?

20     ACC: The website form for the WikiLeaks website.

21     MJ:  So, you uploaded that Reykjavík cable to your personal

22  computer and then -- am I understanding your testimony -- that you

23  sent that cable to WikiLeaks?

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 11 of 127 PageID# 328
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 221 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 12 of 47 PageID# 224

10715

1       ACC: Correct, Your Honor.

2       MJ:  On the form that they told senders to use?

3       ACC: Yes, Your Honor.

4       MJ:  Okay.  And, once again, same as the other things, were you

5    acting willfully?

6       ACC: Yes, Your Honor.

7       MJ:  Did you know you are violating the law?

8       ACC: I did, Your Honor, yes.

9       MJ:  Okay.  Did you -- was WikiLeaks entitled to receive this

10   Department of State cable?

11      ACC: No, Your Honor.

12      MJ:  Were they authorized to receive it?

13      ACC: No, Your Honor.

14      MJ:  Okay.  Were you authorized to send it?

15      ACC: I was not, Your Honor.

16      MJ:  Were you authorized to take it out of the SCIF?

17      ACC: No, Your Honor.

18      MJ:  These offenses also have the element of conduct prejudicial

19   to good order and discipline and service discrediting conduct.  Do

20   you believe your conduct, in sending this Reykjavik cable to

21   WikiLeaks, was prejudicial to good order and discipline?

22      ACC: It was, Your Honor, yes.

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 12 of 127 PageID# 329
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 222 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 13 of 47 PageID# 225

10716

1      MJ:   And was it for the same reason we talked about earlier or

2    different reasons?

3      ACC: Definitely the same reasons, Your Honor, yes.

4      MJ:   Do you believe it was service discrediting?

5      ACC: Yes, Your Honor.

6      MJ:   And for the same reasons we talked about earlier or for

7    different reasons?

8      ACC: The same reasons, Your Honor.

9      MJ:   Okay.   You talked about, here, in your statement that you,

10   basically, concluded that Iceland was being bullied, diplomatically,

11   by two larger European powers and out of viable solutions and coming

12   to the U.S. for assistance and it didn't appear that we were going to

13   do anything.  We're you in a position of authority to decide what the

14   United States government was going to do with respect to Iceland?

15     ACC: No, Your Honor.

16     MJ:   Did -- We talked about the defense of justification and

17   necessity already.   Do you believe the fact that you -- you had a

18   personal belief in this -- that that somehow gave you an authorized

19   military duty to send this cable to WikiLeaks?

20  .   ACC: I did not have that belief, no, Your Honor.

21     MJ:   Okay.   So, you had no military duty, then, to send this

22   cable to WikiLeaks?

23     ACC: No, Your Honor.

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 13 of 127 PageID# 330
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 223 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 14 of 47 PageID# 226

10717

1     MJ: Okay. And did you believe -- do you believe the defense of

2     necessity, as I defined it before -- you know, were you preventing

3     imminent harm to somebody, like the drowning person in the lake, by

4     sending this cable?

5     ACC: Correct, Your Honor. So it doesn't ----

6     MJ: That's a bad question.

7     ACC: ---- apply.

8     MJ: Did I -- let me ask it again a better way. We talked about

9     the defense of necessity.

10    ACC: Yes, Your Honor.

11    MJ: To talk about trespassing over somebody's house to rescue

12    the drowning person because there is nobody else who can do it. When

13    you sent this cable, were you in that kind of situation?

14    ACC: No, Your Honor, I was not.

15    MJ: Does the defense of necessity apply in your case?

16    ACC: No, Your Honor.

17    MJ: For this specification, did the ----

18    ACC: Not this specification, no Your Honor.

19    MJ: Okay. Does either side believe any further inquiry is

20    required? Except for the date of the specification, did you act on -

21    - just a minute, what's the date on the specification, here? That

22    would be -- did you act on 15 -- between 15 February and 18 February

23    of 2010?

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 14 of 127 PageID# 331
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 224 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 15 of 47 PageID# 227

10718

1     ACC: Yes, Your Honor, it was 14 February and 15 February, Your

2     Honor.

3         MJ:  Oh, I'm sorry, that's right.  Those are the words you said

4     -- 14 and 15 February 2010; that's the exceptions and substitutions

5     you made.  So, your conduct, here, in Specification 14, then, was

6     between 14 February 2010 and 15 February 2010?

7         ACC: Yes, Your Honor.

8         MJ:  Okay.  Now, does either side believe any further inquiry is

9     required?

10        ·  ATC[CPT MORROW]:  Your Honor, on Page 18, Paragraph F, the

11    accused states, "I felt I might be able to right a wrong by having

12    them publish this document."  That line, in particular, tends to

13    contradict something being service discrediting, so it might be

14    something the Court wants to explore just one more time.

15        MJ:  All right.  Well, we went over a little bit and the

16    government would like me to go over this in more detail.  This is --

17    your statement that they're talking about is, "I decided the cable

18    was something that would be important and I felt I might be able to

19    right a wrong by having them publish this document."  So, you,

20    personally, believed that you are doing a good thing, is that fair?

21        ACC: I felt it could be, yes, Your Honor.

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 15 of 127 PageID# 332
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 225 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 16 of 47 PageID# 228

10719

1    MJ: Okay. So, we talked about, earlier, that -- did you have

2    the authority to decide to declassify a cable and send it to

3    WikiLeaks because you think a policy is a good thing?

4    ACC: Your Honor, being a junior-enlisted specialist, you know,

5    in the Army, no, Your Honor.

6    MJ: So -- I mean -- so does somebody else get to make those

7    decisions?

8    ACC: I imagine in this case it would be the Department of State

9    in their channels, Your Honor.

10   MJ: So, if the Department of State determines that this cable

11   should be classified and should not be released to WikiLeaks and you

12   decide, as a personal matter, that you don't agree with that and you

13   think it should be released to WikiLeaks and you do release it to

14   WikiLeaks, the fact that you think you're doing the right thing, can

15   that still be service discrediting?

16   ACC: Yes, Your Honor.

17   MJ: And why?

18   ACC: Because it -- if Soldiers in the position I had did that,

19   then it -- I mean, it damages our perception -- the public's

20   perception of how -- whether the military and the services can

21   safeguard information, Your Honor.

1      MJ:  So, with respect to prejudice to good order and discipline,

2    if -- is the military and organization that follows a chain of

3    command?

4      ACC: Yes, Your Honor.

5      MJ:  So, if someone at the top of the chain of command makes a

6    decision and people below decide, "Well, I don't agree with that

7    decision, so I'm going to live off of my own moral code and not

8    follow the rules and regulations that are set forth by the people

9    with authority to make those rules and regulations," what happens to

10   the organization?

11     ACC: It -- you can't operate in that -- I mean, you just have --

12   we would have junior ranks making decisions that contradict the

13   orders and so the system would seize up, Your Honor.

14     MJ:  So, do you think that could be prejudicial to good order

15   and discipline?

16     ACC: Absolutely, Your Honor, yes.

17     MJ:  All right.  And is that sort of what you were talking to me

18   -- when you were talking to me earlier about service discrediting

19   conduct that might cause people to lose confidence in an organization

20   if they see it sort of disintegrating like that?

21     ACC: Yes, Your Honor, it would be worrying, yes.

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 17 of 127 PageID# 334
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 227 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 18 of 47 PageID# 230

10721

1      MJ:  All right.  And do you believe that your conduct in this

2  case, you know, contributed, I guess to, at least a minor part, to

3  that disorganization?

4      ACC: Yes, Your Honor.

5      MJ:  Okay.  Does the government believe any further inquiry is

6  required?

7      ATC[CPT MORROW]:  No, Your Honor.

8      CDC[MR.COOMBS]:  No, Your Honor.

9      MJ:  Now, let's look at Specification 13.  Now, that talks about

10  more than 75 classified cables.  Now, did you have access to more

11  than 75 classified cable -- Department of State cables?

12      ACC: Yes, Your Honor.

13      MJ:  All right.  Did you get those from the same portal that you

14  got the Reykjavík cable from?

15      ACC: I did, Your Honor.

16      MJ:  All right.  And was that also done -- was that done between

17  28 March 2010 and 4 May 2010?

18      ACC: It was done, I think, around the 10th of April, Your Honor.

19      MJ:  All right.  So, is the 10th of April between 28 March 2010

20  and on or about 4 May 2010?

21      ACC: Yes, it is, Your Honor; April.

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 18 of 127 PageID# 335
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 228 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 19 of 47 PageID# 231

10722

1        MJ:  Okay.  So, it would be between those dates that -- I mean,

2    that's the way that your plea by exceptions and substitutions has

3    those dates.  Do you believe that those are accurate dates?

4        ACC: Yes, Your Honor, I do.

5        MJ:  Okay.  Now, where on your timeline are we talking about --

6    or in your statement are we talking about those cables in

7    Specification 13 of Charge II?

8        ACC: It's Page 30, Your Honor, Section 11.

9        MJ:  All right.  So, this is -- so, when you -- are these cables

10   the last thing that you uploaded and sent?

11       ACC: Yes, Your Honor.

12       MJ:  Okay.  So, we're getting, now, into the late March

13   timeframe and you said in your statement that you had begun

14   establishing a dialogue with some -- at least one person -- or two

15   people from WikiLeaks?

16       ACC: At least one user account.  I don't know what was on the

17   other side, Your Honor.

18       MJ:  Okay.  And I guess at some point in your statement you were

19   talking about -- you began to look at these Department of State

20   cables and you began to be really interested in them?

21       ACC: Yes, Your Honor.

22       MJ:  Okay.  Tell me about that.

6891

**225**

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 19 of 127 PageID# 336
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 229 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 20 of 47 PageID# 232

10723

1    ACC: Well, in the course of my duties, I previously started

2    looking at, as directed -- I started looking at cables, more

3    specifically, for the Baghdad series of cables and then things that

4    were tagged with "Iraq" -- so, the general area of Iraq and then I

5    went over to Afghanistan and then I started looking just wherever my

6    interest piqued, Your Honor.

7    MJ: Okay. And did you download any cables off of the SIPRNET?

8    ACC: Yes, Your Honor.

9    MJ: And to what?

10    ACC: To, first, the -- my workstation, Your Honor, and then from

11    the workstation onto CD -- onto DVD-RW and then onto my personal

12    laptop.

13    MJ: Okay. So, did you do this, basically, the same way that --

14    and you were -- were you authorized to access the portal to get the

15    cable -- to look at the cables?

16    ACC: Yes, Your Honor.

17    MJ: Were you authorized to download them to your personal

18    workstation?

19    ACC: To my workstation? Yes, Your Honor.

20    MJ: Were you authorized to download them to a CD?

21    ACC: Yes, Your Honor.

22    MJ: Were you authorized to take them out of the SCIF?

23    ACC: No, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 20 of 127 PageID# 337
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 230 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 21 of 47 PageID# 233

10724

1    MJ:  All right.  Were you authorized put them on your personal

2    computer?

3    ACC: No, Your Honor.

4    MJ:  Were you authorized -- did you transfer them to WikiLeaks?

5    ACC: I re-did the documents to clean them up and then I uploaded

6    them.

7    MJ:  Okay.  When you said you re-did the documents to clean them

8    up, what does that mean?

9    ACC: There was a lot of, like, extraneous formatting that I

10   removed from the documents and I put it into a table, Your Honor.

11   MJ:  Other than formatting, did you take any -- did you change

12   any of the substance?

13   ACC: No substance changes, no, Your Honor.

14   MJ:  So -- what -- and these more than 75 cables were

15   classified, the charged cables?

16   ACC: Yes, Your Honor.

17   MJ:  And did you move anything -- remove anything from those

18   cables that would have made them unclassified?

19   ACC: No, Your Honor.

20   MJ:  So, when you sent them to WikiLeaks, were they still

21   classified?

22   ACC: They still had classification markings, yes, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 21 of 127 PageID# 338
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 231 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 22 of 47 PageID# 234

10725

1    MJ:  Well, if the substance didn't change, would the reason that

2    they had classification markings still be present?

3         ACC: Yes, Your Honor.

4         MJ:  Okay.  So, you didn't change the words?

5         ACC: Correct, Your Honor.

6         MJ: · You just changed the formatting, is that what I'm hearing?

7         ACC: Changed how it worked and how you accessed it, Your Honor.

8         MJ:  But the words of the substance from what you took out of

9    the State Department portal and what you, ultimately, wound up

10   sending to WikiLeaks was the same?

11        ACC: Yes, Your Honor.

12        MJ:  Okay.  Did you act willfully?

13        ACC: Yes, Your Honor.

14        MJ: .And was WikiLeaks entitled to receive the State Department

15   -- the classified State Department cables?

16        ACC: No, Your Honor.

17        MJ:  And, under the circumstances, was your conduct to the

18   prejudice of good order and discipline in the armed forces or of a

19   nature to bring discredit upon the armed forces?

20        ACC: No, Your Honor -- well, yes -- I think.  Yes, it is ----

21        MJ:  Okay.  Let me ask the question again ----

22        ACC: ---- prejudicial.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 22 of 127 PageID# 339
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 232 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 23 of 47 PageID# 235

10726

1      MJ:  Sometimes my questions can be confusing.  Was your conduct

2  to the prejudice of good order and discipline in the armed forces?

3      ACC: Yes, Your Honor.

4      MJ:  Was is of a nature to bring discredit upon the armed

5  forces?

6      ACC: Yes, Your Honor.

7      MJ:  Was -- are you answering "yes" because of the reasons we

8  spoke about earlier or for different reasons?

9      ACC: The same reasons, Your Honor.

10     MJ:  Okay.  So, am I -- what I'm hearing you tell me, is, then -

11  - basically, for all these specifications that we talked about today,

12  your conduct was prejudicial to good order and discipline and service

13  discrediting conduct for the same reason?

14     ACC: Yes, Your Honor.

15     MJ:  All right.  You also say here that you were talking about

16  looking at the Department of State cables and how they were --you

17  know, they're SIPDIS means it goes onto SIPRNET and a lot of people

18  have access to SIPRNET -- when classified documents are on SIPRNET

19  and a lot of people are cleared to have access to SIPRNET, does that

20  give you any authorization, justification, or excuse to -- does that

21  mean those can be downloaded off of SIPRNET to personal computers and

22  shipped to people who don't have clearances?

23     ACC: No, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 23 of 127 PageID# 340
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 233 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 24 of 47 PageID# 236

10727

1    MJ:  Okay.  So, even though a lot of people have access to

2    SIPRNET, it's a controlled access?  I mean, did somebody give them

3    authority to get onto SIPRNET or can any Tom, Dick, and Harry just go

4    onto SIPRNET?

5        ACC: If you have -- at the time, if you had access to a SIPRNET

6    computer and you were on SIPRNET, you have access to the Net-Centric

7    Diplomacy site, Your Honor.

8        MJ:  I guess where I'm going is -- to -- for a person to get

9    access to SIPRNET, you have to -- does someone have to give you a

10   username and password?

11       ACC: For our unit, it was the S-6 that would give us that, Your

12   Honor.

13       MJ:  All right.  So, say I walk into your unit at Contingency

14   Operation Base Hammer and I haven't been authorized by anybody to do

15   anything with respect to SIPRNET and I walk into the SCIF, can I go

16   on SIPRNET?

17       ACC: No, Your Honor, you would have to -- we wouldn't let you

18   in, Your Honor.

19       MJ:  But I guess where I'm going with this is to get onto

20   SIPRNET, are there some kind of controls so I can't get on it if I

21   walk into the SCIF on Contingency Operation Base Hammer?

22       ACC: In the SCIF?  Yes, Your Honor.

1    MJ: Okay. If there is SIPRNET anywhere other than the SCIF,

2  are there some controls on who can get on it and who can have access

3  to that information?

4    ACC: Sometimes no, Your Honor.

5    MJ: No? Okay. So anybody can just get on and go use it?

6    ACC: For some workstations, yes, Your Honor. Legally, no, but

7  the reality was yes.

8    MJ: Okay. WikiLeaks -- are they -- would they have any

9  authorization under any circumstances to access the SIPRNET computer?

10    ACC: No, Your Honor.

11    MJ: So, when you downloaded that Department of State

12  information and brought it to your personal computer and when you

13  sent it to WikiLeaks, did you have any thought in your mind that they

14  were legally authorized to receive it?

15    ACC: No, Your Honor.

16    MJ: Okay. So you knew what you're doing was wrong?

17    ACC: Yes, Your Honor.

18    MJ: And you knew it was against the law?

19    ACC: Correct, Your Honor.

20    MJ: Does either side desire any further inquiry with respect to

21  the more than 75 classified cables?

22    TC[MAJ FEIN]: No, Your Honor.

23    CDC[MR.COOMBS]: No, Your Honor.

10729

1      MJ:  All right.  Did you say something about these files were

2   corrupted and they had to be sent again or something of that nature?

3      ACC: The later ones -- although the ones that were available up

4   to February of 2010 and then March and April were corrupted, Your

5   Honor.

6      MJ:  Okay.  Well, what happened -- I thought you testified

7   earlier that, for Specification 13 of Charge II, you sent them in

8   April?

9      ACC: I did send them in April, but that was the ones up to

10   February, Your Honor.

11      MJ:  Oh, okay.  So you sent the ones up in February that were

12   not corrupted in April?

13      ACC: Yes, Your Honor, and then ----

14      MJ:  So, the more than 75 classified charged documents, were

15   they among the corrupted or the not corrupted?

16      ACC: The not corrupted, Your Honor.

17      MJ:  So they -- you sent them and they made it?

18      ACC: Yes, Your Honor.

19      MJ:  Okay.

20      ACC: And then I made an attempt to add two more months and that

21   never happened, Your Honor.

22      MJ:  Okay.  So, you actually did send them more than 75

23   classified cables to WikiLeaks?

6898

**232**

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 26 of 127 PageID# 343
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 236 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 27 of 47 PageID# 239

10730

1       ACC: Correct, Your Honor.

2       MJ:  Does either side believe any further inquiry is required

3   with respect to Specifications 13 and 14 of Charge II?

4       TC[MAJ FEIN]:  No, Your Honor.

5       CDC[MR.COOMBS]:  No, Your Honor.

6       MJ:  All right.  PFC Manning, then, do you admit that, at or

7   near Contingency Operating Station Hammer, Iraq, for Specification

8   13, between on or about 28 March and on or about 4 May 2010, that you

9   obtained information that has been determined by the United States

10  government, by executive order or statute, to require protection

11  against unauthorized disclosure for reasons of national defense or

12  foreign relations, to wit, for Specification 13:  more than 75 United

13  States Department of State cables?  And do you admit that, at or near

14  Contingency Operations Station Hammer, for Specification 14, between

15  on or about 14 February 2010 and 15 February 2010, you knowingly

16  accessed a computer on a Secret Internet Protocol Router Network and

17  that you obtained information that has been determined by the United

18  States government, by executive order or statute, to require

19  protection against unauthorized disclosure for reasons of national

20  defense or foreign relations, to wit, for Specification 14:  a

21  classified Department of State cable titled, "Reykjavík 13"?

22      ACC: Yes, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 27 of 127 PageID# 344
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019     Pg: 237 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 28 of 47 PageID# 240

10731

1      MJ:  All right.  For this element, too, were you talking about —

2  — the information has been determined by the United States

3  government, by executive order or statute, to require protection

4  against unauthorized disclosure for reasons of national defense or

5  foreign relations, does that mean classification?

