# EXHIBIT F

## FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

In re: Grand Jury Subpoena,   )
                             )
CHELSEA MANNING,      )
                             )
         Subpoenaed Party. )
                             )

**MOTION FOR**
**RELEASE PENDING**
**APPEAL**

**Misc. 19-1287-cv**

## <u>**MOTION FOR RELEASE PENDING APPEAL**</u>

Comes now, Chelsea Manning, through counsel, and respectfully moves this Court to reverse the decision of the United States District Court for the Eastern District of Virginia and release Ms. Manning pending the disposition of her expedited appeal in this Court. Ms. Manning makes this motion pursuant to 28 U.S.C. §1826(b)[1], Federal Rule of Criminal Procedure 46(c), and 18 U.S.C. §3143(b). As a sanction has been imposed on Ms. Manning as a result of the final contempt finding, this is an appeal as of right. Counsel is available for oral argument upon the Court's request.

### <u>**BRIEF STATEMENT OF THE CASE**</u>

Chelsea Manning is recognized world-wide as a champion of the Free Press and open government. In 2013, Ms. Manning, then an all-source

---

[1] As part of a stipulation with respect to an extension of time, Ms. Manning has waived her right to base any application of bail on her right to have her appeal decided within thirty days. This motion for bail is not based on that grounds, but the error of the district court in denying the initial application for bail, and the transformation of her confinement, without due process of law, from coercive to punitive.

intelligence analyst for the U.S. military, was convicted at a United States Army court martial for disclosing classified information to the public. She was sentenced to thirty-five years imprisonment and a dishonorable discharge. She was confined under onerous conditions, including but not limited to prolonged solitary confinement. In 2017 her sentence was commuted by then-President Barack Obama.

In March, 2019, she was summoned to appear and give testimony before a grand jury impanelled in the Eastern District of Virginia. She appeared, and filed under seal an Omnibus Motion to Quash on the grounds that the subpoena itself and/or questions to be asked before the grand jury were premised on unlawful electronic surveillance; impermissibly intruded upon constitutionally protected conduct and associations; violated her right against compelled self-incrimination; and were an improper use of grand jury subpoena power. As a secondary issue, Ms. Manning contested the government's insistence that all pleadings and hearings be kept under seal.

Ms. Manning was granted immunity from both domestic and military prosecution. On Tuesday, March 5, after a brief hearing held under seal, all her motions were denied, with the understanding that the same or similar motions would later be appropriately revisited with respect to specific grand jury questions.

The following day, March 6, 2019, Ms. Manning appeared before the grand jury. She was asked a series of questions, and in response invoked her First, Fourth, Sixth, and other statutory rights. The government made an immediate application for a finding of contempt and after a brief conference in a closed courtroom, a contempt hearing was scheduled for Friday, March 8. On that day, the government conceded that some part of the contempt hearing could be held in open court. After hearing arguments in a closed courtroom, Judge Hilton ruled that Ms. Manning lacked just cause for her refusal to testify. He then opened the courtroom, and publicly reiterated that he had found her in civil contempt of his order to cooperate with the grand jury.

Argument then took place about sentencing. Specifically, Ms. Manning raised grave concerns about whether the jail could accommodate her daily post-surgery medical needs. She reminded the government and the Court that the only legitimate purpose of civil confinement is coercion, and that such confinement may not permissibly be transformed into punishment without due process of law. One pointed issue that was discussed in letters submitted to, but not read by the District Court prior to ruling[2], were concerns that the jail should not subject Ms. Manning to prolonged solitary confinement, which UN Special Rapporteur Juan

---

[2] Counsel for Ms. Manning presented both the government and the Court with documents and letters from Ms. Manning's surgeon, her doctor, a medical expert in transgender health, and two of the world's foremost experts on the risks faced by transgender prisoners. See Exhibit A. Judge Hilton received this packet of letters and set them aside. He did not read them prior to ruling. He did not even flip through them or unfasten them from the binder clip with which they were secured.

Mendez has identified as "cruel, degrading, and inhuman."[3] Such treatment is

punitive by definition. See Exhibit A. On the basis of 28 U.S.C. 1826(a) and (c),

which clearly contemplate confinement at "a suitable place" *other than* a

"facility," Ms. Manning proposed home confinement with an ankle monitor for

the duration of the grand jury.

The District Court ordered Ms. Manning remanded to the custody of the

Alexandria Detention Center, without any explicit comment or ruling on her

motion for bail pending appeal. Ms. Manning has timely filed her notice of appeal,

and now requests that this court grant bail pending the resolution of the appeal.

## **LEGAL ARGUMENT**

### I.    The District Court's Denial of Release Pending Appeal Did Not Comply With F.R.A.P. 9(b).

As a preliminary matter, Ms. Manning believes that the constructive denial

of her application to bail pending appeal at the district level occurred in violation

of Rule 9 of the Federal Rules of Appellate Procedure, which requires the court to

state in writing its reasons for its refusal. This requirement is not a mere procedural

---

[3] Preface to the 2014 Spanish Edition of Sourcebook on Solitary Confinement by Sharon Shalev *available at* http://solitaryconfinement.org/uploads/
JuanMendezPrefaceSourcebookOnSolitaryConfinementTranslation2014.pdf

technicality, and may not be fulfilled by a "mere parroting of the standards set forth in the statute." <u>United States v. Thompson</u>, 452 F.2d 1333 n.7 (D.C. Cir. 1971).

During the hearing, counsel for Ms. Manning requested bail, pointing out that a non-frivolous appeal would be filed forthwith, and that Ms. Manning was clearly not a flight risk nor a danger to the community. The government did not disagree. Judge Hilton did not comment at all. Counsel for Ms. Manning also presented evidence regarding the risks of incarceration faced by Ms. Manning. <u>See</u> Exhibit A. Judge Hilton did not read or comment on this evidence.

Without explicitly ruling on the motion for bail, he ordered Ms. Manning to the custody of the Attorney General. He issued no written denial or justification therefor, nor did he issue any verbal rationale for his denial of bail.

