# EXHIBIT I

## FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| In re: Grand Jury Subpoena, ) | |
| ) | **1-19-dm-00003** |
| CHELSEA MANNING, ) | |
| ) | |
| Movant. ) | |
| _____ ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RELEASE WITNESS

### Preliminary Statement

Chelsea Manning is recognized world-wide as a champion of the Free Press and open

government. In 2013, Ms. Manning, then an all-source intelligence analyst for the U.S. military,

was convicted at a United States Army court martial for disclosing classified information to the

public. Her reasons for making the 2010 disclosures of classified information involved her

inability to reconcile herself to the knowledge that the United States was engaging in, and

concealing, the true nature of modern asymmetric warfare. She took the decision to make those

disclosures entirely on her own, with the full knowledge that she was likely to suffer dearly as a

result. She was sentenced to thirty-five years imprisonment and a dishonorable discharge.  She

was confined under onerous conditions, including but not limited to prolonged solitary

confinement, leading U.N. Special Rapporteur on Torture Juan Mendez to classify isolation

exceeding 15 days as "cruel and inhumane treatment." In 2017 her sentence was commuted by

then-President Barack Obama. She was released from prison in May, 2017.

In early 2019, Ms. Manning was summoned to appear and give testimony before a grand jury sitting in the Eastern District of Virginia. On principle, she refused to answer questions put to her before the grand jury. As a result of her refusal, she was found in contempt by this Court, and was ordered civilly confined until the term of the grand jury expired or such time as she agreed to answer questions, thus "purging" her contempt.

She has been incarcerated since March 8, 2019. The direct and collateral consequences of her confinement have been devastating, severe, and persistent. Nevertheless, her belief that her participation in the Grand Jury investigation will at worst, function to undermine the independence of the free press, and at a minimum, make her complicit in efforts to do so, grow stronger with each loss she suffers. The only lawful purpose for her confinement is to coerce her to give testimony. Because her confinement is not serving and will never serve any coercive purpose, it has become punitive, and the Court must terminate the order of confinement.

## Argument

The relevant question in the instant proceeding is not whether Ms. Manning had "just cause" for her refusal to testify. Rather, the inquiry must be into whether her current confinement is likely ever to lead Ms. Manning to testify before the Grand Jury. What little law there is in the Fourth Circuit is unambiguous: If the witness can show by a preponderance of the evidence that there is no reasonable possibility that she will testify, then continued confinement is unconstitutional, and contrary to the mandate of 28 U.S.C. §1826.

The civil contempt sanction is one that may be imposed without the protections afforded criminal defendants. This is because the confinement is conditioned upon the

contemnor's own conduct. <u>Shillitani v. U.S.</u>, 86 S.Ct. 1531 (1966). Thus, under both the

common law governing the court's traditional contempt powers, and its codification in 28

U.S.C. §1826, civil confinement is intended *only* to be coercive. "If a judge orders

continued confinement without regard to its coercive effect upon the contemnor, or as a

warning to others who might be tempted to violate their testimonial obligations, he has

converted the civil remedy into a criminal penalty." <u>Simkin v. U.S.</u>, 715 F.2d 34 (2d Cir.

1983) at 38. In the event that there is no possibility of purging contempt, either because

the grand jury has ended, or because the witness is uncoerceable, then the confinement

serves no further lawful purpose, and the witness must be released. 28 U.S.C. §1826,

Shillitani v. United States, 384 U.S. 364 (1966); <u>Armstrong v. Guccione</u>, 470 F.3d 89, 111

(2d Cir. 2006).

The recalcitrant witness statute sets 18 months as the maximum term of

confinement, but that is not to say that all confinement up through18 months is

definitionally coercive. <u>Simkin</u>, overruling the logic of <u>United States v. Dien</u>, 598 F.2d

743 (2d Cir. 1979)). Furthermore, although a long civil confinement does not in itself

constitute a due process violation, a witness is not required to demonstrate unusual

circumstances in order to show that confinement has lost its coercive impact. <u>Sanchez v.

United States</u>, 725 F.2d 29 (2d Cir. 1984). Returning directly to the legislative history of

the recalcitrant witness statute, we see in fact that "[a] court is free to conclude at any

time that further incarceration of a recalcitrant witness will not cause the witness to relent

and testify, and, upon such grounds, to release the witness from confinement." <u>Grand Jury

Reform: Hearings on H.R. 94 Before the Subcomm. On Immigration, Citizenship, and</u>

International Law of the House Comm on the Judiciary, 95th Cong., 1st Sess. 713 n. 1

(1977) (statement of Asst. Atty. Gen. Civiletti).

The burden rests with the contemnor to convince the judge of her intransigence,

and the district judge retains "virtually unreviewable discretion." Nevertheless, all

relevant rulings have made clear that such deference can be extended "only if it appears

that the judge has assessed the likelihood of a coercive effect upon the particular

contemnor. There must be an individualized decision, rather than application of a

policy…" Simkin at 37. See also In re Cocilovo, 618 F.Supp. 1378 (S.D.N.Y. 1985); In re

Papadakis, 613 F.Supp. 109 (S.D.N.Y. 1985); U.S.v. Buck, U.S. v. Shakur, 1987 WL

15520 (S.D.N.Y. 1987); United States v. Whitehorn, 808 F.2d 836 (4th Cir. 1986); In re

Cueto, 443 F. Supp. 857 (S.D.N.Y. 1978).  The judge's virtually unreviewable discretion

therefore "detracts in no way from our duty to follow the clear pronouncements of a

higher court…[which] compels a finding" that a truly intransigent witness, "ready,

willing, and able to persist in [his] defiance," be set free.  In re Dorie Clay, 1985 WL

1977 (S.D.N.Y. 1985).

