# CALLEN-LORDE

Rec'd

FILED
IN OPEN COURT

MAY 1 6 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

05/13/2019

Patient Name:     **MANNING , CHELSEA**
Patient dob:      **12/17/1987**

To Whom It May Concern:

I am a family nurse practitioner licensed in New York since 2010. I have been treating transgender people who have had vaginoplasty since that time. I currently lecture internationally on outpatient care of post-vaginoplasty transgender patients.

I evaluated Ms. Manning on May 13, 2019. She reports that she has been having difficulty with her post-operative care due to a burning pain in her vagina when she dilates. Dilation is a medically necessary part of her post-vaginoplasty care. Without dilation, she may be subject to many complications to her vaginoplasty including vaginal stricture, infection, and vaginal closure.

However, dilation has been very difficult and painful for her since April of 2019. This has been caused by internal vaginal granulation tissue that I was able to visualize on vaginal exam. Ms. Manning requires a long course of topical vaginal steroids in order to resolve this problem, and needs to be regularly monitored by a medical practitioner who is familiar with a transgender woman's post-vaginoplasty vagina.

Ms. Manning made staff where she was incarcerated aware of this problem in April of 2019. They reported to her that they were not able to address her medical concerns or offer her proper examination because they did not have adequate training in taking care of transgender women post-vaginoplasty. Ms. Manning was informed that she could see a medical provider of her choice at her own expense and reached out to me.

I was unable to respond to her medical issue in a timely manner due to the process of completing clearance and scheduling with the Alexandria Detention Center. Complications can occur at any time. Without adequate, immediate care, Ms. Manning's now routine complications could become catastrophic and life-threatening.

# CALLEN-LORDE

Additionally, this complication has to do with Ms. Manning's body undergoing extreme stress which prevents her from healing properly. In order to resolve this issue, Ms. Manning requires a hygenic environment where she can control her dilation schedule so she has adequate time to take care of her vagina and avoid further complications.

Treating this complication and having adequate access to health care is not a matter of convenience. It is medically necessary that she have access to immediate and competent health care and be able to control her own dilation schedule.

Thank you,

ZIL GOLDSTEIN FNP

NY Lic # 337032

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| IN RE: | )    <u>UNDER SEAL</u> |
|  | ) |
|  | )    Case No. 1:19-DM-3 |
| GRAND JURY CASE NO. 10-GJ-3793 | ) |
|  | )    GRAND JURY NO. 18-4 |

DECLARATION OF CHASE B. STRANGIO

In accordance with 28 U.S.C. § 1746, I do hereby make the following declaration in the above-captioned action:

1.       I have been a Staff Attorney at the LGBT & HIV Project of the American Civil Liberties Union (ACLU) since 2013. The ACLU is a nationwide, nonprofit, nonpartisan organization with nearly two million members. My work focuses on the needs and legal rights of transgender individuals. I regularly communicate with, advocate on behalf of and directly represent transgender individuals incarcerated in prisons and jails across the country.

2.       Between 2010 and 2012, I was a Staff Attorney and the Director of Prisoner Justice Initiatives at the Sylvia Rivera Law Project. Founded in 2003, the Sylvia Rivera Law Project (SRLP) is a non-profit organization that provides free legal representation to transgender, gender non-conforming and intersex people who are low-income. As an attorney at SRLP, I represented over 150 transgender individuals and provided advice and referrals to another 200 transgender individuals involved in the criminal justice system.

3.       Through my work at SRLP and prior to the promulgation of the final Prison Rape Elimination Act (PREA) regulations in May of 2012, I solicited comments from over 60 transgender prisoners across New York State on the Department of Justice's proposed

regulations. I also interviewed dozens of transgender individuals about the unique circumstances they faced while in custody to inform additional comments on the proposed PREA regulations concerning transgender prisoners and detainees.

4.    Between 2010 and 2015, I personally trained hundreds of New York City Department of Correction officers on the needs of transgender individuals in the custody of the New York City jails and on the officers' legal obligations under PREA and the Constitution.

