IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | ) | |
|---|---|---|
| IN RE: | ) | Case No. 1:19-DM-12 |
| | ) | |
| GRAND JURY CASE NO. 10-GJ-3793 | ) | GRAND JURY NO. 19-3 |
| | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
CHELSEA MANNING'S MOTION TO RECONSIDER SANCTIONS**

Chelsea Manning has moved for the Court to reconsider the coercive sanctions that it imposed last month after she refused to comply with its order to testify in front of the grand jury. Manning, of course, can easily avoid the sanctions by doing what the Court has ordered her to do—by testifying in front of the grand jury. Providing such testimony is "a basic obligation that every citizen owes [her] Government." *United States v. Calandra*, 414 U.S. 338, 345 (1974). In that respect, Manning holds the keys to the jailhouse door and "has it in [her] power to avoid any penalty." *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 633 (1988) (quoting *Penfield Co. v. SEC*, 330 U.S. 585, 590 (1947)) (internal quotation marks omitted). Rather than complying with the Court's order, however, Manning seeks to avoid the sanctions by challenging the legal bases for them. As explained in this memorandum, Manning's arguments have no merit.

The Court has broad discretion in fashioning sanctions to coerce contemnors into complying with its orders, *see United States v. Darwin Constr. Co.*, 873 F.2d 750, 756 (4th Cir. 1989), and it appropriately exercised that discretion here. As the Court is aware, Manning's testimony remains highly relevant and essential to an ongoing grand-jury investigation of national importance. The Court properly fashioned a combination of sanctions tailored to coerce her into testifying, starting with only confinement and then adding and increasing conditional

fines over time.  In doing so, the Court imposed the sanctions in a manner that gradually increased the coercive pressure on Manning to testify.  Such a measured approach was consistent with the case law and well within the Court's discretion.

The government, however, does not object to Manning's request for further fact-finding regarding her financial resources.  Manning's ability to pay is a relevant consideration in imposing the coercive fines, but she bears the burden of proving that she lacks the financial resources to pay them.  Manning has produced no such evidence to date.  The government requests that the Court hold Manning to her burden and order that she produce evidence of her current assets, income (present and future), and earning capacity.  Only then can the Court meaningfully consider the issue.  The government has attached a proposed order that requires the production of such evidence.

## BACKGROUND

In January 2019, Manning was served through counsel with a subpoena to testify before a grand jury empaneled in the Eastern District of Virginia.  Judge Hilton entered an order directing Manning to testify in front of the grand jury and, along with a general court-martial convening authority of the Department of the Army, granted her full use and derivative use immunity.  At the request of Manning's counsel, the original appearance date was moved back approximately one month—to March 5, 2019.

After an unsuccessful attempt to quash the subpoena, Manning appeared before the grand jury but refused to answer questions posed to her.  Judge Hilton therefore conducted a show-cause hearing on March 8.  At the hearing, he found that Manning did not have just cause to refuse to answer the questions posed to her.  Judge Hilton held Manning in civil contempt and

ordered that she be incarcerated until she purged herself of the contempt or for the life of the grand jury. The Fourth Circuit subsequently affirmed Judge Hilton's contempt order.

The term of the grand jury expired on May 9, 2019. Pursuant to the terms of Judge Hilton's contempt order, Manning was released from incarceration on that date. The day before, however, Manning was served through counsel with a subpoena to appear before another grand jury empaneled in the Eastern District of Virginia. The return date of that subpoena was May 14, 2019. At Manning's request, the government agreed to postpone her appearance to May 16 to facilitate a medical appointment.

In connection with the new subpoena, Manning again received full use and derivative use immunity that covers her testimony. The Court entered a compulsion order on May 6, 2019, directing that Manning "testify fully, completely and truthfully" before the grand jury and granting her use and derivative use immunity. Likewise, a general court-martial convening authority again entered an order that granted Manning use and derivative use immunity in connection with her testimony.

