# **EXHIBIT A**

1

```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF VIRGINIA
 2                           ALEXANDRIA DIVISION

 3
                                           )
 4                                         )
                                           )
 5      IN RE:                             )
        GRAND JURY CASE NO. 10-GJ-3793 )      1:19-DM-00012-AJT
 6                                         )  ALEXANDRIA, VIRGINIA
                                           )  MAY 16, 2019
 7                                         )
                                           )
 8      _____)

 9

10

11

12

13      _____

14                        TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE ANTHONY J. TRENGA
15                    UNITED STATES DISTRICT JUDGE

16                          UNSEALED EXCERPT

17      _____

18

19

20

21

22

23

24      Proceedings reported by stenotype, transcript produced by

25      Julie A. Goodwin.
```

1                      A P P E A R A N C E S

2

3    FOR THE GOVERNMENT:
          UNITED STATES ATTORNEY'S OFFICE
4         By:  MR. THOMAS W. TRAXLER
          MR. GORDON D. KROMBERG
5         Assistants U.S. Attorney
                     -AND-
6         MS. TRACY DOHERTY-MCCORMICK
          First Assistant U.S. Attorney
7         2100 Jamieson Avenue
          Alexandria, Virginia  22314
8         703.299.3700
          thomas.traxler@usdoj.gov
9
          MR. NICHOLAS HUNTER
10        Trial Attorney, National Security Division
          U.S. Department of Justice
11        950 Pennsylvania Avenue NW
          Washington, DC  20530
12        202.233.0986

13

14
     FOR THE WITNESS:
15        MS. MOIRA MELTZER-COHEN
          277 Broadway
16        Suite 1501
          New York, New York  10007
17        347.248.6771
          mo_at_law@protonmail.com
18
          MR. CHRISTOPHER LEIBIG
19        114 N. Alfred Street
          Alexandria, Virginia  22314
20        703.683.4310
          chris@chrisleibiglaw.com
21

22

23   OFFICIAL U.S. COURT REPORTER:
          MS. JULIE A. GOODWIN, CSR, RPR
24        United States District Court
          401 Courthouse Square
25        Alexandria, Virginia  22314

3

1  (MAY 16, 2019, 3:10 P.M. ON THE RECORD, OPEN COURT ~ EXCERPT OF
2  UNSEALED PORTION.)
3      THE COURT:  We're in open session with respect to
4  matters that pertain to the grand jury.  Let me summarize for
5  the public record those proceedings.
6          By order dated May 3, 2019, the Court ordered
7  Ms. Manning to testify before the grand jury and also granted
8  use and derivative use immunity.
9          Ms. Manning has refused to testify before the grand
10  jury as ordered.  She has persisted in that refusal and has
11  informed the Court that she will continue to refuse to testify.
12          The Court has also considered whether Ms. Manning
13  has just cause to refuse to testify before the grand jury and
14  has concluded that the reasons she has given for not testifying
15  before the grand jury do not constitute just cause.
16          In that regard, Ms. Manning's position briefly
17  summarized is that she objects in principle to the grand jury,
18  which she views as an abuse of entity and that notwithstanding
19  its -- its being part of the Constitution, does not believe
20  that she can participate in the grand jury on principle.
21          For all these reasons, the Court has found
22  Ms. Manning in contempt, and the Court now will consider what
23  sanction is appropriate.
24          Mr. Traxler.
25      MR. TRAXLER:  Thank you, Your Honor.

4

1          With the Court having found Ms. Manning in

2   contempt, the Government asks that the Court now order that she

3   be incarcerated until she purges herself of that contempt or

4   for the life of the grand jury.

5          It's the basic obligation of all citizens to

6   testify in front of the grand jury when called upon to do so,

7   and the refusal of individuals to testify in front of the grand

8   jury threatens the safety of welfare of all the people.  It

9   hampers the grand jury's ability to carry out its solemn

10  responsibilities of investigating whether a crime has been

11  committed, what crimes have been committed, if any, who

12  committed the crimes, and whether there is sufficient evidence

13  for charges to be brought.  By refusing to testify in front of

14  the grand jury, Ms. Manning prevents the grand jury from

15  carrying out those responsibilities.

