# **EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

MAY 23

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:18-cr-111 (CMH) |
| v. | Count 1:  18 U.S.C. § 793(g)<br>Conspiracy To Receive National Defense Information |
| JULIAN PAUL ASSANGE, | |
| Defendant. | Counts 2-4: 18 U.S.C. § 793(b) and 2<br>Obtaining National Defense Information |
| | Counts 5-8: 18 U.S.C. § 793(c) and 2<br>Obtaining National Defense Information |
| | Counts 9-11: 18 U.S.C. § 793(d) and 2<br>Disclosure of National Defense Information |
| | Counts 12-14: 18 U.S.C. § 793(e) and 2<br>Disclosure of National Defense Information |
| | Counts 15-17: 18 U.S.C. § 793(e)<br>Disclosure of National Defense Information |
| | Count 18:  18 U.S.C. §§ 371 and 1030<br>Conspiracy To Commit Computer Intrusion |

## **SUPERSEDING INDICTMENT**

May 2019 Term – at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At times material to this Superseding Indictment:

**A. ASSANGE and WikiLeaks Repeatedly Encouraged Sources with Access to Classified Information to Steal and Provide It to WikiLeaks to Disclose.**

1.      JULIAN PAUL ASSANGE ("ASSANGE") is the public face of "WikiLeaks," a website he founded with others as an "intelligence agency of the people." To obtain information to release on the WikiLeaks website, ASSANGE encouraged sources to (i) circumvent legal safeguards on information; (ii) provide that protected information to WikiLeaks for public dissemination; and (iii) continue the pattern of illegally procuring and providing protected information to WikiLeaks for distribution to the public.

2.      ASSANGE and WikiLeaks have repeatedly sought, obtained, and disseminated information that the United States classified due to the serious risk that unauthorized disclosure could harm the national security of the United States.  WikiLeaks's website explicitly solicited censored, otherwise restricted, and until September 2010,[1] "classified" materials.  As the website then-stated, "WikiLeaks accepts *classified, censored,* or otherwise *restricted* material of *political, diplomatic, or ethical significance*." [2]

3.      ASSANGE personally and publicly promoted WikiLeaks to encourage those with access to protected information, including classified information, to provide it to WikiLeaks for public disclosure. For example, in December 2009, ASSANGE and a WikiLeaks affiliate gave a presentation at the 26th Chaos Communication Congress (26C3), described by the website as an annual conference attended by the hacker community and others that is hosted by the Chaos

---

[1]   When the Grand Jury alleges in this Superseding Indictment that an event occurred on a particular date, the Grand Jury means to convey that the event was alleged to occur "on or about" that date.

[2]   One month later, the WikiLeaks website not only deleted the term "classified" from the list of materials it would accept, but also included the following disclaimer: "WikiLeaks accepts a range of material, but we do not solicit it."

Computer Club (CCC), which its website purports is "Europe's largest association of hackers." During that presentation, WikiLeaks described itself as the "leading disclosure portal for classified, restricted or legally threatened publications."

4.    To further encourage the disclosure of protected information, including classified information, the WikiLeaks website posted a detailed list of "The Most Wanted Leaks of 2009," organized by country, and stated that documents or materials nominated to the list must "[b]e likely to have political, diplomatic, ethical or historical impact on release . . . and be plausibly obtainable to a well-motivated insider or outsider."

5.    As of November 2009, WikiLeaks's "Most Wanted Leaks" for the United States included the following:

    a.    "Bulk Databases," including an encyclopedia used by the United States intelligence community, called "Intellipedia;" the unclassified, but non-public, CIA Open Source Center database; and

    b.    "Military and Intelligence" documents, including documents that the list described as classified up to the **SECRET** level, for example, "Iraq and Afghanistan Rules of Engagement 2007-2009 (SECRET);" operating and interrogation procedures at Guantanamo Bay, Cuba; documents relating to Guantanamo detainees; CIA detainee interrogation videos; and information about certain weapons systems.

6.    ASSANGE intended the "Most Wanted Leaks" list to encourage and cause individuals to illegally obtain and disclose protected information, including classified information, to WikiLeaks contrary to law. For example, in 2009, ASSANGE spoke at the "Hack in the Box Security Conference" in Malaysia. ASSANGE referenced the conference's "capture the flag" hacking contest and noted that WikiLeaks had its own list of "flags" that it wanted captured—

namely, the list of "Most Wanted Leaks" posted on the WikiLeaks website. He encouraged people to search for the list and for those with access to obtain and give to WikiLeaks information responsive to that list.

7.     ASSANGE designed WikiLeaks to focus on information, restricted from public disclosure by law, precisely because of the value of that information. Therefore, he predicated his and WikiLeaks's success in part upon encouraging sources with access to such information to violate legal obligations and provide that information for WikiLeaks to disclose.

