IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN RE:

GRAND JURY CASE NO. 10-GJ-3793

Case No. 1:19-DM-▢2

GRAND JURY NO. 19-3

Hearing: May 16, 2019

## GOVERNMENT'S BENCH MEMORANDUM

In advance of the upcoming hearing, the United States submits this memorandum to support its position that the Court should hold Chelsea Manning in civil contempt for refusing to comply with the Court's order to testify in front of the grand jury. As described below, Manning previously refused to comply with a lawful court order issued by Judge Hilton to testify in front of a different grand jury in connection with this investigation. Judge Hilton found that Manning did not have just cause to refuse to testify, held her in civil contempt, and ordered her incarceration. The Fourth Circuit affirmed Judge Hilton's handling of the proceedings. Manning, however, was released after only two months of incarceration because the term of the grand jury expired. As Manning's testimony remains highly relevant to an ongoing criminal investigation, she has been subpoenaed by another grand jury, and this Court has ordered her to testify fully, completely, and truthfully in front of the grand jury.

In direct violation of the Court's order, Manning has announced that she will once again refuse to answer questions in front of the grand jury. Through counsel, she has indicated that, at the upcoming hearing, she will orally stipulate that she would not answer the same questions posed to her in the last grand jury. Manning did not have just cause to refuse to answer the

questions then, and she does not have just cause to refuse to answer the questions now. The Court should therefore hold Manning in civil contempt and order her immediate incarceration until she agrees to comply with its order to testify or the term of the grand jury expires.

## BACKGROUND

### A. Manning's Court-Martial Convictions

Manning is a former intelligence analyst in the United States Army who was dishonorably discharged for leaking classified information. *See* Appx4-5, 73.[1] In October 2009, she deployed to Forward Operating Base Hammer in Iraq. *See* Appx134. During her deployment, she downloaded hundreds of thousands of classified documents and transmitted them to one or more agents of WikiLeaks for publication on its website. *See* Appx35, 255-88. The classified documents included, among other things, significant activity reports related to the ongoing wars in Iraq and Afghanistan, *see* Appx267-70, Guantanamo Bay detainee assessment briefs, *see* Appx280-82, and United States Department of State cables, *see* Appx284-86. Manning's disclosure of these documents to WikiLeaks remains one of the largest leaks of classified information in American history.

In May 2010, Manning was arrested for these disclosures. *See* Appx35. She was prosecuted in a military court-martial. *See* Appx4. During her court-martial proceedings, she pleaded guilty to lesser-included offenses of some but not all of the charges against her. *See* Appx72, 120. Manning did not have a plea agreement with the prosecution. *See* Appx250-51.

---

[1] "Appx___" citations are to the addenda that Manning filed in the Fourth Circuit. These addenda contain the record of the proceedings that occurred before Judge Hilton. The government has filed the public addendum as Exhibit A and the sealed addendum as Exhibit B.

When Manning entered her pleas to the lesser-included offenses, the military judge conducted a "providence inquiry" pursuant to the Rules for Courts-Martial. *See* Appx72-253. A providence inquiry is "a more elaborate relative of the Rule 11 proceeding under the Federal Rules of Criminal Procedure" that serves merely to "ensure that a plea is voluntary and that there is a factual basis for the plea." *Partington v. Houck*, 723 F.3d 280, 282-83 (D.C. Cir. 2013). Similar to Rule 11, the Rules for Courts-Martial provide that "[t]he military judge shall not accept a plea of guilty without making such inquiry of the accused as shall satisfy the military judge that there is a factual basis for the plea." Appx69.

At her providence inquiry, Manning first read a voluntary statement to provide a factual basis for her pleas. *See* Appx73-119. In this voluntary statement, Manning chose what facts to admit in support of her pleas to the lesser-included offenses. *See id.* Consistent with that purpose, Manning made various statements and admissions about her disclosures of classified information to WikiLeaks. *See id.* Then, the military judge questioned her specifically about the factual basis of certain elements to which she was pleading guilty. *See* Appx120-253. Manning was not subjected to cross-examination or other questioning by prosecutors. *See id.*

After Manning entered her pleas, the military prosecutors elected to go forward with the more serious offenses with which she was charged. *See* Appx253. Manning was ultimately convicted of Espionage Act and other offenses related to her unauthorized disclosures. *See* Appx35. In 2013, she was sentenced to 35 years of imprisonment. *See* Appx4. In January 2017, the President commuted Manning's sentence so that she would be released in May 2017, after serving approximately seven years in prison. *See* Appx5, 35.

