UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| In re: Grand Jury Subpoena, | ) | **WITNESS' REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO RECONSIDER SANCTIONS** |
| | ) | |
| CHELSEA MANNING, | ) | |
| | ) | |
| Movant. | ) | |
| | ) | **1-19-dm-00012-AJT** |

PRELIMINARY STATEMENT

Comes now Chelsea Manning, by and through counsel, and submits this reply in response to the Government's June 14, 2019 Response to her Motion to Reconsider Sanctions. The Government argues that the sanctions imposed upon Ms. Manning are appropriate, and that her arguments to the contrary have no merit. In so doing, they fail to meaningfully address the clear and settled law prohibiting civil sanctions that have no coercive impact, such as the instant jail sanction, overstate Ms. Manning's arguments, invoke inapposite law, and focus on whether the Court has the power to impose certain sanctions, rather than whether those sanctions will have the required coercive impact upon Ms. Manning. The government also proposed an order that requires Ms. Manning to make financial disclosures beyond those contemplated by the substance of their reply or relevant to the current net worth inquiry at hand.

In addition, Ms. Manning renews her request for a hearing at which an inquiry may be made by the Court into her financial capacity and the potential coercive impact of sanctions, and proposes an alternative set of financial disclosures more carefully-tailored, robust, and relevant to the Court's inquiry.

ARGUMENT

In response to Ms. Manning's argument that the sanctions imposed exceed their lawful scope as coercive civil sanctions, the government asserts that the sanctions imposed were a "measured" approach, consistent with case law, and within the Court's discretion. In so arguing, the government focuses on broad issues of policy and the kinds of sanctions that a Court *may* impose, to the exclusion of the relevant question of whether, in *this* case, such sanctions are appropriate, or likely to have any coercive impact.

**I.     The jail sanction must be reconsidered, as previously argued, because it is not coercive, and has therefore been impermissibly transformed into a punishment.**

The government does not meaningfully respond to the gravamen of Ms. Manning's motion with respect to the jail sanction. There is simply no doubt that the law requires an incoercible witness to be released, however perverse or frustrating the result. See, e.g.: 28 U.S.C. §1826, Shillitani v. United States, 384 U.S. 364 (1966); Armstrong v. Guccione, 470 F.3d 89, 111 (2d Cir. 2006); Simkin v. U.S., 715 F.2d 34 (2d Cir. 1983); In re Cocilovo, 618 F.Supp. 1378 (S.D.N.Y.

1985); In re Papadakis, 613 F.Supp. 109 (S.D.N.Y. 1985); U.S.v. Buck, U.S. v. Shakur, 1987 WL 15520 (S.D.N.Y. 1987); United States v. Whitehorn, 808 F.2d 836 (4th Cir. 1986); In re Cueto, 443 F. Supp. 857 (S.D.N.Y. 1978); In re Dorie Clay, 1985 WL 1977 (S.D.N.Y. 1985); In re Grand Jury Proceedings, 994 F. Supp. 2d 510 (S.D.N.Y. 2014); In re Thomas, 614 F.Supp. 983 (S.D.N.Y. 1985); and In re Dohrn, 560 F.Supp. 179 (S.D.N.Y. 1983).

During the May 16 hearing, Mr. Traxler, speaking for the government, expressed dismay at the thought that any recalcitrant witness might avoid sanctions by persisting in their intransigence. Transcript, page 5. While he was entirely correct that a persistently recalcitrant witness may be eventually relieved of sanctions, it would be inaccurate to say that a sufficiently stubborn witness avoids all penalty. The whole of any already-endured sanction suffered by a recalcitrant witness prior to a finding of terminal recalcitrance must be understood as a punishment exceeding the legitimate scope of the civil sanction. Simkin v. U.S., *supra.*

The government's position, as far as the law is concerned, is unsustainable, and the arguments made in the Motion to Release the Witness (May 5, 2019), and the Motion to Reconsider Sanctions (May 30, 2019), should be duly considered by this Court, in conjunction with Ms. Manning's history and statements. An individualized determination must be made as to whether there is any reasonable possibility that further confinement will induce her to give testimony. Ms. Manning

contends that there is not now and has never been any possibility of compliance, and her history of principled action, and documented ability to endure protracted suffering give credence to her claims. Unless the Court is able to confidently articulate a reasonable belief to the contrary, it must acknowledge that the jail sanction is merely punitive, and Ms. Manning should be released.

## II.     The relevant question before the Court is not simply what kinds of sanctions the Court may impose, but whether those sanctions are coercive or punitive in this case.