6      ACC: Yes, Your Honor.

7      MJ:  Okay.  So, if a document is classified, does that fall into

8  that category, here?

9      ACC: It does, Your Honor.

10     MJ:  Do the parties agree?

11     CDC[MR.COOMBS]:  Yes, Your Honor.

12     TC[MAJ FEIN]:  Yes, Your Honor.

13     MJ:  Okay.  And do you admit, then, for Specifications 13 and 14

14  of Charge II that you communicated, delivered, transmitted, or caused

15  to be communicated, delivered, or transmitted, the information to a

16  person not entitled to receive it?

17     ACC: Yes, Your Honor.

18     MJ:  Do you admit that you acted willfully?

19     ACC: Yes, Your Honor.

20     MJ:  And do you admit that under the circumstances, your conduct

21  was to the prejudice of good order and discipline in the armed forces

22  or of a nature to bring discredit upon the armed forces?

23     ACC: Yes, Your Honor.

6900

**234**

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 28 of 127 PageID# 345
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 238 of 337
Case 1:19-dm-00003-CMH Document 5-7 Filed 03/04/19 Page 29 of 47 PageID# 241

10732

1    MJ: All right. We have one final specification to go over and
2    that's Specification 5 of Charge III. Are the parties ready to
3    proceed? PFC Manning, are you ready to proceed or do you want to
4    have a brief recess before we go into that one?

5    ACC: Continue, Your Honor.

6    MJ: All right. Now, do you have a copy -- I've asked your
7    counsel to make a copy for you of the first page of Army Regulation
8    380-5, dated 29 September 2000, as well as Paragraph 7-4, the
9    paragraph you're charged with violating in that regulation and
10   Paragraph 1-21, entitled "Sanctions." Do you have a copy of all
11   three of those before you?

12   ACC: Yes, Your Honor.

13   MJ: Let's talk about Specification 5 of Charge III. In
14   Specification 5 of Charge III, you're charged with the offense of
15   violating a lawful general order in violation of Article 92, UCMJ.
16   Your defense counsel has entered pleas by exceptions and
17   substitutions for this offense as well. By pleading guilty -- but
18   you're pleading guilty to the same offense, just different dates, I
19   believe, is the exceptions and substitutions.

20         By pleading guilty to this offense, you're admitting that
21   the following elements accurately describe what you did:

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 29 of 127 PageID# 346
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 239 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 30 of 47 PageID# 242

10733

1        One, there was in existence a certain lawful general

2    regulation in the following terms:  Paragraph 7-4, Army Regulation

3    380-5, dated 29 September 2000.

4        Two, that you had a duty to obey that regulation.

5        And three, that at or near Contingency Operating Station

6    Hammer, Iraq, between on or about 8 January 2010 and on or about 10

7    May 2010, you violated this lawful general regulation by wrongfully

8    storing classified information.

9        Okay, give me one minute, here.

10   CDC[MR.COOMBS]:  Ma'am, the Court had stated 10 May for the end

11   date and it's 27 May

12   MJ:  27 May -- that's what -- I thought I saw that.  Okay.  So,

13   let's go -- let's just change that last element, here.  So, that

14   would be that, at or near -- the element three would be that, at or

15   near Contingency Operations Station Hammer, Iraq, between on or about

16   8 January 2010 and on or about 27 May 2010, you violated this lawful

17   general regulation by wrongfully storing information.

18       And general regulations are those regulations which are

19   generally applicable to an armed force in which are properly

20   published by the secretary of a military -- by a military department.

21   General regulations also include regulations which are generally

22   applicable to the command of the officer issuing them throughout the

23   command or a particular subdivision in which are issued by a general

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 30 of 127 PageID# 347
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 240 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 31 of 47 PageID# 243

10734

1   officer having general court-martial jurisdiction or a general or

2   flag officer in command or a commander superior to one of those.

3          When a general regulation prohibits certain acts, except

4   under certain conditions, then your conduct must not have come in --

5   fallen within one of the exceptions to regulation.  And, once again,

6   you must have had a duty to obey that regulation.

7          To do something wrongfully means to do something without

8   legal justification or excuse.

9          Do you understand the elements and definitions as I read

10  them to you?

11      ACC: Yes, Your Honor.

12      MJ:  Do you have any questions about them?

13      ACC: Yes, Your Honor, or no, Your Honor, I don't have any.

14      MJ:  Do understand that your plea of guilty admits that these

15  elements accurately describe what you did?

16      ACC: Yes, Your Honor.

17      MJ:  Do you believe it admits that the elements and definitions,

18  taken together, correctly describe what you did?

19      ACC: Yes, ma'am.

20      MJ:  All right.  Now, let's -- were you still at Contingency --

21  were you still deployed at Contingency Operation Base Hammer, Iraq on

22  the dates that you -- between 8 January 2010 and 27 May 2010?

23      ACC: Yes, Your Honor.

6903

**237**

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 31 of 127 PageID# 348
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019    Pg: 241 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 32 of 47 PageID# 244

10735

1      MJ:  Okay.  Now, you have a copy -- we talked about earlier of

2   the front page of the Army Regulation 380-5?

3      ACC: I do, Your Honor.

4      MJ:  Was the title of that regulation?

5      ACC: Department of Army Information Security Program.

6      MJ:  And who is it issued by?  It's on the bottom.

7      ACC: Headquarters, Department of the Army.

8      MJ:  Do you believe that this is a lawful general regulation?

9      ACC: Yes, Your Honor.

10     MJ:  All right.  Next, at Paragraph 21 -- 1-21, where it says,

11   "Sanctions" ----

12     ACC: Just, Your Honor.

13     MJ:  ---- do you believe that this -- a regulation has to be --

14   sometimes regulations provide guidance and sometimes they're

15   punitive.  Do you believe that AR 380-5 is a punitive regulation?

16     ACC: Yes, Your Honor.

17     MJ:  And what's this regulation meant to govern?

18     ACC: It governs information security, Your Honor.

19     MJ:  All right.  Let's look at -- it's Chapter 7 you also have a

20   copy of, it talks about storage and physical security standards and

21   part of that, in Section 2, is Paragraph 7-4 and that's the paragraph

22   that you are accused of violating.  Can you tell me how you violated

23   that paragraph?

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 32 of 127 PageID# 349
USCA4 Appeal: 19-1287    Doc: 10-2         Filed: 03/29/2019    Pg: 242 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 33 of 47 PageID# 245

10738

1      ACC: Yes, Your Honor, by not abiding by 380-5 -- in this

2   paragraph -- in my -- in wrongfully storing and transferring

3   classified information -- properly classified information throughout

4   my period in Iraq.

5      MJ:  So, are you talking about -- is this information targeting

6   -- we spent the afternoon talking about how you transferred

7   everything from the Reykjavík cable all the way through and then

8   ending with the Department of State cables in each of the

9   specifications that we just discussed.

10     ACC: Yes, Your Honor.

11     MJ:  So, when you were telling me about taking the --

12  downloading the information from your computer to your workstation

13  and then to your CD and then leaving the SCIF and uploading that to

14  your personal computer and sending it out, basically, over the

15  unsecured Internet, is that the conduct that you're talking to me

16  about that violates this regulation?

17     ACC: Yes, Your Honor.

18     MJ:  Are you allowed, under this regulation, to take classified

19  information from a SIPRNET computer and take it to your home computer

20  and upload it?

21     ACC: No, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 33 of 127 PageID# 350
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 243 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 34 of 47 PageID# 246

10737

1    MJ:  Are you authorized to send classified information that

2    you've taken and downloaded on a CD and put on your personal computer

3    to send that over the general Internet waves?

4        ACC:  No, Your Honor.

5        MJ:  All right.  When you do that, does this violate this

6    Paragraph 7-4 of Army Regulation 380-5?

7        ACC:  Yes, Your Honor.

8        MJ:  All right.  Is it the parties' theory that this is -- in

9    this specification, that it's violated in some other fashion?

10       TC[MAJ FEIN]:  No, Your Honor.

11       CDC[MR.COOMBS]:  No, Your Honor.

12       MJ:  All right.  Do the parties believe -- and this was done

13   between the dates we talked about, here, between 8 January 2010 and

14   27 May 2010?

15       ACC:  Yes, Your Honor.

16       MJ:  Okay.  Does either side believe any further inquiry is

17   required?

18       ATC[CPT MORROW]:  Your Honor, I may have missed this, but did

19   you explain divers occasions to the accused?

20       MJ:  Do I have divers occasions on here?

21       ATC[CPT MORROW]:  It is in the specification.

22       MJ:  No, I didn't even read it in the element, thank you.

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 34 of 127 PageID# 351
USCA4 Appeal: 19-1287      Doc: 10-2       Filed: 03/29/2019    Pg: 244 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 35 of 47 PageID# 247

10738

1        All right, the written statement, I believe I have also

2    from you all, doesn't have the words "divers occasions" in it with

3    the elements.  So, PFC Manning, when I'm going over -- this is the

4    attachment to the statement that you gave me.  So, I just want to

5    make sure you understand what divers occasions means and that --

6    since you didn't except those words out, what you are pleading guilty

7    to.  You're charged with -- on divers -- your -- violating this

8    regulation on divers occasions between the dates we just discussed

9    which were 8 January 2010 and 27 May 2010.  Now, "divers occasions"

10   means two or more times.  So, did you violate this regulation,

11   between those dates, two or more times?

12   ACC: Yes, Your Honor.

13   MJ:  Okay.  Because we discussed -- basically -- does your

14   conduct in Specifications 2, 3, 5, 7, 9, 10, 13, 14, and 15, all of

15   those specifications we just discussed involve you taking information

16   off of the SIPRNET, taking it out of the SIPR, and loading it either

17   onto your personal computer or your camera and sending those to

18   WikiLeaks.  So, the loading of the information in those

19   specifications on your personal computer, is that in violation of AR

20   380-5, Paragraph 7-4?

21   ACC: Yes, Your Honor.

22   MJ:  Okay.  And you did that more than two times, right?

23   ACC: Yes, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 35 of 127 PageID# 352
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 245 of 337
Case 1:19-dm-00003-CMH · Document 5-7   Filed 03/04/19   Page 36 of 47 PageID# 248

10739

1    MJ:  Okay.  Same thing for sending the information from your

2  personal computer to, over the unsecure Internet, to WikiLeaks, you

3  did that more than two times, too, is that right?

4    ACC: Yes, Your Honor.

5    MJ:  Okay.  Does either side believe any further inquiry is

6  required?

7    ATC[CPT MORROW]:  No, Your Honor.

8    CDC[MR.COOMBS]:  No, Your Honor.

9    MJ:  All right.  PFC Manning, do you admit that there was in

10  existence a lawful general regulation in the following terms:

11  Paragraph 7-4, Army Regulation 380-5, dated 29 September 2000?

12    ACC: Yes, Your Honor.

13    MJ:  Do you admit that you had a duty to obey that regulation?

14    ACC: Yes, Your Honor.

15    MJ:  And do you admit that, on divers occasions, between on or

16  about 8 January 2010 and on or about 27 May 2010, at or near

17  Contingency Operating Station Hammer, you violated this lawful

18  general regulation by wrongfully storing classified information?

19    ACC: Yes, Your Honor.

20    MJ:  Does either side believe any further inquiry is required as

21  to any of this?

22    CDC[MR.COOMBS]:  No, Your Honor.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 36 of 127 PageID# 353
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 246 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 37 of 47 PageID# 249

10740

1    TC[MAJ FEIN]:  Your Honor, may we ask for a short recess before

2  you continue and before we answer that question?

3    MJ:  Certainly.  How long would you like?

4    TC[MAJ FEIN]:  15 minutes, Your Honor.

5    MJ:  All right.  If we start at 5 after, will 13 minutes give

6  you enough time to do what you need to do?

7    TC[MAJ FEIN]:  It will, ma'am.

8    MJ:  All right.  Court is in recess until 1705 or 5:05 PM.

9  [The Article 39(a) session recessed at 1655, 28 February 2013.]

10 [The Article 39(a) session was called to order at 1708, 28 February

11 2013.]

12   MJ:  This Article 39(a) session is called order.  Let the record

13 reflect all parties present when the court recessed are again present

14 in court.

15     PFC Manning, let me just ask you one more question on that

16 last -- your plea of guilty to Specification 5 of Charge III.  Did

17 you have a duty to obey that regulation?

18   ACC: Yes, Your Honor.

19   MJ:  Government, any further inquiry?

20   TC[MAJ FEIN]:  Yes, ma'am, the first, really, is a question for

21 the Court, Your Honor.  Earlier the Court asked -- or made a

22 statement about the dates and how the government would have to prove

23 the greater date range versus the inclusive date range, but most of

6909

**243**

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 37 of 127 PageID# 354
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 247 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 38 of 47 PageID# 250

10741

1   the specifications are pled in between two dates.  So, I guess, the

2   government was unclear what the Court actually meant after looking

3   back at it.

4       MJ:  Well, if they're pled between two dates, that's fine.

5   Let's address that issue when it's ripe.

6       TC[MAJ FEIN]:  Yes, ma'am.

7       MJ:  If the evidence shows that it's -- if they're two broad

8   dates and the evidence shows it's two narrow dates, the Court could

9   find, by exceptions and substitutions, the narrower dates.  Or, if

10  they're different dates -- I don't know all of the -- I haven't

11  looked at this.  Are all of the lesser included offenses within the

12  dates charged by the government -- in the exceptions and

13  substitutions?

14      TC[MAJ FEIN]:  Yes, ma'am, that's why -- just making sure that

15  the Private First Class Manning understands that they're all

16  inclusive.

17      CDC[MR.COOMBS]:  The lesser included falls within their date

18  range, so the government's date ranges are wider than -- and what we

19  gave them were specific dates.

20      MJ:  All right.  So, I mean, PFC Manning, that's going to be a

21  fact-specific determination, you know, for the fact-finder at the

22  time.  You can plead guilty with a subset within a larger subset, but

23  your subset still is within a larger subset but it would be -- you

10742

1   know, the fact-finder could say, "Well, I just--truncate it and make

2   it on the evidence that has been presented."  So, do you have any

3   questions about that?

4        ACC: No, Your Honor.  I am good.

5        MJ:  Do the parties agree with my interpretation of this?  It's

6   really a fact-finding decision; it could be excepted and substituted

7   or left within the broader date range depending on how the facts come

8   out.

9        TC[MAJ FEIN]:  Yes, ma'am.

10       CDC[MR.COOMBS]:  Yes, Your Honor.

11       MJ:  Any further inquiry other than that?

12       TC[MAJ FEIN]:  Yes, ma'am, I defer to co-counsel.

13       ATC[CPT OVERGAARD]:  Ma'am, on Specification 13, you had

14   explored whether or not the cables were the same when they were

15   transmitted as they were when they were downloaded from the SIPRNET

16   and the government just wonders if the Court wants to explore that

17   with Specifications 5 and 7 as well because in Paragraph 6(t) on Page

18   16, there's reference to the possibility that the CIDNE-I and CIDNE-A

19   transmission had been sanitized between the download and the

20   transmission.

21       MJ:  All right.  Well, PFC Manning, let's talk about -- in all

22   of the specifications we talked about, let's look at it specification

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 39 of 127 PageID# 356
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 249 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 40 of 47 PageID# 252

10743

1    by specification.  In Specification 2 of Charge II, was the video

2    altered in any way when you sent it?

3        ACC: No, Your Honor.

4        MJ:  So, you took what you got off the SIPRNET and that's what

5    you sent?

6        ACC: Yes, Your Honor.

7        MJ:  Specification 3, the two documents in Specification 3, the

8    classified memorandum, was that changed, in anyway, between the time

9    that you got it from SIPRNET and the time you sent it?

10       ACC: No, Your Honor.

11       MJ:  Specification 5, these are the two that the government

12   wants me to explore, Specifications 5 and 7; those are the two

13   databases -- the more than 20 documents.  Did you change those

14   between the time you took them off the SIPRNET and the time you sent

15   them to WikiLeaks?

16       ACC: Yes, Your Honor, I removed some extraneous information that

17   I did not feel needed to be in the version that I sent to whoever I

18   was going to send it to.

19       MJ:  When you talked about "you removed extraneous information,"

20   what extraneous information?

21       ACC: Specifically, IP addresses, usernames, a lot of other

22   information attached to the records, Your Honor.

6912

**246**

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 40 of 127 PageID# 357
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 250 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 41 of 47 PageID# 253

10744

1      MJ:  Would that -- the information that you removed, would that

2   have changed their status from classified to unclassified?

3      ACC: The -- I believe that the extraneous information that was

4   on there was classified -- that's my -- that was my impression and --

5   that, I removed.  So, I removed some classified information without

6   changing the other information, Your Honor.

7      MJ:  So, if the extraneous information you removed was

8   classified, were the cables -- the declassified cables that are

9   charged here that you sent ----

10      ACC: SIGACTs, Your Honor.

11      MJ:  ----- or the SIGACTs, I'm sorry.  Were they -- did they

12   remain classified because you took some of the classified information

13   out?

14      ACC: I did not remove the field -- the classification field, so

15   I don't know what status they are in because a lot of the documents

16   don't have classification markings separately.

17      MJ:  Okay.  Now, Government, the charged documents that we went

18   over at the beginning of the trial when PFC Manning was sitting over

19   here at the panel box, were they the charged documents as downloaded

20   from the SIPRNET or were they the charged documents as released?

21·      TC[MAJ FEIN]:  Your Honor, the charged documents that were

22   printed and put in the binder in Appellate Exhibit 501 were the exact

10745

1   documents printed from the SD card found at Private First Class

2   Manning's aunt's house.

3       MJ:  Okay.

4       TC[MAJ FEIN]:  So, as released.

5       MJ: . The charged documents on Specifications 5 and 7 that we

6   looked through, were those -- did they appear, when you viewed them,

7   in the same form as they were on the SD card in your aunt's camera?

8       ACC: Yes, Your Honor.

9       MJ:  Now, was that before or after they had been changed and the

10  extraneous information removed?

11      ACC: That's after, Your Honor.

12      MJ:  So, the charged documents, as they appear in that binder

13  that you looked at, are in the form that you had already changed and

14  the form that was sent to WikiLeaks?

15      ACC: Yes, Your Honor, it did.

16      MJ:  Were those documents, as you reviewed them in that binder,

17  are they classified?

18      ACC: Well, I would assume so because -- yes, Your Honor.

19      MJ:  Well, you're admitting, here, to a criminal offense that --

20   --

21      ACC: Yes.

6914

**248**

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 42 of 127 PageID# 359
USCA4 Appeal: 19-1287   Doc: 10-2   Filed: 03/29/2019   Pg: 252 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 43 of 47 PageID# 255

10746

1    MJ:  ---- you are transmitting classified documents so why don't

2    you take a couple of moments and talk to your counsel?  If they're

3    not classified, we may need to have another ----

4    ACC: They are classified, Your Honor.

5    MJ:  ---- conversation.

6    ACC: The original classification authority said that they're

7    classified, yes, Your Honor.

8    MJ:  And you're sure about that?

9    ACC: Yes, Your Honor.

10   MJ:  Okay.  So, at the time you sent them, they were classified?

11   ACC: Yes, Your Honor.

12   MJ:  All right.  And you're sure about that?

13   ACC: Yes, Your Honor.

14   MJ:  Okay.  Does other side believe any further inquiry is

15   required?