In light of the fact that Judge Hilton's ruling is not meaningfully preserved for appellate review, release pending the determination of this appeal is an appropriate remedy.

## II.     Ms. Manning Meets All the Criteria for Bail Set Forth in the Constellation of Relevant Statutes.

### A.     Statutory scheme

Under 28 U.S.C. § 1826(b), "no person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal . . . if it appears that the appeal is frivolous or taken for delay." Thus, if the appeal is

neither frivolous nor taken for the purposes of delay, bail should be granted.  In re

July 1979 Term Special Grand Jury, 656 F.2d 64, 66 (4th Cir. 1981)("...§1826(b)

contemplates a liberal standard for granting bail"); Yates v. United States, 356 U.S.

363, 366, 78 S. Ct. 766, 768, 2 L. Ed. 2d 837 (1958); Tierney v. United States, 409

U.S. 1232, 1233, 93 S. Ct. 17, 18, 34 L. Ed. 2d 37 (1972) (in which the plain

language of the statute is straightforwardly applied and bail granted); Rehman v.

State of Cal., 85 S. Ct. 8, 9, 13 L. Ed. 2d 17 (1964) (bail pending appeal should be

denied 'only in cases in which, from substantial evidence, it seems clear that the

right to bail may be abused or the community may be threatened by the applicant's

release.', quoting Leigh v. United States, 82 S. Ct. 994, 996, 8 L. Ed. 2d 269

(1962). The "substantial question" inquiry typically made of bail applications in

*criminal* proceedings is here replaced by the "non-frivolous" inquiry.

This statute may be read in conjunction with the Federal Rule of Criminal

Procedure 46(c), and 18 U.S.C. §§3143(b), all of which militate toward release

pending appeal unless one of four conditions exists: 1) it appears the appeal is

frivolous, 2) it appears the appeal is taken for delay, 3) the court or the judge has

reason to believe that no one or more conditions of release will reasonably assure

that the person will not flee, or 4) the court or the judge has reason to believe that

the defendant poses a danger to any other person or to the community. In the

absentceof these four conditions, bail is mandatory. Civil contemnors are *not*

subject to a heavier burden than any other appellant. Indeed, the Supreme Court

has made clear that in such cases, bail should be denied "only for the strongest of reasons." Sellers v. United States, 89 S. Ct. 36, at 38, 21 L. Ed. 2d 64 (1968).

First, as was noted during the contempt hearing, Ms. Manning is not a flight risk. She appeared at not only the preliminary quash hearing and the grand jury appearance, but also at the contempt hearing two days after the grand jury appearance, which she correctly anticipated would end in her incarceration. Second, she is not a danger to the community, and the government has not contended that she is. Since the commutation of her sentence she has lived a subdued and law abiding life. Third, this appeal is being undertaken as expeditiously as possible, and is on an expedited schedule. It is not in any way being taken for purposes of delay. Finally, the appeal is not frivolous. Arguments regarding the non-frivolous nature of this appeal are explored in detail below.

On the basis that none of the four factors militating against bail are present, let alone "the strongest of reasons" that would rationalize a denial, Ms. Manning must be released on bail pending appeal.

### B.    Ms. Manning's Appeal Is Not Frivolous

Ms. Manning has raised several substantial grounds for appeal. The Appellate Brief filed with this Court on Friday, March 29, 2019, fully sets forth the non-frivolous grounds for her appeal. They are briefly reiterated below in abridged form for purposes of demonstrating their non-frivolous nature.

**i. The argument that the finding of contempt must be vacated because the District Court denied the electronic surveillance motion contrary to and without considering the relevant facts presented or the controlling law is not frivolous.**

In her Omnibus Motion to Quash, and at both the March 5 and March 8

hearings, Ms. Manning set forth reasons for her good faith belief that she had been

subjected to electronic surveillance pursuant to 18 U.S.C. §§2515 and 3504[4]. A

grand jury witness is entitled to refuse to answer questions derived from the illegal

interception of communications. The recalcitrant witness statute plainly affords a

"just cause" defense to civil contempt charges. Gelbard v. United States, 408 U.S.

41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972); In re Askin, 47 F.3d 100, 102 (4th Cir.

1995). In order to determine whether such just cause exists, a witness must raise an

allegation of unlawful government surveillance sufficient to trigger the

---

[4] In a declaration filed prior to hearing, Ms. Manning provided her phone numbers, addresses, and email addresses, and the time period during which she believes her communications were being intercepted. She described surveillance vans outside her apartment, and suspicious interactions with strangers. She raised a logical claim regarding the probability that any "inconsistent" statements the government believes to have been made by her were more likely intercepted, misunderstood, and misattributed electronic communications.

It is in no way unreasonable for Ms. Manning, a former intelligence analyst publicly reviled by high-ranking members of the U.S. government, to believe that she is under fairly intense electronic surveillance. That Ms. Manning was released after her commutation does not in any way mean that the National Security Agency, Federal Bureau of Investigation, Central Intelligence Agency, and Defense Intelligence Agency, all of which undeniably engage in wide-ranging, often unlawful intrusions into people's privacy, have not continued to make her the subject of intense surveillance. Though she has lived a law-abiding life since 2010, the government has not hidden their belief that Ms. Manning figures heavily in their deeply suspicious narratives about national security. There is no doubt that she is subject to physical surveillance, and it frankly strains credulity to imagine that she is *not* being surveilled electronically. Ms. Manning raised these issues and more in her declaration, and in so doing, made a prima facie showing.

government's obligation to either affirm or deny that such surveillance occurred. In re Grand Jury Subpoena (T-112), 597 F.3d 189, 200 (4th Cir. 2010).

The Fourth Circuit clearly accepts such a motion as a legitimate legal claim, and requires that it be considered and ruled upon. Judge Hilton denied the motion *sub silentio,* without explicitly ruling on it, or commenting on it in any manner so as to justify the denial or allow for meaningful appellate review.