Several factors play into the individualized determination of a witness's

intransigence. These include the length of confinement, the witness's connection with the

activity under investigation and continued need for the witness's unique evidence, the

articulated moral basis for the refusal, the witness's perception of community support,

and the witness's conduct and demeanor. These are factors that have been used as the

basis for judges' individualized assessments, although the weight, or even the presence of

each factor in any given inquiry appears to be entirely at the discretion of the judge. See,

generally, In re Cueto, 443 F.Supp. 857 (S.D.N.Y.)(two women working for Episcopal

Church released after ten months, based on "humane factors" as well as their unwavering

belief, supported by the church, that they were suffering religious persecution); In re

Dohrn, 560 F.Supp. 179 (S.D.N.Y. 1983) (Witness released despite Judge's antipathy,

based on the intransigence of her beliefs and the diminished need for her cooperation);

Clay, supra, at 4, (Contemnor released based on her intransigence, despite the need for

her unique and relevant testimony: "To infer that a [grand jury resister] is likely to remain

silent … does not require a great leap of logic. That she is wrong is beside the point." at

2.); Buck, supra, (contemnors' motions granted *prior to confinement* based on the

strength of their convictions); Cocilovo, (contemnor released after ten months with no

indication that he would yield); In re Thomas, 614 F.Supp. 983 (S.D.N.Y. 1985)

(contemnor released based on her articulated principles, strengthened by her awareness of

"the collective disapproval that would follow a decision to testify." at 984.").

    There are cases that say a mere assertion is insufficient, but these do not

countervail so much as confirm the underlying theory that the contemnor must in all

actuality be able to show that they are uncoerceable. Papadakis, *supra*, (Finding that the

contemnor's desire to "obtain the fruits of his friends' criminal activity," however

ignoble, precluded the possibility of his ever testifying); In re Grand Jury Proceedings,

2001 WL 527401 (E.D.N.Y. 2001) (release denied; sole evidence was contemnor's "bald

assertion" that he would not cooperate); S.E.C. v. Princeton Economic International, Ltd.,

152 F.Supp.2d 456 (S.D.N.Y. 2001) (release denied because contemnor's desperate and

disingenuous paper-shuffling convinced the Judge only that he was in fact susceptible to

the coercive effects of incarceration).

Furthermore, unlike a criminal case in which a defendant might be persuaded that they have run out of viable legal options, "judicial process is never truly 'exhausted' for a civil contemnor because [...] the Court has a continuing obligation to assess the efficacy of confinement. [...] There will thus never come a time for [a contemnor] where his only remaining option is to cooperate." In re Grand Jury Proceedings, 994 F. Supp. 2d 510, 519 (S.D.N.Y. 2014).

The overwhelming majority of relevant law stems from the Second Circuit. However, the *Simkin/Sanchez* rule has been endorsed and adopted by courts in the The 1st, 3d, 4th, 6th, 7th, 9th, and 11th Circuits. *See* In re Grand Jury Proceeding, 13 F.3d 459 (1st Cir. 1994); In re Impounded, 178 F.3d 150 (3d Cir. 1999); United States v. Whitehorn, et al, 808 F.2d 836 (4th Cir. 1985); United States v. Adams, 2012 WL 2953075 (N.D.W.V. 2012); United States v. Hallahan, 768 F.2d 754 (6th Cir. 1985); United States v. Jones, 880 F.2d 987, 989 (7th Cir. 1989); Matter of Crededio, 759 F.2d 589, 592 (7th Cir. 1985); United States v. Clough, 946 F.2d 899 (9th Cir. 1991); In re Grand Jury Proceedings, 877 F.2d 849 (11th Cir. 1989).

However counter-intuitive, the state of the law with respect to civil confinement is clear. The sole lawful purpose of confinement is to exert a coercive effect upon a recalcitrant witness. In the absence of a reasonable expectation of coercing testimony, confinement has exceeded its lawful scope, and must be terminated.

This is the impasse at which we have arrived.

Chelsea Manning is known globally for being a person who acts on principle, even at great risk and harm to herself. This is core to her identity, and she has quite

publicly persisted in her various stances in the face of opprobrium, severe punishment, and profound disruptions to her daily life, including her instant incarceration.

Ms. Manning has well-founded reasons to believe the subpoena issued to her is an abuse of process, and may have been propounded on the basis of unlawful electronic surveillance. She has litigated these issues, and believes the decisions of the District and Circuit Courts denying her motions to quash, and denying that she has just cause for her refusal to testify, are incorrect. But above and beyond these legal issues, she is convinced that to cooperate with this grand jury would be a betrayal of her beliefs about the grand jury process, and this grand jury process in particular. She is prepared to suffer the consequences for her beliefs, and it should surprise nobody to find that she has the courage of her convictions.

Upon filing her initial motion to quash, Ms. Manning issued a public statement affirming that she would not cooperate with this or any other grand jury. Upon being found in contempt, Ms. Manning reiterated that statement. She made these statements prior to her confinement with the full knowledge that her liberty is precious, and that being reincarcerated would likely cause and compound physical health issues related to her recent surgery and mental health struggles stemming from her previous incarceration. She took a very public decision, making herself accountable to her friends and political community, with the full knowledge that her career as a writer and public speaker would be radically disrupted. In spite of the imminent harm she faced, she made her position clear: under no circumstances will she cooperate. After her appeal was denied by the Fourth Circuit, she stated "While I miss home, they can continue to hold me in jail, with all the harmful consequences that brings. I will not give up." Press Release, April 22,

2019. She made that statement after having already spent nearly two months in jail, and suffering severe physical and emotional, as well as economic and professional harms.

As is made clear in Chelsea's declaration, she is suffering severe physical, emotional, and career consequences. But the severity of these negative impacts is matched only by the strength of her commitment to her principles, and no amount of suffering will change her mind. see Declaration of Chelsea Manning annexed hereto. Given that the central inquiry here must be the strength of her conviction and the likelihood that her testimony will be coerced, every case decided under the Shillitani/Simkin precedent militates in favor of her release on this factor.