5.    Between 2014 and 2017 I served as counsel to Chelsea Manning in her civil lawsuit against Department of Defense officials over the denial of medical treatment during her incarceration at the United States Disciplinary Barracks (USDB) at Fort Leavenworth.

6.    I make this declaration based on my personal knowledge of the experiences of transgender people in prison and jail across the United States and of Ms. Manning's particular history and risks.

7.    Research into sexual assault in confinement consistently documents the heightened vulnerability of transgender women to sexual victimization at the hands of facility staff and other prisoners in correctional settings. *See, e.g.*, National Prison Rape Elimination Commission Report 73 (June 2009); A. Beck et al., Sexual Victimization in Jails and Prisons Reported by Inmates, 2008-09 at 14-15 (Bureau of Justice Statistics Aug. 2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf; V. Jenness et al., Violence in California Correctional Facilities:  An Empirical Examination of Sexual Assault (Ctr. for Evidence-Based Corrs. 2009).

8.    Even when jail and prison policies outline medical and mental health protocols for treating transgender prisoners in custody, transgender prisoners and detainees frequently face delays and denials of medically necessary treatment related to gender transition. In my

experience, medical and mental health treatment provided to transgender prisoners falls greatly below even the bare minimum outlined in the prevailing standards of care.

9.      Individuals who are known to be transgender in correctional facilities are often singled out for isolation and abuse by other prisoners and staff. Measures such as protective custody and administrative segregation are frequently used to "protect" transgender individuals from abuse. These restrictive housing settings are themselves deeply harmful, particular for individuals with trauma backgrounds.

10.     The harassment, abuse and denial of medical care increase the rates of suicidality among prisoners and detainees who are transgender. This compounds an already staggering rate of attempted suicide among the transgender population, which is estimated at 41% (over 4 in 10 transgender individuals attempt suicide at some point in their lives). Nat'l Ctr for Transgender Equality. Preventing Transgender Suicide Washington: Nat'l Ctr for Transgender Equality (2010), http://www.transequality.org/PDFs/NCTE_Suicide_Prevention.pdf.

11.     Ms. Manning has had multiple suicide attempts including two attempts while incarcerated at the USDB during the period that I served as her counsel. The toll of her childhood trauma, Post Traumatic Stress symptoms from her military service, extreme conditions of solitary confinement during her pre-trial confinement at Quantico between 2010 and 2011, and gender dysphoria are understandably significant. Periods of isolation, harassment or denial of health care can trigger suicidal episodes for Ms. Manning that are not well managed in confinement settings.

12.     Even with assurances from the jail that Ms. Manning will have consistent access to her dilator and hormone therapy, jail conditions likely to disrupt that care can cause extreme distress for Ms. Manning.

13.     I have personally witnessed the toll of incarceration on Ms. Manning over a period of four years. She is just beginning to rebuild her life and I fear that confinement will significantly compromise her physical and emotional health with potentially catastrophic consequences.

14.     If house arrest is an option, I believe that it could be the difference between life and death for Ms. Manning.

Dated:  March 7, 2019
        New York, NY                                    _____
                                                        Chase B. Strangio



**TRANS PRIDE INITIATIVE**

Nell Gaither, President
Trans Pride Initiative
614 West Davis Street, Suite 208
Dallas, Texas 75208

March 5, 2019

To the Honorable Judge considering the case of Chelsea Manning:

I am writing on behalf of Chelsea Manning, who I understand is currently appearing before your court and may face additional incarceration. I would like to express my concerns for the endangerment beyond reasonable penological purpose that such additional commitment to a jail or prison could—and almost certainly would—entail.

Trans Pride Initiative (TPI) has worked for several years with incarcerated transgender persons, and we have exchanged over 7,000 letters with and advocating for transgender and gender diverse persons in prisons. We hear numerous concerns from clients who are suffering from violence in the system that serves no penological purpose and is only the result of social stigma and bias as it is expressed in a closed environment with extreme power differentials that encourage abuse of anyone who does not conform to heterosexual and cisgender (meaning not transgender) stereotypes. We should add that all major professional psychotherapy associations consider forcing transgender persons to conform to non-transgender stereotypes, as every prison setting we have worked with does, to be psychologically abusive.