Nevertheless, Manning publicly announced that she would not testify in front of the grand jury. *See* Chelsea Manning's Statement on Release from Jail and Second Grand Jury Subpoena, YouTube (May 10, 2019) ("When I arrive at the courthouse this coming Thursday, what happened last time will occur again. I will not cooperate with this or any other grand jury."), *available at* https://www.youtube.com/watch?v=TDZGRRk4MnM (last visited June 12, 2019). Manning also informed the government, through counsel, that she would refuse to answer the same questions posed to her in her prior grand-jury appearance. *See* Order 1 (May 16, 2019) (Dkt. No. 9). The government therefore scheduled a hearing with the Court on May 16, 2019, to address Manning's recalcitrance.

The day before the hearing, Manning filed two motions—a Motion for Disclosure of Electronic Evidence (Dkt. No. 6) and a Motion to Quash (Dkt. No. 7). As relevant here, Manning sought to quash the grand-jury subpoena on the ground that the government was improperly using the grand-jury proceedings to prepare for trial on an already indicted defendant, Julian Assange. At that time, Assange had been indicted on one count of conspiracy to commit computer intrusion. *See* Indictment, *United States v. Julian Paul Assange*, No. 1:18-cr-111 (E.D. Va. Mar. 6, 2018) (Dkt. No. 8). To refute those concerns while also maintaining grand-jury secrecy, the government submitted an ex parte pleadings that demonstrated Manning's testimony was directly relevant to an ongoing investigation into charges or targets that were not included in the pending indictment. *See* Gov't's Ex Parte Submission Regarding Nature of Grand-Jury Investigation (May 15, 2019).

At the hearing on May 16, the Court heard argument on the motions and denied both of them. *See* Order 1 (May 16, 2019). The Court then questioned Manning directly to determine whether she would testify in front of the grand jury. *See id.* Manning clearly and unequivocally stated that she would not testify in front of the grand jury, despite the Court's order that she do so. *See* Ex. A, at 3:9-11. Manning claimed that she objected on principle to the grand-jury system and that imprisonment would not compel her to testify. *See id.* at 3:16-20. The Court found that Manning did not have just cause to refuse to testify and held her in civil contempt. *See id.* at 3:12-15.

After hearing argument on the appropriate sanction, the Court ordered that Manning be incarcerated until she purges herself of her contempt or for the life of the grand jury, but in no event to exceed 18 months.[1] *See* Order 2 (May 16, 2019). The Court also directed that Manning

---

[1] Per the Court's order, both parties have filed pleadings addressing whether the two months that Manning spent incarcerated on Judge Hilton's order should be included in calculating the 18-

4

pay a conditional fine of $500 per day after 30 days from the issuance of its order, if she still had not complied by that time. *See id.* The Court further directed that, if Manning still had not complied within 60 days of the order, the fine would increase to $1000 per day. *See id.*

Two weeks later, Manning filed the pending motion. *See* Motion to Reconsider Sanctions (May 31, 2019) (Dkt. No. 14). *First*, she argues that the Court's sanctions have become punitive for essentially two reasons: (1) they will never coerce her into testifying in light of her objection to the grand-jury system, and (2) the superseding indictment returned against Julian Assange on May 23, 2019, has eliminated the need for her testimony. *See id.* at 3-9. *Second*, she argues that the Court cannot impose coercive fines against individuals for civil contempt unless the underlying contempt involves financial misconduct. *See id.* at 11-13. *Third*, she claims that the Court cannot impose fines and imprisonment concurrently as a coercive sanction. *See id.* at 13-14. *Fourth*, she argues that the Court erred in imposing the fines without considering her financial resources. *See id.* at 9-11. As explained below, all of Manning's arguments are without merit and should be rejected.