16          Further incarceration is appropriate here to coerce

17  Ms. Manning into testifying so that the grand jury can perform

18  those responsibilities.  And there's a few points I would like

19  to make, Your Honor, about why the Government believes that

20  further incarceration remains appropriate.

21          First, Your Honor, Ms. Manning on her prior

22  contempt finding served only two months' incarceration before

23  her release.  And she is only out today because the term of

24  that grand jury expired.

25          During half the time of her prior incarceration,

1    she had an appeal pending, so that meant that she had the hope

2    that she would be released on legal grounds which dampen the

3    coercive impact of that incarceration.

4           And I would point out, Your Honor, the courts

5    regularly require contemners to sit in jail for much longer

6    periods of time before entertaining whether to release them

7    because there's no coercive effect.

8           Simply put, Your Honor, Ms. Manning has not spent

9    enough time in jail on civil contempt to arrive at a

10   determination whether further -- that further incarceration

11   would not have a coercive effect.

12          Second, Your Honor, we would submit that

13   Ms. Manning stated for not -- stated reason for not testifying

14   is specious at best.  Ms. Manning claims to be taking a

15   principle stand against the grand jury, but if that claim could

16   pass muster and prevent somebody from being incarcerated for

17   civil contempt, the entire grand jury system would threaten to

18   collapse because everyone could simply take the principled

19   stand against the grand jury to relieve themselves of

20   incarceration.

21          We also believe that Ms. Manning's attacks on the

22   grand jury are unfounded.  The grand jury system exists to

23   protect the very individual liberties that Ms. Manning claims

24   to espouse.  As prosecutors, the Government has to convince the

25   grand jury, a group of ordinary citizens, that there is

1   sufficient evidence to bring criminal charges against someone.

2   The grand jury serves as a buffer or as a kind of referee

3   between the Government and its people.

4         Because it protects individual liberties, our

5   founders enshrine the grand jury in the Fifth Amendment, and

6   the alternative is to bring -- is to give the Government more

7   unfettered power to bring charges.  And based on Ms. Manning's

8   concerns about Government overreach, it's hard to believe that

9   she actually thinks that that's the better way to go.

10         Your Honor, the Government submits as Ms. Manning

11  spends longer in jail she could realize that it's actually in

12  her personal interest to comply with this Court's order to

13  testify in front of the grand jury.  The longer she spends time

14  in jail, the costs of that incarceration mount, she's taken

15  away from her speaking engagements and whatever businesses she

16  has going on, and the pressure to comply with this Court's

17  order will increase.  And that is the purpose of the coercive

18  sanction that the Court should impose today is to get her into

19  the grand jury room as the Court has ordered her to do.

20         Ms. Manning holds the keys to the jailhouse door,

21  and she is the master of her own destiny here.  She can get

22  herself out of jail at any time by simply complying with the

23  Court's order.

24         And, Your Honor, I would like to address just very

25  briefly a couple of alternatives that have been used to -- as

1  opposed to incarceration as a coercive sanction and explain why

2  the Government believes that those would not be effective here.

3        First, some courts have imposed periodic fines as a

4  way to coerce a contemner into complying with the Court's

5  order.  The Government believes that that will not work here

6  because Ms. Manning could simply go out and start trying to

7  raise the money via social media or what other -- what other --

8  whatever other avenues to pay those fines, and that would

9  dampen the coercive impact of the Court's sanction.

10        THE COURT:  They're not mutually exclusive.  They

11  could be -- they could be imposed together, couldn't they?

12        MR. TRAXLER:  They could -- both incarceration and a

13  fine could be imposed --

14        THE COURT:  Yes.

15        MR. TRAXLER:  -- yes, Your Honor.

16        THE COURT:  All right.

17        MR. TRAXLER:  And, Your Honor, we also believe that

18  home confinement, which Ms. Manning seems to want, would not

19  work here.  That's even less restrictive on her than jail.  And

20  she's spent two months in jail and hasn't -- and didn't

21  testify.  There's no reason to think that she -- if she was put

22  in home confinement, that that would somehow have an effect on

23  her to get her to testify.

24        So, jail, Your Honor, is what the Government

25  believes is the appropriate coercive sanction here to get her

8

1   to comply with the Court's order.

2          But let me just be clear.  The Government does not

3   like this turn of events.  As we repeatedly stated, we do not

4   wish we were at this point with Ms. Manning today.  Above all

5   else, what we want is for Ms. Manning to comply with this

6   Court's order and to perform her basic civic obligation to

7   testify.