**B. Chelsea Manning Responded to ASSANGE'S Solicitation and Stole Classified Documents from the United States.**

8.     Chelsea Manning, formerly known as Bradley Manning, was an intelligence analyst in the United States Army who was deployed to Forward Operating Base Hammer in Iraq.

9.     Manning held a "Top Secret" security clearance, and signed a classified information nondisclosure agreement, acknowledging that the unauthorized disclosure or retention or negligent handling of classified information could cause irreparable injury to the United States or be used to the advantage of a foreign nation.

10.     Beginning by at least November 2009, Manning responded to ASSANGE's solicitation of classified information made through the WikiLeaks website. For example, WikiLeaks's "Military and Intelligence" "Most Wanted Leaks" category, as described in paragraphs 4-5, solicited CIA detainee interrogation videos. On November 28, 2009, Manning in turn searched the classified network search engine, "Intelink," for "retention+of+interrogation+videos." The next day, Manning searched the classified network for "detainee+abuse," which was consistent with the "Most Wanted Leaks" request for "Detainee abuse photos withheld by the Obama administration" under WikiLeaks's "Military and Intelligence" category.

4

11.     On November 30, 2009, Manning saved a text file entitled "wl-press.txt" to her external hard drive and to an encrypted container on her computer. The file stated, "You can currently contact our investigations editor directly in Iceland +354 862 3481; 24 hour service; ask for 'Julian Assange.'" Similarly, on December 8, 2009, Manning ran several searches on Intelink relating to Guantanamo Bay detainee operations, interrogations, and standard operating procedures or "SOPs." These search terms were yet again consistent with WikiLeaks's "Most Wanted Leaks," which sought Guantanamo Bay operating and interrogation SOPs under the "Military and Intelligence" category.

12.     Between in or around January 2010 and May 2010, consistent with WikiLeaks's "Most Wanted Leaks" solicitation of bulk databases and military and intelligence categories, Manning downloaded four nearly complete databases from departments and agencies of the United States. These databases contained approximately 90,000 Afghanistan war-related significant activity reports, 400,000 Iraq war-related significant activities reports, 800 Guantanamo Bay detainee assessment briefs, and 250,000 U.S. Department of State cables. The United States had classified many of these records up to the **SECRET** level pursuant to Executive Order No. 13526 or its predecessor orders. Manning nevertheless provided the documents to WikiLeaks, so that WikiLeaks could publicly disclose them on its website.

13.     Manning was arrested on or about May 27, 2010. The "Most Wanted Leaks" posted on the WikiLeaks website in May 2010 no longer contained the "Military and Intelligence" category.

**C. ASSANGE Encouraged Manning to Continue Her Theft of Classified Documents and Agreed to Help Her Crack a Password Hash to a Military Computer.**

14. During large portions of the same time period (between November 2009, when Manning first became interested in WikiLeaks, through her arrest on or about May 27, 2010), Manning was in direct contact with ASSANGE, who encouraged Manning to steal classified documents from the United States and unlawfully disclose that information to WikiLeaks.

15. In furtherance of this scheme, ASSANGE agreed to assist Manning in cracking a password hash stored on United States Department of Defense computers connected to the Secret Internet Protocol Network, a United States government network used for classified documents and communications, as designated according to Executive Order No. 13526 or its predecessor orders.

16. Manning, who had access to the computers in connection with her duties as an intelligence analyst, was also using the computers to download classified records to transmit to WikiLeaks. Army regulations prohibited Manning from attempting to bypass or circumvent security mechanisms on Government-provided information systems and from sharing personal accounts and authenticators, such as passwords.

17. The portion of the password hash Manning gave to ASSANGE to crack was stored as a "hash value" in a computer file that was accessible only by users with administrative-level privileges. Manning did not have administrative-level privileges, and used special software, namely a Linux operating system, to access the computer file and obtain the portion of the password provided to ASSANGE.

18. Had Manning retrieved the full password hash and had ASSANGE and Manning successfully cracked it, Manning may have been able to log onto computers under a username that did not belong to her. Such a measure would have made it more difficult for investigators to identify Manning as the source of disclosures of classified information.

19. Prior to the formation of the password-cracking agreement, Manning had already provided WikiLeaks with hundreds of thousands of documents classified up to the **SECRET** level that she downloaded from departments and agencies of the United States, including the Afghanistan war-related significant activity reports and Iraq war-related significant activity reports.

20. At the time he entered into this agreement, ASSANGE knew, understood, and fully anticipated that Manning was taking and illegally providing WikiLeaks with classified records containing national defense information of the United States that she was obtaining from classified databases. ASSANGE was knowingly receiving such classified records from Manning for the purpose of publicly disclosing them on the WikiLeaks website.