3

### B.    First Grand-Jury Subpoena

In January 2019, Manning was served through counsel with a subpoena to testify on February 5 before Grand Jury 18-4 empaneled in the Eastern District of Virginia. Judge Hilton entered an order directing Manning to testify in front of the grand jury and, along with a general court-martial convening authority of the Department of the Army, granted her full use and derivative use immunity. *See* Appx60-63. At the request of Manning's counsel, the original appearance date was moved back approximately one month—to March 5, 2019.

On March 1, Manning filed a motion to quash the subpoena. *See* Appx4-33. In the motion to quash, she argued that the anticipated questioning would violate her Fifth Amendment and First Amendment rights, that the subpoena was issued for improper purposes, and that under 18 U.S.C. § 3504 the government should affirm or deny whether she was the subject of unlawful electronic surveillance.[2] *See* Appx10-27. Manning also sought production of certain grand jury materials (so-called "ministerial documents") and her prior statements, and requested that Judge Hilton charge the grand jury with specific instructions. *See* Appx28-31. After the government responded, *see* Appx34-58, Judge Hilton held a hearing on March 5 and denied the motion in its entirety, *see* Appx318-20. Manning's grand-jury appearance was scheduled for the next day.

---

[2] Manning claimed to have based her suspicion of electronic surveillance on the government's suggestion to her attorney that it had evidence of statements she made that were inconsistent with the statements she made at the providence inquiry at her court-martial. Regardless of whether the government had any obligation to clarify this discussion, it nevertheless has informed her attorneys that the inconsistency was based not on electronic surveillance, but instead on statements that Manning made in Internet chats to an associate who, in 2010, turned them over to the FBI (and the media).

4







**D.     Civil-Contempt Finding**

Judge Hilton conducted the show-cause hearing on March 8.



7



Judge Hilton then opened the courtroom. *See* Appx322. After the courtroom was opened, Judge Hilton allowed the parties additional time to argue the proper coercive sanction. *See* Appx322-27. At the conclusion, Judge Hilton reiterated his finding that Manning was "in contempt of [his] order requiring [her] to testify before the grand jury." Appx327. Judge Hilton ordered that she "be committed to the custody of the Attorney General until such time as [she] either purge[s] [herself] of the contempt or for the life of th[e] grand jury." *Id.*

### E.   Manning's Appeal

Approximately one week later, Manning filed a notice of appeal. *See* Appx330. She raised three issues on appeal.[3] First, she claimed that Judge Hilton erred in denying her motion to require the government to affirm or deny that she was subjected to electronic surveillance. *See* Ex. C, at 11-19; Ex. D, at 20-35; Ex. E, at 5-12. Second, she asserted that Judge Hilton erred in holding that she failed to demonstrate any grand-jury abuse. *See* Ex. C, at 19-26; Ex. D, at 35-43; Ex. E, at 12-15. Third, she claimed that Judge Hilton erred in closing portions of the

---

[3] The government has attached Manning's sealed merits brief on appeal as Exhibit C, the government's sealed response brief as Exhibit D, and Manning's reply brief as Exhibit E.

contempt proceedings. *See* Ex. C, at 26-32; Ex. D, at 43-54; Ex. E, at 15-20. On April 1,

Manning also filed a motion for release pending appeal, pursuant to 28 U.S.C. § 1826(b).[4] *See*

Ex. F; Ex. G.

On April 22, the Fourth Circuit affirmed Judge Hilton's contempt order in its entirety.

*See* Ex. H. The Fourth Circuit succinctly stated that it found "no error in the district court's

rulings." *Id.* at 2. In the same order, the Fourth Circuit denied Manning's motion for release

pending appeal. *See id.*

### F.    Second Grand-Jury Subpoena

The term of Grand Jury 18-4 expired on May 9, 2019. Pursuant to the terms of Judge

Hilton's contempt order, Manning was released from incarceration on that date. Three days

before that date, however, Manning filed a Motion for Release, arguing that her continued

incarceration no longer served a coercive purpose because she would never comply with Judge

Hilton's order. *See* Ex. I. Her release on May 9 rendered that motion moot.

Meanwhile, on May 8, 2019, Manning was served through counsel with a subpoena to

appear before another grand jury empaneled in the Eastern District of Virginia—Grand Jury 19-

3. *See* Ex. J. The return date of the subpoena was May 14, 2019. *See id.* At Manning's request,

the government agreed to postpone her appearance to May 16 to facilitate a medical

appointment.