A.  The fines imposed are punitive in scope, and inappropriate in this case, because Ms. Manning's contempt is neither borne of, nor intended to facilitate financial malfeasance, and thus will have no coercive impact.

The government somewhat overstates Ms. Manning's arguments. She does not contend that there is a *per se* rule against civil fines, but that according to the logic underlying the imposition of civil sanctions, fines imposed upon individuals whose contempt is not related to financial misconduct are likely to be punitive. To the extent that this argument requires revision in order to accommodate and distinguish those cases in which such fines are imposed upon indemnified individuals, Ms. Manning will so revise her position below.

Precedent shows it is exceedingly unusual if not unique to this case to see fines imposed against non-indemnified individuals, unless the underlying facts of the case involve financial misconduct. This is not to say that a Court may never impose such fines upon civil contemnors — courts routinely impose civil contempt

fines. The significance of this argument is that courts understand they are not to impose any sanction that is not likely to have a coercive impact, lest it become punitive. Informed by that logic, courts have both intuitively and explicitly recognized that fines are appropriate where the contempt is clearly motivated by the desire to benefit from or conceal financial misdeeds, and are not otherwise appropriate sanctions, save in limited circumstances where the individual contemnor is not the party that will actually be responsible for the financial sanction.

The government itself reiterates that the court must "fashion an appropriate coercive remedy … based on the nature of the harm and the probable effect of alternative sanctions." United States v. Darwin  Constr. Co., 873 F.2d 750, 756 (4th Cir. 1989) internal citations omitted. Ms. Manning wishes to make salient the fact that where financial sanctions are imposed, such sanctions are directly related to "the nature of the harm, and the probable effect of alternative sanctions." Id. This critical point seems to have been lost in the responding papers.

First, although the government cites a number of cases for the proposition that courts routinely impose financial sanctions on civil contemnors in the absence of financial crimes, at the heart of each matter cited is the contemnor's egregious financial misconduct and access to ill-gotten gains. In In re Grand Jury Proceedings, the contemnor orthodontist profited handsomely by "submitt[ing] claims to DCFS and IDPA for services he did not perform." 280 F.3d 1103,

1109-10 (7th Cir. 2002). In <u>United States v. Mongelli,</u> the appellants were found guilty of "racketeering, bribery, tax offenses, and money-laundering". 2 F.3d 29, 30 (2d Cir. 1993). In <u>In re Grand Jury Witness</u>, the contemnor was found to have been "embezzling substantial amounts of United States foreign aid to the Philippines, as well as funds of the Philippine government, in order to purchase commercial real estate in New York City." 835 F.2d 437, 438 (2d Cir. 1987). The contemnor in <u>In re Dickinson</u> smuggled $860,000 in cash into the United Kingdom. The court imposed the fine explicitly on the grounds that "the testimony sought by the grand jury relate[d] to funds which at one time were in Dickinson's possession and might, if located, be subject to forfeiture." 763 F.2d 84, 86 (2d Cir. 1985). Finally, in <u>In re Grand Jury Impaneled Jan. 21, 1975</u>, the fined contemnors were called precisely as a result of their history of making illegal payments and failure to report income. 529 F.2d 543 (3d Cir. 1976).

In each case cited by the government for the proposition that financial misconduct is not necessarily relevant to the court's imposition of a financial sanction, there was in fact extreme financial misconduct on the part of the contemnor. This speaks directly to the way in which courts consider the "nature of the harm" when fashioning appropriate civil sanctions. We are unable to find any examples of non-indemnified individuals being fined for contempt that does not involve a massive underlying financial offense. Thus, case law does in fact support

Ms. Manning's contention that there ought to be a reasonable relation between the sanction imposed and the purported damage stemming from the contempt.

Where individuals whose misconduct was not specifically financial in nature were fined, the fines were in each case to be paid by a third party such as a union or employer, who might have been reasonably expected to exert some degree of moral suasion over the contemnor in an effort to avoid the fines. Such cases are related to the second factor identified by the government: the probable impact of alternative sanctions. United States v. Darwin  Constr. Co, *supra*.