16   TC[MAJ FEIN]:  No, Your Honor.

17   CDC[MR.COOMBS]:  No, Your Honor.

18   MJ:  Trial Counsel, what did you calculate to be the maximum

19   punishment authorized in this case based solely on PFC Manning's

20   plea?

21   TC[MAJ FEIN]:  Your Honor, based solely on Private First Class

22   Manning's plea, the maximum punishment is to forfeit all pay and

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 43 of 127 PageID# 360
USCA4 Appeal: 19-1287    Doc: 10-2        Filed: 03/29/2019     Pg: 253 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 44 of 47 PageID# 256

10747

1   allowances, to be reduced to Private (E1), to be confined for 20

2   years, and to be dishonorably discharged from the service.

3       MJ:  Defense Counsel, do you agree?

4       CDC[MR.COOMBS]:  Yes, Your Honor.

5       MJ:  All right.  PFC Manning, do you understand that, based on

6   your plea, alone, this court could sentence you to be reduced to the

7   grade of E1, to forfeit all pay and allowances, to be confined for up

8   to 20 years, and to be dishonorably discharged from the service?

9       ACC: Yes, ma'am.

10      MJ:  Is the government interested in a fine in this case?

11      TC[MAJ FEIN]:  Yes, Your Honor.

12      MJ:  And a potential fine also.  Do you have any question as to

13  the maximum sentence that could be imposed as a result of your guilty

14  plea?

15      ACC: No, Your Honor.

16      MJ:  And, Trial Counsel, is there any pre-trial agreement in

17  this case?

18      TC[MAJ FEIN]:  No, Your Honor.

19      MJ:  Even though, Counsel, there are no formal, written pre-

20  trial agreements, are there any unwritten agreements or

21  understandings in this case?

22      CDC[MR.COOMBS]:  No, Your Honor.

23      TC[MAJ FEIN]:  No, Your Honor.

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 44 of 127 PageID# 361
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019     Pg: 254 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 45 of 47 PageID# 257

10748

1       MJ:  PFC Manning, has anybody made any agreement with you or

2   promise to you in order to get you to plead guilty?

3       ACC: No, Your Honor.

4       MJ:  Mr. Coombs and the rest of the defense team, have you had

5   enough time and opportunity to discuss this case with PFC Manning?

6       CDC[MR.COOMBS]:  Yes, Your Honor.

7       ADC [MAJ HURLEY]:  Yes, ma'am.

8       ADC [CPT TOOMAN]:  Yes, Your Honor.

9       MJ:  All right.  So, I've asked all three of you that; from now

10  on, I'll just -- Mr. Coombs if you can answer as lead counsel, then?

11      CDC[MR.COOMBS]:  Okay.

12      MJ:  PFC Manning, have you, in fact, consulted fully with your

13  defense team and received the full benefit of their advice?

14      ACC: Yes, Your Honor.

15      MJ:  Are you satisfied that your defense team's advice is in

16  your best interest?

17      ACC: Yes, Your Honor.

18      MJ:  Are you satisfied with your defense counsel?

19      ACC: Yes, Your Honor.

20      MJ:  Are you pleading guilty voluntarily and of your own free

21  will?

22      ACC: Yes, ma'am.

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 45 of 127 PageID# 362
USCA4 Appeal: 19-1287    Doc: 10-2       Filed: 03/29/2019    Pg: 255 of 337
Case 1:19-dm-00003-CMH  Document 5-7  Filed 03/04/19  Page 46 of 47 PageID# 258

10749

1        MJ:  Has anyone made any threat or in any way tried to force you

2    to plead guilty?

3        ACC:  No, Your Honor.

4        MJ:  Do you have any questions as to the meaning and effect of

5    your guilty plea?

6        ACC:  No, Your Honor.

7        MJ:  Do you fully understand the meaning and effect of your

8    guilty plea?

9        ACC:  Yes, Your Honor.

10       MJ:  Do you understand that, even though you believe you are

11   guilty, you have a legal right to plead not guilty in place upon the

12   government the burden of proving your guilt beyond a reasonable

13   doubt?

14       ACC:  Yes, Your Honor.

15       MJ:  Take a moment now consult, once again, with your defense

16   team and tell me if you still want to plead guilty.

17   [The accused did as directed.]

18       MJ:  All right.  Do you still want to plead guilty?

19       ACC:  Yes, Your Honor.

20       MJ:  All right.  PFC Manning, I find your plea of guilty is made

21   voluntarily and with full knowledge of its meaning and effect.  I

22   further find you have knowingly, intelligently, and consciously

23   waived your rights against self-incrimination, to a trial of the

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 46 of 127 PageID# 363
USCA4 Appeal: 19-1287      Doc: 10-2           Filed: 03/29/2019      Pg: 256 of 337
Case 1:19-dm-00003-CMH   Document 5-7   Filed 03/04/19   Page 47 of 47 PageID# 259

10750

1   facts by a court-martial, and to be confronted by the witnesses

2   against you.  Accordingly, your plea of guilty is provident and is

3   accepted.  However, I advise you may request withdraw your plea at

4   any time before sentence is announced and, if you have a good reason

5   for your request, I will grant it.

6           Now, is the government going forward on the offenses to

7   which the accused has plead not guilty?

8       TC[MAJ FEIN]:  Ma'am, given the seriousness of Private First

9   Class Manning's charged conduct, the United States does intend to go

10  forward with all the charges as originally charged.

11      MJ:  All right, then, in that case the Court is not going to

12  make findings with respect to the guilty pleas at this point.  PFC

13  Manning, as we discussed earlier, what that means is the government

14  is going to go forward with the charges as charged.  Nothing you've

15  said today can be used by the government when they prove the case,

16  however, the elements that you've established in your plea, the

17  government does not have to present any proof of those.  Your plea

18  has established those elements so we just have the remaining elements

19  that are left, we've got the outstanding issue that the parties are

20  briefing with the 793(e) offenses as to the tangible/intangible

21  element that we discussed earlier, whether it's only intangible that

22  requires the reason to believe additional elements or whether both

23  do.  So, that's -- will be decided at the next Article 39(a) session.

                        *    *    *

                              6919

                        **253**

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 47 of 127 PageID# 364
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 257 of 337
Case 1:19-dm-00003-CMH   Document 5-8   Filed 03/04/19   Page 1 of 35 PageID# 260

# EXHIBIT F

# FILED UNDER SEAL

UNCLASSIFIED

Unmarked redactions were present when the Army received this document. 29 January 2013

MEMORANDUM THRU Civilian Defense Counsel, 11 South Angell Street
#317, Providence, RI 02906
Military Defense Counsel, U.S. Army Trial Defense Service
(USATDS), Fort Belvoir, VA 22060

FOR Military Judge, U.S. Army First Judicial Circuit, Fort
Meade, MD 20755
Trial Counsel, Joint Force Headquarters – National Capital
Region/Military District of Washington (JFHQ-NCR/MDW), 103 3rd
Avenue SW, Fort McNair, DC 20319-5058

SUBJECT: Statement in Support of Providence Inquiry –– U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

1. (U) The following facts are provided in support of the
providence inquiry for my court-martial, United States v. PFC
Bradley E. Manning.

2. (U) Personal Facts.

   a. (U) I am a twenty-five (25) year-old Private First Class
in the United States Army, currently assigned to Headquarters
and Headquarters Company (HHC), U.S. Army Garrison (USAG), Joint
Base Myer-Henderson Hall, Fort Myer, Virginia. Prior to this
assignment, I was assigned to HHC, 2nd Brigade Combat Team, 10th
Mountain Division, Fort Drum, New York. My Primary Military
Occupational Specialty (PMOS) is 35F, "Intelligence Analyst."

   b. (U) I entered Active Duty status on 2 October 2007. I
enlisted with the hope of obtaining both real-world experience
and earning benefits under the GI Bill for college
opportunities.

3. (U) Facts Regarding My position as an Intelligence Analyst.

   a. (U) In order to enlist in the Army, I took the standard
Armed Services Aptitude Battery (ASVAB). My score on this
battery was high enough for me to qualify for any enlisted MOS
position. My recruiter informed me that I should select an MOS
that complimented my interests outside the military. In
response, I told him I was interested in geopolitical matters
and information technology. He suggested I consider becoming an
intelligence analyst.

UNCLASSIFIED

APPELLATE EXHIBIT 499
PAGE REFERENCED:____
PAGE __ OF __ PAGES

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 49 of 127 PageID# 366
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 259 of 337
Case 1:19-dm-00003-CMH   Document 5-8   Filed 03/04/19   Page 3 of 35 PageID# 262

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

b. (U) After researching the Intelligence Analyst position, I
agreed that this would be a good fit for me.  In particular, I
enjoyed the fact that an analyst would use information derived
from a variety of sources to create work products that informed
the command on its available choices for determining the best
courses of action (COAs).  Although the MOS required a working
knowledge of computers, it primarily required me to consider how
raw information can be combined with other available
intelligence sources in order to create products that assisted
the command in its situational awareness (SA).  I assessed that
my natural interest in geopolitical affairs and my computer
skills would make me an excellent Intelligence Analyst.

c. (U) After enlisting, I reported to the Fort Meade Military
Entrance Processing Station (MEPS) on 01 October 2007.  I then
traveled to, and reported at Fort Leonard Wood on 02 October
2007 to begin Basic Combat Training (BCT).

d. (U) Once at Fort Leonard Wood, I quickly realized that I
was neither physically nor mentally prepared for the
requirements of BCT.  My BCT experience lasted six (6) months
instead of the normal ten (10) weeks.  Due to medical issues, I
was placed in a hold status.  A physical examination indicated I
sustained injuries to my right shoulder and left foot.  Due to
these injuries I was unable to continue BCT.

e. (U) During medical hold, I was informed that I may be out-
processed from the Army.  However, I resisted being "chaptered"
because I felt I could overcome my medical issues and continue
to serve.

f. On 20 January 2008, I returned to BCT.  This time I was
better prepared, and I completed training on 2 April 2008.  I
then reported for the MOS-specific Advanced Individual Training
(AIT) on 7 April 2008.

g. (U) AIT was an enjoyable experience for me.  Unlike BCT,
where I felt different than the other Soldiers, I fit in and did
well.  I preferred the mental challenges of reviewing a large
amount of information from various sources and trying to create
useful, or "actionable," products.  I especially enjoyed the
practice of analysis through the use of computer applications
and methods I was familiar with.

2
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


   h. (U) I graduated from AIT on 16 August 2008 and reported to
my first duty station, Fort Drum, New York on 28 August 2008.
As an analyst, Significant Activities (SIGACTs) were a frequent
source of information for me to use in creating work products.
I started working extensively with SIGACTs early after my
arrival at Fort Drum.  My computer background allowed me to use
the tools organic to the Distributed Common Ground System--Army
(DCGS-A) computers and create polished work products for the 2nd
Brigade Combat Team (2BCT) chain of command.

   i. (U) The non-commissioned-officer-in-charge (NCOIC) of the
S2 section, Master Sergeant (MSG) David P. Adkins recognized my
skills and potential, and tasked me to work on a tool abandoned
by a previously assigned analyst, the "Incident Tracker."  The
Incident Tracker was viewed as a backup to the Combined
Information Data Network Exchange (CIDNE) and a unit historical
reference tool.

   j. (U) In the months preceding my upcoming deployment, I
worked on creating a new version of the incident tracker, and
used SIGACTs to populate it.  The SIGACTs I used were from
Afghanistan, because at the time our unit was scheduled to
deploy to the Logar and Wardak provinces Afghanistan.  Later,
our unit was reassigned to deploy to eastern Baghdad, Iraq.  At
that point, I removed the Afghanistan SIGACTs and switched to
Iraq SIGACTs.

   k. (U) As an analyst, I view the SIGACTs as historical data.
I believe this view is shared by other all-source analysts as
well.  SIGACTs give a first-look impression of a specific or
isolated event.  This event can be an Improvised Explosive
Devise (IED) attack, a Small Arms Fire (SAF) engagement with a
hostile force, or any other event a specific unit documented and
reported in real-time.  In my perspective, the information
contained within a single SIGACT, or group of SIGACTs is not
very sensitive.  The events encapsulated within most SIGACTs
involve either enemy engagements or casualties.  Most of this
information is publicly reported by the Public Affairs Office
(PAO), embedded media pools, or host-nation (HN) media.

UNCLASSIFIED.

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


    1. (U) As I started working with SIGACTs, I felt they were
similar to a daily journal or log that a person may keep.  They
capture what happens on a particular day and time.  .They are
created immediately after the event and are potentially updated
over a period of hours until a final version is published on
CIDNE.

    m. (U) Each unit has its own standard operating procedure
(SOP) for reporting and recording SIGACTs.  The SOP may differ
between reporting in a particular deployment, and reporting in
garrison.  In garrison, a SIGACT normally involves personnel
issues, such as a Driving Under-the-Influence (DUI) incident, or
an automobile accident involving the death or serious injury of
a Soldier.  The report starts at the company level, and goes up
to the battalion, brigade, and even up to the division level.
In a deployed environment, a unit may observe or participate in
an event and the platoon leader or platoon sergeant may report
the event as a SIGACT to the Company Headquarters through the
radio transmission operator (RTO).  The commander or RTO will
then forward the report to the Battalion Battlecaptain or Battle
Non-commissioned officer (NCO).  Once the Battalion
Battlecaptain or Battle NCO receives the report, they will
either:

        (1) Notify the Battalion Operations Officer (S3).

        (2) Conduct an action, such as launching the Quick
Reaction Force (QRF).

        (3) Record the event and report further report it up the
chain of command to the Brigade.

The recording of each event is done by radio or over the Secret
Internet Protocol Router Network (SIPRNet), normally by an
assigned Soldier, usually junior enlisted (E-4 and below).

    n. (U) Once a SIGACT is reported, the SIGACT is further sent
up the chain of command.  At each level, additional information
can either be added or corrected as needed.  Normally, within 24
to 48 hours, the updating and reporting of a particular SIGACT
is complete.  Eventually, all reports and SIGACTs go through the
chain of command from Brigade to Division, and Division to
Corps.  At Corps-level, the SIGACT is finalized and published.

4
UNCLASSIFIED

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 52 of 127 PageID# 369
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 262 of 337
Case 1:19-dm-00003-CMH  Document 5-8  Filed 03/04/19  Page 6 of 35 PageID# 265

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


o. (U) The CIDNE system contains a database that is used by
thousands of Department of Defense (DoD) personnel, including
Soldiers, civilians, and contractor support.  It was the U.S.
Central Command (CENTCOM) reporting tool for operational
reporting in Iraq and Afghanistan.  Two separate but similar
databases were maintained for each theater, "CIDNE-I" for Iraq
and "CIDNE-A" for Afghanistan.

p. (U) Each database encompasses over a hundred types of
reports and other historical information for access.  They
contain millions of vetted and finalized records including
operational and intelligence reporting.  CIDNE was created to
collect and analyze battlespace data to provide daily operation
and intelligence community (IC) reporting relevant to a
commander's daily decision making process.

q. (U) The CIDNE-I and CIDNE-A databases contain reporting
and analysis fields from multiple disciplines including:

(1) Human Intelligence (HUMINT) reports.

(2) Psychological Operations (PSYOP) reports.

(3) Engagement reports.

(4) Counter-Improvised Explosive Device (CIED) reports.

(5) SIGACT reports.

(6) Targeting reports.

(7) Social-Cultural reports.

(8) Civil Affairs reports.

(9) Human Terrain reporting.

r. (U) As an intelligence analyst, I had unlimited access to
the CIDNE-I and CIDNE-A databases and the information contained
within them.  Although each table within the databases is
important, I primarily dealt with HUMINT reports, SIGACT
reports, and CIED reports because these reports were used to
create the work product I was required to publish as an analyst.

5
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


   s. (U) When working on an assignment, I looked anywhere and
everywhere for information.  As an all-source analyst, this was
something that was expected.  The DCGS-A systems had databases
built in, and I utilized them on a daily basis.  This includes
the search tools available on DCGS-A systems on SIPRNet such as
Query-Tree, and the DoD and Intelink search engines.

   t. (U) Primarily, I utilized the CIDNE database, using the
historical and HUMINT reporting to conduct my analysis and
provide backup for my work product.  I did statistical analysis
on historical data, including SIGACTs, to back up analyses that
were based on HUMINT reporting and produce charts, graphs, and
tables.  I also created maps and charts to conduct predictive
analysis based on statistical trends.  The SIGACT reporting
provided a reference point for what occurred, and provided
myself and other analysts with the information to conclude a
possible outcome.

   u. (U) Although SIGACT reporting is sensitive at the time of
their creation, their sensitivity normally dissipates within 48
to 72 hours as the information is either publicly released, or
the unit involved is no longer in the area and not in danger.
It is my understanding that the SIGACT reports remain classified
only because they are maintained within CIDNE, because it is
only accessible on SIPRNet.  Everything on CIDNE-I and CIDNE-A,
to include SIGACT reporting was treated as classified
information.

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 54 of 127 PageID# 371
USCA4 Appeal: 19-1287     Doc: 10-2       Filed: 03/29/2019    Pg: 264 of 337
Case 1:19-dm-00003-CMH Document 5-8 Filed 03/04/19 Page 8 of 35 PageID# 267

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

4. (U) Facts Regarding Storage of SIGACT Reports.

a. (U) As part of my training at Fort Drum, I was instructed
to ensure that I create back-ups of my work product.  The need
to create back-ups was particularly acute given the relative
instability of and unreliability of the computer systems we used
in the field and during deployment.  These computer systems
included both organic and theater-provided equipment (TPE) DCGS-
A machines.  The organic DCGS-A machines we brought with us into
the field and on deployment were Dell M-90 laptops, and the TPE
DCGS-A machines were Alienware brand laptops.

b. (U) The M-90 DCGS-A laptops were the preferred machine to
use, as they were slightly faster, and had fewer problems with
dust and temperature than the TPE Alienware laptops.

c. (U) I used several DCGS-A machines during the deployment
due to various technical problems with the laptops.  With these
issues, several analysts lost information, but I never lost
information due to the multiple back-ups I created.

d. (U) I attempted to back-up as much relevant information as
possible.  I would save the information so that I, or another
analyst could quickly access it when a machine crashed, SIPRNet
connectivity was down, or I forgot where data was stored.  When
backing-up information I would do one or all of the following
things, based on my training:

(1) (U) Physical Back-up.  I tried to keep physical backup
copies of information on paper, so information could be grabbed
quickly.  Also, it was easier to brief from hard-copies research
and HUMINT reports.

(2) (U) Local Drive Back-up.  I tried to sort out
information I deemed relevant and keep complete copies of the
information on each of the computers I used in the Temporary
Sensitive Compartmented Information Facility (T-SCIF), including
my primary and secondary DCGS-A machines.  This was stored under
my user-profile on the "desktop."

(3) (U) Shared Drive Backup.  Each analyst had access to a
"T-Drive" shared across the SIPRNet. It allowed others to access
information that was stored on it.  S6 operated the "T-Drive."