Ms. Manning made a prima facie showing sufficient to trigger the government's obligation to affirm or deny electronic surveillance. Thus, the government should have been required by Judge Hilton to respond to Ms. Manning's allegations. A failure of the government to respond sufficiently in the face of a prima facie allegation of electronic surveillance constitutes ground for an appeal of the issue. A failure to make *any* denials has been viewed as sufficient *in itself* to justify vacatur of a contempt. In re Grand Jury Subpoena (T-112), 597 F.3d 189, 210 (4th Cir. 2010), Traxler, *concurrence.*

Here, rather than the government making insufficient denials, the district court did not even consider Ms. Manning's claim that any denials were required. The government made conclusory statements to the effect that they did not believe their obligations were triggered by her claims, but notably they made absolutely no effort whatsoever to deny that electronic surveillance occurred. On March 5, at the close of the hearing, Judge Hilton denied Ms. Manning's motions to quash. He said

nothing whatsoever as to her request for affirmations or denials of electronic surveillance.

During the contempt hearing held March 8, counsel for Ms. Manning renewed the issue of electronic surveillance, referring to Ms. Manning's declaration and the arguments of March 5. The specific basis for the renewal was that at least one question seemed to contain an assumption about Ms. Manning's motivations that had no basis in fact or any prior statement made by Ms. Manning. Therefore, counsel for Ms. Manning reminded the court that a witness in a contempt hearing is entitled to the information in the possession of the government that would support their claim to having just cause excusing their testimony. The government did not respond at all to the §3504 motion during any part of the contempt hearing.

At the close of an extremely brief hearing in a closed courtroom, Judge Hilton found Ms. Manning lacked just cause for her refusal to answer questions before the grand jury. He held her in contempt. At no point did he mention the electronic surveillance motion, or indeed, any of the arguments that had been put before him.

Judge Hilton did not seem to even consider the possibility that the government might have an obligation to disclose whether or not surveillance occurred, despite clear Fourth Circuit law supporting that proposition. The denial of the §3504 at the district level was an abuse of judicial discretion. The error is

compounded by the failure of the district court to consider the arguments, or even make a clear ruling on them. As Judge Hilton's failure to even consider the argument constitutes reversible error, it was not improper for Ms. Manning to decline to testify before the grand jury.

This issue is not frivolous.

### ii.    The issue of whether the finding of contempt must be vacated because the District Court failed to demand from the government even minimal assurances of grand jury regularity despite ample evidence of abuse is not frivolous.

At the contempt hearing, Ms. Manning pointed out that while a presumption of regularity does attach to grand jury proceedings, it may be rebutted. Once arguments are raised that call into question the propriety of a subpoena or questions asked before the grand jury, it is incumbent upon the court to order the government to furnish evidence that the purpose of a grand jury, or a particular subpoena, or even a particular question, is not improper. Mullaney v. Wilbur, 421 U.S. 684, 702 ns. 30 and 31 (1975).

Ms. Manning put before the District Court evidence sufficient to justify her concerns. She pointed out in her papers and at the March 5 hearing that both the current President and the Secretary of State (formerly head of the Central Intelligence Agency) have publicly expressed resentment at President Barack Obama's commutation of her sentence. Furthermore, because her testimony before

the grand jury would be identical to her previous testimony, it would be impermissibly redundant.

At the contempt hearing, Ms. Manning specifically identified the ways in which some of the questions asked were intended to undermine her credibility and could not possibly have yielded information relevant to a criminal investigation.

Finally, Ms. Manning pointed out that the government was clearly asking her questions to which they already knew the answers — that is, re-questioning her about the 2010 disclosure about which she had already testified truthfully and exhaustively at her court martial. As her testimony would be identical, it would in fact run contrary to the government's theory of any case involving anyone besides Ms. Manning — who cannot herself be re-prosecuted for any offenses of which she was already convicted. This situation therefore gives rise to an incentive for the government to use the grand jury to prepare for trial by undermining her as a defense witness.

Thus, Ms. Manning effectively raised substantiated concerns that the subpoena was motivated by an improper purpose; that it was intended as a mechanism of exposure and harassment; and that is was being used as a vehicle for trial preparation.

In spite of the evidence presented, no actual inquiry was made of government with respect to Ms. Manning's specific and concrete objections. The court might have been satisfied merely by an in camera recitation of the specific

reasons for calling this witness and for asking the particular questions. But there *is*

a minimal expectation that the government will satisfy the court that the sole and

dominant purpose of the subpoena is proper, and that the witness in fact is able to

add something of value to the grand jury's investigation.

The law is clear:

> "The principles that the powers of the grand jury may be used only to further its investigation, and that a court may quash a subpoena used for some other purpose, are both well recognized." United States v. Moss, 756 F.2d 329, 332 (4th Cir. 1985). Thus, "practices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden. This includes use of the grand jury by the prosecutor to harass witnesses or as a means of civil or criminal discovery."
> United States v. (Under Seal), 714 F.2d 347 (4th Cir. 1983).

Furthermore, "once a criminal defendant has been indicted, the Government

is barred from employing the grand jury for the 'sole or dominant purpose' of

developing additional evidence against the defendant." United States v. Bros.

Constr. Co. of Ohio, 219 F.3d 300 (4th Cir. 2000).

Given that Ms. Manning seems to have been subpoenaed only *after* a

charging document issued[5], evidence suggests that it was the government's intent

---

[5] Based on reporting which, per the editorial standards of the Washington Post, verified with two government sources possessed of personal knowledge, there is already a charging instrument that has issued with respect to this grand jury. See e.g.: Prosecutors Think Chelsea Manning made 'false or mistaken' statements during military trial, her lawyers say, *available at:* https://www.washingtonpost.com/local/legal-issues/prosecutors-think-chelsea-manning-did-not-tell-truth-about-wikileaks-her-lawyers-say/2019/03/21/ded935a2-4be8-11e9-9663-00ac73f49662_story.html?noredirect=on&utm_term=.2365db80e76a *last visited March 28, 2019.*

to impermissibly "use the grand jury to improve its case in an already pending trial

by preserving witness statements, locking in a witness's testimony, pressuring

potential trial witnesses to testify favorably, or otherwise employing the grand jury

for pretrial discovery." United States v. Alvarado, 840 F.3d 184 (4th Cir. 2016). See

also United States v. Moss, *supra,* ("it is the universal rule that prosecutors cannot

utilize the grand jury solely or even primarily for the purpose of gathering evidence

in pending litigation").