Ms. Manning has been well-supported by people here and around the world for her decision. She is regarded by some as an international hero, a person of principle who was willing to sacrifice everything in the public interest. The fact of her previous incarceration was abhorrent to huge numbers of people who were outraged by the government's willingness to punish the disclosure, rather than the commission of war crimes. She has become a figurehead of the movement for transgender equity. Amnesty International, the ACLU, the Freedom of the Press Foundation, and many other organizations publicly stated their support for her and called for her release. She has been written about sympathetically by scholars and the press. Her actions are viewed as noble by widely-respected philosophers like Noam Chomsky, historians, historical figures such as Daniel Ellsberg, and her many friends. Her reincarceration on the basis of this subpoena is seen as retaliatory, and is felt as a deep wound by the millions of people across the globe who fought for her release. Her incarceration also strengthens the prevailing view that she is being unjustly targeted by the United States government, and

it is understood as a sacrifice in the name of civil liberties, government transparency, and the integrity of the free press. Her incarceration is understood by historical and legal experts as part of a contribution to a long history of principled resistance to political and press repression. See Cueto, supra, where the support of those people whose approval most mattered to contemnors was deemed a significant factor for their release; Clay, supra, in which the support of the contemnor's community played a part in her release; and a contemnor whose "status as a hero" militated against his further confinement. Matter of Ford 615, F.Supp. 259 (S.D.N.Y. 1985). Like those contemnors released on the basis of their rigid unwillingness to cooperate, Ms. Manning is supported in her beliefs by the people about whose opinion she cares. To agree to cooperate would be to betray her own principles, and also her reputation.

At this point, given the sacrifices she has already made, her strong principles, her strong and growing support community, and the disgrace attendant to her capitulation, it is inconceivable that Chelsea Manning will ever change her mind about her refusal to cooperate with the grand jury.

Despite having lost her relatively newfound liberty and nascent stability, Ms. Manning has been steadfast in her silence. Even in the face of sympathetic reminders that she may end her confinement by agreeing to testify she has been adamant in her resolve.

As set forth in her declaration, Ms. Manning has endured great psychological and physical harm as a result of her confinement. Not only has she remained unwavering, her commitment is reinforced by her suffering. That is, inasmuch as Ms. Manning believes that her suffering is in the service of her convictions, her continued anguish is a painful confirmation of her righteousness. Moreover, every fresh insult associated with her

imprisonment serves only to vindicate her beliefs about the failures of the legal system to comport with the government's claims to justice.

Since the law requires an individualized assessment of a contemner's susceptibility to coercion, denials of motions for release have been made on the basis of the contemner's failure to convince the court that confinement is no longer coercive. For example, some contemnors appear to submit no more than a bare claim, unsupported by evidence, that they will not cooperate. In re Grand Jury Proceedings, 2001 WL 527401 (E.D.N.Y. 2001). In another case, release was denied due to the fact that his "decision not to testify [appeared] not to be a matter of absolute principle, but a reflection of [his] view that it is not yet in his personal interest to testify." United States v. Salerno, 632 F.Supp. 529 ( S.D.N.Y. 1986). Release has been denied where a contemnor's desperation resulted in profligate and ever-stranger requests for relief, leading the Court to conclude that confinement was in fact having precisely the desired effect. S.E.C. v. Princeton Economic International, Ltd, 152 F.Supp.2d 456 (S.D.N.Y. 2001).

On the other hand, where a moral basis for the refusal was clearly articulated, the Court determined that release was no less than mandatory under the law, notwithstanding the judge's frustration, which he expressed at great length, at what he considered a perverse outcome. In re Grand Jury Proceedings, 994 F.Supp 2d 510 (S.D.N.Y. 2014), see also In re Duran, No. 12-GJ-149, 2014 WL 7140454 (W.D. Wash. Dec. 12, 2014).

Ms. Manning's articulated moral reasons for her refusal to testify, supported by the many letters and affidavits of her friends, family, supporters, and those who know her in a professional capacity, stand in stark contrast to the self-serving, or unsupported statements of a contemnor who merely seeks the most expedient route home. As should

be clear from her declaration and those of her supporters, she is a deeply principled woman, who has already suffered, and expects to continue to suffer in various ways, as a result of standing by her principles. Whatever one may make of her beliefs, it is evident that they are well-developed, robust, and sincerely held. She will cleave to them as her most trustworthy touchstone.

Conclusion

As Ms. Manning's resolve not to testify has been unwavering, and as her moral conviction, for which she is deservedly renowned, has become only more developed since her confinement, her incarceration is no longer serving its coercive purpose. For that reason, the motion should be granted in its entirety.

Respectfully Submitted,
By Counsel

Dated: May 5, 2019

*/s/ Moira Meltzer-Cohen*
MOIRA MELTZER-COHEN
*(pro hac vice)*
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

*/s/ Sandra Freeman*
SANDRA C. FREEMAN (VSB# 78499)
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

*/s/ Chris Leibig*
CHRISTOPHER LEIBIG (VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-4310
chris@chrisleibiglaw.com

/s/ Vincent J. Ward
VINCENT J. WARD
*(pro hac vice pending)*
Freedman Boyd Hollander Goldberg Urias & Ward,
P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

In re: Grand Jury Subpoena,                )
                                           )          **DECLARATION**
CHELSEA MANNING,                           )
                                           )          **19-1287-cv**
Subpoenaed Party.                          )
_____        )

1. My name is Chelsea Elizabeth Manning. I am competent to be a witness, and I
   possess personal knowledge of the facts set forth below.

2. Currently I am confined at the Alexandria Detention Center ("ADC"), in Alexandria,
   Virginia, following a finding of civil contempt on March 8, 2019, for refusing to
   cooperate in a grand jury investigation that I believe relates to events already
   disclosed in exhaustive testimony in 2013, including the extent of my knowledge.

3. Initially, after arriving at ADC, the jail placed me in Administrative Segregation
   ("adseg") status, despite the stated concerns of myself and my legal representatives
   regarding the effects of prolonged isolation compounding the trauma I suffered in a
   year of solitary confinement during my previous time in confinement. I stayed on
   adseg for 28 days, without any misbehavior or ill will on my or anyone else's part to
   rationalize such isolation. This isolation caused extraordinary pain for me.

4. While in adseg, I suffered many of the ill effects of prolonged isolation as described
   by former United Nations Special Rapporteur on Torture Juan Mendez. For instance,
   consistent with the research of former Harvard Medical School professor Stuart
   Grassian, I experienced difficulty keeping attention on anything, sometimes referred
   to as a "dissociative stupor." Thinking and concentrating get harder. Anxiety,

frustration with minor things, irritation, and a spiraling inability to tolerate each symptom take hold. At one point I started feeling ill during a short visit in a non-contact visit booth while struggling to have even a normal conversation. After weeks of under-stimulation, I became nauseated with vertigo and vomited on the floor, ending my visit prematurely. Such symptoms make up what Grassian describes as a special psychiatric syndrome caused by prolonged solitary confinement. Many of the effects last permanently after only fifteen (15) days of isolation.