Our clients describe experiencing a range of violence in the system, from daily dehumanization and threats (just today we received a letter from a transgender woman who was told by an officer that "you gay bitches" should be killed), to routine extortion, assaults, sexual harassment, sexual assault, and encouragement of self-harm, one probable murder, and one recent suicide (or so it was reported) by a person who was to be released in only three months.

There are a number of specific issues that, based on my experience working with incarcerated transgender persons, I believe Ms. Manning will face.

1. **Unavoidable disclosure of genital status**—Within a few hours of entering any prison or jail, regardless of prohibitions against sharing personal protected healthcare information, Ms. Manning's genital status will be generally known by both prisoners and staff. The prison grapevine will assure that. This will greatly increase her exposure to endangerment discussed below.

---

Trans Pride Initiative          P.O. Box 3982, Dallas, Texas 75208          tpride.org

*Reducing Stigma, Building Confidence*



**TRANS PRIDE
INITIATIVE**

2. **Housing, male facility**—If Ms. Manning is assigned to a male facility, housing her with cisgender men will undeniably put her at risk for multiple types of abuse, from extortion to physical assault and rape. Someone with Ms. Manning's condition would only be safe if housed with another transgender person who has also undergone vaginoplasty, or if housed in what would essentially be solitary confinement. We caution that in our experience, the Texas Department of Criminal Justice often claims that housing two transgender persons in a cell together constitutes noncompliance with Prison Rape Elimination Act (PREA) § 115.42(g) as a "dedicated" housing, and we suspect other prison systems do the same. Although TPI and common sense understand this as an abusive application of PREA § 115.42(g), that does not prevent the standard from being used to deny what is often the safest housing option for transgender women. And solitary confinement is well documented as an abusive practice with extremely negative psychological consequences.

3. **Housing, female facility**—If Ms. Manning is assigned to a female facility, housing her with cisgender women would probably be safer than cisgender men, but this would depend on the culture and the environment at the facility. Housing on a women's unit could also entail risks for similar abuses from extortion to physical assault and rape (we would remind the court that rape involves much more than penile insertion and can involve digital insertion and the use of objects as the means of abuse as well—rape is about power and control, and some of the same power dynamics of men's facilities can be found at women's facilities as well). As with housing at men's facilities, housing with cisgender persons is almost certain to entail endangerment to Ms. Manning's health and safety. Solitary confinement would again be an undesirable alternative.

4. **Privacy in showering, changing, and bodily functions**—Ms. Manning will certainly not have sufficient privacy and security in showering, changing, and performing bodily functions if housed on a men's unit, and is unlikely to have sufficient privacy on a women's unit. Her medically necessary daily dilation will require 30 to 60 minutes or more each day to focus on a specific procedure needed to keep her healthy, as more precisely covered in the letter from Ms. Mukerjee. The chaotic and closed environment of prison will not make this possible on the required daily basis. On men's facilities, toilets in the day rooms, cells, infirmaries, and other areas often have no privacy partitions. Even when cell in-and-outs are required at regular intervals, schedules are missed meaning one can be forced to hold one's bladder or use an open toilet, which would greatly increase Ms. Manning's likelihood of abuse. This is especially harmful to Ms. Manning due to her recent surgery. It should be noted that in the transgender community, regularly holding one's bladder to avoid violence is documented to cause an increase in urinary tract infections as well as kidney and bladder problems. This problem we believe is exacerbated in prison settings.

5. **Endangerment from special treatment**—In contrast to the above, special considerations made to allow Ms. Manning sufficient privacy will set her apart in a prison setting and increase her vulnerability and risk of abuse and harm. Any "special treatment" in prison settings is seen as disrespecting those who do not receive the special treatment, and can result in threats and violence to force the person receiving special treatment to refuse that treatment.



# TRANS PRIDE INITIATIVE

6. **Strip searches**—It should be clear that requiring Ms. Manning to strip in front of men will be psychologically abusive and will greatly increase her endangerment. In prison settings, privacy screens for vulnerable persons are often insufficient and easily misused. Privacy screens often do nothing to obscure voyeurism from the second and third floors of multi-floor units, are seldom tall enough to obscure the breast area, and can be positioned to allow certain areas a direct view into the enclosure, as is often done in Texas facilities.