## DISCUSSION

In a civil-contempt proceeding, the Court may impose "penalties designed to compel future compliance with a court order." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Civil-contempt sanctions must "be coercive and avoidable through obedience." *Id.* The Court has "broad discretion to fashion an appropriate coercive remedy in a case of civil contempt, based on the nature of the harm and the probable effect of alternative

---

month limit. *See* Gov't's Mem. Regarding Calculation of 18-Month Limit on Imprisonment (May 29, 2019) (Dkt. No. 12); Chelsea Manning's Bench Br.: Reiterated Contempt (May 29, 2019) (Dkt. No. 13). The United States noted that it has no objection to including the two months in the calculation. *See* Gov't's Mem. Regarding Calculation of 18-Month Limit on Imprisonment, at 1.

sanctions." *United States v. Darwin Constr. Co.*, 873 F.2d 750, 756 (4th Cir. 1989) (quoting *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984)) (internal quotation marks omitted).

The "paradigmatic coercive, civil contempt sanction" involves confinement. *Bagwell*, 512 U.S. at 828. "Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance."[2] *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "In these circumstances, the contemnor is able to purge the contempt and obtain [her] release by committing an affirmative act, and thus carries the keys of [her] prison in [her] own pocket." *Bagwell*, 512 U.S. at 828 (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)) (internal quotation marks omitted).

In addition, the Court may impose a conditional fine as a coercive sanction for civil contempt. *See id.* at 829; William C. Bryson et al., Grand Jury Law & Practice § 11:17 (2d ed. Dec. 2018 update). "A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases." *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980). An example of a permissible coercive fine is "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order." *Bagwell*, 512 U.S. at 829. "Like civil imprisonment, such fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Id.* Under those circumstances, the contemnor "has it in [her] power to avoid any penalty" by complying with the Court's order.

---

[2] There are limits on how long a recalcitrant witness can be confined for civil contempt. The "period of . . . confinement" cannot "exceed the life of . . . the term of the grand jury, including extensions," and "in no event shall such confinement exceed eighteen months." 28 U.S.C. § 1826(a).

*Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 633 (1988) (quoting *Penfield Co. v. SEC*, 330 U.S. 585, 590 (1947)) (internal quotation marks omitted).

I.       **THE COURT'S SANCTIONS STILL SERVE A COERCIVE PURPOSE.**

Manning first challenges (at 3-9) the sanctions on the ground that they no longer serve a coercive purpose but instead have become impermissibly punitive. She maintains that, in light of her "strong objections to the grand jury process," she is "incoercible" and therefore "confinement . . . will only serve to punish her." Mot. to Reconsider Sanctions 3. She also speculates that her testimony is no longer necessary in light of the intervening superseding indictment against Julian Assange, which was returned after the May 16 hearing.[3] Both arguments are meritless.

Manning's self-serving objections to the grand-jury system are insufficient to demonstrate that the Court's sanctions will not have a coercive effect. Her argument based on those objections has already been addressed and rejected. At the May 16 contempt hearing, Manning raised her objections to the grand-jury system. *See* Ex. A, at 3:16-20, 10:13 – 13:3. The government explained at length why the argument lacks merit, *see* Gov't's Bench Mem. 16-24 (May 15, 2019) (Dkt. No. 4), and the Court ruled against Manning on the issue, *see* Ex. A, at 23:7 – 25:10. For the same reasons, the Court should reject Manning's attempt to relitigate its ruling here.

Nor does the recent superseding indictment against Assange render the sanctions punitive. Even after returning an indictment, the grand jury may continue investigating new

---

[3] Manning claims that Assange was charged in the superseding indictment at some point "between May 14 and May 16, 2019." Mot. to Reconsider Sanctions 2. That representation is inaccurate. The face of the indictment reflects that it was returned in open court on May 23, 2019, and the signature page bears the same date. *See* Superseding Indictment, *United States v. Julian Paul Assange*, No. 1:18-cr-111-CMH (E.D. Va. May 23, 2019) (Dkt. No. 31) (Exhibit B).

charges or targets that are related to the pending indictment. *See United States v. Alvarado*, 840 F.3d 184, 189-90 (4th Cir. 2016); *United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 314 (4th Cir. 2000); *United States v. Moss*, 756 F.2d 329, 332 (4th Cir. 1985). As the government's ex parte submissions reflect, Manning's testimony remains relevant and essential to an ongoing investigation into charges or targets that are not included in the superseding indictment. *See* Gov't's Ex Parte Mem. (May 23, 2019). The offenses that remain under investigation are not time barred, *see id.*, and the submission of the government's extradition request in the Assange case does not preclude future charges based on those offenses, *see* Gov't's Supplement to Ex Parte Mem. (June 14, 2019). Manning's speculations about the direction of the grand-jury investigation, the purpose of her testimony, and the need for it are insufficient to show otherwise.