8          And like every other citizen, Ms. Manning must

9   comply with the Court's order.  She doesn't deserve special

10  treatment to make her exempt from that court -- from this

11  Court's order.  Therefore, as we would with any similarly

12  situated witness who defies a lawful court order, we request

13  that the Court order that Ms. Manning be incarcerated

14  immediately until she purges herself of her contempt or for the

15  life of this grand jury.

16          THE COURT:  All right.

17          MR. TRAXLER:  Thank you, Your Honor.

18          THE COURT:  Ms. Meltzer-Cohen.

19          MS. MELTZER-COHEN:  The recalcitrant witness statute

20  contemplates that the contempt sanction may be enforced with

21  civil confinement for purposes of coercing cooperation.  As

22  Mr. Traxler said, the contemner is said to hold the key to

23  their own cell because they can end their confinement at any

24  time by agreeing to give testimony.

25          The civil contempt sanction is one that may be

9

1   imposed without the protections afforded criminal defendants

2   because the confinement is conditioned upon the contemner's own

3   conduct.   Thus, under both the common law governing the Court's

4   traditional contempt powers and its codification in 20 -- er,

5   yes, in 20 at U.S.C. 1826, civil confinement is intended only

6   to be coercive.   Even more, civil confinement cannot be used as

7   an instrument of policy.

8          And I have a quote here from the leading case on

9   this, *Simpkin v. U.S.*

10         If a judge orders continued confinement without

11  regard to its coercive effect upon the contemner, or as a

12  warning to others who might be tempted to violate their

13  testimonial obligations, he has converted the civil remedy into

14  a criminal penalty.

15         In the event that there is no possibility of

16  purging contempt, either because the grand jury has expired or

17  because the witness is incoercible, then the confinement serves

18  no further lawful purpose, and the witness must be released.

19         Mr. Traxler just talked about Ms. Manning's

20  personal interest.   I think as you just saw, Ms. Manning knows

21  very well that it is in her personal interest to testify before

22  this grand jury.   She subsumes her personal interest to a

23  larger collective principle.   Whatever we may think of that

24  principle, she is staunch in defending it.

25         And I would like to hand up to you, Your Honor,

10

1  this is a motion to release Chelsea that we filed a few days

2  before her release, and in it it includes a declaration from

3  Chelsea that I think is quite compelling, and it also includes

4  letters from her colleagues, her family and her friends.  Many

5  of them expressed some chagrin at her stand, but they do

6  acknowledge that she is likely to persist in it forever.

7          THE COURT:  This had been previously filed --

8          MS. MELTZER-COHEN:  This was previously --

9          THE COURT:  Right.

10          MS. MELTZER-COHEN:  -- filed.

11          THE COURT:  And the Court's reviewed it.

12          MS. MELTZER-COHEN:  Okay.  Great.

13          She is not going to cooperate with this grand jury.

14  She knows it, I know it, her friends and colleagues and family

15  know it.  The Government by stipulating to the questions that

16  they would have asked her today had she agreed to testify seems

17  to have conceded that they know it.

18          Whatever you may think of her, Chelsea Manning is a

19  principled person, and the fact is that many people, many

20  powerful people have expressed extremely public hostility and

21  disdain for her for all kinds of reasons, and this has moved

22  her not at all.

23          For nearly a decade, Ms. Manning has been vilified

24  as a symbol of everything that is wrong with the world, and she

25  has continued to be true to herself.  She has been cajoled and

1  incentivized to be a figurehead for movements and ideas that

2  she doesn't really believe in, and she has continued to be true

3  to herself rather than benefitting from standing up for

4  something that she doesn't believe in.

5          She has been asked to apologize, and she has been

6  given opportunities to displace blame from herself onto others,

7  and none of that has moved her.  She stands firm in taking

8  responsibility for her actions and standing by her principles.

9          She spent a tough seven years in prison being

10  confined in a men's facility, being placed in extended solitary

11  confinement that was so prolonged that the UN got involved.

12  She was denied medically necessary care during that time.  She

13  knows what it is to suffer, and she walked into this with her

14  eyes open.

15          She has taken a very public stand, and she is

16  supported by a global community.  And I'm going to read into

17  the record one -- one paragraph from her declaration.