21. For example, on March 7, 2010, Manning asked ASSANGE how valuable the Guantanamo Bay detainee assessment briefs would be. After confirming that ASSANGE thought they had value, on March 8, 2010, Manning told ASSANGE that she was "throwing everything [she had] on JTF GTMO [Joint Task Force, Guantanamo] at [Assange] now." ASSANGE responded, "ok, great!" When Manning brought up the "osc," meaning the CIA Open Source Center, ASSANGE replied, "that's something we want to mine entirely, btw," which was consistent with WikiLeaks's list of "Most Wanted Leaks," described in paragraphs 4-5, that solicited "the complete CIA Open Source Center analytical database," an unclassified (but non-public) database. Manning later told ASSANGE in reference to the Guantanamo Bay detainee assessment briefs that "after this upload, thats all i really have got left." In response to this statement, which indicated that Manning had no more classified documents to unlawfully disclose, ASSANGE replied, "curious eyes never run dry in my experience." ASSANGE intended his

7

statement to encourage Manning to continue her theft of classified documents from the United States and to continue the unlawful disclosure of those documents to ASSANGE and WikiLeaks.

22.     Manning used a Secure File Transfer Protocol ("SFTP") connection to transmit the Detainee Assessment briefs to a cloud drop box operated by WikiLeaks, with an X directory that WikiLeaks had designated for her use.

23.     Two days later, ASSANGE told Manning that there was "a username in the gitmo docs." Manning told ASSANGE, "any usernames should probably be filtered, period." Manning asked ASSANGE whether there was "anything useful in there." ASSANGE responded, in part, that "these sorts of things are always motivating to other sources too." ASSANGE stated, "gitmo=bad, leakers=enemy of gitmo, leakers=good . . . Hence the feeling is people can give us stuff for anything not as 'dangerous as gitmo' on the one hand, and on the other, for people who know more, there's a desire to eclipse." Manning replied, "true. ive crossed a lot of those 'danger' zones, so im comfortable."

### D. At ASSANGE's Direction and Agreement, Manning Continued to Steal Classified Documents and Provide Them to ASSANGE.

24.     Following ASSANGE's "curious eyes never run dry" comment, on or about March 22, 2010, consistent with WikiLeaks's "Most Wanted Leaks" solicitation of "Iraq and Afghanistan US Army Rules of Engagement 2007-2009 (**SECRET**)," as described in paragraphs 4-5, Manning downloaded multiple Iraq rules of engagement files from her Secret Internet Protocol Network computer and burned these files to a CD, and provided them to ASSANGE and WikiLeaks.

25.     On April 5, 2010, WikiLeaks released on its website the rules of engagement files that Manning provided. It entitled four of the documents as follows: "US Rules of Engagement for Iraq; 2007 flowchart," "US Rules of Engagement for Iraq; Refcard 2007," "US Rules of Engagement for Iraq, March 2007," and "US Rules of Engagement for Iraq, Nov 2006." All of

these documents had been classified as **SECRET**, except for the "US Rules of Engagement for Iraq; Refcard 2007," which was unclassified but for official use only.

26. The rules of engagement files delineated the circumstances and limitations under which United States forces would initiate or continue combat engagement upon encountering other forces. WikiLeaks's disclosure of this information would allow enemy forces in Iraq and elsewhere to anticipate certain actions or responses by U.S. armed forces and to carry out more effective attacks.

27. Further, following ASSANGE's "curious eyes never run dry" comment, and consistent with WikiLeaks's solicitation of bulk databases and classified materials of diplomatic significance, as described in paragraphs 2, 4-5, between on or about March 28, 2010, and April 9, 2010, Manning used a United States Department of Defense computer to download over 250,000 U.S. Department of State cables, which were classified up to the **SECRET** level. Manning subsequently uploaded these cables to ASSANGE and WikiLeaks through an SFTP connection to a cloud drop box operated by WikiLeaks, with an X directory that WikiLeaks had designated for Manning's use. ASSANGE and WikiLeaks later disclosed them to the public.

28. At the time ASSANGE agreed to receive and received from Manning the classified Guantanamo Bay detainee assessment briefs, the U.S. Department of State Cables, and the Iraq rules of engagement files, ASSANGE knew that Manning had unlawfully obtained and disclosed or would unlawfully disclose such documents. For example, not only had ASSANGE already received thousands of military-related documents classified up to the **SECRET** level from Manning, but Manning and ASSANGE also chatted about military jargon and references to current events in Iraq, which showed that Manning was a government or military source; the "releasability" of certain information by ASSANGE; measures to prevent the discovery of

Manning as ASSANGE's source, such as clearing logs and use of a "cryptophone;" and a code phrase to use if something went wrong.

**E. ASSANGE, WikiLeaks Affiliates, and Manning Shared the Common Objective to Subvert Lawful Restrictions on Classified Information and to Publicly Disseminate it.**

29.     ASSANGE, Manning, and others shared the objective to further the mission of WikiLeaks, as an "intelligence agency of the people," to subvert lawful measures imposed by the United States government to safeguard and secure classified information, in order to disclose that information to the public and inspire others with access to do the same.