In connection with this subpoena, Manning has again received full use and derivative use

immunity that covers her testimony. The Court entered a compulsion order on May 6, 2019,

directing that Manning "testify fully, completely and truthfully" before the grand jury and

---

[4] The government has attached Manning's motion as Exhibit F and its sealed response as Exhibit G.

granting her use and derivative use immunity. *See* Ex. K. Likewise, a general court-martial convening authority again entered an order that provided Manning with use and derivative use immunity in connection with her testimony. *See* Ex. L.

Nevertheless, Manning's attorneys have informed the government that she will continue to refuse to answer the same questions posed to her in the prior grand jury. Accordingly, the government and Manning's attorneys have reached an agreement to save time and avoid an unnecessary disruption of the grand jury's service. At the upcoming hearing, the parties will orally stipulate that the government would ask, and Manning would refuse to answer, the same questions posed to her in her last grand-jury appearance.

At the hearing, the Court should question Manning directly to confirm whether she still refuses to testify and answer the same questions posed in her last grand-jury appearance. Assuming Manning remains recalcitrant, the government will move for the Court to hold her in civil contempt. For the reasons explained below, the Court should grant that motion, hold Manning in civil contempt, and order her immediate incarceration.

## DISCUSSION

It is a bedrock principle that the grand jury is entitled to every person's evidence. *See Branzburg v. Hayes*, 408 U.S. 665, 688 (1972); *In re Grand Jury Subpoena*, 646 F.3d 159, 164 (4th Cir. 2011). "[T]he grand jury's authority to subpoena witnesses is not only historic, but essential to its task." *Branzburg*, 408 U.S. at 688. And "[t]he duty to testify has long been recognized as a basic obligation that every citizen owes [her] Government." *United States v. Calandra*, 414 U.S. 338, 345 (1974). Every person called as a "witness is bound not only to attend but to tell what [s]he knows in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry." *Blair v. United States*, 250 U.S. 273, 282 (1919).

10

Where, as here, a person refuses to comply with a grand-jury subpoena, the Court has the inherent authority to enforce the subpoena through its civil-contempt powers. *See Shillitani v. United States*, 384 U.S. 364, 370 (1966); *In re Grand Jury Investigation John Doe*, 542 F. Supp. 2d 467, 468 (E.D. Va. 2008). Its inherent authority is supplemented by the recalcitrant witness statute. *See Grand Jury Investigation John Doe*, 542 F. Supp. 2d at 469. That statute states, in relevant part, as follows:

> Whenever a witness in any proceeding before or ancillary to any . . . grand jury of the United States refuses without just cause shown to comply with an order of the court to testify . . . the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony . . . .

28 U.S.C. § 1826(a). As the statute reflects, a witness may defend against a contempt finding by showing she had "just cause" in refusing to testify. *See In re Askin*, 47 F.3d 100, 102 (4th Cir. 1995).

If the Court finds the witness in civil contempt, it may impose a sanction tailored to *coerce* the witness to testify—not a sanction designed to *punish* the witness for refusing to testify. *See Grand Jury Investigation John Doe*, 542 F. Supp. 2d at 468-69. The idea behind a sanction for civil contempt is that the contemnor holds the keys to the jailhouse door. *See Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911). She must be able to "end the sentence and discharge [herself] at any moment by doing what [s]he ha[s] previously refused to do." *Id.* Thus, "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 371.

The recalcitrant witness statute, moreover, limits how long a person can be confined for civil contempt. Under the statute, the "period of . . . confinement" cannot "exceed the life

11

of . . . the term of the grand jury, including extensions." § 1826(a)(2). And "in no event shall

such confinement exceed eighteen months." *Id.*

### A. The Court Should Close the Courtroom During the Portions of the Proceeding in Which Matters Occurring Before the Grand Jury Are Discussed.

At the upcoming hearing, the government requests that the Court close the portions of the

hearing that address matters occurring before the grand jury. Rule 6(e)(5) governs when a

district court should close the courtroom to protect grand-jury secrecy. *See* Fed. R. Crim. P.

6(e)(5). The rule states, "Subject to any right to an open hearing in a contempt proceeding, the

court must close any hearing to the extent necessary to prevent disclosure of a matter occurring

before the grand jury." *Id.* Under this rule, "hearings which would reveal matters which have

previously occurred before a grand jury or are likely to occur before a grand jury with respect to

a pending or ongoing investigation must be conducted in camera in whole or in part . . . to

prevent public disclosure of . . . secret information." *Id.* advisory committee's notes to 1983

amendments.