For example, courts have imposed financial sanctions on state employee-contemnors precisely because they are indemnified, which creates its own particular coercive strategy. That is "when state- or local-government employees face liability incurred in the course of their employment, their governments indemnify them virtually 100% of the time, even in cases of very bad conduct." *The Endgame of Administrative Law: Governmental Disobedience and the Judicial Contempt Power*, 131 Harv. L. Rev. 685, 758. In such cases, courts have explicitly used fines in hopes of exerting pressure on the agency as a whole, endeavoring to change institutional conduct via fines imposed on a single contumacious individual. See e.g.: Cabrera v. Municipality of Bayamon, 622 F.2d 4, 7 (1st Cir. 1980) (affirming $ 1000 per day against mayor); Alberti v. Klevenhagen, 610 F. Supp. 138, 143 (S.D. Tex. 1985) ($ 5000 per day against sheriff and county commissioners); Miller v. Carson, 550 F. Supp. 543, 549 (M.D. Fla. 1982) ($

10,000 flat sum and $ 5000 per day against sheriff and others "in their individual and official capacities"); Palmigiano v. DiPrete, 737 F. Supp. 1257, 1258 (D.R.I. 1990) (referencing an earlier award of $50 per day per prisoner against governor and state corrections director).

In one such case, the general counsel of the National Labor Relations Board was held in contempt as a result of the client-agency's decision to withhold records. Counsel was fined $1000 per day, with the full knowledge of all parties and the court that counsel was indemnified (to say nothing of the fact that the fines, on consent, were stayed pending appeal). In re Irving, 600 F.2d 1027, 1029 (2d Cir. 1979). Similarly, where journalists were fined for refusing to testify on the basis that they wished to protect sources, it was understood by the court that their union or newspaper would take on the financial burden, and indeed, a coalition of media groups ultimately discharged the $750,000 in sanctions against the individual journalists. Although the sanction was ultimately unavailing in securing the hoped-for testimony, the court harbored a not unreasonable belief that the witnesses might relent, either due to their own internal guilt at the costs being exacted from their employers, or because the court hoped the payors would either pressure the witnesses to testify, or absolve them if they agreed to do so. Lee v. United States Dep't of Justice, 327 F. Supp. 2d 26 (D.D.C. 2004), *aff'd in part*, 413 F.3d 53 (D.C. Cir. 2005).

Likewise, based on this concern with the probable impact of alternative sanctions, fines may also be an appropriate sanction for individuals where other sanctions are unavailable, or are clearly inappropriate. See e.g.: In re Grand Jury Witness,  835 F.2d 437, 438 (2d Cir. 1987) (fines were appropriate where contemnor not only embezzled substantial amounts of U.S. foreign aid, but was on foreign soil such that he — *but not his money* — was beyond reach of the courts); In re Dickinson, *supra*, (finding that, in light of his efforts to conceal and preserve funds to which contemnor has access, "there is reason to believe a fine would be *more* coercive than confinement" emphasis added).

Thus, considerations of the probable impact of alternative sanctions should also militate against the imposition of fines in this case. Ms. Manning will not benefit from formal or social indemnification, and will thus not feel any pressure to spare a third party the pain of the fines. Furthermore, alternative sanctions are available, and while jail has been ineffective, fines are simply non responsive to her ideals and financial circumstances. The imposition of fines was itself a tacit acknowledgement that confinement had failed in its coercive object, but the financial sanction here fails to correlate meaningfully with the nature of the contempt, and does not appear to be based on an individualized forecast on the impact of the contemplated sanction.

Again, the primary relevant inquiry with respect to all civil sanctions is not whether the court has discretion to impose them in any conceivable case, but

whether they can reasonably be expected to exert a coercive impact in the case at bar. Therefore Ms. Manning's arguments regarding the punitive nature of the fines imposed are not intended to manufacture a *per se* rule against *fines*, but to highlight the ways in which a financial penalty is a mismatch for her particular contempt.

Notwithstanding the government's misplaced belief that Ms. Manning is profiting from her current confinement, as it stands, the cumulative fines are so far beyond her ability to pay that they are essentially meaningless. It may make some sense to impose fines on a person who knows those fines can be paid, either from ill-gotten funds they would prefer to preserve, or by the fortuitous intervention of an extremely solvent benefactor. Such sanctions would have some meaning, either by inflicting some sting upon the grifter's bank accounts, or by creating a potentially life-changing personal debt. But for someone who, regardless of her assets, has indicated nothing will change her mind, whatever financial sanctions are imposed will have no coercive effect. Indeed, it is fair to say that Ms. Manning will assume that debt burden rather than compromise her ideals.

B.    The government's position that concurrent sanctions are appropriate in this case is unsupported by case law or the facts of this case.