7
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

        (4) (U) Compact Disc Re-Writable (CD-RW) Back-up.  For
larger datasets, I saved the information onto a re-writable
disc, labeled the discs and stored them in the conference room
of the T-SCIF.

    e. (U) This redundancy permitted us the ability to not worry
about information loss.  If a system crashed, I could easily
pull the information from my secondary computer, the "T-Drive,"
or one of the CD-RWs.  If another analyst wanted access to my
data, but I was unavailable, she could find my published
products directory on the "T-Drive" or on the CD-RWs.  I sorted
all of my products and research by date, time, and group, and
updated the information on each of the storage methods to ensure
that the latest information was available to them.

    f. (U) During the deployment, I had several of the DCGS-A
machines crash on me.  Whenever the computer crashed, I usually
lost information, but the redundancy method ensured my ability
to quickly restore old backup data, and add my current
information to the machine when it was repaired or replaced.

    g. (U) I stored the backup CD-RWs of larger datasets in the
conference room of the T-SCIF or next to my workstation.  I
marked the CD-RWs based on the classification level and its
content.  Unclassified CD-RWs were only labeled with the content
type, and not marked with classification markings.

    h. (U) Early on in the deployment, I only saved and stored
the SIGACTs that were within or near our Operational Environment
(OE).  Later, I thought it would be easier just to save all the
SIGACTs onto a CD-RW.  The process would not take very long to
complete, and so I downloaded the SIGACTs from CIDNE-I onto a
CD-RW.  After finishing with CIDNE-I, I did the same with CIDNE-
A.  By downloading the CIDNE-I and CIDNE-A SIGACTs, I was able
to retrieve the information whenever I needed it, and not rely
upon the unreliable and slow SIPRNet connectivity needed to
"pull" them.  Instead, I could just find the CD-RW, and open the
preloaded spreadsheet.

    i. This process began in late-December 2009, and continued
through early-January 2010.  I could quickly export one month of
the SIGACT data at a time, and download in the background as I
did other tasks.

8
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

j. (U) The process took approximately a week for each table.
After downloading the SIGACT tables, I periodically updated them
by pulling only the most recent SIGACTs, and simply copying them
and "pasting" them into the database saved on CD-RW.

k. (U) I never hid the fact I had downloaded copies of both
the SIGACT tables from CIDNE-I and CIDNE-A.  They were stored on
appropriately labeled and marked CD-RWs stored in the open.  I
views the saved copies of the CIDNE-I and CIDNE-A SIGACT tables
as being for both my use, and the use of anyone within the S2
section during SIPRNet connectivity issues.

l. (U) In addition to the SIGACT table, I had a large
repository of HUMINT reports and CIED reports downloaded from
CIDNE-I.  These contained reports that were relevant to the area
in and around our OE, in eastern Baghdad and the Diyala province
of Iraq.

m. (U) In order to compress the data to fit onto a CD-RW, I
used a compression algorithm called "BZip2."  The program used
to compress the data is called "WinRAR."  WinRAR is an
application that is free and can easily be downloaded from the
Internet via the Non-secure Internet Relay Protocol Network
(NIPRNet).  I downloaded WinRAR on NIPRNet and transferred it to
the DCGS-A machine user profile "desktop" using a CD-RW.

n. (U) I did not try to hide the fact that I was downloading
WinRAR onto my SIPRNet DCGS-A computer.  With the assistance of
the BZip2 compression algorithm using the WinRAR program, I was
able to fit all the SIGACTs onto a single CD-RW, and the
relevant HUMINT and CIED reports onto a separate CD-RW.

9
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry – U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


5. (U) Facts regarding my knowledge of the WikiLeaks
Organization (WLO)

   a. (U) I first became vaguely aware of WLO during my AIT at
Fort Huachuca, AZ.  Though, I did not fully pay attention until
WLO released purported Short Messaging System (SMS) messages
from 11 September 2001 on 25 November 2009.  At that time,
references to the release and the WLO website showed up in my
daily Google News open source search for information related to
U.S. foreign policy.

   b. (U) The stories were about how WLO published approximately
500,000 messages.  I then reviewed the messages myself, and
realized that the posted messages were very likely real given
the sheer volume and detail of the content.

   c. (U) After this, I began conducting research on WLO.  I
conducted searches on both NIPRNet and SIPRNet on WLO beginning
in late November 2009 and early December 2009.  At this time I
also began to routinely monitor the WLO website.

   d. (U) In response to one of my searches in December 2009, I
found the U.S. Army Counter-Intelligence Center (USACIC) report
on WLO.  After reviewing the report, I believed that this report
was the one that my AIT instructor referenced in early 2008.  I
may or may not have saved the report on my DCGS-A workstation.
I know I reviewed the document on other occasions throughout
early 2010, and saved it on both my primary and secondary
laptops.

   e. (U) After reviewing the report, I continued doing my
research on WLO.  However, based upon my open-source collection,
I discovered information that contradicted the 2008 USACIC
report, including information indicating that, similar to other
press agencies, WLO seemed to be dedicated to exposing illegal
activities and corruption.  WLO received numerous awards and
recognition for its reporting activities.  Also, in reviewing
the WLO website, I found information regarding U.S. military
SOPs for Camp Delta at Guantanamo Bay, Cuba, and information on
then-outdated Rules of Engagement (ROE) in Iraq for cross-border
pursuits of former members of Saddam Hussein al-Tikriti's
government.


10
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry - U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


f. (U) After seeing the information available on the WLO
website, I continued following it and collecting open-source
information from it.  During this time period, I followed
several organizations and groups, including wire press agencies
such as the Associated Press and Reuters and private
intelligence agencies including Strategic Forecasting
(STRATFOR).  This practice was something I was trained to do
during AIT, and was something that good analysts are expected to
do.

g. (U) During the searches of WLO I found several pieces of
information that I found useful in my work as an analyst.
Specifically, I recall WLO publishing documents relating to
weapons trafficking between two nations that affected my OE.  I
integrated this information into one or more of my work
products.

h. (U) In addition to visiting the WLO website, I began
following WLO using an Instant Relay Chat (IRC) client called
"X-Chat" sometime in early January 2010.  IRC is a protocol for
real-time internet communications by messaging or conferencing,
colloquially referred to as "chat rooms" or "chats."  The IRC
chat rooms are designed for group communication in discussion
forums.  Each IRC chat room is called a "channel."  Similar to a
television, you can "tune-in" to or "follow" a channel, so long
as it is open and does not require an invite.  Once joining a
specific IRC conversation, other users in the conversation can
see you have "joined" the room.  On the Internet, there are
millions of different IRC channels across several services.
Channel topics span a range of topics, covering all kinds of
interests and hobbies.

i. (U) The primary reason for following WLO on IRC was
curiosity, particularly in regards to how and why they obtained
the SMS messages referenced above.  I believed collecting
information on the WLO would assist me in this goal.

j. (U) Initially, I simply observed the IRC conversations.  I
wanted to know how the organization was structured, and how they
obtained their data.  The conversations I viewed were usually
technical in nature, but sometimes switched to a lively debate
on issues a particular individual felt strongly about.

11
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry - U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


k.  (U) Over a period of time, I became more involved in these
discussions, especially when the conversation turned to
geopolitical events and information topics, such as networking
and encryption methods.  Based on these observations I would
describe the WLO conversation as almost academic in nature.


l.  (U) In addition to the WLO conversations, I participated
in numerous other IRC channels across at least three different
networks.  The other IRC channels I participated in normally
dealt with technical topics including the Linux and Berkeley
Security Distribution (BSD) Operating Systems (OS), networking,
encryption algorithms and techniques, and other more political
topics such as politics and queer rights.


m.  (U) I normally engaged in multiple IRC conversations
simultaneously, mostly publicly but often privately.  The X-Chat
client enabled me to manage these multiple conversations across
different channels and servers.  The screen for X-Chat was often
busy, but experience enabled me to see when something was
interesting.  I would then select the conversation and either
observe or participate.


n.  (U) I really enjoyed the IRC conversations pertaining to
and involving the WLO.  However, at some point in late February
or early March, the WLO IRC channel was no longer accessible.
Instead, the regular participants of this channel switched to
using a "Jabber" server.  Jabber is another Internet
communication tool, similar, but more sophisticated than IRC.
The IRC and Jabber conversations allowed me to feel connected to
others even when alone.  They helped me pass the time and keep
motivated throughout the deployment.


12
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry – U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

6. (U) Facts regarding the unauthorized storage and disclosure
of the SIGACTs.

   a. (U) As indicated above, I created copies of the CIDNE-I
and CIDNE-A SIGACTs tables as part of the process of backing up
information.  At the time I did so, I did not intend to use this
information for any purpose other than for back-up.  However, I
later decided to release this information publicly.  At that
time I believed, and still believe, that these tables are two of
the most significant documents of our time.

   b. (U) On 8 January 2010, I collected the CD-RW I stored in
the conference room of the T-SCIF and placed it into the cargo
pocket of my Army Combat Uniform (ACU).  At the end of my shift,
I took the CD-RW out of the T-SCIF and brought it to my
Containerized Housing Unit (CHU).  I copied the data onto my
personal laptop.  Later, at the beginning of my shift, I
returned the CD-RW back to the conference room of the T-SCIF.

   c. (U) At the time I saved the SIGACTs to my laptop, I
planned to take them with me on mid-tour leave, and decide what
to do with them.  At some point prior to mid-tour leave, I
transferred the information from my computer to a Secured
Digital memory card for my digital camera.  The SD card for the
camera also worked on my computer, and allowed me to store the
SIGACT tables in a secure manner for transport.

   d. (U) I began mid-tour leave on 23 January 2010, flying from
Atlanta, GA to Reagan National Airport in Virginia.  I arrived
at the home of my aunt, Debra M. Van Alstyne, in Potomac, MD and
quickly got into contact with my then-boyfriend Tyler R.
Watkins.  Tyler, then a student at Brandeis University in
Waltham, MA, and I made plans for me to visit in the Boston, MA
area.  I was excited to see Tyler, and planned on talking to
Tyler about where our relationship was going, and about my time
in Iraq.

   e. (U) However, when I arrived in the Boston area, Tyler and
I seemed to have become distant.  He did not seem very excited
about my return from Iraq.  I tried talking to him about our
relationship, but he refused to make any plans.  I also tried
raising the topic of releasing the CIDNE-I and CIDNE-A SIGACT
tables to the public.

13
UNCLASSIFIED

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 61 of 127 PageID# 378
USCA4 Appeal: 19-1287      Doc: 10-2          Filed: 03/29/2019      Pg: 271 of 337
Case 1:19-dm-00003-CMH   Document 5-8   Filed 03/04/19   Page 15 of 35 PageID# 274

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry – U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


f. (U) I asked Tyler hypothetical questions about what he
would do if he had documents that he thought the public needed
access to. Tyler didn't really have a specific answer for me.
He tried to answer the question and be supportive, but seemed
confused by the question and its context. I then tried to be
more specific, but he asked too many questions. Rather than try
to explain my dilemma, I decided to just drop the conversation.

g. (U) After a few days in Waltham, I began feeling that I
was overstaying my welcome, and I returned to Maryland. I spent
the remainder of my time on leave in the Washington, DC area.

h. (U) During this time, a blizzard bombarded the mid-
Atlantic, and I spent a significant period of time essentially
stuck at my aunt's house in Maryland. I began to think about
what I knew, and the information I still had in my possession.
For me, the SIGACTs represented the on-the-ground reality of
both the conflicts in Iraq and Afghanistan. I felt we were
risking so much for people that seemed unwilling to cooperate
with us, leading to frustration and hatred on both sides.

i. (U) I began to become depressed at the situation that we
found ourselves increasingly mired in, year-after-year. The
SIGACTs documented this in great detail, and provided context to
what we were seeing on-the-ground. In attempting to conduct
counter-terrorism (CT) and counter-insurgency (COIN) operations,
we became obsessed with capturing and killing human targets on
lists, on being suspicious of and avoiding cooperation with our
host-nation partners, and ignoring the second and third order
effects of accomplishing short-term goals and missions.

j. (U) I believed that if the general public, especially the
American public, had access to the information contained within
the CIDNE-I and CIDNE-A tables, this could spark a domestic
debate on the role of the military and our foreign policy in
general, as well as it related to Iraq and Afghanistan. I also
believed a detailed analysis of the data over a long period of
time, by different sectors of society, might cause society to
re-evaluate the need, or even the desire to engage in CT and
COIN operations that ignored the complex dynamics of the people
living in the affected environment each day.


14
UNCLASSIFIED

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 62 of 127 PageID# 379
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 272 of 337
Case 1:19-dm-00003-CMH  Document 5-8  Filed 03/04/19  Page 16 of 35 PageID# 275

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


k. (U) At my aunt's house, I debated about what I should do
with the SIGACTs.  In particular, whether I should hold on to
them, or disclose them through a press agency.  At this point, I
decided it made sense to try and disclose the SIGACT tables to
an American newspaper.

l. (U) I first called my local newspaper, the Washington Post
and spoke with a woman saying she was a reporter.  I asked her
if the Washington Post would be interested in receiving
information that would have enormous value to the American
public.  Although we spoke for about five minutes concerning the
general nature of what I possessed, I do not believe she took me
seriously.  She informed me that the Washington Post would
possibly be interested, but that such decisions are made only
after seeing the information I was referring to, and after
consideration by the senior editors.

m. (U) I then decided to contact the largest and most popular
newspaper, the New York Times.  I called the public editor
number on the New York Times website.  The phone rang and was
answered by a machine.  I went through the menu to the section
for news tips and was routed to an answering machine.  I left a
message stating I had access to information about Iraq and
Afghanistan that I believed was very important.  However,
despite leaving my Skype phone number and personal email
address, I never received a reply from the New York Times.

n. (U) I also briefly considered dropping into the office for
the political commentary blog Politico.  However, the weather
conditions during my leave hampered my efforts to travel.

o. (U) After these failed efforts, I ultimately decided to
submit the materials to the WLO.  I was not sure if WLO would
actually publish the SIGACT tables, or, even if they did
publish, I was concerned they might not be noticed by the
American media.  However, based on what I read about WLO through
my research described above, this seemed to be the best medium
for publishing this information to the world within my reach.

p. (U) At my aunt's house, I joined in on an IRC conversation
and stated I had information that needed to be shared with the
world.  I wrote that the information would help document the
true costs of the wars in Iraq and Afghanistan.

15
UNCLASSIFIED

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 63 of 127 PageID# 380
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 273 of 337
Case 1:19-dm-00003-CMH Document 5-8 Filed 03/04/19 Page 17 of 35 PageID# 276

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

q. (U) One of the individuals in the IRC asked me to describe
the information. However, before I could describe the
information, another individual pointed me to the link for the
WLO website's online submission system.

r. (U) After ending my IRC connection, I considered my
options one more time. Ultimately, I felt that the right thing
to do was to release the SIGACTs. On 3 February 2010, I visited
the WLO website on my computer, and clicked on the "Submit
Documents" link. Next, I found the "submit your information
online link," and elected to submit the SIGACTs via the TOR
Onion Router (TOR) anonymizing network by a special link.

s. (U) TOR is a system intended to provide anonymity online.
The software routes Internet traffic through network of servers
and other TOR clients in order to conceal a user's location and
identity. I was familiar with TOR and had it previously
installed on my computer to anonymously monitor the social media
websites of militia groups operating within central Iraq.

t. (U) I followed the prompts and attached the compressed
data files of the CIDNE-I and CIDNE-A SIGACTs. I attached a
text file I drafted while preparing to provide the documents to
the Washington Post. It provided rough guidelines stating "it's
already been sanitized of any source identifying information.
You might need to sit on this information, perhaps 90-180 days,
to figure out how best to release such a large amount of data,
and to protect source. This is possibly one of the more
significant documents of our time, removing the fog of war, and
revealing the true nature of 21st century asymmetric warfare.
Have a good day." After sending this, I left the SD card in a
camera case at my aunt's house, in the event I needed it again
in the future.

u. (U) I returned from mid-tour leave on 11 February 2010.
Although the information had not yet been published by the WLO,
I felt a sense of relief by them having it. I felt had
accomplished something that allowed me to have a clear
conscience based upon what I had seen, read about and knew were
happening in both Iraq and Afghanistan every day.

16
UNCLASSIFIED

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 64 of 127 PageID# 381
USCA4 Appeal: 19-1287     Doc: 10-2        Filed: 03/29/2019     Pg: 274 of 337
Case 1:19-dm-00003-CMH  Document 5-8  Filed 03/04/19  Page 18 of 35 PageID# 277

●                        ●

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

7. (U) Facts regarding the unauthorized storage and disclosure
of "10REYKJAVIK13".

  a. (U) I first became aware of diplomatic cables during my
training period in AIT.  I later learned about the Department of
State (DOS) Net-Centric Diplomacy (NCD) portal from the 2-10BCT
S2, Captain (CPT) Steven Lim.  CPT Lim sent a section-wide email
to the other analysts and officers in late December 2009
containing the SIPRNet link to the portal, along with
instructions to look at the cables contained within and
incorporate them into our work product.  Shortly after this, I
also noticed that diplomatic cables were being referred to in
products from the Corps-level, U.S. Forces-Iraq (USF-I).

  b. (U) Based on CPT Lim's direction to become familiar with
its contents, I read virtually every published cable concerning
Iraq.  I also began scanning the database and reading other,
random, cables that piqued my curiosity.  It was around this
time, in early-to-mid-January 2010 that I began searching the
database for information on Iceland.  I became interested in
Iceland due to IRC conversations I viewed in the WLO channel
discussed an issue called "Icesave."  At this time, I was not
very familiar with the topic, but it seemed to be a big issue
for those participating in the conversation.  This is when I
decided to investigate, and conduct a few searches on Iceland to
find out more.

  c. (U) At the time, I did not find anything discussing the
"Icesave" issue, either directly or indirectly.  I then
conducted an open source search for "Icesave."  I then learned
that Iceland was involved in a dispute with the United Kingdom
(UK) and Netherlands concerning the financial collapse of one or
more of Iceland's banks.  According to open source reports, much
of the public controversy involved the UK's use of "anti-
terrorism legislation" against Iceland in order to freeze
Icelandic assets for payment of the guarantees for UK depositors
that lost money.

  d. (U) Shortly after returning from mid-tour leave, I
returned to the NCD to search for information on Iceland and
"Icesave" as the topic had not abated on the WLO IRC channel.
To my surprise, on 14 February 2010, I found the cable
10REYKJAVIK13 which referenced the "Icesave" issue directly.

17
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


     e. (U) The cable, published on 13 January 2010, was just over
two pages in length.  I read the cable, and quickly concluded
that Iceland was essentially being bullied, diplomatically, by
two larger European powers.  It appeared to me that Iceland was
out of viable solutions, and was now coming to the U.S. for
assistance.  Despite their quiet request for assistance, it did
not appear we were going to do anything.  From my perspective,
it appeared we were not getting involved due to the lack of long
term geopolitical benefit to do so.

     f. (U) After digesting the contents of 10REYKJAVIK13, I
debated on whether this was something I should send to the WLO.
At this point, the WLO had not published nor acknowledged
receipt of the CIDNE-I and CIDNE-A SIGACT tables.  Despite not
knowing if the SIGACTs were a priority for the WLO, I decided
the cable was something that would be important, and I felt I
might be able to right a wrong by having them publish this
document.  I burned the information onto a CD-RW on 15 February
2010, took it to my CHU and saved it onto my personal laptop.

     g. (U) I navigated to the WLO website via a TOR connection
like before, and uploaded the document via the secure form.
Amazingly, the WLO published 10REYKJAVIK13 within hours, proving
that the form worked and that they must have received the SIGACT
tables.