At the conclusion of contempt proceedings, Judge Hilton found, without

considering the facts, law, arguments, or evidence presented, that Ms. Manning

lacked just cause excusing her testimony. He justified his decision based not on any

arguments raised, but solely on his contention that, being immunized, Ms.

Manning was not entitled to refuse to answer questions. He made no comment

whatsoever on the issue of grand jury abuse.

As it was abuse of discretion for the Judge not to have considered these

arguments and required the government to satisfy the sole and dominant purpose

test, the foregoing constitutes a non-frivolous basis for appeal.

**iii.    The finding of contempt must be vacated because the District
Court held the significant portions of the contempt hearing in a closed
courtroom in violation of the Fifth and Sixth amendments to the United**

States Constitution and F.R.Crim.P. Rule 6(e)(5). **This argument is not frivolous.**

The District Court ordered that the hearings on March 5 and 6, and the contempt proceedings held March 8, 2019, be closed to the public, presumably acting pursuant to the grand jury secrecy requirement articulated in Fed. R. Crim. P. 6(e). The Court held the entirety of the three days of proceedings in a closed courtroom over Ms. Manning's objection, only perfunctorily opening the courtroom *after* finding Ms. Manning in contempt. The courtroom was opened, the District Court repeated its finding of contempt, allowed the parties brief argument as to sentencing, and ordered Ms. Manning into confinement. The brief opening of the courtroom for the conclusion of the sanction proceedings was inadequate and violated Ms. Manning's rights to due process and a public trial.

The text of Rule 6(e)(5) recognizes that the fundamental rights implicated by contempt proceedings and sanctions are paramount to grand jury secrecy. A "[c]ourt must close any hearing <u>to the extent necessary</u> to prevent disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. Rule 6(e)(5), *emphasis added*. This imperative requiring closure of the courtroom is conditional and "subject to any right to an open proceeding." <u>Id</u>. A court's decision to close contempt hearings to the public affects the rights of the alleged contemnor as well

as those of the press and the public because "the explicit Sixth Amendment right of

the accused is no less protective of a public trial than the implicit First Amendment

right of the press and public," Waller v. Georgia, 467 U.S. 39, at 46 (1984)

(reversing conviction because exclusion of public from multi-day suppression

hearing regarding sensitive wiretap information violated defendants' Sixth

Amendment right to public trial).

Although secrecy is the defining feature of the grand jury, courts have long

recognized that Fifth Amendment due process rights and Sixth Amendment public

trial rights apply to proceedings finding and sanctioning a grand jury witness for

civil contempt. In re Oliver, 33 U.S. 257 (1948)(reversing finding of civil contempt

made and punished in closed proceeding because "it is 'the law of the land' that no

[person]'s life, liberty or property be forfeited as a punishment until there has been

a charge fairly made and fairly tried in a public tribunal" and finding further that

"Summary trials for alleged misconduct called contempt of court have not been

regarded as an exception to this universal rule against secret trials..."). In the

matter of In re: Rosahn, the Second Circuit joined the majority of federal circuits to

hold that the Fifth Amendment requires that alleged civil and criminal contemnors

both be afforded the same procedural safeguards, including the right to counsel and the right to a public contempt hearing. 671 F.2d 690 (2nd Cir., 1982).

The Government did not assert any compelling governmental interests for closure of the proceedings in the District Court . The District Court incorrectly presumed that the contempt hearing should and must be closed, did not require the government to articulate a compelling interest necessitating closure of the courtroom, and did not narrowly tailor closure of the courtroom to a specific, non-conclusory government interest.

The brief opening of the courtroom for the conclusion of the sanction proceedings was inadequate and violated Ms. Manning's rights to due process and a public trial. This issue is not frivolous in any sense of the word.

## C. The Appeal is not Taken for Purposes of Delay

Ms. Manning filed her notice of appeal and ordered transcripts of the proceedings within days of being remanded. Ms. Manning has moved as expeditiously as possible, as this is an expedited appeal. She has already endured irreparable harm as a result of her incarceration, which will only compound with further incarceration. Should she prevail on this appeal, any incarceration endured pending that decision will represent an irremediable injury. She has no incentive to

delay, and every incentive to move as quickly as may happen without compromising the integrity of the appeal papers.

## D. Ms. Manning is Not a Flight Risk or A Danger to the Community

Ms. Manning is not a flight risk. She has a stable home, and a community of supportive friends. She has appeared each time the government or the court has summoned her, even when she correctly anticipated that doing so would result in her reincarceration, essentially self-surrendering to custody. She believes in taking a principled stand for what she believes in, and also in taking accountability for her actions. No bond would be necessary to secure her reappearance in court. Furthermore, if deemed necessary, conditions such as monitoring could ensure her reappearance. However, neither the government nor the district court has ever indicated any anxiety about her as a flight risk, because it is manifestly apparent that she is not inclined to flee.

Nor is Ms. Manning a danger to the community. She engaged in a globally publicized criminal offense a decade ago. Since that time she has lived lawfully. She has engaged in her communities and public life, even running for elected office. While she remains to some a controversial figure, she is by no stretch of the imagination anything approaching "a danger to any other person," as contemplated by the provisions of 18 U.S.C. §3143(2)(B).