5. After public outcry and pressure, the ADC released me into general population ("GP") after 28 days of isolation.

6. After two months of confinement, and using every legal mechanism available so far, I can - without any hesitation - state that nothing that will convince me to testify before this or any other grand jury for that matter. This experience so far only proves my long held belief that grand juries are simply outdated tools used by the federal government to harass and disrupt political opponents and activists in fishing expeditions. Without committing a federal crime, and after exhaustive testimony at a trial several years ago, I am again ripped from my life by a vindictive and politically-motivated investigation and prosecution. The way I am being treated proves what a corrupt and abusive tool the grand jury truly is. With each passing day my disappointment and frustration grow, but so too do my commitments to doing the right thing and continuing to refuse to submit.

7. My decision not to testify before grand juries is rooted in the study of history and philosophical principles. Many times in this nation's history, people who speak out or express dissent against the government face disproportionate repression. One of the

most common tools to silence dissent, the grand jury, attempts to sow distrust within activists' organizations and communities through secrecy and compelling exhaustive and redundant testimony aimed at identifying other members of that community.

8. I understand that this grand jury related to my disclosures of classified and unclassified but sensitive information and records in 2010. I acted alone in these disclosures. The government is still preoccupied with punishing me, despite a court-martial, sentence, and presidential commutation nearly two years ago. This can be seen in statements and actions by several administration officials, especially the current secretary of state, who threatened Harvard University over a low-paid speaking engagement in 2017, when he was Director of Central Intelligence. This speaks compellingly to my rationale for both my disclosures, for which I already served time, and my present refusal to cooperate with an increasingly frightening and untrustworthy government. Let me state clearly, again, that my actions were my own.

9. I believe my principles allow me to focus on helping others, and to challenge the use of power to coerce or manipulate people. Such coercive power forms what I define as "violence," and the "threat of violence" which powerful institutions attempt to accumulate to obtain more power.

10. I do not believe, nor do I possess any reasonable evidence to believe that participating in this grand jury could lead to any new theories of criminal liability for any person. I took responsibility for my actions over six years ago. I find it difficult to comprehend that the Department of Justice believes that my redundant testimony could actually provide any value to an investigation. Their stated reasons appear disingenuous at best and outright malicious at worst. The government's theories contradict not only

my testimony, but the forensic evidence the military possesses. Therefore, I suspect they are simply interested in previewing my potential testimony as a defense witness, and attempting to undermine my testimony without the benefit of reviewing forensic evidence. This justifies my theory that participating in this investigation functions simply to abuse the justice system for political ends.

11. I believe this grand jury seeks to undermine the integrity of public discourse with the aim of punishing those who expose any serious, ongoing, and systemic abuses of power by this government, as well as the rest of the international community. Therefore, participating in this fishing expedition - which potentially exposes other innocent people to the grand jury process - would constitute an unjustifiable and unethical action. Now, after sustaining serious psychological injury from my current confinement, I don't wish to expose any other person to the trauma and exhaustion of civil contempt or other forms of prison or coercion.

12. In jail at ADC, I try every day to maintain my physical, mental, and intellectual capacities, as well as some modicum of human dignity. I live a quiet social life in a housing unit that holds a dozen people, who rotate frequently. I try to occupy myself with crossword and sudoku puzzles in the absence of good reading material. I try to stay positive despite the aftermath of isolation and the knowledge that my life once again is put on hold for a few more years, potentially. With limited books, I read what I can, though most are books that are either already read by me or are simply bad. I am re-accustomed to the intrusion and lack of privacy of frequent searches and heavy surveillance.

13. I arrived at ADC with concerns and anxiety about my physical health, particularly so soon after gender confirmation surgery in October. My post-surgery regimen requires delicate and regular self-care at least twice daily, including the use of anti-bacterial soap and dilators. Otherwise, I risk serious medical complications, including permanent injury or deadly infections. I worry about dilating in an environment rife with poor hygiene and with limited time and no privacy. I worry about seeing medical professionals with knowledge about post-operative care if complications develop, which I have reason to think has already happened. I worry about regular access to daily hormones. Unfortunately, despite initial assurances by jail and U.S. Marshal Service ("U.S.M.S.") officials, such efforts normally come slower and are very limited. It appears that I have already developed some complications during my stay at ADC. Medical staff acknowledges they lack expertise to examine or assist me appropriately, In response, I requested outside professionals at my own expense over three weeks ago. Despite this, I remain unseen by a professional competent to treat me. Every passing day further complicates my medical care and health, exposing me to permanent, intractable complications. The intrinsic bureaucracy and formality of ADC and USMS policy risks me to permanent harm. I do not know how serious these complications are, but I may need costly reparative surgery upon my release, causing me even more permanent injury and psychological harm, not to mention the expensive medical bills.

14. In an ideal world, agreeing to cooperate would avoid this situation, however, this government abuses the grand jury process, and forces me to choose between an

unethical decision and suffering intimate and permanent consequences for doing the right thing. I am not willing to compromise for my own physical benefit.

15. This decision comes at an overwhelming cost, My physical and mental health deteriorate rapidly in conditions normally reserved for short term confinement. I am almost entirely without sunlight. My skin regularly breaks out from bacterial infections. I gain weight due to poor nutrition, currently at nearly twenty pounds since March.

16. Sleep and concentration remain difficult. Mental health access remains limited, without access to comprehensive treatment for complex post-traumatic stress — stemming in part from previous confinement conditions.

17. My business now falters, without me able to appear at speaking engagements or professional consultations. I recently laid off a valuable and trusted employee. Numerous existing contracts remain vulnerable, likely needing renegotiation or outright cancellation. My friends and colleagues suffer from the impact of my absence, causing me to worry endlessly about their health and well being. I missed the premier event of a documentary about my commutation in which dozens of my friends reunited afterward.