7. **Extortion**—One of the most common forms of violence that we hear about in our communications with transgender persons is extortion. Anyone in a prison or jail who is on their own or "solo" is vulnerable to the operations of organizations and associations that are common in confinement settings. Transgender persons are immediately identified as being solo and vulnerable to extortion because they are not allowed to be affiliated with organizations and associations, so transgender persons are automatic targets for manipulation. Extortion often begins with demands for commissary or regular payments for "protection" from the organizations, then grows into forced labor, forced sexual favors, and forced holding or distribution of contraband. Refusal to cooperate with extortion demands can greatly increase the risk of assault, rape, or other violence. It is almost impossible for transgender persons to avoid extortion in prison settings.

8. **Manipulation by staff**—The factors that make trans persons vulnerable to extortion also increase their risk of manipulation by staff at jails and prisons. In our work at TPI, we have seen numerous cases where transgender persons appear to be placed in cells with persons known to be running contraband or engaging in other illicit operations so they can provide information; there is little or no regard to the safety of the transgender person. This appears to be done because prison staff know that transgender persons very seldom can rely on protection from associations, forcing them in situations of endangerment to provide information to prison staff in the hopes of getting safer housing. Time and again, we see that when information is provided, instead of greater housing safety, transgender persons are viewed as a reliable tool and their safety is further compromised by placing them in additional situations where they can collect information that benefits staff. Such manipulation has resulted in numerous threats and assaults and other abuses to clients with whom we have worked. This situation also very often creates a reputation for the transgender person as an informant, and that reputation can follow them with facility transfers, creating long-lasting endangerment.

9. **Assault and other physical harm**—As mentioned above, transgender persons are at risk of physical harm due to escalating demands of extortion that eventually cannot be met. Other factors that put transgender persons at risk in all prison settings include the banning of transgender persons from prison associations and organizations. Due to intense stigma, association members will often be pressured to assault transgender persons to prove they are not having sexual or other "disrespectful" relations with them. Simply being transgender in prison is an endangerment due to the strict association codes of conduct that encourage assault of transgender persons to prove one's adherence to those conduct codes.

---

Trans Pride Initiative          P.O. Box 3982, Dallas, Texas 75208          tpride.org

*Reducing Stigma, Building Confidence*



# TRANS PRIDE
# INITIATIVE

10. **Encouragement of self-harm**—The daily dehumanization, demands for sexual favors through extremely common sexual harassment, risk of extortion and assault, and the constant threatening environment that disproportionately affects transgender persons (and indeed all persons who do not clearly fit gender stereotypes) encourages multiple forms of self-harm. This can include substance use in order to mentally distract oneself from the constant environment of abuse, to greater instances of cutting, engaging in risky behaviors, and efforts to end one's life to escape the abuse.

These encompass a few of the major issues that we see as particularly problematic for placing Ms. Manning —or any other transgender person—in a prison or jail setting. TPI strongly implores that for her own health and safety, and to avoid assured endangerment and violence that serves no penological purpose, the court should avoid confinement to any penological institution.

If you would like additional information, please do not hesitate to contact me at my office (214-449-1439), via my mobile phone (214-394-9835), or by email (nell@tpride.org).

Thank you for your earnest consideration in this matter,

Nell Gaither, President
Trans Pride Initiative

Powered by Proofpoint Encryption™

Save As...                                                              Help

Digital Signature is VALID ✔ ✔

_____[SECURE] Dilation

| From: | Goldstein, Zil |
|---|---|
| To: | mo_at_law@protonmail.com |
| Cc: | |

Sent: 3/7/2019 11:50:04 AM

To Whom It May Concern:


I was a consulting provider to Ms. Chelsea Manning (DOB:
12/17/1987) in helping her secure gender-affirming vaginoplasty
with Dr. Marci Bowers. For the past 10 years, I have been
providing healthcare to transgender people, including managing
many of Dr. Bowers' vaginoplasty patients' post-operative care.