## II. THE COURT HAD THE DISCRETION TO IMPOSE A FINE EVEN WHEN THE UNDERLYING CONTEMPT DID NOT INVOLVE FINANCIAL MISCONDUCT.

Manning also suggests that there is a per se rule against imposing a coercive fine on an individual unless the underlying contempt involves financial misconduct, such as "disobedience of a court order directing the management of a large amount of money." Mot. to Reconsider Sanctions 11. None of the cases that Manning cites (at 11-12), however, suggests that a coercive fine is appropriate only under those circumstances. That is because no such per se rule exists.

On the contrary, it is well settled that district courts may impose a fine as a coercive sanction where, as here, an individual refuses to comply with a grand-jury subpoena. *See, e.g.*, *In re Grand Jury Proceedings*, 280 F.3d 1103, 1109-10 (7th Cir. 2002) (affirming imposition of a fine of $1,500 per day as a coercive sanction for failing to produce documents pursuant to grand-jury subpoena); *United States v. Mongelli*, 2 F.3d 29, 30 (2d Cir. 1993) (affirming imposition of a fine of $10,000 per business day on contemnors who refused to comply with a court order to testify in front of the grand jury); *In re Grand Jury Witness*, 835 F.2d 437, 443 (2d

Cir. 1987) (affirming order imposing a $50,000 fine if a contemnor did not appear to testify before the grand jury before a particular date and thereafter requiring the contemnor to pay $5,000 each day that he did not appear); *In re Dickinson*, 763 F.2d 84, 86 (2d Cir. 1985) (affirming imposition of a $1500 per day fine on a contemnor for refusing to testify in front of the grand jury); *In re Grand Jury Impaneled Jan. 21, 1975*, 529 F.2d 543, 551 (3d Cir. 1976) (recognizing that the "district court has power to impose upon a civil contemnor a coercive monetary fine" for failing to produce documents pursuant to a grand-jury subpoena). As these cases demonstrate, the Court may impose coercive fines even when the underlying contempt does not involve financial misconduct. That is consistent with the broad discretion afforded to district courts in fashioning sanctions to coerce compliance with their orders. *See Darwin Constr.*, 873 F.2d at 756.

Manning suggests (at 13) that the Excessive Fines Clause of the Eighth Amendment limits the Court's discretion, but that provision is inapplicable in the civil-contempt context. *See Grand Jury Proceedings*, 280 F.3d at 1110 ("[A] fine assessed for civil contempt does not implicate the Excessive Fines Clause."). "The purpose of the Eighth Amendment . . . was to limit the government's power to punish," *Austin v. United States*, 509 U.S. 602, 609 (1993), and therefore, "a defendant must make a threshold showing of 'punishment' before [the Excessive Fines Clause's] protections will attach," *Mongelli*, 2 F.3d at 30. Because coercive fines imposed for civil contempt "are not punitive in nature, they do not implicate the protection of the . . . excessive fine clause[]." *Id.*

### III. THE COURT HAD THE DISCRETION TO IMPOSE A FINE IN ADDITION TO ORDERING MANNING'S CONFINEMENT.

Manning also argues (at 13) that the Court could not order her to pay a fine while she was confined because the concurrent use of these sanctions is "almost always *per se* punitive." But

9

she does not cite to any authority that imposes such an arbitrary restriction on the Court's discretion. Instead, the case law demonstrates that such a per se rule does not exist.