18          It says:  I received enormous support from all

19  around the world.  My family and close friends all support me

20  and express their pride in me.  It's emotionally overwhelming

21  sometimes to see their unwavering generosity.

22          I receive warmth and strength from colleagues,

23  educators, lawyers, diplomats, activists, factory workers,

24  veterans, journalists, union leaders, store clerks, gardeners,

25  chefs, airplane pilots, and politicians from all across the

1  U.S. and the world at large, every class, culture, and age

2  imaginable.

3  Chelsea Manning is not going to back down.

4  Everything she has said and done over the last ten years has

5  made it abundantly clear that she is more willing to put

6  herself at grave risk than to betray her dearly held

7  principles.  It is for that reason that she is hailed as an

8  exemplar of integrity, and it is for that reason that her

9  agreeing to cooperate would be met with disappointment and

10  condemnation from those who form the base of her support.

11  Judges frequently lament what they perceive as the

12  perversity of this law, but they nevertheless universally

13  conclude that in the event a witness is never going to be

14  swayed by incarceration, that confinement has lost its

15  character as coercive and must be terminated.

16  There is no question but that the law forbids her

17  further confinement unless it can have a coercive effect.

18  Ms. Manning is a famously principled person.  She

19  has made many public statements that she will not capitulate.

20  Those closest to her affirm that while they may not always

21  agree with her, they have no doubt that she will stand by her

22  principles even at great cost to herself.  The internal and

23  social cost of betraying those principles would be

24  catastrophic.

25  An order confining her will not have the required

1   effect.  Such an order would therefore be not only ineffective,

2   but unlawful.  However, in the event that you do wish to have

3   her confined, I would ask that you review these letters, which

4   I don't believe are part of the record --

5          THE COURT:  All right.

6          MS. MELTZER-COHEN:  -- below, and issue an order for

7   house arrest.

8              I also do want to briefly state that I agree with

9   the Government that other sanctions, including fines, are also

10  unlikely to have a coercive effect.

11             And I'll give you a moment to review those letters.

12      (BRIEF PAUSE.)

13         THE COURT:  All right.  I've reviewed this.

14         MS. MELTZER-COHEN:  Thank you.

15             Your Honor, Section 1826 explicitly contemplates

16  confinement at what they call a suitable place.  What we argued

17  previously and what was borne out in spite of, I think, the

18  very best efforts of the Alexandria Detention Center, and

19  specifically Chief Pankey, was that the ADC medical staff lacks

20  the necessary training to examine and treat Chelsea in the

21  event of any post-surgical complications.  And, in fact, this

22  is what happened.

23             In April, as soon as Chelsea developed

24  complications, she informed ADC medical staff, and as we

25  appeared, what they told her was that they did not have

14

1  sufficient training to examine or treat a post-vaginoplasty

2  vagina.  They told her that they had never encountered a

3  patient who had her particular needs, and that not only did

4  they feel that treating her was beyond the scope of their

5  practice, but they said that they did not even know how to

6  examine her or diagnose her.

7        The solution that was proposed was for her to reach

8  out to her own doctor at her own expense and get her cleared,

9  Doctor Goldstein cleared, to come in to examine and treat her.

10 And that clearance has now been obtained, and it sounds like it

11 will not take as long to re-obtain that clearance should it

12 become necessary, but it ended up taking so long that Chelsea

13 ended up being released before Doctor Goldstein was able to get

14 to ADC to see her.

15       So, now Doctor Goldstein has been cleared, and we

16 have been given assurances that if a serious complication were

17 to arise Chelsea would be taken to an emergency room.

18       I want to again recognize, I don't think there's

19 any ill will here.  I don't think -- I think that the

20 Government and ADC are making genuine efforts to accommodate

21 Chelsea's medical needs, but what has become apparent is that

22 they actually don't understand what those needs are or what the

23 risks are associated with those needs.

24       So, first of all, the source of the complications

25 that Chelsea has experienced seem to have been at least in part

15

1  due to the questionable hygiene of the jail and the lack of

2  control that Chelsea herself has over her daily post-surgical

3  regimen.  And that is something -- that lack of control is

4  something that ADC is absolutely unwilling to -- to change.