30.     Manning and ASSANGE discussed this shared philosophy.  For example, when Manning said, "i told you before, government/organizations cant control information ... the harder they try, the more violently the information wants to get out," ASSANGE replied, "restrict supply = value increases, yes."  Further, when Manning said, "its like you're the first 'Intelligence Agency' for the general public," ASSANGE replied, that is how the original WikiLeaks had described itself.

31.     Even after Manning's arrest on or about May 27, 2010, ASSANGE and others endeavored to fulfill this mission of WikiLeaks to publish the classified documents that Manning had disclosed by threatening to disclose additional information that would be even more damaging to the United States and its allies if anything should happen to WikiLeaks or ASSANGE to prevent dissemination.

32.     On August 20, 2010, for instance, WikiLeaks tweeted that it had distributed an encrypted "'insurance' file" to over 100,000 people and referred to the file and the people who downloaded it as "our big guns in defeating prior restraint."

33. ASSANGE spoke about the purpose of this "insurance file," stating that it contained information that WikiLeaks intended to publish in the future but without "harm minimization," that is to say, without redactions of things, like names of confidential informants, that could put lives at risk. When asked how these insurance files could be used to prevent "prior restraint and other legal threats," ASSANGE responded that WikiLeaks routinely "distributed encrypted backups of material we have yet to release. And that means all we have to do is release the password to that material and it's instantly available. Now of course, we don't like to do that, because there is various harm minimization procedures to go through." But, ASSANGE continued, the insurance file is a "precaution[] to make sure that sort of material [the data in WikiLeaks's possession] is not going to disappear from history, regardless of the sort of threats to this organization."

34. Similarly, on August 17, 2013, WikiLeaks posted on its Facebook account: "WikiLeaks releases encrypted versions of upcoming publication data ('insurance') from time to time to nullify attempts at prior restraint." The post also provided links to previous insurance files and asked readers to "please mirror" the links, meaning to post the links on other websites to help increase the number of times the files are downloaded.

## F. ASSANGE Revealed the Names of Human Sources and Created a Grave and Imminent Risk to Human Life.

35. Also following Manning's arrest, during 2010 and 2011, ASSANGE published via the WikiLeaks website the documents classified up to the **SECRET** level that he had obtained from Manning, as described in paragraphs 12, 21, and 27, including approximately 75,000 Afghanistan war-related significant activity reports, 400,000 Iraq war-related significant activities reports, 800 Guantanamo Bay detainee assessment briefs, and 250,000 U.S. Department of State cables.

36. The significant activity reports from the Afghanistan and Iraq wars that ASSANGE published included names of local Afghans and Iraqis who had provided information to U.S. and coalition forces. The State Department cables that WikiLeaks published included names of persons throughout the world who provided information to the U.S. government in circumstances in which they could reasonably expect that their identities would be kept confidential. These sources included journalists, religious leaders, human rights advocates, and political dissidents who were living in repressive regimes and reported to the United States the abuses of their own government, and the political conditions within their countries, at great risk to their own safety. By publishing these documents without redacting the human sources' names or other identifying information, ASSANGE created a grave and imminent risk that the innocent people he named would suffer serious physical harm and/or arbitrary detention.

37. On May 2, 2011, United States armed forces raided the compound of Osama bin Laden in Abbottabad, Pakistan. During the raid, they collected a number of items of digital media, which included the following: (1) a letter from bin Laden to another member of the terrorist organization al-Qaeda in which bin Laden requested that the member gather the DoD material posted to WikiLeaks, (2) a letter from that same member of al-Qaeda to Bin Laden with information from the Afghanistan War Documents provided by Manning to WikiLeaks and released by WikiLeaks, and (3) Department of State information provided by Manning to WikiLeaks and released by WikiLeaks.

38. Paragraphs 39 and 40 contain examples of a few of the documents ASSANGE published that contained the unredacted names of human sources. These are not the only documents that WikiLeaks published containing the names of sources, nor the only documents that put innocent people in grave danger simply because they provided information to the United States.

12

39.     The following are examples of significant activity reports related to the Afghanistan and Iraq wars that ASSANGE published without redacting the names of human sources who were vulnerable to retribution by the Taliban in Afghanistan or the insurgency in Iraq:

    a.     Classified Document C1 was a 2007 threat report containing details of a planned anti-coalition attack at a specific location in Afghanistan. Classified Document C1 named the local human source who reported the planned attack. Classified Document C1 was classified at the **SECRET** level.

    b.     Classified Document C2 was a 2009 threat report identifying a person who supplied weapons at a specific location in Afghanistan. Classified Document C2 named the local human source who reported information. Classified Document C2 was classified at the **SECRET** level.

    c.     Classified Document D1 was a 2009 report discussing an improvised explosive device (IED) attack in Iraq. Classified Document D1 named local human sources who provided information on the attack. Classified Document D1 was classified at the **SECRET** level.

    d.     Classified Document D2 was a 2008 report that named a local person in Iraq who had turned in weapons to coalition forces and had been threatened afterward. Classified Document D2 was classified at the **SECRET** level.