In *Levine v. United States*, 362 U.S. 610 (1960), the Supreme Court addressed the extent

to which a trial court may close the courtroom to protect grand-jury secrecy. In that case, the

defendant was charged with criminal contempt. *See id.* at 611. His "contemptuous conduct, the

adjudication of guilt, and the imposition of sentence all took place after the public had been

excluded from the courtroom." *Id.* The Court recognized that due process generally entitles a

contemnor to a public proceeding but clarified that its application "must turn on the particular

circumstances of the case." *Id.* at 616-17.

The *Levine* Court specifically recognized that the right to a public proceeding must be

balanced with the need for grand-jury secrecy. The Court repeatedly emphasized that a trial

12

court may close a portion of the contempt hearing when the questions posed in the grand jury are being discussed. *See id.* at 614-15, 617-18. As the Court reasoned, "[u]nlike an ordinary judicial inquiry, where publicity is the rule, grand jury proceedings are secret." *Id.* at 617. The Court further explained that, after the grand-jury questions are discussed, there is "no further cause for enforcing secrecy in the sense of excluding the general public" and the courtroom should be opened. *Id.* at 618.

While the *Levine* Court ultimately disposed of the case on the ground that the defendant had forfeited the issue by not raising it below, *see id.* at 619-20, its reasoning still provides the framework that governs contempt proceedings today, *see* Fed. R. Crim. P. 6(e)(5) advisory committee's notes to 1983 amendments (citing *Levine* for the proposition that there is no constitutional requirement that "the entire contempt proceedings, including recitation of the substance of the questions [the contemnor] has refused to answer, be public"). Since *Levine*, courts have adopted its bifurcated approach in addressing when contempt proceedings, civil or criminal, should be open to the public. *See, e.g., In re Grand Jury Subpoena*, 97 F.3d 1090, 1094-95 (8th Cir. 1996); *In re Grand Jury Matter*, 906 F.2d 78, 86-87 (3d Cir. 1990); *In re Rosahn*, 671 F.2d 690, 697 (2d Cir. 1982). Under this approach, the Court may close the courtroom when matters occurring before the grand jury are discussed, but it must open the courtroom, "upon the contemnor's request, [for] the 'final stage' of [the] contempt proceedings." *United States v. Smith*, 123 F.3d 140, 149 n.13 (3d Cir. 1997).

Consistent with this approach, the Court should close the upcoming hearing when the questions and answers that occurred before the grand jury (and that Manning is stipulating she will refuse to answer here) are recited or discussed. Such topics are quintessential "matters occurring before the grand jury" that should be kept secret. *See* Fed. R. Crim. P. 6(e); *United*

13

*States v. Index Newspapers LLC*, 766 F.3d 1072, 1085 (9th Cir. 2014) ("Rule 6(e) secrecy extends beyond grand jury transcripts and includes summaries and discussions of grand jury proceedings."); *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 501 (D.C. Cir. 1998) ("The witness's identity, the fact that [s]he was subpoenaed to testify, the fact that [s]he invoked the privilege in response to questions, the nature of the questions asked—all these would be . . . 'matters occurring before the grand jury.'"). To protect these grand-jury matters, the Court should start the proceedings in a closed session to address (1) the stipulation that Manning would refuse to answer the same questions that were posed to her in the prior grand jury, and (2) whether just cause exists for her refusal to testify. After addressing those matters, the Court should then open the courtroom (1) to announce its finding of whether Manning is in contempt, and (2) to hear argument about and impose the appropriate coercive sanction.

This recommendation is consistent with the approach that Judge Hilton followed in the prior proceedings. *See supra* pp. 7-8. On appeal, Manning specifically challenged Judge Hilton's closure of the courtroom, and the parties extensively briefed the issue. *See* Ex. C, at 26-32; Ex. D, at 43-54; Ex. E, at 15-20. Consistent with the above-described law, the Fourth Circuit affirmed Judge Hilton's handling of the proceedings. *See* Ex. H, at 2. The Court should follow the same approach here.