With respect to the issue of concurrent fines and confinement, the government again focuses on the court's discretion to impose sanctions rather than the relevant question of whether those sanctions are coercive or punitive *in this case*. Furthermore, in spite of the government's insistence that the Court may

impose fines and confinement concurrently, they seem to produce only a single instance in which a court has actually done so. That case involves the ongoing fraud of orthodontist Dr. Rinaldi, who submitted years of falsified invoices to the state, such that his recalcitrance caused ongoing financial harm to the state, and ongoing financial benefit to himself. In re Grand Jury Proceedings, 280 F.3d 1103, 1107 (7th Cir. 2002). Clearly, no such considerations are here at issue. In addition, Dr. Rinaldi's withholding of records to which he had unique access is not comparable to Ms. Manning's principled noncooperation in a matter that proceeds apace because the government already has access to any information she could possibly provide.

More troubling, investigation into the logic undergirding the Rinaldi decision shows that case to rest on extremely shaky ground. The rationale given for the concurrent impositions of fines and confinement rests on the claim that Dinnan explicitly authorizes such action (it does no such thing). In fact, resting on dicta in Dinnan, the Rinaldi court proposes the following fallacious reasoning: concurrent imposition is clearly unlawful for criminal contempt. There is no explicit prohibition on the imposition of concurrent sanctions in the event of a civil contempt. Therefore, as it is not clearly forbidden, the imposition of concurrent sanctions must be permissible in cases of civil contempt. In re Dinnan, 625 F.2d 1146, 1148 (5th Cir. 1980). The Rinaldi court, with some assistance from a

manifestly reluctant <u>Dinnan</u> court, thus magically bootstraps itself into justifying concurrent sanctions without actually having any legitimate authority for doing so.

Apart from that single problematic example, the government sets forth a number of instances in which courts have imposed fines and confinement at different times, but not concurrently. For example, in <u>Grand Jury Witness</u>, which the government cites for the proposition that fines are a sanction that may be imposed in addition to confinement, the concurrent imposition of sanctions was actually never contemplated. The recalcitrant witness, who had engaged in expansive "embezzlement of public funds," was fined a total $50,000 for his failure to appear at all before the grand jury; he was later confined for his refusal to testify.

Neither does the primary case cited by the government for the proposition that concurrent fines and confinement are appropriate involve such concurrent sanctions. <u>Dinnan</u>, *supra.* Here again, the sanctions imposed upon Professor Dinnan were consecutive, and not concurrent.

The government does correctly state that the Third Circuit's concern in <u>In re Grand Jury Impaneled January 21, 1975</u> was with the unexplained severity of the sanction, and not necessarily with whether the court might under any conceivable circumstances legitimately impose concurrent fines and confinement. 529 F.2d at 551. Specifically, the court entertains the possibility that fines, *as opposed to* incarceration, might be appropriate near the end of a grand jury's term, to reinstate

or replace a coercive effect when a contemnor might see a light at the end of the

carceral tunnel, and the coercive aspect of confinement has thus become

"attenuated." Id. at 551. It is worth noting that a secondary effect of imposing a

financial sanctions only toward the end of the grand jury is that fines will

accumulate only briefly, mitigating the risk that they will become impermissibly

punitive. What's more, after noting that they have not been cited to a single

instance in which fines and confinement have been concurrently imposed, the

Circuit concludes that concurrent sanctions are disfavored. Concurrent sanctions,

they state, should not be imposed "in the absence of findings supported by the

record showing the necessity of such severe action." The Circuit then makes a

point to remind us that a court may not "visit Draconian punishment upon the civil

contemnor." 529 F.2d at 551. This is hardly the endorsement of concurrently

imposed sanctions claimed by the government.

　　In retracing the government's steps, it is clear that they have construed the

phrases "the coercive combination of both fine and imprisonment," (Dinnan, 625 F.

2d at 1150); "fines are an additional or alternative sanction" (Grand Jury Witness,

835 F.2d at 440), and "the court has the discretion to impose a coercive fine in lieu

of or in addition to confinement" (William C. Bryson et al., Grand Jury Law &

Practice § 11:17 (2d ed. Dec. 2018 update)) as contemplating the *concurrent*

imposition of sanctions. In fact, case law, including all of that cited in the Bryson

practice manual, suggests this reading is unwarranted, and that what is actually

contemplated is the successive or alternative use of sanctions, tailored to the facts of each case, to maximize possible coercive effect while avoiding any punitive impact. Whether or not a court has, in any imaginable case, the discretion to impose concurrent fines and incarceration, the plain fact is that they may not impose penalties that are too Draconian or are punitive by way of having no reasonable chance of coercing compliance, and courts have shied away from the imposition of concurrent sanctions for precisely that reason.