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

8. (U) Facts regarding the unauthorized storage and disclosure
of the 12 July 2007 Air Weapons Team (AWT) video.

   a. (U) During the mid-February 2010 timeframe, the 2-10BCT
Targeting analyst, then-Specialist (SPC) Jihrleah W. Showman and
others discussed video Ms. Showman found on the "T-Drive."  The
video depicted a several individuals being engaged by an Air
Weapons Team (AWT).  At first, I did not consider the video very
special, as I had viewed countless other "war-porn" type videos
depicting combat.  However, the recorded audio comments by the
AWT crew and the second engagement in the video, of an unarmed
bongo truck, troubled me.

   b. (U) Ms. Showman and a few other analysts and officers in
the T-SCIF commented on the video, and debated whether the crew
violated the Rules of Engagement (ROE) in the second engagement.
I shied away from this debate, and instead conducted some
research on the event.  I wanted to learn what happened, and
whether there was any background to the events of the day the
event occurred, 12 July 2007.

   c. (U) Using Google, I searched for the event by its date and
general location.  I found several news accounts involving two
Reuters employees who were killed during the AWT's engagement.
Another story explained that Reuters requested for a copy of the
video under the Freedom of Information Act (FOIA).  Reuters
wanted to view the video in order to be able to understand what
happened, and improve their safety practices in combat zones.  A
spokesperson for Reuters was quoted saying that the video might
help avoid a reoccurrence of the tragedy, and believed there was
a compelling need for the immediate release of the video.

   d. (U) Despite the submission of a FOIA request, the news
account explained that CENTCOM replied to Reuters, stating that
they could not give a timeframe for considering the FOIA
request, and the video might no longer exist.  Another story I
found, written a year later, said that even though Reuters was
still pursuing their request, they still did not receive a
formal response or written determination in accordance with the
FOIA.

19
UNCLASSIFIED

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 67 of 127 PageID# 384
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019     Pg: 277 of 337
Case 1:19-dm-00003-CMH   Document 5-8   Filed 03/04/19   Page 21 of 35 PageID# 280

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

e. (U) The fact neither CENTCOM nor Multi-National Forces-
Iraq (MCF-I) would not voluntarily release the video troubled me
further. It was clear to me that the event happened because the
AWT mistakenly identified the Reuters employees with a potential
threat, and that the people in the bongo truck were merely
attempting to assist the wounded. The people in the van were
not a threat, but "good Samaritans."

f. (U) The most alarming aspect of the video to me, however,
was the seemingly delightful bloodlust they appeared to have.
They dehumanized the individuals they were engaging, and seemed
to not value human life by referring to them as "dead bastards"
and congratulating each other on the ability to kill in large
numbers.

g. (U) At one point in the video, there is an individual on
the ground attempting to crawl to safety. The individual is
seriously wounded. Instead of calling for medical attention to
the location, one of the AWT crew members verbally asked for the
wounded person to pick up a weapon so he would have a reason to
engage. For me, this seems similar to a child torturing ants
with a magnifying glass.

h. (U) While saddened by the AWT crew's lack of concern about
human life, I was disturbed by their response to the discovery
of injured children at the scene. In the video, you can see the
bongo truck driving up to assist the wounded individual. In
response, the AWT crew assumes the individuals are a threat.
They repeatedly request for authorization to fire on the bongo
truck, and once granted, they engage the vehicle at least six
times.

i. (U) Shortly after the second engagement, a mechanized
infantry unit arrives at the scene. Within minutes, the AWT
crew learns that children were in the van and, despite the
injuries, the crew exhibits no remorse. Instead, they
downplayed the significance of their actions saying "well, it's
their fault for bringing their kids into a battle." The AWT
crew members sound like they lack sympathy for the children or
their parents. Later, in a particularly disturbing manner, the
AWT crew verbalizes enjoyment at the sight of one of the ground
vehicles driving over the bodies.

20
UNCLASSIFIED

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 68 of 127 PageID# 385
USCA4 Appeal: 19-1287     Doc: 10-2          Filed: 03/29/2019      Pg: 278 of 337
Case 1:19-dm-00003-CMH  Document 5-8  Filed 03/04/19  Page 22 of 35 PageID# 281

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


j. (U) As I continued my research I found an article
discussing a book "The Good Soldiers," written by Washington
Post writer David Finkel.  In Mr. Finkel's book, he writes about
the AWT attack.  As I read an online excerpt on "Google Books,"
I followed Mr. Finkel's account of the event, along with the
video.  I quickly realized Mr. Finkel was quoting, I feel in
verbatim, the audio communications of the AWT crew.  It's clear
to me that Mr. Finkel obtained access and a copy of the video
during his tenure as an embedded journalist.

k. (U) I was aghast at Mr. Finkel's portrayal of the
incident.  Reading his account, one would believe the engagement
was somehow justified as "payback" for an earlier attack that
lead to the death of a Soldier.  Mr. Finkel ends his account of
the engagement by discussing how a Soldier finds an individual
still alive from the attack.  He writes that the Soldier finds
him, and sees him gesture with his two forefingers together, a
common method in the Middle-East to communicate that they are
friendly.  However, instead of assisting him, the Soldier makes
an obscene gesture, extending his middle finger.  The individual
apparently dies shortly thereafter.  Reading this, I can only
think of how this person was simply trying to help others, and
then quickly finds he needs help as well.  To make matters
worse, in the last moments of his life, he continues to express
his friendly intent, only to find himself receiving this well
known gesture of "unfriendliness."  For me, it's all a big mess,
and I'm left wondering what these things mean, and how it all
fits together.  It burdens me emotionally.

l. (U) I saved a copy of the video on my workstation.  I
searched for, and found the ROE, ROW Annexes and a flowchart
from the 2007 time period, as well as an unclassified ROE smart
card from 2006.  On 15 February 2010, I burned these documents
onto a CD-RW, the same time I burned 10REYKJAVIK13 onto a CD-RW.

m. (U) At the time, I placed the video and ROE information
onto my personal laptop in my CHU.  I planned to keep this
information there until I redeployed in Summer 2010.  I planned
on providing this to the Reuters office in London, UK to assist
them in preventing events such as this in the future.


21
UNCLASSIFIED


**275**

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


n. (U) However, after the WLO published 10REYKJAVIK13, I
altered my plans.  I decided to provide the video and ROEs to
them, so that Reuters would have this information before I
redeployed from Iraq.  On about 21 February 2010, as described
above, I used the WLO submission form and uploaded the
documents.

o. (U) The WLO released the video on 5 April 2010.  After the
release, I was concerned about the impact of the video, and how
it would be perceived by the general public.  I hoped the public
would be as alarmed as me about the conduct of the AWT crew
members.  I wanted the American public to know that not everyone
in Iraq and Afghanistan were targets that needed to be
neutralized, but rather people who were struggling to live in
the "pressure-cooker" environment of what we call asymmetric
warfare.

p. (U) After the release, I was encouraged by the response in
the media and general public who observed the AWT video.  As I
hoped, others were just as troubled, if not more troubled, than
me by what they saw.  At this time, I began seeing reports
claiming that DoD and CENTCOM could not confirm the authenticity
of the video.  Additionally, one of my supervisors CPT Casey
Fulton (nee'Martin) stated her belief that the video was not
authentic.  In response, I decided to ensure that the
authenticity of the video would not be questioned in the future.
On 25 April 2010 I e-mailed CPT Fulton a link to the video that
was on our "T-Drive" and to a copy of the video published by WLO
from the Open Source Center (OSC) so she could compare them
herself.

q. (U) Around this timeframe, I burned a second CD-RW
containing the AWT video.  In order to make it appear authentic,
I placed a classification sticker and wrote "Reuters FOIA Req"
on its face.  I placed the CD-RW in one of my personal CD cases
containing a set of "Starting out in Arabic."  I planned on
mailing the CD-RW to Reuters after I redeployed so they could
have a copy that was unquestionably authentic.

r. (U) Almost immediately after submitting the AWT video and
ROE documents, I notified the individuals in the WLO IRC to
expect an important submission.  I received a response from an
individual going by the handle of "office."

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

s. (U) At first our conversations were general in nature, but
over time, as our conversations progressed, I assessed this
individual to be an important part of the WLO.  Due to the
strict adherence of anonymity by the WLO, we never exchanged
identifying information; however, I believed the individual was
likely Mr. Julian Assange, Mr. Daniel Schmidt, or a proxy-
representative of Mr. Assange and Schmidt.

t. (U) As the communications transferred from IRC to the
Jabber client, I gave "office," and later "pressassociation" the
name of "Nathaniel Frank" in my address book, after the author
of a book I read in 2009.

u. (U) After a period of time, I developed what I felt was a
friendly relationship with Nathaniel.  Our mutual interest in
information technology and politics made our conversations
enjoyable.  We engaged in conversation often, sometimes as long
as an hour or more.  I often looked forward to my discussions
with Nathaniel after work.

v. (U) The anonymity that provided by TOR, the Jabber client,
and WLO's policy allowed me to feel I could just be myself, free
of the concerns of social labeling and perceptions that are
often place upon me in real life (IRL).  IRL, I lacked close
friendship with the people I worked with in my section, the S2
sections in subordinate battalions, and 2BCT as a whole.  For
instance, I lacked close ties with my roommate due to his
discomfort regarding my perceived sexual orientation.

w. (U) Over the next few months, I stayed in frequent contact
with Nathaniel.  We conversed on nearly a daily basis, and I
felt we were developing a friendship.  The conversations covered
many topics, and I enjoyed the ability to talk about pretty much
anything, and not just the publications that the WLO was working
on.

x. (U) In retrospect, I realize these dynamics were
artificial, and were valued more by myself than Nathaniel.  For
me, these conversations represented an opportunity to escape
from the immense pressures and anxiety that I experienced and
built up throughout the deployment.  It seemed that as I tried
harder to "fit in" at work, the more I seemed to alienate my
peers, and lose respect, trust and the support I needed.

23
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

9. (U) Facts regarding the unauthorized storage and disclosure
of documents relating to detainments by the Iraqi Federal Police
(FP), the Detainee Assessment Briefs (DABs), and the USACIC
report.

a. (U) On 27 February 2010, a report was received from a
subordinate battalion.  The report described an event in which
the FP detained fifteen (15) individuals for printing "anti-
Iraqi literature."  By 2 March 2010, I received instructions
from an S3 section officer in the 2-10BCT Tactical Operations
Center (TOC) to investigate the matter, and figure out who these
"bad guys" were, and how significant this event was for the FP.

b. (U) Over the course of my research, I found that none of
the individuals had previous ties with anti-Iraqi actions or
suspected terrorist or militia groups.  A few hours later, I
received several photos from the scene from the subordinate
battalion.  They were accidently sent to an officer on a
different team in the S2 section, and she forwarded them to me.
These photos included pictures of the individuals, palettes of
unprinted paper, seized copies of the final printed document,
and a high-resolution photo of the printed material.

c. (U) I printed a blown up copy of the high-resolution
photo, and laminated it for ease of storage and transfer.  I
then walked to the TOC and delivered the laminated copy to our
category 2 interpreter.  She reviewed the information and about
a half-hour later delivered a rough written transcript in
English to the S2 section.

d. (U) I read the transcript, and followed up with her,
asking for her take on its contents.  She said it was easy for
her to transcribe verbatim since I blew up the photograph and
laminated it.  She said the general nature of the document was
benign.  The documentation, as I assessed as well, was merely a
scholarly critique of the then-current Iraqi Prime Minister,
Nouri al-Maliki.  It detailed corruption within the cabinet of
al-Maliki's government, and the financial impact of this
corruption on the Iraqi people.

e. (U) After discovering this discrepancy between the FP's
report, and the interpreter's transcript, I forwarded this
discovery, in person to the TOC OIC and Battle NCOIC.

24
UNCLASSIFIED

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 72 of 127 PageID# 389
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 282 of 337
Case 1:19-dm-00003-CMH Document 5-8 Filed 03/04/19 Page 26 of 35 PageID# 285

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

f. (U) The TOC OIC and, the overhearing Battlecaptain,
informed me they didn't need or want to know this information
any more. They told me to "drop it" and to just assist them and
the FP in finding out where more of these print shops creating
"anti-Iraqi literature" might be. I couldn't believe what I
heard, and I returned to the T-SCIF and complained to the other
analysts and my section NCOIC about what happened. Some were
sympathetic, but no-one wanted to do anything about it.

g. (U) I am the type of person who likes to know how things
work, and as an analyst, this means I always want to figure out
the truth. Unlike other analysts in my section, or other
sections within 2-10BCT, I was not satisfied with just
scratching the surface, and producing "canned" or "cookie-
cutter" assessments. I wanted to know why something was the way
it was, and what we could do to correct or mitigate a situation.
I knew that if I continued to assist the Baghdad FP in
identifying the political opponents of Prime Minister al-Maliki,
those people would be arrested, and in the custody of this
special unit of the Baghdad FP, very likely tortured and not
seen again for a very long time, if ever.

h. (U) Instead of assisting the special unit of the Baghdad
FP, I decided to take the information and disclose it to the WLO
in the hope that, before the upcoming 7 March 2010 election,
they could generate immediate press on the issue, and prevent
this unit of the FP from continuing to crack down on political
opponents. On 4 March 2010, I burned the report, the photos,
the high resolution copy of the pamphlet, and the interpreter's
handwritten transcript onto a CD-RW. I took the CD-RW to my CHU
and copied the data onto my personal computer.

i. (U) Unlike the times before, instead of uploading the
information through the WLO websites' submission form, I made a
Secure File Transfer Protocol (SFTP) connection to a "cloud"
dropbox operated by the WLO. The dropbox contained a folder
that allowed me to upload directly into it. Saving files into
this directory allowed anyone with login access to the server to
view and download them.

25
UNCLASSIFIED

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 73 of 127 PageID# 390
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 283 of 337
Case 1:19-dm-00003-CMH   Document 5-8   Filed 03/04/19   Page 27 of 35 PageID# 286

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


  j. (U) After uploading these files to the WLO on 5 March
2010, I notified Nathaniel over Jabber.  Although sympathetic,
he said that the WLO needed more information to confirm the
event in order for it to be published or to gain interest in the
international media.  I attempted to provide specifics, but to
my disappointment, the WLO website chose not to publish this
information.

  k. (U) At the same time, I began sifting through information
from the U.S. Southern Command (SOUTHCOM) and Joint Task Force
(JTF) Guantanamo, Cuba (GTMO).  The thought occurred to me,
although unlikely, that I wouldn't be surprised if the
individuals detained by the FP might be turned over back into
U.S. custody and ending up in the custody of JTF-GTMO.

  l. (U) As I digested through the information on JTF-GTMO, I
quickly found the detainee assessment briefs (DABs).  I
previously came across these documents before, in 2009, but did
not think much of them.  However, this time I was more curious
and during this search I found them again.  The DABs were
written in standard DoD memorandum format, and addressed the
Commander, U.S. SOUTHCOM.  Each memorandum gave basic background
information about a specific detainee held at some point by JTF-
GTMO.

  m. (U) I have always been interested on the issue of the
moral efficacy of our actions surrounding JTF-GTMO.  On the one
hand, I always understood the need to detain and interrogate
individuals who might wish to harm the U.S. and our allies.  I
felt that was what we were trying to do at JTF-GTMO.  However,
the more I became educated on the topic, it seemed that we found
ourselves holding an increasing number of individuals
indefinitely that we believed or knew were innocent, low-level
"foot soldiers" that didn't have useful intelligence and would
be released if they were still held in theater.

  n. (U) I also recalled that in early 2009, the then-newly-
elected President Barack Obama stated he would close JTF-GTMO
and that the facility compromised our standing in the world and
diminished our "moral authority."  After familiarizing myself
with the DABs, I agreed.


                          26
                     UNCLASSIFIED


                        **280**

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


o. (U) Reading through the DABs, I noted that they were not
analytical products.  Instead, they contained summaries of tear-
lined versions of Interim Intelligence Reports (IIRs) that were
old or unclassified.  None of the DABs contained names of
sources or quotes from Tactical Interrogation Reports (TIRs).
Since the DABs were being sent to the U.S. SOUTHCOM commander, I
assessed that they were intended to provide very general
background information on each detainee, and not a detailed
assessment.

p. (U) In addition to the manner the DABs were written, I
recognized that they were at least several years old, and
discussed detainees that were already released from JTF-GTMO.
Based on this, I determined that the DABs were not very
important from either an intelligence or national security
standpoint.

q. (U) On 7 March 2010, during my Jabber conversations with
Nathaniel, I asked him if he thought the DABs were of any use to
anyone.  Nathaniel indicated that although he didn't believe
they were of political significance he did believe that they
could be used to merge into the general historical account of
what occurred at JTF-GTMO.  He also thought that the DABs might
be helpful to the legal counsel of those currently and
previously held at JTF-GTMO.

r. (U) After this discussion, I decided to download the DABs.
I used an application called "WGet" to download the DABs.  I
downloaded WGet off the NIPRNet laptop in the T-SCIF like other
programs.  I saved that onto a CD-RW and placed the executable
in "My Documents" directory of my user profile on the DCGS-A
SIPRNet workstation.

s. (U) On 7 March 2010, I took the list of links for the DABs
and WGet downloaded them sequentially.  I burned the DABs onto a
CD-RW and took it to my CHU and copied them to my personal
computer.  On 8 March 2010, I combined the DABs with the USACIC
report on the WLO into a compressed "zip" file.  Zip files
contain multiple files which are compressed to reduce their
size.  After creating the zip file, I uploaded the file onto
their "cloud" dropbox via SFTP.  Once these were uploaded, I
notified Nathaniel that the information was in the "x"
directory, which had been assigned for my use.

27
UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)


t. (U) Earlier that day, I downloaded the USACIC report on WLO. As discussed above, I previously reviewed the report on numerous occasions and, although I had saved the document onto workstation before, I could not locate it. After I found the document again, I downloaded it to my workstation and saved it onto the same CD-RW as the DABs, described above.

u. (U) Although I my access included a great deal of information, I decided I had nothing else to send to the WLO after sending them the DABs and the USACIC report. Up to this point I sent them the following:

(1) The CIDNE-I and CIDNE-A SIGACT tables.

(2) The "10REYKJAVIK13" DOS cable.

(3) The 12 July 2007 AWT video and the 2006 and 2007 ROE documents.

(4) The SIGACT report and supporting documents concerning the 15 individuals detained by the Baghdad FP.

(5) The U.S. SOUTHCOM and JTF-GTMO DABs.

(6) The USACIC report on the WLO and website.

v. (U) Over the next few weeks, I did not send any additional information to the WLO. I continued to converse with Nathaniel over the Jabber client, and in the WLO IRC channel. Although I stopped sending documents to WLO, no one associated with the WLO pressured me into giving more information. The decisions that I made to send documents and information to the WLO and website were my own decisions, and I take full responsibility for my actions.

28
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

10.  (U) Facts regarding the unauthorized storage and disclosure
of other government documents.

   a.  (U) On 22 March 2010, I downloaded two documents.  I found
these documents over the course of my normal duties as an
analyst.  Based on my training and the guidance of my superiors,
I looked at as much information as possible.  Doing so provided
me with the ability to make connections others might miss.

   b.  (U) On several occasions during the month of March, I
accessed information from a government entity.  I read several
documents from a section within this government entity.  The
content of two of these documents upset me greatly.  I had
difficulty believing what this section was discussing.

   c.  (U) On 22 March 2010, I downloaded the two documents that
I found troubling.  I compressed them into a zip file named
"blah.zip" and burned them onto a CD-RW.  I took the CD-RW to my
CHU and saved the file to my personal computer.  I uploaded the
information to the WLO website using the designated drop-box.