## E. Ms. Manning Ought to Be Immediately Released as The Conditions of Her Confinement Have Already Been Transformed From Coercive to Punitive

The Recalcitrant Witness statute may be enforced for a single lawful purpose: to coerce, through confinement, the testimony of a recalcitrant witness. Conditions and purpose of confinement may not become punitive, because due process protections are lower for the civil contempt hearing that is provided under §1826 than they are for someone upon accused or convicted of a crime, upon whom punishment is to be imposed.

Usually, it is argued that confinement has slipped from coercive to punitive at whatever point a witness can prove that they are never going to cooperate, and that, as they cannot be coerced, their confinement serves no further non-punitive purpose. Ms. Manning has maintained consistently that while she will certainly exhaust her legal avenues in order to legally justify her decision not to cooperate, her continued noncooperation is a foregone conclusion, regardless of the legal outcomes. However, at this early stage, that argument may be premature.

More urgent at this moment are our concerns about the instant use of prolonged solitary confinement. Ms. Manning was kept in solitary confinement for nearly a year during her confinement at Quantico. As a result of studying her case, UN Special Rapporteur on Torture Juan Mendez issued reports defining solitary confinement as tantamount to torture after it becomes "prolonged." On the basis of

scientific research about irrevocable changes in brain chemistry he defined

"prolonged" as more than 15 days.[6]

Ms. Manning has now been kept in administrative segregation ("adseg") for

25 days. While the word used for her placement is not "solitary confinement," the

description of adseg in the Alexandria Detention Center's ("ADC") inmate

handbook is identical in its critical attributes to the definition outlined by the

Special Rapporteur. In particular, both definitions involve being kept confined to a

single cell for 22 hours per day.[7]

We make no claim that she is being singled out for this treatment. It is

evident in fact that being placed in adseg is typical for so-called high profile

prisoners, including pre-trial detainees and people already convicted of an offense.

While Ms. Manning objects on humanitarian grounds to *anyone* enduring such

treatment, she recognizes that it is likely lawful for the jail to segregate people who

are being subjected to punishment. However, under §1826, Ms. Manning <u>may not</u>

<u>be punished</u>. Adseg, particularly after 15 days, definitionally constitutes

punishment, regardless of the motive, policy, or practice surrounding it.

Therefore, Ms. Manning's conditions of confinement must either be

modified so as not to constitute punishment, or she must be released. Since the jail

---

[6] "Manning's treatment was cruel and inhuman, UN torture chief rules," *The Guardian* (March 12, 2012) *Available at* https://www.theguardian.com/world/2012/mar/12/bradley-manning-cruel-inhuman-treatment-un *last visited* March 29, 2019

[7] https://ia601507.us.archive.org/0/items/AdministrativeSegregation-Alexandria/Administrative-Segregation.pdf *last visited April 1, 2019*

cannot turn back the clock on punishment that has already occurred, her

confinement in adseg in excess of 15 days already constitutes an incurable due

process violation. She must therefore be released.

It is clear that while the jail has bent over backwards to accommodate Ms.

Manning's health needs, it may simply be impossible for them to confine her in a

manner that does not constitute punishment. The concerns about isolated

confinement expressed to counsel and admitted into the record at the March 8

hearing have all in fact come to pass. See Exhibit A. The policies of the ADC seem

to demand that Ms. Manning be held in adseg for some amount of time. That time

has already passed into the range of the definitionally punitive, in the absence of

due process. We would argue this has created an incurable due process violation

that necessitates her release. We believe in any case that the Court ought to release

Ms. Manning pending determination of this appeal.

## **CONCLUSION**

Ms. Manning's appeal is not frivolous and is not interposed for the purpose

of delay.  She is not a flight risk or a danger. Furthermore, she is being

impermissibly punished in the absence of due process. Thus, Ms. Manning's

request for bail pending the determination of this appeal should be GRANTED.

Counsel respectfully submits that the issue of release can be determined without

remand.

For the foregoing reasons, Ms. Manning's request for bail pending appeal should be granted and she should be released on her own recognizance.

/s/ Chris Leibig
CHRISTOPHER LEIBIG
(VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-431 O
chris@chrisleibiglaw.com

/s/ Moira Meltzer-Cohen
MOIRA MELTZER-COHEN
(*pro hac vice* pending)
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

/s/ Sandra Freeman
SANDRA C. FREEMAN
(VSB# 78499)
5023 W. 120th Avenue, #280 '
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

/s/ Vincent J. Ward
VINCENT J. WARD
(*pro hac vice* pending)
Freedman Boyd Hollander
Goldberg
Urias & Ward, P.A
20 First Plaza, Suite 700

Albuquerque, New Mexico
87102
505-842-9960
vjw@fbdlaw.com

Tree of Life Primary Care and Recovery
Clinical Director, Ronica Mukerjee DNP, FNP-BC, MsA, LAc

To Whom It May Concern:

I am writing on the behalf of Chelsea Manning, who may be entering incarceral custody shortly. Her recent medical history, as relayed by her legal counsel, includes a major surgery resulting in a vaginoplasty. As an experienced clinician specializing in the care of transgender patients, particularly their post-operative care after gender reassignment surgery, I cannot state strongly enough how important her post-operative care is to preventing life-long deleterious consequences.

The care that is needed by Ms. Manning includes having immediate access to her vaginal dilators as well as appropriate lubrication, which are both needed to ensure that she does not lose the function of her genitals through vaginal prolapse or irreversible stiffening of her vaginal walls. The ability of C. Manning to dilate throughout the day and in the privacy of her cell is integral to her entire well-being as dilation prevents medical issues related to urination as well as defecation, two major bodily functions needed to ensure overall health. A stiffening or prolapse of the vaginal walls can be caused by not enough dilation and create problems in her genital, urinary, gastro-intestinal (rectal), and local musculoskeletal, and neurological systems.  The necessary preparation and insertion of the dilators, when done correctly, is multi-step process which takes at least one hour per administration and at least three hours per day.