18. I sometimes see visitors, but only in a non-contact booth, with inches of glass between us. This makes visitation uncomfortable, surreal, and saddening.

19. I receive between dozens and several hundred letters a day. I lack the resources or time to respond to even a small fraction of these. The impact on my friends and supporters feels overwhelming and makes me feel lonely.

20. I receive enormous support from all around the world. My family and close friends all support me and express their pride of me. It's emotionally overwhelming sometimes to see their unwavering generosity. I receive warmth and strength from colleagues, educators, lawyers, diplomats, activists, factory workers, veterans, journalists, union leaders, store clerks, gardeners, chefs, airplane pilots, and politicians from all across the U.S. and the world at large, every class, culture, and age imaginable.

21. Despite the heartbreak and hardship, cooperation with this grand jury is simply not an option. Doing so would mean throwing away all of my principles, accomplishments, sacrifices, and erase decades of my reputation - an obvious impossibility.

22. As before, I cannot regain the lost time - which may again extend to years. Repairing the damage to my relationships and both my physical and mental health might never come to pass. Whatever one might make of my principles and decisions, I shall continue to make hard choices and sacrifices rather than relinquish my ethical positions in exchange for mere trinkets of personal gain or self-pleasure in the form of being released.

23. Over the past decade, I grappled with bouts of depression. I can think of nothing that could exacerbate those struggles more than pretending to live as someone I am not once again, and turning my back on everything I care about and fight for. Jail, and prison, exist as an archaic institution hiding the basest stream of dehumanizing and humiliating behaviors by the government — a trail of mounting loss and pain. Here, behind the event horizon, I remain certain that losing the approval, trust, and acceptance of my friends, family, and supporters would make this situation worse.

24. I wish to return home. I want to return to my work — writing, speaking, consulting, and teaching. The idea I hold the keys to my own cell is an absurd one, as I face the prospect of suffering either way due to this unnecessary and punitive subpoena: I can either go to jail or betray my principles. The latter exists as a much worse prison than the government can construct.

25. I digress a bit - but the point is, I'm not going to change my mind. Not now, not ever. So be it.

> I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: May 5, 2019
Alexandria, VA


Chelsea Elizabeth Manning

LEGAL DEPARTMENT
LESBIAN GAY
BISEXUAL
TRANSGENDER &
HIV PROJECT



AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

Hon. Claude M. Hilton
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

May 6, 2019

      Re: In re Grand Jury Subpoena, CHELSEA MANNING, 19-DM-00003

Dear Hon. Judge Hilton:

I am writing in regard to Chelsea Manning in the above-referenced matter. I am a lawyer
and Staff Attorney at the American Civil Liberties Union (ACLU). I represented Ms.
Manning as her counsel in a civil case between 2013 and 2017. During that time, I visited
with her in prison and spoke to her on the phone regularly. I was with her when she was
released from prison in 2017 and have remained in contact with her on and off over the
past two years. In total, we have probably spoken on over 200 occasions. I know Ms.
Manning well as a client, an activist, and a friend. One constant in Ms. Manning's life is
her unwavering commitment to her principles. She is willing to undergo physical,
emotional, and spiritual pain in the service of those principles and based on my knowledge
of her, I am certain that no punishment could coerce her to violate those principles.

For the years that I represented Ms. Manning, I watched her experience great emotional
distress and health decline related to her incarceration. In addition to her two attempts at
suicide during her incarceration at the United States Disciplinary Barracks (USDB), she
experienced traumatic denials of health care and PTSD symptoms throughout her
incarceration. When she was released, one of her great fears was returning to confinement
and yet, it did not surprise me at all that she accepted incarceration over testifying where
she was principally opposed to the proceeding. Even when urged by counsel to act in
certain ways, I have watched that Ms. Manning would sooner undergo anguish than
violate her principles.

Ms. Manning would likely die before giving in to a demand that she believes to be unjust.
Her incarceration in Kuwait and then Quantico and the USDB very nearly killed her and
yet she never wavered in her commitment to her strong sense of justice. I have no doubt
that she would also risk death through incarceration at this time before testifying or
engaging in a process that violated her principles.

Please feel free to contact me should you need any additional information.

Very truly yours,

Chase Strangio
ACLU Staff Attorney
Former counsel to Chelsea Manning

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LGBT AND HIV PROJECT
125 BROAD STREET, 18TH FL
NEW YORK, NY 10004-2400
T/212.549.2627
F/212.549.2650
WWW.ACLU.ORG/LGBT



# FREEDOM OF THE PRESS FOUNDATION

May 6, 2019

Dear District Judge Claude M. Hilton,

My name is Trevor Timm, I am the executive director of Freedom of the Press Foundation, a non-profit that supports journalists and whistleblowers. I have known Chelsea Manning personally for several years.

I know Chelsea to be a principled, passionate, extraordinary person. She has decided to take a principled stand in refusing to testify in front of a grand jury, and I am confident she will not change her mind. I respectfully ask that the court release her now that she has spent more than two months behind bars.

Chelsea has already suffered immensely in both military and federal detention. Over 250 law professors described the military's treatment of her before her trial in 2013 as "torture." She served seven years in prison after her trial, under the longest sentence ever for a defendant accused of giving information to journalists or publishers. She then was subject to prolonged periods in solitary confinement, which severely affected her mental health.

I am convinced that, despite Chelsea's fear in going back to prison, she is committed to refusing to testify to the grand jury on the basis of her beliefs. She is prepared to remain in prison for the duration of the grand jury, if that was called for.

She does not deserve that. It will harm her mentally and physically, but it will not change her decision. I respectfully ask that you release her, so that she can move on with her life and live in peace.

Thank you very much for your consideration.

Sincerely,

Trevor Timm
Executive Director
Freedom of the Press Foundation

Freedom of the Press Foundation | 601 Van Ness Avenue, Suite E731 | San Francisco, CA 94102

**Website:** https://freedom.press | **Twitter:** @FreedomOfPress | **Email:** info@freedom.press

May 5, 2019

Dear Judge Hilton,

I am the aunt of Chelsea Manning and have known Chelsea since she was born. Chelsea lived with me for many months before enlisting in the U.S. Army, and I spent time with her on a number of occasions during the court-martial. Although I saw her several times after her release, I have neither seen or spoken with her since last summer. We have had no discussions concerning her possible testimony to the Grand Jury.