After this procedure, it is medically necessary for Ms.Manning
to dilate her vagina by inserting a dilator in her vagina three
times a day for 20 minutes each time in absolute privacy. If she
is not able to complete daily dilation on this regimen, she will
be at risk for severe, potentially life-threatening
complications.


Without proper dilation, Ms. Manning is at high risk for vaginal
stricture. Given the nature of the vaginoplasty procedure,
vaginal stricture can lead not only to expensive corrective
surgical procedures, but can lead to vaginal infection and
potentially toxic shock syndrome.


Without an experienced follow-up care provider who can
appropriately monitor Ms. Manning's recovery, she is at risk for
many complications including infection and toxic shock syndrome.
Physicians and gynecologists without specialized training in

caring for people who have had vaginoplasty are not equipped to
monitor and advise patients on how to stay healthy after this
procedure. Ms. Manning will require specialized follow-up care
in order for her to properly recover from vaginoplasty which is
only available a few places in the country.


Thank you,


Zil Garner Goldstein, FNP-BC
Assistant Professor of Medical Education
Program Director
Center for Transgender Medicine and Surgery at Mount Sinai
275 7th Avenue
New York, NY 10011
212-604-1730

http://www.mountsinai.org/ctms<https://webmail.mountsinai.org/
owa/redir.aspx?C=MiRZTPPZ0U-
SapVvkXUgFnHj0VOC0tMITqsFhvKZlxVPHBA7s0-
M5XrLsWByM0AUBbkKMeAQ4FM.&URL=http%3a%2f%2fwww.mountsinai.org%2f
ctms>

[cid:image002.jpg@01CF4E71.99B23DE0]

Tree of Life Primary Care and Recovery
Clinical Director, Ronica Mukerjee DNP, FNP-BC, MsA, LAc

To Whom It May Concern:

I am writing on the behalf of Chelsea Manning, who may be entering incarceral custody shortly. Her recent medical history, as relayed by her legal counsel, includes a major surgery resulting in a vaginoplasty. As an experienced clinician specializing in the care of transgender patients, particularly their post-operative care after gender reassignment surgery, I cannot state strongly enough how important her post-operative care is to preventing life-long deleterious consequences.

The care that is needed by Ms. Manning includes having immediate access to her vaginal dilators as well as appropriate lubrication, which are both needed to ensure that she does not lose the function of her genitals through vaginal prolapse or irreversible stiffening of her vaginal walls. The ability of C. Manning to dilate throughout the day and in the privacy of her cell is integral to her entire well-being as dilation prevents medical issues related to urination as well as defecation, two major bodily functions needed to ensure overall health. A stiffening or prolapse of the vaginal walls can be caused by not enough dilation and create problems in her genital, urinary, gastro-intestinal (rectal), and local musculoskeletal, and neurological systems.  The necessary preparation and insertion of the dilators, when done correctly, is multi-step process which takes at least one hour per administration and at least three hours per day.

In addition, the psychological harm possible to Ms. Manning following the lack of appropriate and immediate access to her vaginal dilators includes depression, anxiety and



129 Church St. #808, New Haven, CT, 16510 | www.treeoflifeprimarycare.org |
P: 203.553.1730 | F: 203.567.4145 | drm@treeoflifeprimarycare.org

Tree of Life Primary Care and Recovery
Clinical Director, Ronica Mukerjee DNP, FNP-BC, MsA, LAc

suicidal ideation. There is a well-known marked increase in mental health issues in patients with unsuccessful genital surgeries. In this case, that mental health injury would be the result of having inadequate access to needed medical equipment: her vaginal dilators.

Please allow Chelsea Manning to maintain her regular, needed post-operative care of thrice-daily dilation with in-cell access to her dilators. If you have any further questions regarding the clinical need for this, feel free to contact me at my office (below) or my mobile phone at 646-785-7452.

Sincerely,

Dr. Ronica Mukerjee
Clinical Faculty, Yale School of Nursing
Clinical Director, Tree of Life Primary Care & Recovery



129 Church St. #808, New Haven, CT, 16510 | www.treeoflifeprimarycare.org |
P: 203.553.1730 | F: 203.567.4145 | drm@treeoflifeprimarycare.org