Multiple courts of appeals have recognized that fines may be imposed in addition to confinement as a coercive sanction for civil contempt. *See Grand Jury Witness*, 835 F.2d at 440 (recognizing that, along with confinement, "[f]ines are an additional or alternative sanction that may be imposed" on a recalcitrant witness); *Dinnan*, 625 F.2d at 1150 (recognizing that "a finding of civil contempt permits the coercive combination of both fine and imprisonment"); Bryson et al., *supra*, § 11:17 (recognizing that a court has the discretion to impose "a coercive fine in lieu of, or in addition to, the order of confinement"). In fact, the Seventh Circuit has squarely approved the concurrent imposition of both a fine and confinement as a coercive sanction. *See Grand Jury Proceedings*, 280 F.3d at 1109-10 (affirming the district court's contempt order imposing a concurrent $1500 per day fine and incarceration when the contemnor failed to comply with the court's order to produce documents pursuant to a grand-jury subpoena).

Manning primarily relies on the Third Circuit's decision in *In re Grand Jury Impaneled January 21, 1975*, but that case further demonstrates that there is no per se rule against concurrent sanctions. There, the district court held a contemnor in civil contempt for failing to comply with its order to produce documents pursuant to a grand-jury subpoena. *See* 529 F.2d at 546. The district court simultaneously ordered his incarceration and imposed "a coercive fine of $1500 per day until such time as he complied." *Id.* at 546-47. The contemnor appealed, arguing, among other things, "that in a civil contempt proceeding the court may not impose a coercive monetary fine." *Id.* at 547. The Third Circuit rejected this argument, "conclud[ing] that the district court has power to impose upon a civil contemnor a coercive monetary fine." *Id.* at 551.

The Third Circuit expressed concern that the district court simultaneously imposed both a fine and imprisonment without explaining why such a severe sanction was necessary. As the Third Circuit explained, the district court should apply "the degree of coercion minimally necessary to gain compliance with its orders" and not "visit Draconian punishment upon the civil contemnor." *Id.* The Third Circuit stated that "a district court may use these civil sanctions interchangeably or successively, but not simultaneously *in the absence of findings supported by the record showing the necessity for such severe action*." *Id.* (emphasis added). As the italicized language clarifies, the Third Circuit did not hold that it is "*per se* punitive" to impose a fine and incarceration concurrently, as Manning suggests (at 13) it did.

Rather, the Third Circuit's concern was that the district court should have taken a more measured approach in imposing sanctions for the civil contempt. The district court had immediately and simultaneously imposed both confinement and a conditional fine, without explaining why both were necessary at the outset. *See id.* at 546-47. In that context, the Third Circuit cautioned that it did "not believe that the *simultaneous imposition* of monetary and jail sanctions necessarily add[ed] to the in terrorem effect of a properly devised solitary sanction." *Id.* at 551 (emphasis added). The Third Circuit instead instructed that district courts should initially "apply the least coercive sanction (e.g., a monetary penalty) reasonably calculated to win compliance" and then increase the initial penalty or choose a new penalty "[i]f compliance is not forthcoming." *Id.*

That is exactly the type of measured approach that the Court adopted here. Unlike the contemnor before the Third Circuit, Manning was not immediately subjected to imprisonment and a conditional fine after being found in civil contempt. Instead, Judge Hilton initially imposed only imprisonment—the "paradigmatic coercive, civil contempt sanction." *Bagwell*,

11

512 U.S. at 828. Manning had served two months of imprisonment on that civil-contempt order by the time she appeared before this Court. Upon appearing before the Court, she remained recalcitrant, proclaiming that imprisonment would never cause her to testify. Under these circumstances, the Court appropriately increased the coercive pressure by imposing a conditional fine on top of confinement. Even then, the Court's fines increased the coercive pressure gradually, starting at $500 per day after 30 days and increasing to $1000 per day after 60 days. The Court's measured approach in imposing these penalties falls directly in line with the approach contemplated by the Third Circuit.

The Court, moreover, had ample justification to impose the coercive fines on top of—rather than in lieu of—imprisonment. A fine alone would not have been sufficiently coercive. Manning likely could have raised the money from sympathizers to pay the fines—a well-justified concern. Manning and her supporters have used social media to raise money to pay her lawyers.[4] News reports also indicate that supporters raised more than $150,000 for Manning when she was released in 2017. *See* Sandhya Somashekhar, *Chelsea Manning, Who Gave Trove of U.S. Secrets to WikiLeaks, Leaves Prison*, Washington Post (May 17, 2017) (Exhibit C).