5          More seriously, the medical staff at ADC are in no

6  way unusual in their lack of competence with respect to being

7  able to diagnose and treat a -- the post-surgery needs of a

8  transwoman.  So, going to the emergency room of a hospital does

9  not actually represent any kind of meaningful guarantee that

10 Chelsea would receive appropriate treatment for complications

11 arising from her gender confirmation surgery because it is such

12 a niche area of medical practice that there is no reason to

13 think that an emergency room would have a trans competent

14 doctor there.

15          The nearest doctors as far as we know who provide

16 this kind of treatment, and certainly Chelsea's doctor, is in

17 New York, and so emergency room care in Alexandria is not

18 actually likely to be responsive or immediate.

19          Now, Mr. Miranda has told me that he believes there

20 may be another facility somewhere in this area to which she

21 might be able to be taken, but I have no -- this was a sort of

22 vague representation:  I don't know who these doctors are; we

23 have not really looked into this.

24          And in any case, my larger concern is that there is

25 no reason to think that ADC medical staff would know -- would

1  be able to identify what a serious complication was in order to

2  get Chelsea to appropriate medical care.

3         You know, I don't think we -- we need to be

4  circumspect about taking chances with somebody's health like

5  this, particularly because ADC medical staff has explicitly

6  said that they are unwilling to examine her because they are

7  not competent to do so.

8         I don't think it is misplaced that we are gravely

9  concerned that a serious complication might not be noticed or

10 taken seriously until it had reached the point of being life

11 threatening, which is I think as you saw in the letters you

12 just read an actual possibility.

13        So, again, I want to be clear that I don't think

14 anyone is trying to harm Chelsea.  I don't think they have any

15 interest in harming Chelsea, and in fact, I think that they

16 very much want to demonstrate their capacity to accommodate

17 Chelsea because they very much want to incarcerate her.  But,

18 ADC is by their own admission not a place that is capable of

19 providing anything approaching adequate care, and there's no

20 reason to think that the emergency room could provide such care

21 either, even in the event that the medical staff at ADC were

22 able to recognize, understand, and take seriously a serious

23 complication before it was too late.

24        So, for this reason, I do not believe that

25 confinement at Alexandria Detention Center represents a

1  suitable place as contemplated by the recalcitrant witness

2  statute.  However, house arrest, with whatever conditions you

3  might want to impose, would certainly be onerous and would

4  exert upon Ms. Manning an enormous degree of frustration.

5          I -- I want to clarify, again, not only do I think

6  that ADC is not a suitable place, I think it would be a

7  necessarily punitive place, because in the event that any

8  Eighth Amendment issues arose, they would just be catastrophic,

9  unresolvable, potentially permanent, potentially life

10  threatening, and so I think of necessity what we're looking at

11  in that case is not something -- is something that

12  definitionally passes out of the realm of the coercive and into

13  the punitive.

14          So, house arrest, as I said with conditions, would

15  be onerous and frustrating.  I will say I do not believe that

16  it would have any more coercive effect than confinement at ADC

17  because it is absolutely clear to me that my client is not

18  coercible.  But confining Chelsea in a manner that would not

19  affirmatively prevent her from accessing medically necessary

20  care in a timely manner would at the very least put her at less

21  risk of permanent harm.

22          And I believe I have nothing further, Your Honor.

23          THE COURT:  All right.  Thank you.

24          MS. MELTZER-COHEN:  Thank you.

25          THE COURT:  Counsel.

18

1          MS. MCCORMICK:  Thank you, Your Honor.

2          I just want to address the -- the medical issues

3    primarily because the ADC is suitable, suitable under 1826 and

4    it's suitable as -- as a facility.

5          It can accommodate and it has accommodated

6    Ms. Manning's ongoing medical needs.  The Court already has the

7    declaration of the deputy chief from the ADC in the record, so

8    I'm not going to belabor those points.

9          THE COURT:  Well, she could -- she could also be

10   assigned to other facilities, couldn't she?

11         MS. MCCORMICK:  There are.  There are medical

12   facilities in the Bureau of Prisons --

13         THE COURT:  Right.

14         MS. MCCORMICK:  -- that are potential if this -- if --

15   as needed.

16         THE COURT:  Right.

17         MS. MCCORMICK:  But, in fact, the U.S. Attorney's

18   office, the Alexandria Detention Center, and the U.S. Marshal

19   Service have all bent over backwards to accommodate

20   Ms. Manning's needs, and I think that Ms. Manning's counsel has

21   publicly and privately stated as such.