40.     The following are examples of State Department cables that ASSANGE published without redacting the names of human sources who were vulnerable to retribution.

    a.     Classified Document A1 was a 2009 State Department cable discussing a political situation in Iran. Classified Document A1 named a human source of information

located in Iran and indicated that the source's identity needed to be protected. Classified Document A1 was classified at the **SECRET** level.

b. Classified Document A2 was a 2009 State Department cable discussing political dynamics in Iran. Classified Document A2 named a human source of information who regularly traveled to Iran and indicated that the source's identity needed to be protected. Classified Document A2 was classified at the **SECRET** level.

c. Classified Document A3 was a 2009 State Department cable discussing issues related to ethnic conflict in China. Classified Document A3 named a human source of information located in China and indicated that the source's identity needed to be protected. Classified Document A3 was classified at the **SECRET** level.

d. Classified Document A4 was a 2009 State Department cable discussing relations between Iran and Syria. Classified Document A4 named human sources of information located in Syria and indicated that the sources' identities needed to be protected. Classified Document A4 was classified at the **SECRET** level.

e. Classified Document A5 was a 2010 State Department cable discussing human rights issues in Syria. Classified Document A5 named a human source of information located in Syria and indicated that the source's identity needed to be protected. Classified Document A5 was classified at the **SECRET** level.

## G. ASSANGE Knew that the Dissemination of the Names of Individual Sources Endangered Those Individuals.

41. ASSANGE knew that his publication of Afghanistan and Iraq war-related significant activity reports endangered sources, whom he named as having provided information to U.S. and coalition forces.

42.     In an interview in August 2010, ASSANGE called it "regrettable" that sources disclosed by WikiLeaks "may face some threat as a result." But, in the same interview, ASSANGE insisted that "we are not obligated to protect other people's sources, military sources or spy organization sources, except from unjust retribution," adding that in general "there are numerous cases where people sell information . . . or frame others or are engaged in genuinely traitorous behavior and actually that is something for the public to know about."

43.     ASSANGE also knew that his publication of the State Department cables endangered sources whom he named as having provided information to the State Department. In a letter dated November 27, 2010 from the State Department's legal adviser to ASSANGE and his counsel, ASSANGE was informed, among other things, that publication of the State Department cables would "[p]lace at risk the lives of countless innocent individuals—from journalists to human rights activists and bloggers to soldiers to individuals providing information to further peace and security." Prior to his publication of the unredacted State Department cables, ASSANGE claimed that he intended "to gradually roll [the cables] out in a safe way" by partnering with mainstream media outlets and "reading through every single cable and redacting identities accordingly." Nonetheless, while ASSANGE and WikiLeaks published some of the cables in redacted form beginning in November 2010, they published over 250,000 cables in September 2011, in unredacted form, that is, without redacting the names of the human sources.

44.     On July 30, 2010, the New York Times published an article entitled "Taliban Study WikiLeaks to Hunt Informants." The article stated that, after the release of the Afghanistan war significant activity reports, a member of the Taliban contacted the New York Times and stated, "We are studying the report. We knew about the spies and people who collaborate with U.S. forces. We will investigate through our own secret service whether the people mentioned are really

spies working for the U.S. If they are U.S. spies, then we know how to punish them." When confronted about such reports, ASSANGE said, "The Taliban is not a coherent outfit, but we don't say that it is absolutely impossible that anything we ever publish will ever result in harm—we cannot say that."

### H. United States Law to Protect Classified Information

45.     Executive Order No. 13526 and its predecessor orders define the classification levels assigned to classified information. Under the Executive Order, information may be classified as "Secret" if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security, and information may be classified as "Confidential" if its unauthorized disclosure reasonably could be expected to cause damage to the national security. Further, under the Executive Order, classified information can generally only be disclosed to those persons who have been granted an appropriate level of United States government security clearance and possess a need to know the classified information in connection to their official duties.

46.     At no point was ASSANGE a citizen of the United States, nor did he hold a United States security clearance or otherwise have authorization to receive, possess, or communicate classified information.

# COUNT 1

(Conspiracy to Obtain, Receive, and Disclose National Defense Information)

A.    The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B.    Between in or about November 2009 and continuing until at least September 2011, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, knowingly and unlawfully conspired with other co-conspirators, known and unknown to the Grand Jury, to commit the following offenses against the United States:

1.    To obtain documents, writings, and notes connected with the national defense, for the purpose of obtaining information respecting the national defense—namely, detainee assessment briefs related to detainees who were held at Guantanamo Bay, U.S. State Department cables, and Iraq rules of engagement files classified up to the **SECRET** level—and with reason to believe that the information was to be used to the injury of the United States or the advantage of any foreign nation, in violation of Title 18, United States Code, Section 793(b);