## B.   The Court Should Hold Manning in Civil Contempt Because She Has No Just Cause for Refusing to Testify.

Manning's lack of just cause for refusing to answer the questions in front of the grand jury has already been established. As noted, Manning's attorneys have represented that she will refuse to answer the same questions that were posed to her in her prior grand-jury appearance. In connection with that appearance, the parties extensively litigated whether she had sufficient

14

cause to refuse to comply with the subpoena and answer the questions. Specifically, Judge Hilton rejected the following arguments that Manning raised: (1) that the grand-jury subpoena violated Manning's Fifth Amendment rights; (2) that the grand-jury subpoena violated the First Amendment; (3) that the grand-jury subpoena was issued based on improper motives; (4) that the specific questions posed in the grand jury were improper; and (5) that the government should have to affirm or deny any electronic surveillance. *See supra* pp. 4, 7-9. Manning appealed Judge Hilton's contempt order to the Fourth Circuit, specifically raising the arguments that the questions were improper and the electronic-surveillance issue. *See supra* pp. 8-9. The Fourth Circuit affirmed. *See supra* p. 9. Accordingly, the Court should not entertain any attempt to relitigate those issues.

One recent development merits addressing, however. Since the last contempt proceeding, the government has arrested and unsealed an indictment against Julian Assange. The indictment charges Assange with a single count of conspiracy to commit computer intrusion, in violation of 18 U.S.C. §§ 371 and 1030. *See* Ex. M. The charge is premised on a specific agreement that Assange and Manning reached in 2010 to crack the password to Department of Defense computers connected to the Secret Internet Protocol Network, a United States government network used for classified documents and communications. *See id.* ¶ 7. On April 11, 2019, Assange was arrested in the United Kingdom in connection with the indictment. *See* Motion to Unseal, *United States v. Julian Paul Assange*, No. 1:18-CR-111-CMH (E.D. Va. Apr. 11, 2019) (Dkt. No. 17). Assange is currently detained in the United Kingdom, and news reports indicate that he will fight his extradition to the United States.[5]

---

[5] *See, e.g.*, William Booth & Karla Adam, *WikiLeaks Founder Julian Assange Begins Long Court Battle Against Extradition*, Washington Post (May 2, 2019), *available at*

15

This indictment against Assange does not affect Manning's obligation to appear and testify before the grand jury. Under the law, the government "cannot use grand jury proceedings for the 'sole or dominant purpose' of preparing for trial on an already pending indictment." *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (quoting *United States v. Moss*, 756 F.2d 329, 332 (4th Cir. 1985)). Yet it is equally well settled that, even after returning an indictment, the grand jury may continue investigating new charges or targets that are related to the pending indictment. *See id.* at 189-90; *United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 314 (4th Cir. 2000); *Moss*, 756 F.2d at 332. At the same time it files this memorandum, the government is filing an ex parte pleading that describes the nature of the grand jury's ongoing investigation in this matter. *See* Gov't's Ex Parte Submission Regarding Nature of Grand-Jury Investigation (May 14, 2019). As that filing reflects, Manning has testimony that is directly relevant and important to an ongoing investigation into charges or targets that are not included in the pending indictment. *See id.* Thus, the recently unsealed indictment against Assange does not provide Manning with just cause for refusing to comply with the Court's order to testify in front of the grand jury.

## C.   The Court Should Order that Manning Be Incarcerated Until She Purges Herself of Her Contempt or for the Life of the Grand Jury.

In light of Manning's continued recalcitrance, the Court should order her returned to incarceration at the Alexandria Detention Center ("ADC") until she purges herself of her

---

https://www.washingtonpost.com/world/wikileaks-founder-julian-assange-begins-long-drawn-out-court-battle-against-extradition/2019/05/02/6f865008-6c55-11e9-bbe7-1c798fb80536_story.html?utm_term=.621806246e31 (last visited May 13, 2019); Sasha Ingber, *Julian Assange Vows to Fight Extradition to the United States*, NPR (May 2, 2019), *available at* https://www.npr.org/2019/05/02/719435175/julian-assange-vows-to-fight-extradition-to-the-united-states (last visited May 13, 2019).

contempt or the term of the grand jury expires. Prior to her confinement on the original

contempt order, the government went to considerable lengths to ensure that the ADC would be a

suitable place of confinement. *See supra* p. 8; Ex. N (declaration from Chief Deputy Joseph

Pankey, who oversees the ADC, providing factual basis for why the ADC is a suitable place of

confinement for Manning). There is no reason to think that the ADC will not continue to serve

as such.