Taken together with a showing that Ms. Manning's debts more than balance out her assets and earning potential, and the fact that she is incoercible, a steep daily fine, accumulating for up to 15 months, during which also Ms. Manning remains confined, would constitute exactly the kind of "Draconian punishment" that so alarmed the Third Circuit.

The government's argument that Ms. Manning could use social media to pay her fines were she not incarcerated is somewhat incoherent. There is nothing to stop her or her supporters from making an attempt to do just that while she is yet incarcerated. It is entirely possible that people would support her and contribute to a fund to pay off whatever fines are imposed, although this is entirely speculative, particularly since the most money ever raised on her behalf was but a fraction of these fines, and as of this writing no such fund exists. She is, in any case, so committed to the intellectual and ethical rigor of her position that she would sooner

work herself to the bone, or bankrupt herself to gather the funds required to pay this debt, than capitulate to what she perceives to be an unjust demand.

The government aptly restates the well-settled law that the Court must make an "individualized decision" as to the coercive power of the proposed sanction. It is absolutely the case that any coercive sanction must be fashioned in light of the "peculiar facts of [that] case" and may not simply ramp up sanctions without regard to their probable impact, if any, on the contemnor. Dickinson, *supra*. In examining the facts of this case, we must return to the foundational case of grand jury litigation, Simkin v. United States, which states clearly and unambiguously that any civil sanction must be based on a realistic possibility that it will coerce compliance with the court's order, and may not be used as an instrument of policy, or a warning to others who might be tempted to resist court orders. The question, again, and always, is whether there is a realistic possibility that the sanctions opposed upon *Ms. Manning* will have a coercive effect upon *her*.

C.    The Court should order a hearing and financial inquiry; the government's proposed judicial order is inadequate.

"[W]hen the civil contempt order imposes a fine, the contemnor's financial resources must be weighed in order to decide whether the sanctions appropriately compel obedience to the order. In re Grand Jury Witness, 835 F.2d 437, 443 (2d Cir. 1987). No such inquiry has been made. Ms. Manning therefore proposes as a

cure the holding of a hearing at which the Court may make appropriate inquiries into her current assets and debt liabilities, and her potential earning power. Ms. Manning proposed this in her original motion with the full expectation that she would gather and produce financial records relevant to her current assets, debts, contracts, and potential earnings.

The government has proposed an order asking her to complete the CJA form which is intended to show indigence, and is not the most robust or relevant dataset, and also to produce bank statements dating from 2017, which have absolutely no relevance to her current assets or earning potential, which can be calculated accurately starting from May 16, 2019, the date on which fines were imposed.

Rather than signing the government's proposed order, which is not necessary, Ms. Manning will produce a detailed statement of net worth (U.S. Probation Form 48), including supporting documents, such as bank statements, financial statements of her business, tax records and estimates, records of current debts, and all contracts to which she is a party, such as book or film contracts, and a statement of her available commissary funds. With these disclosures, the government's proposed order is inadequate, as Ms. Manning intends to submit

substantially more detailed information, to provide the Court a full picture of her financial condition.

As noted above, Ms. Manning is prepared to endure ongoing debt and financial hardship rather than compromise her principles. She recognizes that, as a new tactic, the Court may feel the need to test her resolve, despite having conclusively demonstrated that she will not bend in the face of even prolonged confinement. She believes the fines are inappropriate to the case, and impermissibly punitive. She continues to aver that she will never relent, and that any proposed fines will not move her. As such, they lack the required coercive effect, and should be vacated.

## CONCLUSION

As Ms. Manning's resolve not to testify has been unwavering, and jail has not exerted any coercive impact, she must at least be released from confinement. In addition, the Court must conduct a financial inquiry, for the purpose of determining Ms. Manning's current financial position, after which a finding can be made by the Court as to whether in the fines can be reasonably expected to induce her to testify. To the extent that the fines are not reasonably related to the nature of the harm alleged to be done by her refusal to testify, they must be vacated. To the extent that

the sanctions can not reasonably be expected to induce her to testify, she should be,

after inquiry, relieved of all fines.


Respectfully Submitted,
By Counsel


Dated: June 20, 2019

*/s/ Moira Meltzer-Cohen*
MOIRA MELTZER-COHEN
*(pro hac vice)*
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

/s/ *Sandra Freeman*
SANDRA C. FREEMAN (VSB# 78499)
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

/s/ *Chris Leibig*
CHRISTOPHER LEIBIG (VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-4310
chris@chrisleibiglaw.com

/s/ Vincent J. Ward
VINCENT J. WARD
*(pro hac vice pending)*
Freedman Boyd Hollander Goldberg Urias
& Ward,

P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com