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)

11.  (U) Facts regarding the unauthorized storage and disclosure of the NCD DOS cables.

a.  (U) In late March I received a warning over Jabber from Nathaniel that the WLO website would be publishing the AWT video.  He indicated that the WLO would be very busy and the frequency and intensity of our Jabber conversations decreased significantly.

b.  (U) During this time, I had nothing but work to distract me.  I read more of the diplomatic cables published on the DOS NCD server.  With my insatiable curiosity and interest in geopolitics, I became fascinated with them.  I read not only cables on Iraq, but also about countries and events I found interesting.  The more I read, the more I was fascinated by the way we dealt with other nations and organizations.  I also began to think that they documented backdoor deals and seemingly criminal activity that didn't seem characteristic of the de facto leader of the free world.

c.  (U) Up to this point during the deployment, I had issues I struggled with and difficulty at work.  Of the documents released, the cables are the only one I was not absolutely certain couldn't harm the U.S.  I conducted research on the cables published on NCD, as well as how DOS cables work in general.  In particular, I wanted to know how each cable was published on SIPRNet via the NCD.

d.  (U) As part of my open-source research, I found a document published by DOS on its official website.  The document provided guidance on caption markings for individual cables and handling instructions for their distribution.  I quickly learned that caption markings clearly detail the sensitivity level of a DOS cable.  For example, "NODIS" (No Distribution) was used for messages of the highest sensitivity, and were only distributed to the authorized recipients.  The "SIPDIS" (SIPRNet Distribution) caption was applied only to reporting and other informational messages that were deemed appropriate for release to a wide number of individuals.

30
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


     e.  (U) According to the DOS guidance for a cable to have the
SIPDIS caption it could not include any other captions that were
intended to limit distribution.  The SIPDIS caption was only for
information that could be shared with anyone with access to
SIPRNet.  I was aware that thousands of military personal, DoD,
DOS, and other civilian agencies had easy access to the cables.
The fact that the SIPDIS caption was only for wide distribution
made sense to me given that the vast majority of the NCD cables
were not classified.

     f.  (U) The more I read the cables, the more I came to the
conclusion that this type of information should become public.
I once read and used a quote on open diplomacy written after the
First World War, and how the world would be a better place if
states would avoid making secret pacts and deals with and
against each other.  I thought these cables were a prime example
of the need for a more open diplomacy.  Given all the DOS
information I read, the fact that most of the cables were
unclassified, and that all of the cables had the SIPDIS caption,
I believed that the public release of these cables would not
damage the U.S.  However, I did believe the cables might be
embarrassing, since they represented very honest opinions and
statements behind the backs of other nations and organizations.
In many ways, these cables are a catalog of cliques and gossip.
I believed exposing this information might make some within the
DOS and others unhappy.

     g.  (U) On 28 March 2010, I began downloading a copy of the
SIPDIS cables using the program WGet described above.  I used
instances of the WGet application to download the NCD cables in
the background, as I worked on my daily tasks.  The NCD cables
were downloaded from 28 March 2010 to 9 April 2010.  After
downloading the cables, I saved them onto a CD-RW.  These cables
went from the earliest dates in NCD to 28 February 2010.  I took
the CD-RW to my CHU on 10 April 2010.  I sorted the cables on my
personal computer, compressed them using the BZip2 compression
algorithm described above, and uploaded them to the WLO via the
designated dropbox described above.


                              31
                          UNCLASSIFIED


                            **285**

UNCLASSIFIED.

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

h. (U) On 3 May 2010, I used WGet to download an update of
the cables for the months of March 2010 and April 2010, and
saved the information onto a zip file and burned it to CD-RW.  I
then took the CD-RW to my CHU and saved them to my computer.

i. (U) I later found that the file was corrupted during the
transfer.  Although I intended to resave another copy of these
cables, I was removed from the T-SCIF on 8 May 2010, after an
altercation.

Case 1:19-dm-00012-AJT Document 4-2 Filed 05/15/19 Page 80 of 127 PageID# 397
USCA4 Appeal: 19-1287 Doc: 10-2 Filed: 03/29/2019 Pg: 290 of 337
Case 1:19-dm-00003-CMH Document 5-8 Filed 03/04/19 Page 34 of 35 PageID# 293

UNCLASSIFIED

12. (U) Facts regarding the unauthorized storage and disclosure of the Gharani (Farah province), Afghanistan 15-6 investigation and videos.

a. (U) In late March 2010, I discovered a U.S. CENTCOM directory on a 2009 airstrike in Afghanistan. I was searching CENTCOM for information I could use as an analyst. As described above, this was something that myself and other analysts and officers did on a frequent basis.

b. (U) As I reviewed the documents, I recalled the incident and what happened. The airstrike occurred in the Gharani village in the Farah Province of Northwestern Afghanistan. It received worldwide press coverage during the time as it was reported that up to 100 to 150 Afghan civilians, mostly women and children, were accidently killed during the airstrike.

c. (U) After going through the report and its annexes, I began to view the incident as being similar to the 12 July 2007 AWT engagements in Iraq. However, this event was noticeably different in that it involved a significantly higher number of individuals, larger aircraft, and much heavier munitions. Also, the conclusions of the report are even more disturbing than those of the 12 July 2007 incident.

d. (U) I did not see anything in the 15-6 report or its annexes that gave away sensitive information. Rather, the investigation and its conclusions help explain how this incident occurred and what those involved should have done, and how to avoid an event like this from occurring again.

e. (U) After reviewing the report and its annexes, I downloaded the 15-6 investigation, PowerPoint presentations, and several other supporting documents to my DCGS-A workstation. I also downloaded three zip files containing the videos of the incident. I burned this information onto a CD-RW and transferred it to the personal computer in my CHU. Either later that day or the next day, I uploaded the information to the WLO website, this time using a new version of the WLO website submission form. Unlike other times using the submission form above, I did not activate the TOR anonymizer.

33
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:   Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


13.  (U) This concludes my statement and facts for this
providence inquiry.  The point of contact (POC) for this
memorandum is the undersigned at HHC, USAG, Joint Base Myer-
Henderson Hall, Fort Myer, Virginia 22211.



1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF VIRGINIA
2   ALEXANDRIA DIVISION

3   IN RE:  GRAND JURY SUBPOENA )   Case 1:19-dm-00003
    FOR CHELSEA MANNING          )
4                                )   Alexandria, Virginia
                                 )   March 5, 2019
5                                )   9:34 a.m.
                                 )   Pages 1 - 32
6   _____ )

7              TRANSCRIPT OF UNDER SEAL HEARING

8         BEFORE THE HONORABLE CLAUDE M. HILTON

9            UNITED STATES DISTRICT COURT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

                          UNDER SEAL

     Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

2

1   APPEARANCES:

2   FOR THE UNITED STATES OF AMERICA:

3        THOMAS W. TRAXLER, ESQUIRE
         GORDON D. KROMBERG, ESQUIRE
4        TRACY D. MCCORMICK, ESQUIRE
         KELLEN S. DWYER, ESQUIRE
5        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
6        Alexandria, Virginia  22314
         (703) 299-3700
7
         NICOLAS HUNTER, ESQUIRE
8        U.S. DEPARTMENT OF JUSTICE
         NATIONAL SECURITY DIVISION
9        600 E Street, N.W.
         Washington, D.C.  20004
10       (202) 307-5176

11  FOR CHELSEA E. MANNING:

12       SANDRA C. FREEMAN, ESQUIRE
         LAW OFFICE OF SANDRA FREEMAN
13       5023 West 120th Avenue, Suite 280
         Broomfield, Colorado  80020
14       (720) 593-9004

15       MOIRA MELTZER-COHEN, ESQUIRE, *PRO HAC VICE*
         LAW OFFICE OF MOIRA MELTZER-COHEN
16       277 Broadway, Suite 1501
         New York, New York  10007
17       (347) 248-6771

18       CHRISTOPHER LEIBIG, ESQUIRE
         LAW OFFICE OF CHRISTOPHER LEIBIG
19       114 North Alfred Street
         Alexandria, Virginia  22314
20       (703) 683-4310

21

22

23

24

25

UNDER SEAL

Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

**290**

3

1        THE CLERK:  Case No. 19-3, *In Re Grand Jury*
2  *Subpoena Regarding Chelsea Manning.*

3        MR. TRAXLER:  Good morning, Your Honor.
4  Tommy Traxler on behalf of the United States.  With me
5  at counsel table is Gordon Kromberg, Tracy McCormick,
6  Kellen Dwyer, and Nicolas Hunter also on behalf of the
7  United States, Your Honor.

8        THE COURT:  All right.

9        MR. LEIBIG:  Good morning, Judge.  Chris
10  Leibig for Ms. Manning.  With me is Sandra Freeman and
11  Moira Meltzer-Cohen.

12        As an initial matter, Judge, I would ask that
13  you grant my motion to move Ms. Meltzer-Cohen *pro hac*
14  *vice* for this matter.

15        THE COURT:  All right.  The motion is
16  granted.

17        MR. LEIBIG:  Thank you, sir.

18        MS. FREEMAN:  Good morning, Your Honor.
19  Sandra Freeman on behalf of Ms. Manning.

20        As a preliminary matter, I would request the
21  Court first take up our motion to unseal the pleadings,
22  and I would join that with a motion to open the
23  courtroom to the public.

24        THE COURT:  All right.

25        MS. FREEMAN:  Yes, sir.  I just wanted to

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**291**

4

 1  make sure the Court received the pleadings filed

 2  yesterday and the motion to unseal the pleadings.

 3          THE COURT:  I have.

 4          MS. FREEMAN:  Judge, the matter before the

 5  Court today is not a matter occurring before the grand

 6  jury as we are not in front of the grand jury.  The

 7  pleadings filed on Ms. Manning's behalf by counsel are

 8  not subject to the secrecy provisions in Rule 6(e), and

 9  Ms. Manning, as a witness, is not contemplated by the

10  secrecy rules of 6(e).

11          The pleadings that we filed before you,

12  specifically the motion to quash and the motion to

13  unseal, do not contain any information about what has

14  occurred before the grand jury.  The United States

15  Attorneys have not disclosed any of the information

16  that they are prohibited from disclosing.  The

17  information that we have put before the Court within

18  our pleadings and the information that we anticipate

19  arguing to you today are all matters that are already

20  within the sphere of public knowledge and that are not

21  protected by the secrecy provisions within the law.

22          The motion to quash in and of itself is not

23  something that is subject to the rules of grand jury

24  secrecy.

25          We would ask the Court to authorize

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**292**

5

1  disclosure of the pleadings filed as to Ms. Manning

2  with the exception, of course, of Ms. Manning's

3  declaration that is sealed and secret pursuant to the

4  personal identifying detail provisions in the rules

5  regarding redaction.

6        The rules around grand jury secrecy, first, I

7  think are explicit in that they say that no one other

8  than those listed in 6(e)(2)(B) shall be required to

9  adhere to the rules of secrecy.  The persons are

10 identified, such as the attorneys for the government

11 and court personnel.  Of course, those people are

12 subject to the provisions, and they are explicitly

13 identified.

14       It's clear from the rule, from the advisory

15 committee notes to the rule, and from case law from

16 various circuits interpreting the rule that the witness

17 herself, the pleadings that we have filed that do not

18 contain nonpublic information regarding the nonpublic

19 proceedings before the grand jury are not subject to

20 those secrecy provisions.

21       What we are asking today is that the Court

22 authorize unsealing of the motion to quash filed on

23 Ms. Manning's behalf, authorize unsealing of the motion

24 to unseal, and we would further ask the Court open the

25 courtroom to the public for arguments on these matters.

6

 1        Of course, the public has no right to be
 2 present for the grand jury itself.  The public and
 3 press have no First Amendment right of access.  We are
 4 not requesting that the public or the press or even
 5 counsel have any access to the actual proceedings
 6 before the grand jury.

 7        Our request here is for these proceedings
 8 specifically before you regarding whether or not to
 9 quash Ms. Manning's subpoena, regarding whether or not
10 to unseal the pleadings, that those matters the public
11 does have a particularized interest and a right of
12 access to be present.  Ms. Manning has a right for the
13 public to be able to be present for specifically these
14 arguments that do not involve protected information and
15 material.

16        There are questions and tests set out.  We
17 have to show a particularized need and that those
18 materials were present and opening of the courtroom
19 would be needed to avoid injustice at other
20 proceedings.  This is another proceeding being
21 contemplated by the rule.  We are not asking the Court
22 to open up the proceedings of the grand jury itself.
23 We are asking that these proceedings particularly be
24 opened.  The request has been narrowly tailored as to
25 these pleadings.

1          So based on all of that, we would ask that

2    the Court be opening the pleadings and the public

3    information, the information that has already been

4    disclosed and revealed by both the government and by

5    socialists throughout the past decade, to be accessible

6    by the public and the hearing as well.

7          THE COURT:  All right.

8          MR. TRAXLER:  Thank you, Your Honor.

9          As a preliminary matter, I want to observe

10   that the government has not received a copy of the

11   motion to unseal.  So we don't have the benefit of

12   responding to the specific arguments that were in that

13   pleading.  But instead, we just heard about it today

14   from Ms. Manning's counsel.  We would oppose

15   Ms. Manning's request to open the courtroom and to

16   unseal the pleadings in this matter.

17         First, I want to take up opening the

18   courtroom.  Rule 6(e)(5), Your Honor, states, and I

19   quote, that aside from criminal contempt proceedings,

20   the Court must close any hearing to the extent

21   necessary to prevent disclosure of a matter occurring

22   before a grand jury.

23         We would submit, Your Honor, that this entire

24   hearing concerns a matter occurring before a grand

25   jury, and that is a subpoena that the grand jury has

8

1   issued for Ms. Manning to testify in connection with a

2   grand jury investigation.  That investigation is

3   ongoing.  It's hard to imagine, Your Honor, how we can

4   have an effective hearing this morning without

5   discussing or potentially discussing matters that are

6   occurring before a grand jury.

7          Moreover, the pleadings and the hearing

8   directly involve matters occurring before the grand

9   jury.  Rule 6(e) would preclude the government from

10  confirming Ms. Manning's subpoena, a matter occurring

11  before a grand jury; Ms. Manning's immunity order,

12  another order that was issued in connection with a

13  matter occurring before a grand jury; and other items.

14         So practically speaking, Your Honor, we

15  wouldn't be able to have an effective hearing if the

16  government is constantly evaluating under Rule 6(e)

17  whether it can say certain things because the media is

18  present in the courtroom.  So we would submit, Your

19  Honor, that Rule 6(e)(5) answers the question this

20  morning, and that is the hearing, because it addresses

21  a matter occurring before the grand jury, should be

22  closed.

23         With respect to sealing, Your Honor, I would

24  direct the Court's attention to the following

25  subsection of Rule 6(e), and that's Rule 6(e)(6).  That

UNDER SEAL

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

**296**

9

1   specifically states that records, orders, and subpoenas
2   relating to grand jury proceedings must be kept under
3   seal to the extent and as long as necessary to prevent
4   the unauthorized disclosure of a matter occurring
5   before a grand jury.

6          Your Honor, at the outset, we would submit,
7   having not had the benefit of receiving the pleading
8   that Ms. Manning filed yesterday, that the Court should
9   defer ruling on unsealing at this time.   There is no
10  reason to go to a rushed judgment today.   There is too
11  much at stake, and whatever the Court's ruling is, it
12  would likely be appealed to the Fourth Circuit.

13         Instead, let the parties brief this issue in
14  due course, and that would give the parties an
15  opportunity to work through these issues.   It would
16  also give the Court an opportunity to make a considered
17  judgment in light of full briefing and the parties'
18  views on the issue.

19         But if the Court is inclined to rule today,
20  we would oppose unsealing all of the pleadings and
21  papers that they request be unsealed.

22         Just to reiterate, the fact that Ms. Manning
23  has been subpoenaed to testify in an ongoing grand jury
24  proceeding is a matter occurring before the grand jury.
25  Again, the fact that she's been granted immunity is

10

1   directly contemplated in the advisory notes of

2   Rule 6(e)(5) as being a matter that should be sealed,

3   as being paper that should be sealed, and is a matter

4   occurring before the grand jury.  Therefore, the briefs

5   that talk about that immunity order and the subpoena,

6   those are related to an ongoing grand jury proceeding

7   and should be sealed.

8           Thank you, Your Honor.

9           THE COURT:  All right.  Well, I find that

10  Rule 6(e)(5) and Rule 6(e)(6) require that we go

11  forward with these matters at this point in time under

12  seal and also that the courtroom be closed for the

13  hearing.

14          The government hasn't had time to respond to

15  your brief.  I will give time for you all to look

16  further at this issue as to what ought to be unsealed

17  or not unsealed.

18          As far as the hearing on the motion to quash

19  this grand jury subpoena, that's a matter before the

20  grand jury, and we'll go forward with the courtroom

21  closed.

22          MS. MELTZER-COHEN:  Good morning, Your Honor.

23  So thank you for hearing us this morning, Your Honor.

24          We understand that this is a robust and

25  complicated motion, so I will try to simplify it.  This

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**298**

11

1  is an omnibus motion.  The motion to quash is an

2  omnibus motion that contains several smaller motions

3  within it, many of which contain arguments that

4  interact with each other or are somewhat overlapping.

5      Each of the quash motions in our omnibus

6  motion represents an independent legal basis that would

7  constitute just cause for objecting to the subpoena

8  generally.  Each of these quash motions might also

9  constitute grounds to object to individual questions

10 that would be propounded before the grand jury.

11     So to the extent that the government has said

12 that some of these motions may be premature, they're

13 not entirely incorrect because it is true that we can't

14 litigate these issues today with respect to questions

15 that we have not yet heard.  But these motions may be

16 appropriate both today and then, again, revisited after

17 Ms. Manning hears questions.

18     THE COURT:  Aren't you conceding the

19 government's position in regard to what questions may

20 be asked?  I don't know how I can rule on that.  I have

21 no idea what questions are there.  You don't have any

22 idea what questions are there.  Clearly, we can't go

23 forward with today; can we?

24     MS. METZLER-COHEN:  Judge, I'm sorry.  Your

25 Honor, what I'm suggesting and I believe what the law

12

1   says is we can object to the subpoena generally, and we

2   can also, you know, in a later hearing object on

3   similar or the same grounds to individual questions.

4          So what's not premature here are the

5   following issues:  With regard to Ms. Manning's Fifth

6   Amendment privileges, it would appear that the

7   government has worked to moot this issue by not only

8   securing an immunity order from you but by securing a

9   parallel order from the military.

10          So, first, as we said in the motion, we do

11   have concerns about a perjury trap.  Ms. Manning gave

12   extensive and truthful testimony at her court marshal.

13   If you look at the document that's appended to the

14   government's reply, you will, in fact, see the

15   painstaking detail with which Ms. Manning accounted for

16   each instance of her conduct.  I mean down to file

17   names, Your Honor.

18          So if the government intends to question her

19   about any of the same matters, which the reply seems to

20   suggest they do, she's sort of faced with the choice of

21   reiterating her previous answers, which the government

22   appears not to accept, or being untruthful, which she

23   refuses to do.