In addition, the psychological harm possible to Ms. Manning following the lack of appropriate and immediate access to her vaginal dilators includes depression, anxiety and

129 Church St. #808, New Haven, CT, 16510 | www.treeoflifeprimarycare.org |
P: 203.553.1730 | F: 203.567.4145 | drm@treeoflifeprimarycare.org

Tree of Life Primary Care and Recovery
Clinical Director, Ronica Mukerjee DNP, FNP-BC, MsA, LAc

suicidal ideation. There is a well-known marked increase in mental health issues in patients
with unsuccessful genital surgeries. In this case, that mental health injury would be the result
of having inadequate access to needed medical equipment: her vaginal dilators.

Please allow Chelsea Manning to maintain her regular, needed post-operative care of
thrice-daily dilation with in-cell access to her dilators. If you have any further questions
regarding the clinical need for this, feel free to contact me at my office (below) or my mobile
phone at 646-785-7452.

Sincerely,

Dr. Ronica Mukerjee
Clinical Faculty, Yale School of Nursing
Clinical Director, Tree of Life Primary Care & Recovery

129 Church St. #808, New Haven, CT, 16510 | www.treeoflifeprimarycare.org |
P: 203.553.1730 | F: 203.567.4145 | drm@treeoflifeprimarycare.org

Tree of Life Primary Care and Recovery
Clinical Director, Ronica Mukerjee DNP, FNP-BC, MsA, LAc



129 Church St. #808, New Haven, CT, 16510 | www.treeoflifeprimarycare.org |
P: 203.553.1730 | F: 203.567.4145 | drm@treeoflifeprimarycare.org



Marci L. Bowers, MD

Clinical Office:                          www.marcibowers.com                    Administrative Office:
345 Lorton Ave Ste 101                                                                  PO Box 1044
Burlingame, Ca 94010                                                              Trinidad, Co 81082
Ph: (650) 570-2270 Fax: (650) 570-2283


Date: March 6, 2019


Re: Chelsea Manning


To Judge Hilton, Eastern District of Virginia, Alexandria,

It is my opinion that prison would have potentially devastating consequences for an
individual who is post op after MTF vaginoplasty. Specifically, dilation requirements
are crucial. If this is not met, the body can close off the newly created anatomy and
create pockets of infection that could place the individual's life in jeopardy.
Furthermore, the expense of reversing this consequence could far exceed the
original cost of surgery. The psychological damage to an individual denied this basic
daily function would also have deleterious effects on her mental health and well-
being.


Sincerely,

Marci L Bowers, MD

Powered by Proofpoint Encryption™

_____ Save As...                                            Help  _____  _____

Digital Signature is VALID

**[SECURE] Dilation**

From: Goldstein, Zil

To: mo_at_law@protonmail.com

Cc:

Sent: 3/7/2019 11:50:04 AM

To Whom It May Concern:


I was a consulting provider to Ms. Chelsea Manning (DOB:
12/17/1987) in helping her secure gender-affirming vaginoplasty
with Dr. Marci Bowers. For the past 10 years, I have been
providing healthcare to transgender people, including managing
many of Dr. Bowers' vaginoplasty patients' post-operative care.


After this procedure, it is medically necessary for Ms.Manning
to dilate her vagina by inserting a dilator in her vagina three
times a day for 20 minutes each time in absolute privacy. If she
is not able to complete daily dilation on this regimen, she will
be at risk for severe, potentially life-threatening
complications.


Without proper dilation, Ms. Manning is at high risk for vaginal
stricture. Given the nature of the vaginoplasty procedure,
vaginal stricture can lead not only to expensive corrective
surgical procedures, but can lead to vaginal infection and
potentially toxic shock syndrome.


Without an experienced follow-up care provider who can
appropriately monitor Ms. Manning's recovery, she is at risk for
many complications including infection and toxic shock syndrome.
Physicians and gynecologists without specialized training in

caring for people who have had vaginoplasty are not equipped to
monitor and advise patients on how to stay healthy after this
procedure. Ms. Manning will require specialized follow-up care
in order for her to properly recover from vaginoplasty which is
only available a few places in the country.

Thank you,

Zil Garner Goldstein, FNP-BC
Assistant Professor of Medical Education
Program Director
Center for Transgender Medicine and Surgery at Mount Sinai
275 7th Avenue
New York, NY 10011
212-604-1730

http://www.mountsinai.org/ctms<https://webmail.mountsinai.org/
owa/redir.aspx?C=MiRZTPPZ0U-
SapVvkXUgFnHj0VOC0tMITqsFhvKZlxVPHBA7s0-
M5XrLsWByM0AUBbkKMeAQ4FM.&URL=http%3a%2f%2fwww.mountsinai.org%2f
ctms>

[cid:image002.jpg@01CF4E71.99B23DE0]

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN RE: | ) | **UNDER SEAL** |
| | ) | |
| | ) | Case No. 1:19-DM-3 |
| GRAND JURY CASE NO. 10-GJ-3793 | ) | |
| | ) | GRAND JURY NO. 18-4 |

DECLARATION OF CHASE B. STRANGIO

In accordance with 28 U.S.C. § 1746, I do hereby make the following declaration in the above-captioned action:

1.      I have been a Staff Attorney at the LGBT & HIV Project of the American Civil Liberties Union (ACLU) since 2013. The ACLU is a nationwide, nonprofit, nonpartisan organization with nearly two million members. My work focuses on the needs and legal rights of transgender individuals. I regularly communicate with, advocate on behalf of and directly represent transgender individuals incarcerated in prisons and jails across the country.

2.      Between 2010 and 2012, I was a Staff Attorney and the Director of Prisoner Justice Initiatives at the Sylvia Rivera Law Project. Founded in 2003, the Sylvia Rivera Law Project (SRLP) is a non-profit organization that provides free legal representation to transgender, gender non-conforming and intersex people who are low-income. As an attorney at SRLP, I represented over 150 transgender individuals and provided advice and referrals to another 200 transgender individuals involved in the criminal justice system.