Chelsea grew up under difficult conditions, with two alcoholic parents who provided little emotional support during her childhood. They then subjected her to a messy divorce in her preteen years, which eventually resulted in her mother taking Chelsea (Bradley at that time), age 13, back to her mother's hometown in Wales. In Wales, she was subjected to bullying from classmates not only because of her accent, her inability to speak Welsh, and so on but also because she was clearly a "different" type of person. During her time in Wales, her mother was hospitalized for complications from alcoholism, and Chelsea took it upon herself to try to mitigate the consequences from her mother from her alcoholism. When she finished school at 17, she moved to Oklahoma to live with her father. There, she encountered abuse from his wife with little protection provided by her father. When this became too much to endure, she left home and, as a result of an open invitation, moved in with my family. She remained with us, working every day and saving her money, until she enlisted in the Army.

Based on all that I know about Chelsea, I can say with absolute certainty that she is a person who lives by her beliefs. She risked much to draw attention to what she believed were unlawful actions by allied forces in Iraq. She spent nearly seven years in federal custody, enduring in some instances most difficult conditions, including solitary confinement. It is most unlikely that continued incarceration in an attempt to obtain her testimony will have any effect on her willingness to testify. In fact, I am absolutely certain that she will endure indefinite confinement rather than comply with an order to testify.

I may not agree with all of Chelsea's decisions, but she is an honorable person with a strong belief in justice. I request that you consider her background and current state of mind and, after that consideration, conclude that continued incarceration is pointless.

Sincerely,

Debra Van Alstyne

Dear Honorable Judge Hilton,

My name is William Budington and I am a Senior Staff Technologist for the Electronic Frontier Foundation (EFF). I have advised our legal team on cases involving digital civil liberties, led technology projects installed on millions of computers, and spoken at conferences worldwide on topics involving Internet privacy and security. This letter is written in my personal capacity, as a close friend and colleague of Chelsea Manning. As someone who knows her convictions and level of commitment to social change, I am hoping you will strongly consider her release.

Chelsea has shown many times, both in public and in private conversation, that her decision to leak classified documents to the press was a decision based on her moral conviction and commitment to protecting not only the American people but people around the world. In an interview with ABC's *Nightline*, she explained:

"We're getting all this information from all these different sources and it's just death, destruction, mayhem ... We're filtering it all through facts, statistics, reports, dates, times, locations, and eventually, you just stop. I stopped seeing just statistics and information, and I started seeing people."

She has never wavered in her moral convictions despite what she could potentially lose: her military position, her future, or her freedom. She carries her deep level of conviction through everything she does. This extends to her inability to ever testify in the matters before the grand jury.

I am writing at the request of Ms. Manning's legal team to confirm that when faced with the prospect of jail time or testifying in spite of her political beliefs, she will choose jail time without equivocation or hesitation. Because of this, keeping her confined serves no purpose for the court.

I hope you find this information useful and thank you for the opportunity to submit this letter.

Sincerely,

William Budington

May 5, 2019

Dear Honorable Judge Hilton,

My name is Evan Greer. I am the Deputy Director of Fight for the Future, a civil liberties non-profit with more than 2 million members nationwide, and I write regularly for Washington Post, The Guardian, TIME, and Newsweek. I am also a friend of Contemnor, Chelsea Manning, and spoke to her regularly on the phone during her incarceration at Fort Leavenworth.

I am writing to ask that you release Ms. Manning. Knowing the contemnor well, I can tell you with complete confidence that no amount of suffering or confinement will compel her to compromise her strongly held beliefs. She has made public her views about the Grand Jury process clear long before she was subpoenaed, and has consistently stated her principled objection to testifying in such a setting.

During her previous incarceration at Leavenworth, I heard first hand about the immense suffering Chelsea experienced due to her confinement and lack of access to medically recommended gender related health care. As has been widely reported, she attempted twice to take her own life. I believe strongly that continuing to incarcerate her serves no purpose other than to cause her unjust and unreasonable suffering.

Regardless of what you believe about her actions or convictions, the contemnor has a consistent and well documented track record of standing up for her beliefs, even when faced with potential life imprisonment or other severe punishment. She is one of the most ethically consistent and principled people I know. There is no number of days in a cell that will change her mind. But each day causes her more undue pain and suffering.

I hope you will take this information into consideration and release Chelsea Manning. Continuing to imprison her will not compel her to acquiesce to a demand that she perceives to be unjust.

Best,
Evan Greer
Deputy Director
Fight for the Future

Dear Honorable Judge Hilton,

My name is Kelly Wright and I served as Chelsea Manning's campaign manager and director of communications for the 2018 midterm election campaign to represent the state of Maryland in the United States Senate. Given my personal and professional history with Ms. Manning I believe that I may offer a unique perspective as to the stalwart and steadfast nature of Ms. Manning's commitment to certain political principles.

First and foremost, Ms. Manning, holds utmost respect for our constitutional rights including but not limited to the freedoms guaranteed by the Bill of Rights of the U.S. Constitution. These include the freedom of the people to protest, protections for an adversarial and inquisitive press, the right to a fair trial, the right to be from self-incrimination, the right to be free from double jeopardy, and unemunerated rights to privacy and to be secure from unreasonable searches and seizures. Ms. Manning believes that the grand jury system serves primarily as a tool for the executive branch to police, spy on, disrupt, and ultimately shut down activist communities and has been used to do so throughout history. She is categorically opposed to the grand jury process and she cannot be coerced into compliance.

Since her release from Ft. Leavenworth in 2017, Ms. Manning has been an active member of many activist communities in the Washington, D.C. & New York City metro areas, as well as within activist communities around the world. She has been an outspoken advocate for LGBTQ rights and for the rights of protesters, especially the so-called J20 protestors in Washington, D.C. who faced an overzealous (and ultimately unsuccessful) prosecution. Furthermore Ms. Manning is well aware of the history of the prosecutorial abuse of the grand jury process to target, investigate, and silence activist communities.