Furthermore, Manning could have used the media attention generated by her contempt to obtain more speaking engagements and pursue other financial opportunities to offset the fines. *See infra* pp. 16-17. By defying the court orders to testify, Manning has returned to the news cycle at a time when she is promoting an upcoming memoir, starring in a Showtime

---

[4] *See, e.g.*, Chelsea Resists (@ResistsChelsea), Twitter (May 16, 2019, 4:05 PM) ("This is almost unbelievable. Please donate if you can & organize benefit shows for Chelsea. #WeGotThis") (Exhibit D); Chelsea E. Manning (@xychelsea), Twitter (Apr. 11, 2019, 12:39 PM) ("Reminder: Chelsea is still in need of funds for her legal expenses. Please donate if you can, and help spread the word so she can have a soft landing when she is finally released.") (Exhibit E); Chelsea E. Manning (@xychelsea), Twitter (Mar. 8, 2019, 11:10 AM) ("[F]or further updates on her grand jury resistance, follow her support committee at @ResistsChelsea and please donate to her legal fund.") (Exhibit F).

documentary, and seeking speaking engagements. *See id.* The unfortunate reality is that Manning's recalcitrance, and specifically the publicity it has generated, could benefit her financially. Confinement is therefore necessary not only to coerce Manning, but also to help ensure the fines imposed by the Court serve their coercive purpose.

Finally, to support her argument that the Court could impose only one sanction at a time, Manning cites *Acosta v. N & B Lundy Corp.*, No. 4:16-MC-00396, 2017 WL 1709438 (M.D. Pa. May 3, 2017), for the proposition that "[s]ome courts . . . have fashioned a coercive penalty of accruing fines limited in duration by the possible imposition of incarceration." Mot. to Reconsider Sanctions 13. That proposition is true but irrelevant. The fact that, under certain circumstances, it makes sense to impose successive sanctions does not preclude courts, in other circumstances, from imposing concurrent sanctions. The Court's "responsibility [is] to make an 'individualized decision' in assessing the most effective coercive remedy." *Dickinson*, 763 F.2d at 87-88 (quoting *Simkin v. United States*, 715 F.2d 34, 38 (2d Cir. 1983)). As described above, the unique circumstances of this case warranted the measured approach that the Court took in imposing concurrent sanctions. Manning does not cite any case that suggests otherwise.

IV. **MANNING HAS FAILED TO DEMONSTRATE THAT SHE LACKS THE FINANCIAL RESOURCES TO PAY THE FINES.**

Manning contends (at 9-11) that the Court should have considered whether she had the financial resources to pay the fines. She does not argue that she lacks the financial resources to pay the fines, much less provide any evidence to that effect. Instead, she requests that the Court hold a hearing to inquire into her financial resources. As explained below, the government does not oppose such a hearing, but the Court should first order Manning to produce evidence of her financial resources. Only then can the Court meaningfully address the issue at a hearing. The government has attached a proposed order requiring the production of such information.

### A. Manning Has Not Carried Her Burden of Proving an Inability to Pay the Fines.

Courts are to consider several factors when imposing a fine as a coercive sanction. These factors include (1) "the character and magnitude of the harm threatened by continued contumacy"; (2) "the probable effectiveness of any suggested sanction in bringing about the result desired"; and (3) "the amount of [the contemnor's] financial resources and the consequent seriousness of the burden to that particular [contemnor]." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). The purpose of weighing the contemnor's financial resources is "to decide whether the sanctions appropriately compel obedience to the order." *Grand Jury Witness*, 835 F.2d at 443.