22         Most recently, we agreed to delay this court

23   hearing and to delay the testimony to allow Ms. Manning to go

24   see a doctor.  The ADC and the U.S. Marshal Service agreed to

25   allow Ms. Manning's position -- I guess it's a nurse

1   practitioner.  We got the letter --

2           THE COURT:  Right.

3           MS. MCCORMICK:  -- before the hearing to come to the

4   ADC to examine her.

5               Now, there are clearance processes they have to go

6   through.  They have to make sure she doesn't have a criminal

7   record.  That she actually has licenses that she says.  So,

8   those things have been done.

9               And I have Chief Tom Miranda from the U.S. Marshal

10  Services here if the Court has any questions, but I can proffer

11  to you what he's discussed with me and also with Manning's --

12  with Ms. Manning's attorneys earlier today, is that they have

13  previously cleared this Ms. Goldstein, or Nurse Goldstein, to

14  come to the facility.  And that if they needed to do a recheck

15  of that it would take two days to do so, so there's no

16  significant delay in getting care.  The ADC has also stated

17  that it would accept Ms. Manning's topical steroid that she was

18  prescribed for her condition.

19              And let me just talk to the -- to the fact that the

20  ADC, you know, couldn't do a specific examination.  I mean,

21  anytime you go to a general practitioner and they don't have a

22  specialty, they're not going to treat you.  They're going to

23  refer you to a specialist.  So I don't think there's anything

24  different about this here.  In fact, Ms. Manning's attorney

25  said that even an emergency room would not be sufficient.

1            So, I don't think -- I don't think the standard

2     under 1826 is -- is -- is perfect.  It's suitable.  It's what's

3     required.  The ADC is a suitable facility to care for

4     Ms. Manning.

5            If there is any urgent care issues, which general

6     practitioners are trained to watch for, they don't have to do a

7     specific examination.  If someone has a fever, generally a

8     doctor might suspect an infection.  There are other signs that

9     the body gives people to tell you if there's an urgent care --

10    care issue, and the ADC, just like they would with anyone else

11    who has an urgent care issue, if you have a cardiac arrest or

12    if you have a stroke, they would bring Ms. Manning to a

13    hospital.

14           So safety is an interest we all share here and the

15    ADC has not only been a suitable place, but I believe it -- and

16    I think Ms. Manning's attorneys would agree, that they've been

17    remarkably accommodating to Ms. Manning's needs and they've

18    bent over backward to -- to -- to help her.

19           To be clear, we are -- we are not making these

20    arguments because we want to incarcerate Ms. Manning.  We

21    actually would like Ms. Manning to follow the law and testify.

22    We do not -- we do not want to put her in incarceration.  We

23    would very much like her to change her mind right now.

24           And if I could speak to that for a second, because

25    Ms. Meltzer-Cohen just discussed a little bit about how this is

1   turning from a coercive to a punitive sanction because

2   Ms. Manning has stated that under no circumstances will she

3   ever testify.  That -- you know, a blanket statement like that

4   by any witness, you know, you have to be scrutable with because

5   any witness could therefore just come in and say, I'm never

6   going to testify in the grand jury, so you can't hold me

7   accountable under your court order and you can't hold me in --

8   you can't hold me in contempt or incarcerate me because I'm not

9   going to change my mind.  So, that would break down the whole

10  grand jury system.

11          And the fact of the matter is people do change

12  their mind.  They change their mind all the times when it's in

13  their interest to do so.

14          In fact, Ms. Manning has changed her mind.  She has

15  stood for transparency, she's stood for freedom of information,

16  and yet she's depriving the grand jury the opportunity to --

17  for her transparency to them and to provide full information to

18  them.

19          I don't have anything further.

20          THE COURT:  All right.  Thank you.

21          MS. MELTZER-COHEN:  Your Honor?

22          THE COURT:  Yes.

23          MS. MELTZER-COHEN:  May I respond?

24          THE COURT:  Yes.

25          MS. MELTZER-COHEN:  I guess as a preliminary matter I

22

1   would like to clarify that I think Ms. Manning has stood for

2   government transparency, and, in fact, continues to stand for

3   transparency in terms of even what she told you earlier, Your

4   Honor, about her objections to secrecy.

5           I -- I do hear Ms. McCormick with respect to the

6   ways in which ADC has been remarkably accommodating.  And,

7   again, I want to make quite clear that this is not to cast

8   dispersions on ADC.  The issue of intent is irrelevant here.