2.    To receive and obtain documents, writings, and notes connected with the national defense—namely, detainee assessment briefs related to detainees who were held at Guantanamo Bay, U.S. State Department cables, Iraq rules of engagement files, and information stored on the Secret Internet Protocol Network classified up to the **SECRET** level—for the purpose of obtaining information respecting the national defense, and knowing and with reason to believe at the time such materials are obtained, they had been and would be taken, obtained, and disposed of by a person contrary to the provisions of

Chapter 37 of Title 18 of the United States Code, in violation of Title 18, United States Code, Section 793(c);

3.  To willfully communicate documents relating to the national defense—namely, detainee assessment briefs related to detainees who were held at Guantanamo Bay, U.S. State Department cables, Iraq rules of engagement files, and documents containing the names of individuals in Afghanistan, Iraq, and elsewhere around the world, who risked their safety and freedom by providing information to the United States and our allies, which were classified up to the **SECRET** level—from persons having lawful possession of or access to such documents, to persons not entitled to receive them, in violation of Title 18, United States Code, Section 793(d); and

4.  To willfully communicate documents relating to the national defense—namely, (i) for Manning to communicate to ASSANGE the detainee assessment briefs related to detainees who were held at Guantanamo Bay, U.S. State Department cables, and Iraq rules of engagement files classified up to the **SECRET** level, and (ii) for ASSANGE to communicate documents classified up to the **SECRET** level containing the names of individuals in Afghanistan, Iraq, and elsewhere around the world, who risked their safety and freedom by providing information to the United States and our allies to the public—from persons in unauthorized possession of such documents to persons not entitled to receive them in violation of Title 18, United States Code, Section 793(e).

C.   In furtherance of the conspiracy, and to accomplish its objects, the defendant and his conspirators committed overt acts including, but not limited to, those described in the General Allegations Section of this Indictment.

(All in violation of Title 18, United States Code, Section 793(g))

# COUNT 2

(Unauthorized Obtaining of National Defense Information)
(Detainee Assessment Briefs)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, knowingly and unlawfully obtained and aided, abetted, counseled, induced, procured and willfully caused Manning to obtain documents, writings, and notes connected with the national defense, for the purpose of obtaining information respecting the national defense—namely, detainee assessment briefs classified up to the **SECRET** level related to detainees who were held at Guantanamo Bay—and with reason to believe that the information was to be used to the injury of the United States or the advantage of any foreign nation.

(All in violation of Title 18, United States Code, Sections 793(b) and 2)

# COUNT 3

(Unauthorized Obtaining of National Defense Information)
(State Department Cables)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, knowingly and unlawfully obtained and aided, abetted, counseled, induced, procured and willfully caused Manning to obtain documents, writings, and notes connected with the national defense, for the purpose of obtaining information respecting the national defense—namely, U.S. Department of State cables classified up to the **SECRET** level—and with reason to believe that the information was to be used to the injury of the United States or the advantage of any foreign nation.

(All in violation of Title 18, United States Code, Sections 793(b) and 2)

# COUNT 4
(Unauthorized Obtaining of National Defense Information)
(Iraq Rules of Engagement Files)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, knowingly and unlawfully obtained and aided, abetted, counseled, induced, procured and willfully caused Manning to obtain documents, writings, and notes connected with the national defense, for the purpose of obtaining information respecting the national defense—namely, Iraq rules of engagement files classified up to the **SECRET** level—and with reason to believe that the information was to be used to the injury of the United States or the advantage of any foreign nation.

(All in violation of Title 18, United States Code, Sections 793(b) and 2)

## COUNT 5

(Attempted Unauthorized Obtaining and Receiving of National Defense Information)

A.  The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B.  Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, knowingly and unlawfully attempted to receive and obtain documents, writings, and notes connected with the national defense—namely, information stored on the Secret Internet Protocol Network classified up to the **SECRET** level— for the purpose of obtaining information respecting the national defense, knowing and having reason to believe, at the time that he attempted to receive and obtain them, that such materials would be obtained, taken, made, and disposed of by a person contrary to the provisions of Chapter 37 of Title 18 of the United States Code.

(All in violation of Title 18, United States Code, Sections 793(c) and 2)

# COUNT 6

(Unauthorized Obtaining and Receiving of National Defense Information)
(Detainee Assessment Briefs)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, knowingly and unlawfully received and obtained documents, writings, and notes connected with the national defense—namely, detainee assessment briefs classified up to the **SECRET** level related to detainees who were held at Guantanamo Bay—for the purpose of obtaining information respecting the national defense, knowing and having reason to believe, at the time that he received and obtained them, that such materials had been and would be obtained, taken, made, and disposed of by a person contrary to the provisions of Chapter 37 of Title 18 of the United States Code.

(All in violation of Title 18, United States Code, Sections 793(c) and 2)

## COUNT 7

(Unauthorized Obtaining and Receiving of National Defense Information)
(State Department Cables)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, knowingly and unlawfully received and obtained documents, writings, and notes connected with the national defense—namely, U.S. Department of State cables classified up to the **SECRET** level—for the purpose of obtaining information respecting the national defense, knowing and having reason to believe, at the time that he received and obtained them, that such materials had been and would be obtained, taken, made, and disposed of by a person contrary to the provisions of Chapter 37 of Title 18 of the United States Code.