Manning has suggested that she should not be confined because further incarceration will

not serve any coercive purpose. Immediately before her release, she filed a motion arguing that

continued incarceration would not serve a coercive purpose because she will never testify in

front of the grand jury. *See* Ex. I. In an accompanying declaration, Manning proclaimed

"without any hesitation . . . that nothing . . . will convince [her] to testify before

. . . any . . . grand jury." *See* Ex. O, ¶ 6. She claims that her refusal is based on a principled

stand against the grand-jury system. *See id.* Based on her "study of history and philosophical

principles," *id.* ¶ 7, Manning asserts that grand juries "are simply outdated tools used by the

federal government to harass and disrupt political opponents and activists in fishing

expeditions," *id.* ¶ 6. Likewise, in a recent video she posted on YouTube and statements that she

has posted on Twitter, Manning has stated that her refusal to testify is based on her opposition to

the grand-jury system.[6]

---

[6] *See* Chelsea Manning's Statement on Release from Jail and Second Grand Jury Subpoena,
YouTube (May 10, 2019) ("As a general principle, I object to grand juries. Prosecutors run grand
juries behind closed doors and in secret, without a judge present. Therefore, I declined to answer
any questions. Based on my refusal to answer questions, District Court Judge Hilton ordered me
held in contempt until the grand jury ended."), *available at* https://www.youtube.com/
watch?v=TDZGRRk4MnM (last visited May 13, 2019); Chelsea E. Manning (@xychelsea),
Twitter (Mar. 8, 2019, 10:58 AM) ("I will not comply with this, or any other grand jury.
Imprisoning me for my refusal to answer questions only subjects me to additional punishment for

In arguing that she should be not incarcerated further, Manning relies on *Simkin v. United States*, 715 F.2d 34 (2d Cir. 1983), and its progeny. In *Simkin*, the Second Circuit recognized that district courts have "broad discretion . . . to determine that a civil contempt sanction has lost its coercive effect upon a particular contemnor at some point short of [the] eighteen months" prescribed in § 1826(a). *Id.* at 37. The Second Circuit held that, when a contemnor who is incarcerated for civil contempt moves for early release, the district court must "determine whether there remains a realistic possibility that continued confinement might cause the contemnor to testify." *Id.* The district court must make this determination based on "a conscientious consideration of the circumstances pertinent to the individual contemnor." *Id.*

Under *Simkin*, the contemnor carries the heavy burden of demonstrating that there is no "realistic possibility" that continued incarceration will cause her to testify. *Id.* The district court "need not . . . accept as conclusive a contemnor's avowed intention never to testify." *Id.* And "[e]ven if the [district court] concludes that it is the contemnor's present intention never to testify, that conclusion does not preclude the possibility that continued confinement will cause the witness to change [her] mind." *Id.* "As long as the judge is satisfied that the coercive sanction might yet produce its intended result, the confinement may continue." *Id.*

There are important reasons for why courts should proceed cautiously in conducting this inquiry. First, the determination is inherently speculative. As the Seventh Circuit has questioned, "[g]iven that the district court operates without [the] benefit of a crystal ball, how is

---

my repeatedly-stated ethical objections to the grand jury system. . . . I will not participate in a secret process that I morally object to, particularly one that has been historically used to entrap and persecute activists for politically protected speech."), *available at* https://twitter.com/ xychelsea?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor (last visited May 13, 2019).

18

the court to determine whether a recalcitrant witness will or will not cave into the coercive

pressure of a civil contempt order?" *United States v. Jones*, 880 F.2d 987, 989 (7th Cir. 1989).

"All recalcitrant witness[es] vehemently insist they will never talk. Trying to differentiate

among them is a line of inquiry which is speculative at best and time-consuming and pointless at

worst." *Id.*

Second, the approach threatens to reward and incentivize recalcitrant behavior. It fosters

a situation in which "the more disrespect the witness shows for a grand jury and for the Court,

and the greater the showing of a refusal to obey the Court, even in the face of a possible lengthy

confinement, the more likely the witness is to be released." *In re Grand Jury Proceedings*, 994

F. Supp. 2d 510, 515 (S.D.N.Y. 2014) (quoting *In re Clay*, No. M-11-188, 1985 WL 1977, at *3

(S.D.N.Y. June 27, 1985)). An overly liberal application of the *Simkin* standard only magnifies

these dangers.

While a number of other circuits have applied *Simkin*,[7] the Fourth Circuit has addressed it

only in a nonprecedential, unpublished decision in 1986. *See United States v. Whitehorn*, No.