24          Ms. Manning has not given and would not give

25   untruthful testimony.  However, since her prior

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**300**

13

1  testimony made clear that she acted alone and since we

2  have been advised that she is herself not a target in

3  this investigation, it would appear that the government

4  may harbor an interest in undermining her previous

5  testimony since it doesn't inculpate anyone else who

6  might be a target.

7          THE COURT:  Aren't you getting back where we

8  were just a minute ago?  You're saying if or what.

9  There's no way of knowing this.  This is just entire

10 speculation.  I can't base a ruling on that.

11         MS. METZLER-COHEN:  Okay.  Judge, I think

12 I -- I think it's important for me to make the record

13 of the argument here.  So if you'll --

14         THE COURT:  Well, you have that in your

15 papers, but go ahead and make your argument quickly.

16 It seems to me we're right at the same ground we were

17 before.

18         MS. METZLER-COHEN:  Okay.  I will attempt to

19 be clear and quick.

20         THE COURT:  Well, that is, we can't base a

21 decision on that.

22         MS. METZLER-COHEN:  Okay.

23         THE COURT:  I mean, you can conjure up

24 anything, or I could too.  Who knows whether that's

25 going to happen or not?

1    MS. METZLER-COHEN:  Well, Judge, there are

2  questions as to the subpoena as a whole that I think

3  deserve to be heard and are ripe for review today.  So,

4  you know, if in case the subpoena has been propounded

5  with an interest in either coercing perjury or

6  attempting to build a case against Ms. Manning for

7  perjury, you know, in order to undermine her as a

8  potential defense witness, since the immunity order

9  can't immunize that potential perjury, she retains an

10  interest in not testifying.

11    I do also want to clarify for the record that

12  the government correctly repeated my statement of the

13  law with respect to foreign prosecution.  It is

14  absolutely the case that the Supreme Court ruled in

15  *Balsys*, which both of us cite, that the immunity order

16  and immunity orders coextensive with the Fifth

17  Amendment privilege and that that privilege extends

18  only to domestic and not foreign prosecution.  I am not

19  suggesting that it does extend to foreign prosecution

20  but that because the immunity order does not extend to

21  foreign prosecution, it does create an unresolved

22  problem for Ms. Manning, which I think is worth

23  considering.

24    With respect to constitutional rights, it

25  appears to be the government's position that this

15

1   challenge is premature.  While we, of course, agree

2   that we can't make arguments today about grand jury

3   questions that we haven't yet heard, there are other

4   issues with respect to the subpoena generally, again,

5   that can be heard today.

6          As mentioned, Ms. Manning has disclosed to

7   the government everything she can about her involvement

8   in the 2010 disclosures for which she took full

9   responsibility.  If the government wishes to question

10  her further about these issues, as I said before, we

11  have concerns about a perjury trap.

12         But maybe they have interest in asking her

13  about subjects beyond those disclosures, and that would

14  be very concerning because Ms. Manning has no

15  information material or relevant to any other violation

16  of federal law.  So we can only conclude at that point

17  that the government wants to ask questions of

18  Ms. Manning that do not implicate any crimes.  That

19  would be information to which the grand jury is not

20  entitled because it would be an obvious violation of

21  her First Amendment expressive and associational

22  rights.

23         As we discussed in our pleadings, there is a

24  long and well-documented history with grand juries

25  being used for improper purposes, specifically to

UNDER SEAL

16

1   disrupt communities of activists and journalists who

2   are engaged in lawful and constitutionally valuable

3   activities.  Ms. Manning is not bringing this up in

4   order to assert the constitutional rights of

5   journalists or other third parties but to ensure that

6   the issue of the grand jury's purpose here and the

7   issue of this particular subpoena here is duly

8   considered.

9          The administration has been very publicly

10  hostile to the press.  This administration has also

11  been very publicly hostile to Ms. Manning.  The highest

12  ranking government officials have called her out by

13  name and called for her reincarceration and expressed

14  displeasure at her release.  So tremendous executive

15  pressure has been brought to bear on issues that are

16  implicated by this grand jury with respect to the

17  press, and tremendous executive pressure has been

18  brought to bear more specifically on Ms. Manning, who

19  is the subject of this individual subpoena.

20         So we think it makes sense for Ms. Manning to

21  be worried about a possible improper motive for this

22  subpoena in general.  We believe that that issue is

23  ripe today.

24         We have, of course, expressed our concerns

25  about the potential for a perjury trap and our concerns

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**304**

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 98 of 127 PageID# 415
USCA4 Appeal: 19-1287    Doc: 10-2    Filed: 03/29/2019    Pg: 308 of 337

17

1  that this grand jury subpoena is being used to
2  undermine Ms. Manning potentially as a witness, put her
3  in jeopardy of contempt and reincarceration, or to go
4  on a fishing expedition to constitutionally protected
5  activity.

6         As the government noted, there is a
7  presumption of regularity that attaches to grand jury
8  proceedings.  There is -- either must be a real
9  compelling need for judicial intervention into grand
10 jury proceedings, but we think that's present here.
11 Because once evidence of abuse has been introduced, it
12 is the prosecution that must demonstrate that
13 regularity.

14         Ms. Manning, of course, is not in a position
15 to introduce highly specific concrete evidence of
16 abuse.  But given the kind of attention that she has
17 been subject to, it is absolutely reasonable for her to
18 bulk at being compelled to cooperate with a government
19 that has been actively and publicly hostile to her.  We
20 believe that the prosecution should be called upon to
21 establish the regularity, not simply this grand jury
22 proceeding but specifically of this subpoena.

23         The electronic surveillance motion we believe
24 is also ripe for review but might also be appropriately
25 revisited after questioning before the grand jury.

18

1  Unlawful electronic surveillance, if used to propound a

2  subpoena or any question before a grand jury, would

3  constitute just cause excusing testimony.  The subject

4  of covert surveillance is rarely well positioned to

5  prevent overwhelming evidence of that surveillance, and

6  Ms. Manning is no exception.

7         That is why the law is well settled that

8  making even an allegation or at most, I think, in this

9  circuit a colorable claim of electronic surveillance is

10 sufficient to trigger the government's obligation to

11 either affirm or deny that electronic surveillance took

12 place.  This is not a particularly onerous task for

13 them, and we think it's worth noting that the

14 government did not make such a denial in their reply.

15        The government's argument here on the law is

16 a little misplaced.  Ms. Manning certainly has standing

17 to object to any electronic surveillance that would

18 have led to -- any unlawful electronic surveillance of

19 her that would have led to this subpoena or to

20 questions that may occur before it.

21        The case that is cited by both Ms. Manning

22 and the government, *U.S. v. Apple*, makes clear that a

23 cognizable claim -- and this is a quote from the

24 case -- need be no more than a mere assertion but must

25 have a colorable basis.

UNDER SEAL

Rhonda F. Montgomery    OCR-USDC/EDVA    (703) 299-4599

19

1       While this circuit may overwhelmingly find
2  that government denials of electronic surveillance are
3  sufficient to defeat this kind of claim, making a
4  colorable claim suffices to trigger the government's
5  obligation.  So the government would be expected to
6  make the requisite canvas of agencies and state their
7  unambiguous denials for the record.

8       So, Your Honor, all we're asking for here is
9  a very simple answer.  You know, to start with, if --
10 you know, if you ask the government now, "Are you aware
11 of any electronic surveillance," and if he says, "Yes,
12 we're done," you know, we know and we can go from
13 there.  If he says no, then all the government has to
14 do is make the relevant inquiries of the federal
15 agencies, and either they say yes, this kind of
16 surveillance happened, or no, it didn't.

17       Your Honor, we also included a motion to
18 instruct the grand jury to which the government
19 objects.  It is our position -- and I think it is
20 noncontroversial -- that the grand jurors are entitled
21 to fully understand not only the full scope of their
22 rights and power, but also the rights afforded to a
23 witness called to testify before them.  There is
24 nothing in our set of proposed grand jury instructions
25 that is legally questionable.  Each proposed

UNDER SEAL

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 101 of 127 PageID# 418
USCA4 Appeal: 19-1287   Doc: 10-2       Filed: 03/29/2019    Pg: 311 of 337

20

1   instruction is a simple statement of fact regarding the

2   powers of the grand jury or the rights of the witness.

3   In that the government painted such a plainly

4   educational document as in some way controversial is

5   perplexing and does not necessarily bode well for the

6   grand jury's independence.

7        Your Honor, there is also a motion for

8   disclosure of prior statements that I do want to

9   clarify in light of the government's response to us.

10  The government has objected to our request for

11  disclosure of prior statements based on the admittedly

12  stringent rules around disclosing grand jury testimony.

13  They are correct also that there is no prior grand jury

14  testimony to disclose.  I want to clarify that with

15  respect to the law on which this request is based, I am

16  arguing here by analogy.  Presumably, nongrand jury

17  testimony or other statements that are not bound by

18  Rule 6 would be significantly less tightly controlled

19  than grand jury testimony.

20        In preliminary discussions with the

21  government, counsel was given to understand that the

22  government believes Ms. Manning may have made prior

23  statements that were either incorrect or in some way at

24  variance with her prior statements or testimony.

25  Ms. Manning, of course, has raised concerns that this

UNDER SEAL

21

1   grand jury may be working toward eliciting

2   contradictory statements or worse, and her perceptions

3   have not been helped by the public resentment that has

4   been expressed by other actors in the government.   So

5   one way in which the government might make a show of

6   good faith here would be to disclose whatever prior

7   statements they seem to be relying on to justify the

8   subpoena.

9        It is in no way a violation of grand jury

10  secrecy to reveal to a witness statements that they

11  themselves are said to have made.   Doing so could have

12  many collateral benefits, including clarifying

13  authorship and attribution and refreshing the witness'

14  recollection.   There is certainly no law that forbids

15  such disclosure, and there does appear to be law both

16  encouraging and compelling it.

17        The final component of our omnibus motion

18  concerns our motion to disclose ministerial documents,

19  and Ms. Freeman will speak to that now.   I thank you,

20  Your Honor.

21        MS. FREEMAN:   Thank you, Your Honor.   Just

22  briefly, I would reincorporate everything that I said

23  regarding our motion to unseal in that I think that the

24  law that applies in terms of determining what is a

25  matter that occurs before the grand jury also applies

UNDER SEAL

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 103 of 127 PageID# 420
USCA4 Appeal: 19-1287    Doc: 10-2      Filed: 03/29/2019    Pg: 313 of 337

22

1  to this when you're looking at the analysis under

2  Rule 6(e).  Cases are clear not only from the Ninth

3  Circuit but from circuits across the country that

4  documents reflecting the commencement and termination,

5  reflecting that the grand jury has been -- a term has

6  been extended, records of impanelment to include

7  manuals, procedures, and the impanelment instructions,

8  that none of those issues have been held to be matters

9  occurring before the grand jury.  It would not affect

10 deliberations of a grand jury for us to know them.  It

11 would not potentially undermine the integrity of the

12 investigation or any witness' testimony to the grand

13 jury itself.

14         THE COURT:  You have available the

15 impanelment of this grand jury.

16         MS. FREEMAN:  No, sir, we do not.

17         THE COURT:  It was impaneled in the

18 courtroom; wasn't it?

19         MS. FREEMAN:  Judge, we do not have any of

20 the documents reflecting the --

21         THE COURT:  Every grand jury I've impaneled

22 is done here in the open courtroom.

23         MS. FREEMAN:  Understood, Judge.  It is

24 something that we would request access to.  It appears

25 that the --

23

1          THE COURT:  I don't have it.  I don't know if
2  the clerk has it somewhere.  There is some record of it
3  around here; isn't it?  We don't impanel the grand jury
4  in secret.

5          MS. FREEMAN:  Judge, I think the issue is
6  that the -- what different courts and what different
7  clerks -- I think that it is understandable the clerks
8  would be acting in abundance of caution in refusing to
9  disclose some of those documents.  It's our position
10 that things, such as an impanelment --

11         THE COURT:  While they're here, that's a
12 matter of information they may not give out, as to who
13 in particular is sitting on a grand jury.

14         MS. FREEMAN:  Yes.  We would not be
15 requesting identifying information of who those grand
16 jurors are.  These would just be documents basically
17 affecting the form and function, the mode, if you will,
18 of operation of this particular grand jury, not
19 regarding persons specifically on the grand jury, not
20 regarding witnesses who have testified before it, but
21 simply the -- what we would call the ministerial
22 documents.

23         THE COURT:  That's impaneling the grand jury
24 and the termination of the grand jury when it's over.

25              MS. FREEMAN:  Yes, sir.  So that would be the

                    UNDER SEAL

    Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

                         **311**

24

```
 1  request.   It's not for any of the private information.
 2             THE COURT:  All right.  I understand.
 3             MS. FREEMAN:  Thank you, Judge.
 4             All right.  Mr. Traxler.
 5             MR. TRAXLER:  Thank you, Your Honor.
 6             Your Honor, I'd like to pick up where the
 7  Court began, and that is that Ms. Manning's arguments
 8  today are premature.  As Your Honor noted, there has
 9  been no questioning yet.  Ms. Manning has not appeared
10  before the grand jury.  So she can only speculate that
11  the questions that might be asked would infringe upon
12  the rights that she cites in her papers.  As we
13  explained in our submission, such premature arguments
14  should be rejected.  They should be normally answered
15  on a question-by-question basis.
16             That said, Your Honor, we did argue
17  alternatively that this motion could be denied on its
18  merits.  We would, in fact, urge the Court, if it's so
19  inclined, to deny the motion on its merits now.  We
20  submit that the advantage of doing that would be it
21  would hopefully reduce the number of times or eliminate
22  the parties coming up here during the actual grand jury
23  questioning to have the Court rule on various issues
24  that have already been teed up in the papers.
25             So with that, I would like to address the
```

UNDER SEAL

Rhonda F. Montgomery    OCR-USDC/EDVA    (703) 299-4599

25

1  merit arguments that Ms. Manning makes in her papers.

2  First would be her Fifth Amendment claim.  As the

3  government argued in its papers, under *Kastigar*

4  (phonetic), there are no Fifth Amendment concerns here.

5  Ms. Manning has received full use and derivative use

6  immunity for her testimony by both this Court and the

7  Department of the Army.  Under *Kastigar*, that

8  eliminates any Fifth Amendment concerns.

9          The next argument Ms. Manning makes is a

10  First Amendment claim, and the government submits, as

11  we argued in our papers, that she has not asserted any

12  legitimate First Amendment interest that could be

13  infringed upon.

14          We submit, Your Honor, that the Supreme

15  Court's decision in *Branzburg v. Hayes* forecloses

16  Ms. Manning's arguments.  There the Supreme Court held

17  that reporters had to testify in front of the grand

18  jury even if it required them to disclose their

19  sources.  The reporters argued that they should have a

20  First Amendment privilege to not have to go before the

21  grand jury because disclosing those sources would have

22  an inhibiting effect for reporters to recruit sources

23  and it would diminish the flow of news.  The Supreme

24  Court rejected that argument.  It held it was

25  speculative.  We submit, Your Honor, that Ms. Manning

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**313**

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 107 of 127 PageID# 424
USCA4 Appeal: 19-1287  Doc: 10-2  Filed: 03/29/2019  Pg: 317 of 337

26

1 has an even weaker claim than the reporters had in

2 *Branzburg.*

3        Even assuming the questioning in the grand

4 jury were to touch on the disclosures from 2009 and

5 2010, Ms. Manning had no First Amendment rights with

6 respect to those disclosures.  As the government noted

7 in its papers, Ms. Manning was a government insider who

8 signed a nondisclosure agreement, and under

9 well-established precedent, that means that she had no

10 First Amendment rights.

11        Ms. Manning talks about the concerns that the

12 questioning would have for journalists.  I'll say at

13 the outset:  Certainly, Ms. Manning seems to be

14 speculating that at some future date the grand jury may

15 return an indictment that she speculates might violate

16 the First Amendment.  That's not a legitimate basis,

17 Your Honor, for a fact witness to refuse to testify in

18 front of the grand jury.  If it was, the whole grand

19 jury process would break down if every fact witness who

20 came in front of the grand jury could speculate that

21 the crimes being investigated might violate someone

22 else's constitutional rights.  She has no standing to

23 make that argument.

24        Next, Your Honor, Ms. Manning argues that the

25 grand jury subpoena was improperly motivated, and we

UNDER SEAL

Case 1:19-dm-00012-AJT  Document 4-2  Filed 05/15/19  Page 108 of 127 PageID# 425
USCA4 Appeal: 19-1287  Doc: 10-2       Filed: 03/29/2019   Pg: 318 of 337

27

 1  emphasize to the Court that Ms. Manning's speculations
 2  are exactly that.  They are mere speculations.  As the
 3  cases that we cited in our papers show, speculation and
 4  conjecture is not enough to rebut the long-standing
 5  presumption that the grand jury acts reasonably and
 6  properly when it issues a subpoena.

 7          Your Honor, I want to address in particular
 8  one thing that we heard throughout counsel's argument,
 9  and that is the speculation that the government issued
10  a grand jury subpoena just so it could catch
11  Ms. Manning in a so-called perjury trap.  Again, we
12  emphasize to the Court that's just speculation as to
13  what the government's motives are.  There's no basis
14  for that.

15          We also submit, Your Honor, that that
16  argument is premature.  Any concerns about an alleged
17  perjury trap are properly raised if there was some
18  charge for perjury at a future date.  It's not a
19  justification for a fact witness to refuse to go in
20  front of the grand jury.

21          Finally, Your Honor, we submit that
22  Ms. Manning has not provided the Court with a colorable
23  basis for believing that the government has -- I'm
24  sorry -- that she might have been subjected to unlawful
25  electronic surveillance.  As the Court noted in its

28

1  papers, there's certain threshold requirements that

2  Ms. Manning has to meet to even trigger the

3  government's obligation to affirm or deny or generally

4  respond to her allegations. She has to come forward

5  with something more than mere suspicion that she might

6  have been subjected to unlawful electronic

7  surveillance.

8          If you read her papers, she clearly has not

9  done that. You can tell by the way she couches her

10 argument throughout her papers, that she has reason to

11 believe, that she believes she might have been subject

12 to unlawful electronic surveillance. The truth is she

13 has no idea, and she is using this statute improperly

14 as an attempt to get discovery from the government.

15 Therefore, the government submits that Ms. Manning is

16 not entitled to even that threshold affirmance or

17 denial from the government about whether there is any

18 such surveillance in this case.

19         There is one last topic I want to touch on,

20 and that's the ministerial documents issue that counsel

21 raised just a moment ago. I would emphasize that, as

22 Judge Ellis noted in the decision we cited in our

23 papers, the Fourth Circuit has not adopted the approach

24 of the cases that Ms. Manning cites. We submit that

25 Ms. Manning, if there is anything done in open court,

29

1  should figure out on her own what's available.  If it's

2  not available because it was not done in open court, we

3  submit she should not receive those materials.

4       There is no right of access to the grand jury

5  proceedings.  Ms. Manning has provided no justification

6  or no need or has not provided any justification or

7  explained why she needs those documents.  In light of

8  that, we submit to the Court that the general rule of

9  secrecy should apply here and she should not receive

10  any documents relating to the grand jury proceedings

11  that have not otherwise already been done in open

12  court.