3.      Through my work at SRLP and prior to the promulgation of the final Prison Rape Elimination Act (PREA) regulations in May of 2012, I solicited comments from over 60 transgender prisoners across New York State on the Department of Justice's proposed

regulations. I also interviewed dozens of transgender individuals about the unique circumstances they faced while in custody to inform additional comments on the proposed PREA regulations concerning transgender prisoners and detainees.

4.      Between 2010 and 2015, I personally trained hundreds of New York City Department of Correction officers on the needs of transgender individuals in the custody of the New York City jails and on the officers' legal obligations under PREA and the Constitution.

5.      Between 2014 and 2017 I served as counsel to Chelsea Manning in her civil lawsuit against Department of Defense officials over the denial of medical treatment during her incarceration at the United States Disciplinary Barracks (USDB) at Fort Leavenworth.

6.      I make this declaration based on my personal knowledge of the experiences of transgender people in prison and jail across the United States and of Ms. Manning's particular history and risks.

7.      Research into sexual assault in confinement consistently documents the heightened vulnerability of transgender women to sexual victimization at the hands of facility staff and other prisoners in correctional settings. *See, e.g.*, National Prison Rape Elimination Commission Report 73 (June 2009); A. Beck et al., Sexual Victimization in Jails and Prisons Reported by Inmates, 2008-09 at 14-15 (Bureau of Justice Statistics Aug. 2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf; V. Jenness et al., Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault (Ctr. for Evidence-Based Corrs. 2009).

8.      Even when jail and prison policies outline medical and mental health protocols for treating transgender prisoners in custody, transgender prisoners and detainees frequently face delays and denials of medically necessary treatment related to gender transition. In my

experience, medical and mental health treatment provided to transgender prisoners falls greatly below even the bare minimum outlined in the prevailing standards of care.

9.     Individuals who are known to be transgender in correctional facilities are often singled out for isolation and abuse by other prisoners and staff. Measures such as protective custody and administrative segregation are frequently used to "protect" transgender individuals from abuse. These restrictive housing settings are themselves deeply harmful, particular for individuals with trauma backgrounds.

10.     The harassment, abuse and denial of medical care increase the rates of suicidality among prisoners and detainees who are transgender. This compounds an already staggering rate of attempted suicide among the transgender population, which is estimated at 41% (over 4 in 10 transgender individuals attempt suicide at some point in their lives). Nat'l Ctr for Transgender Equality. Preventing Transgender Suicide Washington: Nat'l Ctr for Transgender Equality (2010), http://www.transequality.org/PDFs/NCTE_Suicide_Prevention.pdf.

11.     Ms. Manning has had multiple suicide attempts including two attempts while incarcerated at the USDB during the period that I served as her counsel. The toll of her childhood trauma, Post Traumatic Stress symptoms from her military service, extreme conditions of solitary confinement during her pre-trial confinement at Quantico between 2010 and 2011, and gender dysphoria are understandably significant. Periods of isolation, harassment or denial of health care can trigger suicidal episodes for Ms. Manning that are not well managed in confinement settings.

12.     Even with assurances from the jail that Ms. Manning will have consistent access to her dilator and hormone therapy, jail conditions likely to disrupt that care can cause extreme distress for Ms. Manning.

13.     I have personally witnessed the toll of incarceration on Ms. Manning over a period of four years. She is just beginning to rebuild her life and I fear that confinement will significantly compromise her physical and emotional health with potentially catastrophic consequences.

14.     If house arrest is an option, I believe that it could be the difference between life and death for Ms. Manning.

Dated:  March 7, 2019
      New York, NY

                                            Chase B. Strangio



**TRANS PRIDE
INITIATIVE**

Nell Gaither, President
Trans Pride Initiative
614 West Davis Street, Suite 208
Dallas, Texas 75208

March 5, 2019

To the Honorable Judge considering the case of Chelsea Manning:

I am writing on behalf of Chelsea Manning, who I understand is currently appearing before your court and may face additional incarceration. I would like to express my concerns for the endangerment beyond reasonable penological purpose that such additional commitment to a jail or prison could—and almost certainly would—entail.

Trans Pride Initiative (TPI) has worked for several years with incarcerated transgender persons, and we have exchanged over 7,000 letters with and advocating for transgender and gender diverse persons in prisons. We hear numerous concerns from clients who are suffering from violence in the system that serves no penological purpose and is only the result of social stigma and bias as it is expressed in a closed environment with extreme power differentials that encourage abuse of anyone who does not conform to heterosexual and cisgender (meaning not transgender) stereotypes. We should add that all major professional psychotherapy associations consider forcing transgender persons to conform to non-transgender stereotypes, as every prison setting we have worked with does, to be psychologically abusive.

Our clients describe experiencing a range of violence in the system, from daily dehumanization and threats (just today we received a letter from a transgender woman who was told by an officer that "you gay bitches" should be killed), to routine extortion, assaults, sexual harassment, sexual assault, and encouragement of self-harm, one probable murder, and one recent suicide (or so it was reported) by a person who was to be released in only three months.

There are a number of specific issues that, based on my experience working with incarcerated transgender persons, I believe Ms. Manning will face.

1.  **Unavoidable disclosure of genital status**—Within a few hours of entering any prison or jail, regardless of prohibitions against sharing personal protected healthcare information, Ms. Manning's genital status will be generally known by both prisoners and staff. The prison grapevine will assure that. This will greatly increase her exposure to endangerment discussed below.



**TRANS PRIDE INITIATIVE**

2. **Housing, male facility**—If Ms. Manning is assigned to a male facility, housing her with cisgender men will undeniably put her at risk for multiple types of abuse, from extortion to physical assault and rape. Someone with Ms. Manning's condition would only be safe if housed with another transgender person who has also undergone vaginoplasty, or if housed in what would essentially be solitary confinement. We caution that in our experience, the Texas Department of Criminal Justice often claims that housing two transgender persons in a cell together constitutes noncompliance with Prison Rape Elimination Act (PREA) § 115.42(g) as a "dedicated" housing, and we suspect other prison systems do the same. Although TPI and common sense understand this as an abusive application of PREA § 115.42(g), that does not prevent the standard from being used to deny what is often the safest housing option for transgender women. And solitary confinement is well documented as an abusive practice with extremely negative psychological consequences.