Ms. Manning's ethical, moral, and political worldview precludes her from complying with grand juries due to their secretive nature and the ability of prosecutors to abuse them for non-investigatory purposes like pre-trial discovery or for preemptive gathering of witness testimony to bolster potential future cross-examination. She believes grand juries often amount to nothing more than fishing expeditions and/or perjury traps. As a result, she is ready, able and willing to endure severe personal harm to her mental & physical health and her financial well-being in a principled stand against this system. Furthermore, she is so dedicated to these principals she is even risking lifelong deleterious effects resulting from ineffectual post-operative care following her gender confirmation surgery late last year.

As her communications director on the campaign trail I spent extended periods of time with Ms. Manning on grueling schedules of public speaking engagements and major press interviews. In these high stress situations, I witnessed the manifestation of the emotional and psychological trauma that was inflicted upon her by seven years of imprisonment in a men's military prison and the months of solitary confinement that she was subjected to for her commitment to her principles. I fear this harm is being compounded by her current situation. But I feel uniquely qualified to tell you: no matter how much harm she comes to confinement is not going to convince her to change her mind. In light of that, I believe the law requires her release.

Kelly Wright

May 5, 2019

Dear Honorable Judge Hilton,

My name is Micah Lee. I'm a journalist and security engineer at The Intercept, and also a founder and board member of Freedom of the Press Foundation. I have closely followed Chelsea Manning's case since 2010, but I didn't meet her personally until after she was released from prison in 2017. Since then we've become close friends.

Chelsea is the bravest and most principled person I've ever met, and I don't believe she will ever agree to testify before any grand jury, no matter the case, on principal. She believes that being compelled to testify at a grand jury against her wishes fundamentally violates her rights. I urge you to release her from jail. Continuing to confine her is not going to change her mind. It is only cruel and punitive, and it doesn't serve any lawful purpose.

In late February I read in the New York Times that Chelsea had received a grand jury subpoena, so I texted her to ask how she felt about it and what she was going to do. It wasn't even a question: she had already firmly made up her mind to resist it. She knew she would have to go back to jail for some unknown length of time, and she knew the experience would be awful, but that didn't factor into her decision. She was willing to suffer any consequences if it meant she didn't have to betray her principles and do something she considered unethical.

Chelsea's extraordinary willingness to sacrifice her own comfort and safety to do what she believes is right isn't new. Regardless of whether you agree with her actions, her act of leaking documents to WikiLeaks in 2010 was similarly principled. As an Army intelligence analyst she witnessed undeniable war crimes, like the video of the aerial weapons team killing several civilians, including Reuters journalists, and firing on a van with children in it, all while laughing and acting like they were playing a video game. She told the court that she hoped the release of the Iraq and Afghanistan war logs would "spark a domestic debate" about the crimes being committed by U.S. soldiers. She made up her mind then, too. Regardless of the great personal risk she was taking, she couldn't stay silent with knowledge of these crimes, and did what she believed was the right thing to do.

It's been nearly two years since Chelsea was released from prison. Instead of slowly adjusting to life outside, she has spent a considerable portion of this time doing something much riskier, especially for a trans woman: fighting the alt-right and the larger American fascist movement, both on the internet and in street protests. The last time I saw her in person a group of neo-Nazis was infiltrating the computer security conference she was keynoting, in order to disrupt her speech. Despite the endless harassment and threats of violence she faces, she isn't going to stop. The rise of right-wing extremism and white supremacist terrorism is one of the most disturbing ways the world has changed since her previous incarceration, and she believes she has a moral obligation to do what she can to stop it.

I frequently worry about her for this reason, for her willingness to do what she believes is right no matter the personal sacrifice. But it's also the quality that I admire most about her. Chelsea's refusal to testify in this grand jury is no different. Federal grand juries have been used to investigate and intimidate activist communities for decades. She knows this history of abuse, and she believes that being coerced into testifying is a violation of her rights. So, again, she's doing what she believes is right. Continuing to confine her is not going to change her mind.

It's also no secret Chelsea has a history of mental health issues, including depression. During her seven years of incarceration, where her conditions were "cruel, inhuman and degrading" according to the UN's export on torture. She attempted suicide twice. After her release she had a mental health crisis as well, but thankfully sought help.

While I have no reason to believe that she is suicidal now, I'm extremely worried about the toll her continued detention is having on her physical and mental health, especially since (I have read in news reports) she was held in prolonged solitary confinement for the first 28 days of her detainment in March. All of this is so unnecessary. Whether she gets released today, or stays confined for months or years more, it won't affect her decision to stand behind her principles. She's never going to be coerced into testifying before a grand jury.

Sincerely,

*Micah Lee*

Micah Lee

2

May 3, 2019

To District Judge Hilton:

My name is Gerald Koch, and I was incarcerated from May 21, 2013 to January 28, 2014 for civil contempt stemming from grand jury resistance. I am writing today to try to contextualize Ms. Chelsea Manning's grand jury resistance, and to attempt to explain why I believe her own experience of coercive detention will not result in her testifying before a federal grand jury.

During my incarceration, I was held in both general population and in solitary confinement. The conditions of my confinement were onerous and at times frankly cruel. Suffering as I do from mental illness only compounded the pain of my detention, but I never even considered cooperation as a viable way to end my incarceration. As an anarchist I am part of a political community that holds great distrust for the government, and I drew solace and strength from the support of that community. But it is worth noting that the other side of that support is that my community does not respect those who cooperate with the government. Had I chosen to cooperate, I would have been ostracized and lost the support of those I cared about most deeply. This was never a difficult decision for me, as my resistance was based just as much on my core political and ethical beliefs as it was on being part of a community for which I care deeply. Indeed, this dichotomy of support for resistance on the one hand and contempt for cooperation on the other certainly factored into Judge Keenan's ultimate decision to order my release after it became clear to him that no amount of incarceration would ever make me cooperate. If you would like to read his opinion, you can find it at 994 F.Supp.2d 510.