As Manning acknowledges (at 11), the contemnor bears the burden of proving that she lacks the ability to pay the fines. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (7th Cir. 2004); *Grand Jury Proceedings*, 280 F.3d at 1109; *Grand Jury Witness*, 835 F.2d at 443. The contemnor cannot choose "to remain silent" on the issue and then raise it on appeal. *Grand Jury Witness*, 835 F.2d at 443. Even when the contemnor claims that she "is without any funds," she must present evidence that she cannot pay. *Dickinson*, 763 F.2d at 88. "A contemnor's failure to provide financial information upon which the burden of a sanction may be evaluated may not . . . result in a holding that the district court abused its discretion in imposing the sanction." *Paramedics*, 369 F.3d at 658 (quoting *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989)) (internal quotation marks omitted).

Manning has failed to carry her burden of showing that she lacks the financial resources to pay the fines. When the Court imposed the fines at the contempt hearing, Manning did not suggest that she lacked the financial resources to pay them. Instead, after the Court imposed the sanctions, she simply argued that her prior period of confinement under Judge Hilton's contempt

order should count in calculating the 18-month limit on her confinement. *See* Ex. A, at 27:2 – 28:2. She stayed silent on the issue of the fines. *See id.* Even in her current motion, Manning does not argue, much less produce any evidence to demonstrate, that she lacks the financial resources to pay the fines. Manning makes only a passing comment that she is "in the process of losing her home as a result of her present confinement." Mot. to Reconsider Sanctions 7. But that cryptic statement is insufficient to prove that she lacks the resources to pay the fines.

    **B.    The Court Should Require Manning to Produce Financial Information Concerning Her Present and Future Ability to Pay the Fines.**

Rather than producing any evidence of an inability to pay, Manning requests that the Court order a hearing to address her financial resources. The government does not oppose such a hearing. In advance of the hearing, however, the government requests that the Court order Manning to produce the financial information necessary to assess her ability to pay. Aside from the information it reads in news reports and other open sources, the government lacks evidence of Manning's financial resources. The Court needs, in advance, information about Manning's financial resources to allow for a meaningful hearing on the issue.

To satisfy her burden, Manning must produce information about more than just her "current worth." Mot. to Reconsider Sanctions 10. She must also produce information concerning her ability to pay the fines over time. As the Second Circuit has held, even if a contemnor "is without assets and is unable to render payment out of current funds, the pressure of having to pay in the future would be presently felt and could have a coercive effect." *Dickinson*, 763 F.2d at 88. Thus, in addition to providing information about her current assets, the Court should require Manning to produce information that is relevant to determining her earning capacity and sources of future income. *See id.* at 86 ("[W]e hold that, even if [the contemnor] is financially unable to pay the fine as it accrues daily, the knowledge that he will

eventually have to pay may presently coerc[e] him to testify, and, as such, the fine is not punitive in nature.").

There is reason to believe that Manning has, or in the future will have, the resources to pay the fines. Manning has stated that she makes a business out of speaking engagements, consulting, and writing. *See* Ex. G, ¶¶ 17, 24. In fact, one booking agency publicly promotes Manning and offers information on how to book her as a speaker. *See* Evil Twin Booking Agency, Chelsea Manning, *available at* https://eviltwinbooking.org/speakers/chelsea-manning/ (last visited June 12, 2019) (Exhibit H). Manning's recent recalcitrance has raised her profile and returned her to the news cycle, which could increase the demand for her as a speaker after her release. Indeed, Manning has actively sought publicity through the current proceedings—for example, by holding a press conference in front of the courthouse before the contempt hearing and publicly posting messages on Twitter. *See* Chelsea E. Manning (@xychelsea), Twitter, *available at* https://twitter.com/xychelsea?lang=en (last visited June 12, 2019) (sample posts attached as Exhibit I); Aaron Navarro, *Chelsea Manning Ordered Back to Jail for Refusing to Testify Before Grand Jury*, CBS News (May 16, 2019), *available at* https://www.cbsnews.com/news/chelsea-manning-says-she-will-refuse-to-testify-before-grand-jury/ (last visited June 12, 2019). When Manning was released on Judge Hilton's civil-contempt order, she promptly appeared on CNN to give an interview. *See* Devan Cole, *Chelsea Manning Says She Doesn't Know if She'll Be Jailed Again After Refusing to Testify About WikiLeaks*, CNN (May 12, 2019), *available at* https://www.cnn.com/2019/05/12/politics/chelsea-manning-jail-subpoena-wikileaks-cnntv/index.html (last visited June 12, 2019). Given Manning's return to the news cycle, she is likely to experience an increase in demand for her business after her release, which could provide her with the income pay the fines.