9           It is clear to me that ADC has bent over backwards

10  and that nevertheless it is not possible for a carceral

11  environment to accommodate the kinds of health needs and

12  potential health needs that Ms. Manning has.

13          I do not, as I have said repeatedly, believe that

14  there is any sanction that is going to be effectively coercive,

15  but jail has proven not to be coercive.

16          I mentioned earlier Ms. Manning's previous

17  seven-year confinement.  It was quite damaging to her, but she

18  certainly has survived it.  Further confinement is likely to

19  compound the trauma and harm that she will come to, but there

20  is -- I don't think there's any chance that she's going to

21  capitulate simply as a result of being jailed again.

22          So, you know, I guess I would suggest that we -- if

23  you're going to impose a sanction, maybe try something else.

24          THE COURT:  All right.

25          MS. MELTZER-COHEN:  I -- I know that corporations

 1  routinely do get fined.  I'm not aware of cases where

 2  individuals do, but another sanction and maybe, you know,

 3  combined with various kinds of conditions would be only to go

 4  on this.

 5          THE COURT:  All right.  Thank you.

 6          MS. MELTZER-COHEN:  Thank you.

 7          THE COURT:  It's unfortunate that we're at this point,

 8  particularly given the grounds upon which Ms. Manning has

 9  embraced for refusing to testify for the grand jury, but the

10  threshold issue for the Court in terms of a sanction is whether

11  there's a realistic possibility that a further coercive

12  sanction will cause her to comply with the Court's order.

13          With respect to her contention that nothing will

14  convince her to testify before the grand jury, the Court has

15  considered and needs to consider a number of factors,

16  including, first of all, her reasons for not testifying, the

17  length of time she's already been subjected to a course of

18  sanction, and generally whether there remains, as I indicated,

19  a realistic possibility that continued confinement or other

20  permissive course of measures can -- may cause her to testify

21  factored into this analysis as the determination whether a

22  recalcitrant witness will not cave in the course of pressure of

23  a civil contempt order is really inherently speculative, and a

24  claim that a person will not yield is easily made and whether

25  the full range of permissive course of remedies have been used.

24

1          Here, the Court also needs to consider really

2    whether -- consider the extent to which there is a need to

3    avoid essentially incentivising or rewarding recalcitrant

4    behavior and foster a situation in which the more adamant the

5    contention and refusal to testify, the more likely a witness

6    would be released.

7          Here, Ms. Manning refuses to testify because of a

8    philosophical objection to the use of grand juries because of

9    what she views as a history of politically motivated abusive

10   prosecutions.  That is a view that she indicated is in conflict

11   with the oath she took as an Army -- a member of the armed

12   services to uphold the Constitution.  It is a process that is

13   in a rule to our criminal justice system.  It is an institution

14   that consists of 23 United States citizens who are sworn to

15   protect the citizenry from abuse of Government practices, and

16   it takes 12 members, United States citizens, to authorize a

17   prosecution.

18         It's the Court's hope that Ms. Manning would

19   reflect on the principles that she says she's embracing, and

20   the Court would -- believes that her views would have a chance

21   to, as she reflects on them, to perhaps change over time as far

22   as the role of grand juries, and whether -- perhaps most

23   importantly, whether those views are worth the price that she

24   is paying for adhering to them.

25         Courts have also rejected motions to terminate

1  civil contempt.  The confinements based on detentions must --

2  much shorter than -- much longer than Ms. Manning has already

3  been subjected to, particularly in the circumstances of this

4  case where some of her previous time in confinement was during

5  her appeal which arguably allowed her to retain the hope that

6  she could avoid testifying.

7            In any event, the Court concludes that civil

8  contempt remedy is not lost.  It's a course of impact and has

9  not become punitive, and the Court's going to impose a sanction

10 at this time.

11           Ms. Manning, I'm going to give you an opportunity

12 to say anything you would like to say before the Court imposes

13 a sanction.  Would you like to say anything?