(All in violation of Title 18, United States Code, Sections 793(c) and 2)

# COUNT 8

(Unauthorized Obtaining and Receiving of National Defense Information)
(Iraq Rules of Engagement Files)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, knowingly and unlawfully received and obtained documents, writings, and notes connected with the national defense—namely, Iraq rules of engagement files classified up to the **SECRET** level—for the purpose of obtaining information respecting the national defense, knowing and having reason to believe, at the time that he received and obtained them, that such materials had been and would be obtained, taken, made, and disposed of by a person contrary to the provisions of Chapter 37 of Title 18 of the United States Code.

(All in violation of Title 18, United States Code, Sections 793(c) and 2)

# COUNT 9

(Unauthorized Disclosure of National Defense Information)
(Detainee Assessment Briefs)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, aided, abetted, counseled, induced, procured and willfully caused Manning, who had lawful possession of, access to, and control over documents relating to the national defense—namely, detainee assessment briefs classified up to the **SECRET** level related to detainees who were held at Guantanamo Bay—to communicate, deliver, and transmit the documents to ASSANGE, a person not entitled to receive them.

(All in violation of Title 18, United States Code, Sections 793(d) and 2)

## **COUNT 10**
(Unauthorized Disclosure of National Defense Information)
(State Department Cables)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, aided, abetted, counseled, induced, procured and willfully caused Manning, who had lawful possession of, access to, and control over documents relating to the national defense—namely, U.S. Department of State cables classified up to the **SECRET** level—to communicate, deliver, and transmit the documents to ASSANGE, a person not entitled to receive them.

(All in violation of Title 18, United States Code, Sections 793(d) and 2)

# COUNT 11

(Unauthorized Disclosure of National Defense Information)
(Iraq Rules of Engagement Files)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, aided, abetted, counseled, induced, procured and willfully caused Manning, who had lawful possession of, access to, and control over documents relating to the national defense—namely, Iraq rules of engagement files classified up to the **SECRET** level—to communicate, deliver, and transmit the documents to ASSANGE, a person not entitled to receive them.

(All in violation of Title 18, United States Code, Sections 793(d) and 2)

# COUNT 12

(Unauthorized Disclosure of National Defense Information)
(Detainee Assessment Briefs)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, aided, abetted, counseled, induced, procured and willfully caused Manning, who had unauthorized possession of, access to, and control over documents relating to the national defense—namely, detainee assessment briefs classified up to the **SECRET** level related to detainees who were held at Guantanamo Bay—to communicate, deliver, and transmit the documents to ASSANGE, a person not entitled to receive them.

(All in violation of Title 18, United States Code, Sections 793(e) and 2)

# COUNT 13

(Unauthorized Disclosure of National Defense Information)
(State Department Cables)

A. The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B. Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, aided, abetted, counseled, induced, procured and willfully caused Manning, who had unauthorized possession of, access to, and control over documents relating to the national defense—namely, U.S. Department of State cables classified up to the **SECRET** level—to communicate, deliver, and transmit the documents to ASSANGE, a person not entitled to receive them.

(All in violation of Title 18, United States Code, Sections 793(e) and 2)

# COUNT 14

(Unauthorized Disclosure of National Defense Information)
(Iraq Rules of Engagement Files)

A.  The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B.  Between in or about November 2009 and in or about May 2010, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, and others unknown to the Grand Jury, aided, abetted, counseled, induced, procured and willfully caused Manning, who had unauthorized possession of, access to, and control over documents relating to the national defense—namely, Iraq rules of engagement files classified up to the **SECRET** level—to communicate, deliver, and transmit the documents to ASSANGE, a person not entitled to receive them.

(All in violation of Title 18, United States Code, Sections 793(e) and 2)

## **COUNT 15**

(Unauthorized Disclosure of National Defense Information)

A.      The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B.      From in or about July 2010 and continuing until at least the time of this Superseding Indictment, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, having unauthorized possession of, access to, and control over documents relating to the national defense, willfully and unlawfully caused and attempted to cause such materials to be communicated, delivered, and transmitted to persons not entitled to receive them.

C.      Specifically, as alleged above, ASSANGE, having unauthorized possession of significant activity reports, classified up to the **SECRET** level, from the Afghanistan war containing the names of individuals, who risked their safety and freedom by providing information to the United States and our allies, communicated the documents containing names of those sources to all the world by publishing them on the Internet.

(All in violation of Title 18, United States Code, Section 793(e))

# COUNT 16

(Unauthorized Disclosure of National Defense Information)

A.    The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B.    From in or about July 2010 and continuing until at least the time of this Superseding Indictment, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, having unauthorized possession of, access to, and control over documents relating to the national defense, willfully and unlawfully caused and attempted to cause such materials to be communicated, delivered, and transmitted to persons not entitled to receive them.