86-5574, 1986 WL 16245 (4th Cir. Dec. 12, 1986). In *Whitehorn*, a district court found a

witness in contempt and ordered her confinement after she refused to provide a handwriting

sample, as ordered by the court. *See id.* at *1. "Several months later, [the witness] filed a

motion to 'rescind' her commitment for contempt." *Id.* The district court denied the motion.

*See id.*

---

[7] *See In re Grand Jury Proceedings of the Special Apr. 2002 Grand Jury*, 347 F.3d 197, 206-07 (7th Cir. 2003); *In re Grand Jury Proceeding*, 13 F.3d 459, 463 (1st Cir. 1994); *In re Grand Jury Proceedings*, 877 F.2d 849, 850 (11th Cir. 1989).

19

The Fourth Circuit affirmed the district court's denial of the motion. Citing *Simkin*, the Fourth Circuit stated that a "district court has broad discretion as to whether a civil contempt sanction has lost its coercive effect." *Id.* But it concluded that "nothing in the record . . . show[ed] that the civil contempt ha[d] lost its coercive impact and thereby become punitive." *Id.* It discounted the witness's statement that she would 'never comply with the order," noting that a "present intention never to cooperate does not preclude the possibility that continued confinement will cause [the witness] to change her mind." *Id.* The Fourth Circuit further recognized that it "would undermine the authority of the district courts to coerce litigants through the use of contempt if it required release of every contemnor who boldly asserts her refusal to comply with an order of the court." *Id.*

Likewise, here, there is reason to believe that continued incarceration might have its intended effect. Most importantly, Manning has not been incarcerated for a sufficient period to pressure her into complying with the orders to testify. Prior to her release on May 9, Manning was incarcerated for only two months. Courts have affirmed denials of motions to release when the contemnors had been held for much longer than two months. *See, e.g.*, *In re Grand Jury Proceedings*, No. 94-1704, 1994 WL 390139, at *3 (1st Cir. July 22, 1994) (affirming denial of motion for release when the contemnor had been confined for seven months and noting that "other courts have upheld similar orders after even lengthier periods of imprisonment"); *Grand Jury Proceedings*, 877 F.2d at 850 (affirming denial of motion for release when the contemnor had been confined for more than four months); *In re Crededio*, 759 F.2d 589, 590-93 (7th Cir. 1985) (affirming denial of motion for release even though the contemnor had been confined for almost ten months). In this context, two months of incarceration is "far less than anything

20

that . . . might be regarded as 'punitive.'" *In re Martin-Trigona*, 590 F. Supp. 87, 90-91 (D. Conn. 1984) (quoting *In re Grand Jury Investigation*, 600 F.2d 420 (3d Cir. 1979)).

In addition, the coercive impact of Manning's two-month confinement was significantly reduced. For more than half of the time of her confinement, Manning's appeal was pending in the Fourth Circuit. During that time, Manning had the hope that she would prevail in her appeal and thereby be released from confinement. That potential for release reduced the coercive pressures of her confinement. *See Commodity Futures Trading Comm'n v. Armstrong*, 284 F.3d 404, 406 (2d Cir. 2002) ("[W]e agree with the district court that the coercive effect of Armstrong's incarceration has likely been attenuated somewhat by the pendency of his various appeals and petitions for extraordinary relief."). Then, after Manning's appeal was denied, she was incarcerated for less than three weeks before the term of the grand jury expired. *See id.* (recognizing that "the coercive effect of the initial contempt order decreased as the expiration date drew near").

The Court should require Manning to serve a lengthier, more coercive period of incarceration to encourage her to comply with its order. As the Third Circuit has recognized, "incarceration of intransigent witnesses for civil contempt is premised on the notion that the desire for freedom, and concomitantly the willingness to testify, increases with the time spent in prison." *Grand Jury Investigation*, 600 F.2d at 428. "[E]ven if the contemnor actually believes [s]he is unbending, the Court may nevertheless conclude that the passage of further time may yet change the contemnor's mind." *United States v. Salerno*, 632 F. Supp. 529, 531 (S.D.N.Y. 1986). Given the relatively short period of confinement that Manning has served and the reduced coercive effect of that confinement, there is still reason to believe that incarceration might cause her to comply with the Court's order.

21

The Court should give little credence to Manning's claims that she intends never to comply with the grand-jury process. *See Grand Jury Proceedings*, 877 F.2d at 850 ("The trial judge need not accept a contemnor's avowal not to testify but must consider whether the circumstances reflect there is no possibility the contemnor will testify."); *Whitehorn*, 1986 WL 16245, at *2 (noting that a "present intention never to cooperate does not preclude the possibility that continued confinement will cause [the witness] to change her mind"). Such self-serving statements—and those of her friends and family—are insufficient to demonstrate that there is no realistic possibility that continued incarceration will cause her to testify.