13       So with that, Your Honor, we would rest on

14  our papers for the rest of the arguments.  We submit

15  that the Court should deny the motion to quash.  It's a

16  bedrock principal, a long-standing principal in our

17  jurisprudence that the grand jury is entitled to every

18  person's evidence.  We submit that Ms. Manning is no

19  different.  She has been lawfully subpoenaed to testify

20  in the grand jury.  The Court has ordered her to

21  testify already fully and truthfully in front of the

22  grand jury.  She's been fully immunized with use and

23  derivative use testimony -- I'm sorry -- immunity in

24  connection with her testimony.  Like every other

25  citizen in this nation, Ms. Manning should be required

UNDER SEAL

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

30

1   to appear before the grand jury pursuant to the

2   subpoena and to testify fully and truthfully.  We

3   submit that there is no reason to treat Ms. Manning

4   differently than we would any other civilian in

5   responding to a grand jury subpoena.

6          Thank you, Your Honor.

7          THE COURT:  All right.  Well, as I've

8   listened to the arguments here, it's almost like

9   listening to lawyers discussing a case that they're

10  looking into and finding out what issues are involved.

11  This whole thing is just really speculation about what

12  may or may not happen.  Most of this is really

13  premature except your issue of the Fifth Amendment.  I

14  find that you have no rights in that regard because of

15  the immunity order that I've entered, and you have one

16  from the military.  I also find that there's no First

17  Amendment implication here that's been represented to

18  me or that I can even get my hands around to rule on.

19  There just isn't anything.

20         There's no evidence presented of any improper

21  motive.  You've raised questions about what might or

22  might not be the motive.  I don't have anything in

23  front of me that would require me to rule on it.

24         Also, your motion to instruct the grand jury,

25  I see no need to instruct the grand jury.

1          Your motion for disclosure of prior

2   statements, that's going to be denied as well.

3   Disclosing the ministerial documents here, I don't see

4   any relevancy that's been presented to me that would

5   require that at all.

6          So with that said, your motion to quash the

7   subpoena will be denied.

8          Now, I don't know if you want to set a time

9   frame on this unsealing or whatever it is, time to

10  respond to it. I mean, I'll deal with that.

11         MR. TRAXLER: Your Honor, the government

12  would request two weeks to prepare a response. Like I

13  mentioned, we still need to receive the papers from

14  Ms. Manning and then time to formulate a response.

15         THE COURT: All right. Why don't you all get

16  together on that. Two weeks sounds reasonable. Just

17  notice it to a Friday, and I'll deal with it when you

18  get ready to argue it again.

19         MR. TRAXLER: We will. Thank you, Your

20  Honor.

21         MR. KROMBERG: If I may, Your Honor. Our

22  time before the grand jury is tomorrow at 9:30. We ask

23  the Court -- we just let the Court know that so in case

24  these issues recur tomorrow or new issues come up

25  tomorrow, that's when we're expecting to be before the

UNDER SEAL

Rhonda F. Montgomery    OCR-USDC/EDVA    (703) 299-4599

**319**

32

1  grand jury.

2          THE COURT:  Well, I hope that I have dealt

3  with enough of them that we won't have any problems

4  like that.  If not, I'll be around.

5          MR. KROMBERG:  Thank you, Your Honor.

6          THE COURT:  All right.  We'll adjourn until

7  tomorrow morning at 9:30.

8          ------------------------------------
                    Time:  10:15 a.m.
9

10

11

12

13

14

15

16

17

18

19

20

21        I certify that the foregoing is a true and

22   accurate transcription of my stenographic notes.

23

24
                              _____
25                              /s/
                              Rhonda F. Montgomery, CCR, RPR
                                   UNDER SEAL

      Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703) 299-4599

**320**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


------------------------------:
                              :
IN RE:  Grand Jury Subpoena   :
                              :  Case No. 1:19-DM-3
CHELSEA MANNING               :
                              :    18-4/10-GJ-3793
                              :
------------------------------:




PARTIAL TRANSCRIPT
(Open Court Proceedings)

March 8, 2019


Before:    Claude M. Hilton, USDC Judge






APPEARANCES:

Tracy Doherty-McCormmick, Gordon D. Kromberg, Kellen S. Dwyer,
Thomas W. Traxler, Matthew R. Walczewski, and Nicholas Hunter,
Counsel for the United States

Moira Meltzer-Cohen and Christopher Leibig,
Counsel for C. Manning

Chelsea Manning, in person

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

2

1          NOTE:  After certain matters are heard with the

2    courtroom sealed, the courtroom is opened to the public and the

3    hearing continues as follows:

4          THE COURT:  All right.  Now, the Government, you were

5    getting ready to tell me something about sentencing.

6          MS. McCORMMICK:  Good morning, Your Honor.

7          The Government just wanted to respond to Ms.

8    Manning's counsel's request that given the Court's ruling on no

9    just cause and holding Ms. Manning in contempt, that Ms.

10   Manning should be sentenced to home confinement.

11         And under Section 1826, the Government just does not

12   believe that home confinement will have the coercive effect to

13   have Manning comply with the subpoena.

14         As Manning's counsel stated, the Government has

15   worked with the Marshals Service and with the Sheriff's

16   Department at ADC, at the Alexandria Detention Center, for the

17   last two days since having found out about Ms. Manning's

18   medical needs.  The safety of Ms. Manning is, obviously, a

19   concern and something that all of us share to make sure that

20   she would be safe in any environment.

21         We first received notice of Ms. Manning's medical

22   needs on Wednesday.  And since that time we have spent great

23   lengths to make sure that Ms. Manning's post-surgical medical

24   needs can be accommodated at the Alexandria Detention Center.

25         The Government has already shared a declaration with

3

 1   Manning's counsel and has submitted that to the Court, and I am

 2   just going to read quickly some of the relevant portions of it.

 3   And this is a declaration by Chief Deputy Joseph Pankey from

 4   the Alexandria Sheriff's Office.

 5            As described in the declaration the Alexandria

 6   Detention Center is confident that it can accommodate Ms.

 7   Manning's ongoing medical needs.  In fact, transgender inmates

 8   are not uncommon in the ADC.  And in the past it has

 9   accommodated requests from a similarly situated inmate.

10            Ms. Manning would be assigned to female housing, and

11   the ADC would work to ensure her safety and privacy.

12            Now, of course, because it is a detention center,

13   they can't guarantee absolute privacy because they also have

14   the added duties of maintaining safety and security.

15            However, the ADC did say that in consultation with

16   medical staff, that they reviewed the information that was

17   provided by Ms. Manning's counsel concerning the device that is

18   needed, and they have no issue with the device.  They have no

19   issue with the prescribed hormones needed.

20            They do have an issue with the narcotic because that

21   is just not allowed in a detention center.

22            The dilator would be retained by the medical unit and

23   would be provided to Ms. Manning as prescribed by her doctor

24   three times a day for 20 minutes per day.

25            Now, what the prescription is is sort of a moving

4

1    target here because we were first told one prescription.  We

2    received the prescription in writing yesterday, and that said

3    another set of times and minutes.  And the stack of information

4    I received today has different prescriptions again.

5              So the Government doesn't need to get involved in

6    that.  We have spoken to the Sheriff's Office, and the

7    Sheriff's Office has said that they are confident that they

8    will work with Ms. Manning's doctor, and with Ms. Manning's

9    counsel, and with Ms. Manning, and they will be able to safely

10   accommodate her medical needs and respect her privacy within

11   the confines of the detention center.

12             As you know, Your Honor, the ADC has accommodated

13   inmates with very significant medical issues, and they have

14   also successfully and safely dealt with inmates of notoriety.

15             So at the end of the day, after we spent a full day

16   yesterday on the phone with Manning's counsel, the Sheriff, the

17   Deputy Sheriff, and Chief Dean from the Marshals Service, who

18   are here if you need to have any questions answered, but we

19   provided the declaration, and we think that is sufficient, we

20   believe that under 1826 the Alexandria Detention Center is a

21   suitable place.  It is not a perfect place, it doesn't give Ms.

22   Manning everything she wants, but that is not the requirement.

23   The requirement is a suitable place.

24             In fact, to be clear, the Government doesn't want to

25   confine Ms. Manning.  The Government has all along hoped that

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

**324**

5

1   Ms. Manning would come in, comply with the valid Court order,

2   comply with the subpoena, and testify.  Ms. Manning could

3   change her mind right now, it is her choice.  If she chooses

4   not to comply, however, the law provides consequences because

5   if a witness could come in every day and choose what to comply

6   with and what not to comply with, or whether not to comply at

7   all, the entire system would break down.

8          This is really at the base a rule of law issue.  Ms.

9   Manning is not above the law, and the law requires her to

10  testify.  The Government, above all else, wishes she would.  We

11  hope she changes her mind now.

12         And if she does not, the Government recommends that

13  because it's a suitable place of confinement and because it is

14  necessary to secure her compliance with a valid Court order,

15  that Ms. Manning be confined to the Alexandria Detention Center

16  under the terms of 1826.

17         Thank you.

18         THE COURT:  All right.  I will give you five minutes

19  to respond.

20         MS. MELTZER-COHEN:  Thank you, Judge.  Thank you,

21  Your Honor.

22         The Government is correct that the only lawful

23  purpose for confinement under the recalcitrant witness statute

24  is its coercive effect.  Confinement may not be used simply to

25  cause harm.

6

1          In this case, they are also correct that Ms. Manning

2    is not above the law.  And Ms. Manning is prepared to suffer

3    the consequences of confinement for what you have ruled is a

4    contempt.

5          But that if she were confined to ADC, it would simply

6    cause harm to her.  You have heard and you have seen and been

7    given documents and letters about her recent surgery.  The

8    unique medical needs that arise from that surgery, both

9    physical and mental health needs.

10          And at the end of the day, notwithstanding the

11    Government's efforts, their declaration still says that this

12    device will be allowed if the documentation is appropriate.

13    And we still have an e-mail from Chief Pankey saying that:  We

14    cannot make guarantees.

15          We understand that they are acting in good faith, but

16    we believe, respectfully, that it is not possible for them to

17    make the kinds of guarantees that would need to be made in

18    order to ensure that Ms. Manning's health is not placed at

19    serious, grave risk.

20          Again, Judge, it is quite clear that you have the

21    discretion to sentence Ms. Manning to home confinement rather

22    than a jail.  The statute indicates that a recalcitrant witness

23    may be confined at what is called in the statute "a suitable

24    place."  We believe that her home is a suitable place, and that

25    a jail or a prison is not.

7

1          I urge you to exercise your discretion here to

2     confine Ms. Manning to her one-bedroom apartment for the term

3     of the grand jury as opposed to allowing her to be placed in a

4     carceral environment that could give rise to immediate and

5     unresolvable Eighth, Fifth, and Fourteenth Amendment issues.

6     And that would be, essentially, an act of tremendous cruelty as

7     opposed to the kind of coercive impact that is contemplated by

8     1826.

9          Thank you.

10          THE COURT:  All right.  Ms. Manning, would you come

11     to the podium.

12          Is there anything you would want to say before I

13     impose the sentence?

14          MS. MANNING:  Just that -- whatever happens, I will

15     accept whatever you bring upon me, Your Honor.

16          THE COURT:  All right.  Well, I found you in contempt

17     of my order requiring you to testify before the grand jury.

18     And it will be the sentence of the Court you be committed to

19     the custody of the Attorney General until such time as you

20     either purge yourself of the contempt or for the life of this

21     grand jury.

22          MS. MANNING:  Yes, Your Honor.

23          MS. MELTZER-COHEN:  Your Honor --

24          MR. LEIBIG:  Your Honor, may I be heard briefly on

25     one point?  Not contesting your ruling.  An additional matter.

8

1          THE COURT:  Yes.

2          MR. LEIBIG:  Judge, I wanted to make a motion that

3   within your schedule permitting, if you would consider setting

4   a brief hearing some day soon.  For example, Monday or Tuesday.

5          My intention for asking for that would be that I

6   would check on Ms. Manning this weekend after a couple of days

7   to see how things are working under the orders.  Again, we

8   don't know -- there has been no guarantee made about what will

9   happen.

10         If we had a hearing in court set for any time within

11  your schedule Monday or Tuesday, I think that would be

12  appropriate to check on how she adjusted in the intake and

13  everything else.  Because these treatments and such are

14  multiple times per day, and there is a complexity to it.

15         THE COURT:  Well, no, no, I am not going to do that.

16  For one practical matter, I am not going to be here next week.

17  But I would be available for any kind of messages.

18         But the treatment you are going to have to work out

19  with the Marshals.  They are fully capable of giving the

20  medical care and the medical treatment, and you need to work

21  that out with them instead of trying to get me to do it.

22         If some problem develops that you need to raise an

23  issue with me, why I'll be available, you just call my office.

24         MR. LEIBIG:  Okay.  Judge, we can do that early next

25  week by calling the Clerk if something did develop of an

9

1    emergency nature?

2           THE COURT:  Talk to the Government, call the Clerk,

3    whatever.  If there is a problem, it can always be addressed.

4    But now, I'm not going to get involved in this medical

5    treatment.  That's for the Marshals to do.  Okay?

6           MR. LEIBIG:  Thank you, sir.

7           THE COURT:  All right.  And we have still got a civil

8    case, don't we?

9           All right, we will take a brief recess, and I will

10   come back and hear the civil case.

11          MR. KROMBERG:  Thank you, Your Honor.

12          MS. McCORMMICK:  Thank you, Your Honor.

13   ------------------------------------------------
                          HEARING CONCLUDED
14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23              /s/   Norman B. Linnell
              Norman B. Linnell, RPR, CM, VCE, FCRR
24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:19-DM-3 |
| | ) | |
| CHELSEA MANNING, | ) | |
| | ) | |
| Defendant | ) | |

NOTICE OF APPEAL

Notice is hereby given that Chelsea Manning, through counsel, hereby appeals to the

United States Court of Appeals to the United States Court of Appeals for the Fourth Circuit from

the Order entered in this action on the 8th day of March, 2019 finding her in contempt of court

and committing her to the custody of the Attorney General.

THE LAW OFFICE OF CHRISTOPHER LEIBIG

___/S/_____

Christopher Leibig
114 North Alfred Street
Alexandria, VA 22314
703 683 4310
Chris@chrisleibiglaw.com

March 13, 2019

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 124 of 127 PageID# 441
USCA4 Appeal: 19-1287      Doc: 10-2       Filed: 03/29/2019     Pg: 334 of 337
Case 1:19-dm-00003-CMH   Document 21   Filed 03/18/19   Page 1 of 3 PageID# 352

FILED

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

Alexandria Division

... A 11· 34

|  |  |  |
|---|---|---|
| IN RE: | ) | **UNDER SEAL** |
|  | ) | (Pursuant to Local Criminal Rule 49 and |
|  | ) | Fed. R. Crim. P. 6(e)) |
| **GRAND JURY CASE NO. 10-GJ-3793** | ) |  |
|  | ) | Case No. 1:19-DM-3 |
|  | ) |  |
|  | ) | **GRAND JURY NO. 18-4** |
|  | ) |  |

## GOVERNMENT'S RESPONSE TO MOTION TO UNSEAL

The United States respectfully submits this response to Chelsea Manning's Motion to

Unseal. In her motion, Manning requests that the Court unseal the pleadings related to her

Motion to Quash filed on March 1, 2019. In light of the contempt proceedings that were

conducted in open court, the United States does not oppose this request. As a result, the United

States submits that the Court may unseal (1) the Motion to Quash (with the exception of the

Declaration of Chelsea Manning, which Manning asks be kept under seal), (2) the Government's

Response in Opposition to the Motion to Quash, filed on March 4, 2019, (3) the transcript of the

March 5, 2019 hearing on the Motion to Quash, (4) the Motion to Unseal, filed on March 4,

2019, and (5) this response.[1]  The United States has attached a proposed order to this effect.

---

[1] Manning has not moved to unseal the transcript of the closed portion of the contempt
proceedings. The Court should keep that transcript under seal because it reveals questions that
were asked of Manning during the grand jury proceeding. Consistent with well-established
caselaw, the Court properly closed the courtroom during that portion of the contempt proceeding
and then opened the courtroom for the remainder of the proceeding. *See, e.g.*, Fed. R. Crim. P.
6(e)(5) advisory committee's notes to 1983 amendments; *Levine v. United States*, 362 U.S. 610,
614-15 (1960); *United States v. Index Newspapers LLC*, 766 F.3d 1072, 1090-91 (9th Cir. 2014);
*United States v. Smith*, 123 F.3d 140, 149 n.13 (3d Cir. 1997); *In re Grand Jury Subpoena*, 97
F.3d 1090, 1094-95 (8th Cir. 1996).

**331**

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 125 of 127 PageID# 442
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 335 of 337
Case 1:19-dm-00003-CMH   Document 21   Filed 03/18/19   Page 2 of 3 PageID# 353

Because the United States does not oppose the relief sought in the Motion to Unseal, the Court

need not conduct a hearing on it.


Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____

Tracy Doherty-McCormick
First Assistant United States Attorney

Gordon D. Kromberg
Kellen S. Dwyer
Thomas W. Traxler
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3700
Facsimile (703) 299-3980
Thomas.traxler@usdoj.gov

Matthew R. Walczewski
Nicholas Hunter
Trial Attorneys, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone (202) 233-0986
Facsimile (202) 532-4251
Matthew.walczewski@usdoj.gov

2

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 126 of 127 PageID# 443
USCA4 Appeal: 19-1287      Doc: 10-2         Filed: 03/29/2019      Pg: 336 of 337
Case 1:19-dm-00003-CMH   Document 21   Filed 03/18/19   Page 3 of 3 PageID# 354

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March, 2019, I caused the foregoing document to

be sent to the following via electronic mail:

Moira Meltzer-Cohen
Attorney at Law
Mo_at_Law@protonmail.com

Christopher Leibig
Attorney at Law
Chris@chrisleibiglaw.com

Sandra C. Freeman
Attorney at Law
sandra.c.freeman@protonmail.com

Thomas W. Traxler
Assistant United States Attorney

3

Case 1:19-dm-00012-AJT   Document 4-2   Filed 05/15/19   Page 127 of 127 PageID# 444
USCA4 Appeal: 19-1287      Doc: 10-2        Filed: 03/29/2019       Pg: 337 of 337
Case 1:19-dm-00003-CMH   Document 26   Filed 03/20/19   Page 1 of 1 PageID# 437

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN RE: | ) | Case No. 1:19-DM-3 |
| | ) | |
| GRAND JURY CASE NO. 10-GJ-3793 | ) | GRAND JURY NO. 18-4 |
| | ) | |

## PROPOSED ORDER

This matter is before the Court on Chelsea Manning's Motion to Unseal. The Government does not oppose the motion. The Motion to Unseal is GRANTED. The Clerk's Office shall unseal the following filings: (1) the Motion to Quash filed by Chelsea Manning on March 1, 2019, (2) the Response in Opposition to the Motion to Quash filed by the Government on March 4, 2019, (3) the transcript of the March 5, 2019 hearing on the Motion to Quash, (4) the Motion to Unseal filed by Chelsea Manning on March 4, 2019, and (5) the Response to the Motion to Unseal filed by the Government on March 18, 2019. The Clerk's Office shall not unseal the Declaration of Chelsea Manning that was submitted as an exhibit to her Motion to Quash. All other sealed filings and transcripts shall remain under seal until further notice from the Court.

IT IS SO ORDERED.

*Claude M. Hilton*

THE HONORABLE CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Date: _Mar. 20, 2019_
Alexandria, Virginia