3. **Housing, female facility**—If Ms. Manning is assigned to a female facility, housing her with cisgender women would probably be safer than cisgender men, but this would depend on the culture and the environment at the facility. Housing on a women's unit could also entail risks for similar abuses from extortion to physical assault and rape (we would remind the court that rape involves much more than penile insertion and can involve digital insertion and the use of objects as the means of abuse as well—rape is about power and control, and some of the same power dynamics of men's facilities can be found at women's facilities as well). As with housing at men's facilities, housing with cisgender persons is almost certain to entail endangerment to Ms. Manning's health and safety. Solitary confinement would again be an undesirable alternative.

4. **Privacy in showering, changing, and bodily functions**—Ms. Manning will certainly not have sufficient privacy and security in showering, changing, and performing bodily functions if housed on a men's unit, and is unlikely to have sufficient privacy on a women's unit. Her medically necessary daily dilation will require 30 to 60 minutes or more each day to focus on a specific procedure needed to keep her healthy, as more precisely covered in the letter from Ms. Mukerjee. The chaotic and closed environment of prison will not make this possible on the required daily basis. On men's facilities, toilets in the day rooms, cells, infirmaries, and other areas often have no privacy partitions. Even when cell in-and-outs are required at regular intervals, schedules are missed meaning one can be forced to hold one's bladder or use an open toilet, which would greatly increase Ms. Manning's likelihood of abuse. This is especially harmful to Ms. Manning due to her recent surgery. It should be noted that in the transgender community, regularly holding one's bladder to avoid violence is documented to cause an increase in urinary tract infections as well as kidney and bladder problems. This problem we believe is exacerbated in prison settings.

5. **Endangerment from special treatment**—In contrast to the above, special considerations made to allow Ms. Manning sufficient privacy will set her apart in a prison setting and increase her vulnerability and risk of abuse and harm. Any "special treatment" in prison settings is seen as disrespecting those who do not receive the special treatment, and can result in threats and violence to force the person receiving special treatment to refuse that treatment.

---

Trans Pride Initiative                 P.O. Box 3982, Dallas, Texas 75208                 tpride.org

*Reducing Stigma, Building Confidence*



**TRANS PRIDE
INITIATIVE**

6.  **Strip searches**—It should be clear that requiring Ms. Manning to strip in front of men will be psychologically abusive and will greatly increase her endangerment. In prison settings, privacy screens for vulnerable persons are often insufficient and easily misused. Privacy screens often do nothing to obscure voyeurism from the second and third floors of multi-floor units, are seldom tall enough to obscure the breast area, and can be positioned to allow certain areas a direct view into the enclosure, as is often done in Texas facilities.

7.  **Extortion**—One of the most common forms of violence that we hear about in our communications with transgender persons is extortion. Anyone in a prison or jail who is on their own or "solo" is vulnerable to the operations of organizations and associations that are common in confinement settings. Transgender persons are immediately identified as being solo and vulnerable to extortion because they are not allowed to be affiliated with organizations and associations, so transgender persons are automatic targets for manipulation. Extortion often begins with demands for commissary or regular payments for "protection" from the organizations, then grows into forced labor, forced sexual favors, and forced holding or distribution of contraband. Refusal to cooperate with extortion demands can greatly increase the risk of assault, rape, or other violence. It is almost impossible for transgender persons to avoid extortion in prison settings.

8.  **Manipulation by staff**—The factors that make trans persons vulnerable to extortion also increase their risk of manipulation by staff at jails and prisons. In our work at TPI, we have seen numerous cases where transgender persons appear to be placed in cells with persons known to be running contraband or engaging in other illicit operations so they can provide information; there is little or no regard to the safety of the transgender person. This appears to be done because prison staff know that transgender persons very seldom can rely on protection from associations, forcing them in situations of endangerment to provide information to prison staff in the hopes of getting safer housing. Time and again, we see that when information is provided, instead of greater housing safety, transgender persons are viewed as a reliable tool and their safety is further compromised by placing them in additional situations where they can collect information that benefits staff. Such manipulation has resulted in numerous threats and assaults and other abuses to clients with whom we have worked. This situation also very often creates a reputation for the transgender person as an informant, and that reputation can follow them with facility transfers, creating long-lasting endangerment.

9.  **Assault and other physical harm**—As mentioned above, transgender persons are at risk of physical harm due to escalating demands of extortion that eventually cannot be met. Other factors that put transgender persons at risk in all prison settings include the banning of transgender persons from prison associations and organizations. Due to intense stigma, association members will often be pressured to assault transgender persons to prove they are not having sexual or other "disrespectful" relations with them. Simply being transgender in prison is an endangerment due to the strict association codes of conduct that encourage assault of transgender persons to prove one's adherence to those conduct codes.

---



**TRANS PRIDE
INITIATIVE**

10. **Encouragement of self-harm** — The daily dehumanization, demands for sexual favors through extremely common sexual harassment, risk of extortion and assault, and the constant threatening environment that disproportionately affects transgender persons (and indeed all persons who do not clearly fit gender stereotypes) encourages multiple forms of self-harm. This can include substance use in order to mentally distract oneself from the constant environment of abuse, to greater instances of cutting, engaging in risky behaviors, and efforts to end one's life to escape the abuse.

These encompass a few of the major issues that we see as particularly problematic for placing Ms. Manning — or any other transgender person — in a prison or jail setting. TPI strongly implores that for her own health and safety, and to avoid assured endangerment and violence that serves no penological purpose, the court should avoid confinement to any penological institution.

If you would like additional information, please do not hesitate to contact me at my office (214-449-1439), via my mobile phone (214-394-9835), or by email (nell@tpride.org).

Thank you for your earnest consideration in this matter,

Nell Gaither, President
Trans Pride Initiative

---