In my case, Judge Keenan stated that I had "endless contempt" for the legal system. As a law student, I would not necessarily agree with that description, but I have never regretted my decision not to testify. Not when I was placed in solitary, not when my personal life fell apart, and not when my physical health started to suffer along with my mental health. As a grand jury resistor, I saw myself as part of a long tradition of political resistance to overbroad government investigations and surveillance. I strongly disagreed with the secretive nature of federal grand juries and felt that as a matter of principle I would never testify before one.

I believe that Ms. Manning's coercive detention is similarly fruitless and will do nothing but cause her harm without ever increasing the likelihood of her testifying before a federal grand jury. Her own feelings and criticisms of federal grand juries have been made public, and I know of no reason not to take her at her word.

I hope that this statement has been useful in clarifying grand jury resistance.

Very Truly Yours

Gerald Koch

To Hon. Claude M. Hilton
United States District Court
Eastern District of Virginia

May 5, 2019

Judge Hilton,

My name is Janus Rose, and I am writing to urge you to release Chelsea Manning from confinement. I am a close personal friend of Chelsea. I corresponded with her during her incarceration at U.S.D.B. Fort Leavenworth, and have spent significant time with her since her release in May 2017.

During this period, I have come to know Chelsea as a woman of unshakable convictions. I can not think of anyone I've met more stubbornly devoted to their principles. Chelsea and I have disagreed on many occasions, and in every instance I've come to the same conclusion: once Chelsea decides to take principled action, there is nothing anyone can say or do to convince her otherwise, even if it ultimately proves detrimental to her own well-being or self-interest.

By refusing to answer questions before a grand jury, Chelsea has again chosen to stand for her beliefs. In private and public comments, she has repeatedly stated that she objects to the grand jury system, and that no amount of imprisonment will persuade her to testify. After being held in contempt on March 8th, Chelsea said she "will not comply with this, or any other grand jury." On April 22nd, after more than a month of imprisonment at William Truesdale Detention Center, and following the 4th Circuit Court of Appeals denial of her motion for release on bail, she again stated: "I don't have anything to contribute to this, or any other grand jury […] I will not give up."

As Chelsea's friend, I can confidently say that this stance is consistent with her character. I have no reason to believe further confinement will change her mind. Therefore, given that her confinement is meant to be coercive and not punitive, I urge you to order Chelsea released, as her continued imprisonment serves no legitimate purpose.

Thank you,

Janus Cassandra Rose

Dear Honorable Judge Hilton,

My name is Elizabeth Bell, and I have known Chelsea Manning since she started planning her run for Senate. We lived together for a time, and I've had the opportunity to get to know her extremely well; I consider her a very close personal friend and confidante.

I had followed her incarceration, from her initial arrest and trial through to her release, and I had been shocked, as an outside observer, by the conditions of her detainment at Fort Leavenworth. Her conditions there, in both general population and in solitary confinement, had an incredibly strong effect on her nature and her behavior, her imprisonment occurring as it did during major formative years of her life.

Since her detainment at the Alexandria detention facility, I've regularly visited her to keep her company and check on her. Prior to being detained there, she was animated, excitable, vivacious and active; since, she is calm, measured, focused, and subdued. This environment is corrosive to her, and is re-traumatizing someone who suffered greatly the first time she was imprisoned; however, it is an environment she is both deeply familiar with and highly adapted to.

Being in jail, while profoundly painful for her and deeply distressing to her loved ones, is not an environment likely to compel her to testify because she both knows what she is capable of enduring, and has already demonstrated that she would rather die than compromise her principles. Imprisonment will not compel her to testify, and only serves to hurt someone who has already suffered a great deal of personal harm.

Faithfully,

Elizabeth Bell

Dear Honorable Judge Hilton,

My name is Maya Little and I have gotten to know Chelsea Manning personally over the last year. I am writing to you today because I am a friend and also an admirer of her courage, resilience, and willingness to be punished for her beliefs. Chelsea describes herself as a political prisoner or former political prisoner because she was literally imprisoned for 7 years, partly in solitary confinement for her political beliefs. Even though the court may not agree with her beliefs, I have admired that she will stick by her beliefs through I believe anything and any punishment inflicted on her. I am writing to you today because I believe that regardless of the court's understanding of Chelsea, I know she will never break from her principles. I know that she cannot be compelled, even by jail time, to participate in something she considers against the very principles upon which she has based her life since at least 2010. The court may consider this strange or not agree with Chelsea's principles but I ask the court to consider that there is no purpose in keeping Chelsea jailed, knowing that she will never break these principles and testify.

I first met Chelsea in March, 2018. She spoke at a rally against white supremacy and against American imperialism. She spoke of the time she spent in jail between 2010 and 2017 and how being placed in solitary confinement resulted in extreme trauma and mental anguish. Chelsea had 7 years of her life taken away and even though she had just been out for year she made it clear she was fully committed to struggling against what she believes are attempts by courts to silence her and silence criticism of the United States military. Every day she is in jail myself and other friends and fellow activists are utterly lost for a community leader and warm, compassionate friend. We admire her bravery, we know she will never give in, but we know she is undergoing extremely torturous conditions and punishment for her unwillingness to testify and that she will continue to. When Chelsea was in solitary confinement last month she threw up from over-stimulation the first time she visited face to face with some friends. By continuing to keep her imprisoned the court is only inflicting further mental trauma on Chelsea which will lead to nothing.

By keeping Chelsea jailed the court is also depriving Chelsea's friends, fellow activists, community, and the many queer and trans people who look up to her of a mentor and community activist. Chelsea is one of the most brilliant and persistent free speech and LGBTQ rights activists I know. I have personally watched how her pride in her identity and service to others through speaking events has led to greater self-confidence and courage among LGBTQ youth who have been impacted by her message. By keeping Chelsea jailed, the LGBTQ community is being deprived of a leader in advocating for our rights and our safety. The court may not agree with Chelsea's stances but she is an advocate for free speech and government transparency. Even if it's not within your honor's discretion to praise Chelsea for her actions, I believe an American court of law should be able to appreciate these principles and know that we need all kinds of activists to advocate for them. Please release Chelsea from imprisonment. I believe keeping her imprisoned will serve no purpose other than to draw out traumatic experiences for Chelsea and it will not further the court's interests in any way.

Thank you for your consideration
Sincerely,
Maya Little