Manning, moreover, has also alluded to "[n]umerous" outstanding contracts that she has, which may also provide her with sources of income. Ex. G, ¶ 17. The recent news about Manning's book deal serves as an example. Within days after Manning was released from incarceration on Judge Hilton's contempt order, a publisher announced that it had signed a book deal with Manning. *See* Charlie Savage, *'I'm Really Opening Myself Up': Chelsea Manning Signs Book Deal*, N.Y. Times (May 13, 2019) (Exhibit J). In connection with the announcement, Manning gave an interview to the *New York Times*. *See id.* According to the publisher's website, the book is projected to be released in March 2020 and to sell for $26.00. *See* Macmillan Publishers, Untitled Chelsea Manning Memoir, *available at* https://us.macmillan.com/books/9780374279271 (last visited June 12, 2019) (Exhibit K). Manning's book deal could provide her with the proceeds to pay the coercive fines, either now or in the future.

As another example, Manning is also the subject of a recent documentary by Showtime. According to Showtime's website, the documentary, which was publicly released on June 7, 2019, was "[s]hot over two years and featur[es] exclusive interviews and behind-the-scenes verité with Manning." Showtime, XY Chelsea, *available at* https://www.sho.com/titles/3456427/xy-chelsea (last visited June 12, 2019) (Exhibit L). As with the book deal, the Court needs information about any payments Manning has received or will receive for the documentary to determine whether she has the ability to pay the fines.

    **C.**    **The Court Should Enter the Proposed Order Requiring Manning to Produce the Necessary Financial Information.**

The government has attached a proposed order that requires Manning to produce the necessary information about her current assets, income (present and future), and earning capacity. Specifically, the proposed order seeks three categories of information.

The first category requires Manning to complete the financial affidavit that the Court uses for indigent defendants—CJA Form 23.  *See* Ex. M.  This court-approved financial affidavit requires Manning to provide basic information about her current financial situation and assets.  That information is critical to determining Manning's present ability to pay the fines.

The second and third categories in the proposed order seek information related to Manning's ability to pay the fines over time.  The second category requires the production of all of Manning's financial account statements since she was released from imprisonment on May 17, 2017.  Such statements are necessary to determine her sources of income and to project her earning capacity.  The third category requires the production of all agreements that provide or could provide Manning with a source of income or assets, including but not limited to any agreements with her book publisher and the makers or producers of the documentary.  Such documents are likewise necessary to determine her future income and earning capacity.

## CONCLUSION

Manning has failed to demonstrate a meritorious ground for reconsidering her sanctions.  In advance of any hearing on her motion, the Court should enter the proposed order requiring Manning to produce the financial information set forth therein.  After Manning has produced the information, the parties will notice a hearing to address her financial resources and the other issues raised in her motion.

        Respectfully submitted,

        G. Zachary Terwilliger
        United States Attorney

By        /s/
        Tracy Doherty-McCormick
        First Assistant United States Attorney

        Gordon D. Kromberg
        Kellen S. Dwyer
        Thomas W. Traxler
        Assistant United States Attorneys
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, VA 22314
        Telephone (703) 299-3700
        Facsimile (703) 299-3980
        Thomas.traxler@usdoj.gov

        Matthew R. Walczewski
        Nicholas Hunter
        Adam Small
        Trial Attorneys, National Security Division
        U.S. Department of Justice
        950 Pennsylvania Avenue NW
        Washington, DC 20530
        Telephone (202) 233-0986
        Facsimile (202) 532-4251
        Matthew.walczewski@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of June, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

                                                 /s/
                                    Thomas W. Traxler
                                    Assistant United States Attorney