14           THE WITNESS:  Yes, Your Honor.

15           THE COURT:  All right.

16           THE WITNESS:  Your Honor, I think that -- the

17 Government's position is that the, I have the keys to my own

18 cell, so to speak.  I do not believe that this is an accurate

19 statement.  I believe and I think that I've -- my entire life

20 and my -- the entire life that I've lived proves the fact that

21 I have a philosophical position, as you have heard.

22           My belief is that it is a far worse thing than any

23 amount of that -- the Government cannot build a prison bad

24 enough, cannot create a system worse than the idea that I would

25 ever change my principles or, as you -- as you so eloquently

1   put it, alter my opinion on -- alter my opinions on this.  The

2   simple fact of the matter is, is that I would rather starve to

3   death than to change my opinions in this regard.  And when I

4   say that, I mean -- I mean that quite literally.

5             THE COURT:  All right.

6             THE WITNESS:  Thank you, Your Honor.

7             THE COURT:  Why don't you just stay there.

8             Ms. Manning, there's nothing dishonorable about

9   discharging your legal obligations as a United States citizen,

10   and I would just ask you to reflect on that.

11             The Court finds you in contempt.  The Court's going

12   to commit you to the custody of the Attorney General, and until

13   you purge yourself of your contempt or the grand jury expires,

14   and no event more than 18 months.  If you do not purge yourself

15   of contempt within 30 days, the Court's going to impose a

16   coercive conditional fine of $500 per day.  If you don't -- if

17   you don't purge yourself of contempt within 60 days, the

18   Court's going to increase that to $1,000 a day.  And that will

19   be -- that will be the sanction the Court imposes.

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  All right?

22             And the Court remands you to the custody of the

23   United States Marshals.

24             All right.

25             MS. MELTZER-COHEN:  Your Honor?

27

```
 1              THE COURT:  Yes.

 2              MS. MELTZER-COHEN:  May I inquire?

 3              THE COURT:  Yeah, let me also say that to the extent

 4  there are medical issues or urgent care issues that are not

 5  being met, the Court -- they should be brought to the attention

 6  of the Court, and the Court will certainly have the ability to

 7  address those.

 8              MS. MELTZER-COHEN:  Your Honor, may I --

 9              THE COURT:  Yes.

10              MS. MELTZER-COHEN:  -- ask you a question?

11          My understanding of the recalcitrant witness

12  statute and the case law surrounding it is that when a witness

13  is re-subpoenaed to a new grand jury after the expiration of

14  the previous one, the time that they sat during that previous

15  grand jury is included in that 18-month calculation.

16          Do you have a different understanding?

17              THE COURT:  I am not -- I haven't dealt with that

18  issue.

19              MS. MELTZER-COHEN:  Okay.

20              THE COURT:  If that's the case, we can certainly --

21              MS. MELTZER-COHEN:  Let's brief that issue.

22              THE COURT:  Yeah, you should.

23              MS. MELTZER-COHEN:  Can we make a schedule to brief

24  that issue?

25              THE COURT:  Why don't you -- why don't you file a
```

28

1   follow-up of -- why don't you both file something within 14

2   days.

3          MS. MELTZER-COHEN:  You've got it.

4          THE COURT:  All right?

5          MS. MELTZER-COHEN:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.

7          Counsel are excused.  Ms. Manning's remanded.  The

8   Court stands in recess.

9          THE LAW CLERK:  All rise.

10          (PROCEEDINGS CONCLUDED AT 3:50 P.M.)

11                         -oOo-

12

13

14  UNITED STATES DISTRICT COURT   )
    EASTERN DISTRICT OF VIRGINIA   )

15

16          I, JULIE GOODWIN, Official Court Reporter for the
    United States District Court, Eastern District of Virginia, do
17  hereby certify that the foregoing is a correct transcript from
    the record of proceedings in the above matter, to the best of
18  my ability.
           I further certify that I am neither counsel for,
19  related to, nor employed by any of the parties to the action in
    which this proceeding was taken, and further that I am not
20  financially nor otherwise interested in the outcome of the
    action.
21          Certified to by me this 12TH day of JUNE, 2019.

22

23          _____/s/_____
            JULIE GOODWIN
24          Official U.S. Court Reporter
            401 Courthouse Square
25          Alexandria, Virginia  22314

                                    Julie A. Goodwin, CSR, RPR