C.    Specifically, as alleged above, ASSANGE, having unauthorized possession of significant activity reports, classified up to the **SECRET** level, from the Iraq war containing the names of individuals, who risked their safety and freedom by providing information to the United States and our allies, communicated the documents containing names of those sources to all the world by publishing them on the Internet.

(All in violation of Title 18, United States Code, Section 793(e))

## COUNT 17

(Unauthorized Disclosure of National Defense Information)

A.    The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

B.    From in or about July 2010 and continuing until at least the time of this Superseding Indictment, in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, having unauthorized possession of, access to, and control over documents relating to the national defense, willfully and unlawfully caused and attempted to cause such materials to be communicated, delivered, and transmitted to persons not entitled to receive them.

C.    Specifically, as alleged above, ASSANGE, having unauthorized possession of State Department cables, classified up to the **SECRET** level, containing the names of individuals, who risked their safety and freedom by providing information to the United States and our allies, communicated the documents containing names of those sources to all the world by publishing them on the Internet.

(All in violation of Title 18, United States Code, Section 793(e))

## COUNT 18

(Conspiracy to Commit Computer Intrusion)

1.      The general allegations of this Superseding Indictment are re-alleged and incorporated into this Count as though fully set forth herein.

2.      Beginning on or about March 2, 2010, and continuing thereafter until on or about March 10, 2010, the exact date being unknown to the Grand Jury, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, the defendant, JULIAN PAUL ASSANGE, who will be first brought to the Eastern District of Virginia, did knowingly and unlawfully conspire with others known and unknown to the Grand Jury to commit offenses against the United States, to wit:

(A)     to knowingly access a computer, without authorization and exceeding authorized access, to obtain information that has been determined by the United States Government pursuant to an Executive order and statute to require protection against unauthorized disclosure for reasons of national defense and foreign relations, namely, documents relating to the national defense classified up to the **SECRET** level, with reason to believe that such information so obtained could be used to the injury of the United States and the advantage of any foreign nation, and to willfully communicate, deliver, transmit, and cause to be communicated, delivered, or transmitted the same, to any person not entitled to receive it, and willfully retain the same and fail to deliver it to the officer or employee entitled to receive it; and

(B)     to intentionally access a computer, without authorization and exceeding authorized access, to obtain information from a department and agency of the United States

in furtherance of a criminal act in violation of the laws of the United States, that is, a violation of Title 18, United States Code, Sections 641, 793(c), and 793(e).

## PURPOSE AND OBJECT OF THE CONSPIRACY

The primary purpose of the conspiracy was to facilitate Manning's acquisition and transmission of classified information related to the national defense of the United States so that WikiLeaks could publicly disseminate the information on its website.

## MANNERS AND MEANS OF THE CONSPIRACY

ASSANGE and his conspirators used the following ways, manners and means, among others, to carry out this purpose:

1.    It was part of the conspiracy that ASSANGE and Manning used the "Jabber" online chat service to collaborate on the acquisition and dissemination of the classified records, and to enter into the agreement to crack the password hash stored on United States Department of Defense computers connected to the Secret Internet Protocol Network.

2.    It was part of the conspiracy that ASSANGE and Manning took measures to conceal Manning as the source of the disclosure of classified records to WikiLeaks, including by removing usernames from the disclosed information and deleting chat logs between ASSANGE and Manning.

3.    It was part of the conspiracy that ASSANGE encouraged Manning to provide information and records from departments and agencies of the United States.

4.    It was part of the conspiracy that ASSANGE and Manning used a special folder on a cloud drop box of WikiLeaks to transmit classified records containing information related to the national defense of the United States.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

In order to further the goals and purposes of the conspiracy, ASSANGE and his conspirators committed overt acts, including, but not limited to, the following:

1.     On or about March 2, 2010, Manning copied a Linux operating system to a CD, to allow Manning to access a United States Department of Defense computer file that was accessible only to users with administrative-level privileges.

2.     On or about March 8, 2010, Manning provided ASSANGE with part of a password hash stored on United States Department of Defense computers connected to the Secret Internet Protocol Network.

3.     On or about March 10, 2010, ASSANGE requested more information from Manning related to the password hash. ASSANGE indicated that he had been trying to crack the password hash by stating that he had "no luck so far."

(All in violation of Title 18, United States Code, Sections 371, 1030(a)(1), 1030(a)(2),
1030(c)(2)(B)(ii).)

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
FOREPERSON

_5/23/19__
DATE

G. Zachary Terwilliger
United States Attorney

By:     _____
Tracy Doherty-McCormick
First Assistant United States Attorney
Kellen S. Dwyer
Thomas W. Traxler
Gordon Kromberg
Assistant United States Attorneys

Matthew Walczewski
Nicholas Hunter
Trial Attorneys, National Security Division
U.S. Department of Justice