The Court should be particularly skeptical of these statements because Manning's stated reasons for refusing to testify are "inconsistent and lack credibility." *Crededio*, 759 F.2d at 593. Specifically, Manning's stand against grand juries as a "corrupt and abusive tool" is unpersuasive. Ex. O, ¶ 6. As the Court is well aware, the grand-jury system safeguards individual liberty. *See United States v. Calandra*, 414 U.S. 338, 343 (1974). By requiring the Executive Branch to convince a group of ordinary citizens that the evidence warrants bringing criminal charges against someone, the grand-jury system "serve[s] as a kind of buffer or referee between the Government and the people," *United States v. Williams*, 504 U.S. 36, 47 (1992), and provides an added layer of "protection . . . against unfounded criminal prosecutions,"[8] *Calandra*, 414 U.S. at 343. That is why the Bill of Rights specifically enshrines the grand-jury system as an individual right. *See* U.S. Const. amend. V. The alternative approach would give the government *more* power to bring criminal charges against its citizens. Given Manning's

---

[8] The secrecy of grand juries serves similar laudable purposes. Among other things, it "assure[s] that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Douglas Oil Co. of Calif. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979).

concerns about governmental overreach, it is unlikely that she actually opposes the grand-jury system but instead is refusing to testify out of self-interest.



As Manning continues to be incarcerated and the costs of such incarceration increase, she might realize that it is in her self-interest to testify in front of the grand jury, particularly since she has use and derivative use immunity. *See Salerno*, 632 F. Supp. at 531 ("Continued confinement—or its prospect—in my judgment may well persuade [the witness] to reexamine whether refusal to testify still serves his interests."). In fact, her recent declaration demonstrates that the costs of incarceration had started to weigh on her prior to her release. *See* Ex. O, ¶ 15. Among other things, she claimed that her "business now falters, without [her] able to appear at speaking engagements or professional consultations." *Id.* ¶ 17. She asserted that "[n]umerous existing contracts remain vulnerable, likely needing renegotiation or outright cancellation." *Id.* She lamented that she "missed the premier event of a documentary about [her] commutation in which dozens of [her] friends reunited afterward." *Id.* And she claimed that the circumstances of prison makes "visitation uncomfortable, surreal, and saddening." *Id.* ¶ 18. Manning stated that the "impact on [her] friends and supporters feels overwhelming and makes [her] feel lonely." *Id.* ¶ 19.

23

As her time in incarceration continues, these costs will mount and Manning will have more of an incentive to take advantage of the keys that she holds to her jailhouse door. *See In re Federal Grand Jury Feb. 1987 Term*, 677 F. Supp. 26, 28 (D. Me. 1988) (denying motion for release and recognizing that "[f]or each day that [the witness] refuses to testify, he extends his prison term and delays his reunion with his family, which he asserts to be of great importance to him."). There remains a realistic possibility that continued incarceration, and the mounting costs that come with it, will "eventually induce a change of heart." *Grand Jury Proceeding*, 13 F.3d at 463.

The government has repeatedly stated that it does not wish to incarcerate Manning, and that remains true. Like any other citizen, however, Manning must comply with the Court's lawful order to testify in front of the grand jury. Above all else, the government hopes that she will change her mind. In the meantime, the Court should order Manning's incarceration to coerce her into complying with its order.

## CONCLUSION

For the foregoing reasons, the Court should hold Manning in civil contempt and order her incarceration until she purges herself or for the life of the grand jury.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____

Tracy Doherty-McCormick
First Assistant United States Attorney

Gordon D. Kromberg
Kellen S. Dwyer
Thomas W. Traxler
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3700
Facsimile (703) 299-3980
Thomas.traxler@usdoj.gov

Matthew R. Walczewski
Nicholas Hunter
Trial Attorneys, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone (202) 233-0986
Facsimile (202) 532-4251
Matthew.walczewski@usdoj.gov

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2019, I caused the foregoing document to be

sent to the following via electronic mail:

Moira Meltzer-Cohen
Attorney at Law
Mo_at_Law@protonmail.com

Christopher Leibig
Attorney at Law
Chris@chrisleibiglaw.com

Thomas W. Traxler
Assistant United States Attorney

26