UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| In re: Grand Jury Subpoena, | ) | |
| | ) | **1-19-dm-00012-AJT** |
| CHELSEA MANNING | ) | |
| | ) | |
| Movant | ) | |
| | ) | |
| | ) | |

## **NOTICE OF MOTION**

Comes Now, Chelsea Manning, movant in the above-listed matter, and respectfully

notices her Memorandum of Law in Support of Motion to Release Witness and respectfully

requests an in-court hearing as soon as practicable.


Respectfully submitted,

CHELSEA MANNING

By Counsel


Dated: February 19, 2020



/s/ Chris Leibig
CHRISTOPHER LEIBIG
(VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-431 O
chris@chrisleibiglaw.com

/s/     Sandra C. Freeman
SANDRA C. FREEMAN
(VSB# 78499)
5023 W. 120th Avenue, #280 '
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

/s/ Moira Meltzer-Cohen
MOIRA MELTZER-COHEN
(*pro hac vice* pending)
277 Broadway, Suite 1501
New York, NY  10007
347-248-6771
mo_at_law@protonmail.com

/s/ Vincent J. Ward
VINCENT J. WARD
(*pro hac vice* pending)
Freedman Boyd Hollander Goldberg
Urias & Ward, P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

In re: Grand Jury Subpoena,   )
                             )
                             )     **1-19-dm-00012-AJT**
CHELSEA MANNING,        )
                             )
        Movant.       )
                             )

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RELEASE WITNESS**

STATEMENT OF MOTION

Comes now Chelsea Manning, by and through counsel, and pursuant to 28 U.S.C. §1826 and applicable law, moves this Court to vacate the sanctions imposed upon her, as these sanctions exceed their lawful civil function as coercive, and not punitive sanctions.

Ms. Manning states the following in support of this request:

Statement of the Case

Chelsea Manning is a former all-source intelligence analyst for the U.S. military, who in 2013 was convicted at a United States Army court martial for disclosing classified information to the public. Her reasons for making those disclosures involved her inability to reconcile herself to the knowledge that the United States was not only engaging in, but concealing the true nature of modern asymmetric warfare. She took and carried out the decision to make those disclosures

entirely on her own, with the full knowledge that she was likely to suffer dearly as a result. After taking full responsibility for her actions in a detailed sworn statement, she was sentenced to thirty-five years imprisonment and a dishonorable discharge. In 2017 her sentence was commuted by then-President Barack Obama. She was released from prison in May, 2017. Since her arrest in 2010, Ms. Manning has been both lauded and criticized for her relentless commitments to her ideals.

On March 6, 2018, a grand jury sitting in the Eastern District of Virginia issued under seal a one-count indictment against the first person to publish Ms. Manning's disclosures. Ms. Manning was summoned to appear on March 6, _2019_, exactly one year later, to give testimony before the same grand jury. After litigation and denial of various motions to quash the subpoena, she was brought before the grand jury, and refused to give testimony. Finding no "just cause" for her refusal, District Court Judge Hilton found her in contempt, and remanded her to the Alexandria Detention Center until the term of the grand jury expired or such time as she agreed to answer questions, thus "purging" her contempt.

One month after her confinement began, on April 11, 2019, the 'John Doe' indictment, in which Ms. Manning is named throughout as an alleged coconspirator, was made public, confirming that the grand jury had obtained this indictment without the benefit of or apparent need for Ms. Manning's testimony.

On May 9, the term of the first grand jury expired and she was released.

However, Ms. Manning was subpoenaed to appear on May 16 before a new grand jury. On May 15, the government filed an _ex parte_ letter with this Court. On May 16, Ms. Manning appeared before this Court, and moved to quash the new subpoena on the basis that her

testimony was not necessary, and that the government had not made adequate denials of unlawful electronic surveillance. The Court acknowledged that post-indictment subpoenas were inherently suspect. The Court furthermore pressed the government to clarify that their offered denial of unlawful electronic surveillance was limited only to Article III surveillance, and did not cover, for example, any potential surveillance that may have taken place under the authority of executive order or other statutory authority, such as FISA. Finally, the Court acknowledged that the cumulative effect of grand jury secrecy and *ex parte* filings functioned to force Ms. Manning to litigate blind. Nevertheless, the Court denied Ms. Manning's motions. She then reiterated her refusal to give testimony before the Grand Jury.

This Court again found no just cause for her refusal, and held her in contempt. Having concluded that confinement alone was unavailing in coercing her compliance, the Court imposed concurrent fines upon Ms. Manning, to be assessed at a rate of $500.00 per day after 30 days, and $1000.00 per day after 60 days.

On May 23, 2019, the prosecution obtained a superseding 17 Count indictment against Julian Assange. This indictment was also obtained without the benefit of or apparent need for Ms. Manning's testimony. The related extradition proceedings are ongoing, and are not expected to conclude for many months, if not years. At most, Ms. Manning may be confined under the Recalcitrant Witness Statute for a total eighteen months. The latest she may be released is September, 2020, two months prior to the termination of the term of this grand jury, and certainly prior to the conclusion of extradition proceedings.

Over the last decade Chelsea Manning has shown unwavering resolve in the face of censure, punishment, and even threats of violence. Her declaration (Exhibit A) articulates her perceptions of the grand jury and the moral basis for her refusal to comply with the instant

subpoena, and her willingness to remain incarcerated speaks for itself. The report of Dr. Sara Boyd (Exhibit B) confirms that her personality traits and coping mechanisms insulate her from the effects of pressure to change her principles or her decisions, essentially concluding that Ms. Manning is constitutionally incapable of acting against her conscience. The letter of Nils Melzer (Exhibit C), which casts serious doubt on the continued permissibility of the practice of coercive sanctions, functions to authorize Ms. Mannings perceptions and confirm her articulated moral basis for refusing to give testimony. The petition signed by 60,000 people (Exhibit D) is compelling evidence of Ms. Manning's wide social support, as well as the potential withdrawal of that support, were Ms. Manning to change her position. No realistic possibility remains that continued confinement or other sanctions will bring about Ms. Manning's testimony; in this circumstance further confinement is merely punitive and in direct opposition to both the Recalcitrant Witness statute and decades of case law.

As Ms. Manning's resolve not to testify has been unwavering, and as her moral conviction, for which she is deservedly renowned, has become only more developed since her confinement, her incarceration is not serving its only permissible purpose. Ms. Manning has now been incarcerated for eleven of the maximum eighteen months. There is no reason to believe she will experience a change of heart; there are a plethora of indications that she will not. For that reason, the motion should be granted in its entirety.

### Burden of Proof

The witness may show by a preponderance of the evidence that there is no reasonable possibility that she will testify, and that sanctions must therefore be terminated. 28 U.S.C. §1826; U.S.C.A. Const.Amend. 14, Matter of Parrish, 782 F2d 325, 328 (2d Cir 1986).

Argument

I.    Civil contempt sanctions may only be coercive. The sanctions against Ms. Manning serve no coercive purpose and must be terminated.

The question at bar is whether Ms. Manning's current confinement and the fines threatening to total nearly half a million dollars, are likely ever to lead her to testify before the Grand Jury. Whether Ms. Manning had "just cause" for her refusal to comply with the subpoena is no longer relevant. What little law there is in the Fourth Circuit is unambiguous: If the witness can show by a preponderance of the evidence that there is no reasonable possibility that she will testify, then continued confinement transforms from a coercive sanction to a punishment, contrary to the mandate of 28 U.S.C. §1826.

The civil contempt sanction is one that may be imposed without the protections afforded criminal defendants. This is because the confinement is conditioned upon the contemnor's own conduct. Shillitani v. U.S., 86 S.Ct. 1531 (1966). Thus, under both the common law governing the court's traditional contempt powers, and its codification in 28 U.S.C. §1826, civil confinement is intended *only* to be coercive. "If a judge orders continued confinement without regard to its coercive effect upon the contemnor, or as a warning to others who might be tempted to violate their testimonial obligations, he has converted the civil remedy into a criminal penalty." Simkin v. U.S., 715 F.2d 34 (2d Cir. 1983) at 38. That is, civil sanctions may not, under any circumstances, be used as a deterrent to other potentially recalcitrant witnesses. In the event that there is no possibility of purging contempt, either because the grand jury has ended, or because the witness is incoercible, then the confinement serves no further lawful purpose, and the

witness must be released. 28 U.S.C. §1826, <u>Shillitani v. United States</u>, 384 U.S. 364 (1966);

<u>Armstrong v. Guccione</u>, 470 F.3d 89, 111 (2d Cir. 2006).

The recalcitrant witness statute sets 18 months as the maximum term of confinement, but that is not to say that all confinement up through 18 months is definitionally coercive. <u>Simkin</u>, overruling the logic of <u>United States v. Dien</u>, 598 F,2d 743 (2d Cir. 1979)). Furthermore, although a long civil confinement does not in itself constitute a due process violation, a witness is not required to demonstrate unusual circumstances in order to show that confinement has lost its coercive impact. <u>Sanchez v. United States</u>, 725 F.2d 29 (2d Cir. 1984). Returning directly to the legislative history of the recalcitrant witness statute, we see in fact that "[a] court is free to conclude at any time that further incarceration of a recalcitrant witness will not cause the witness to relent and testify, and, upon such grounds, to release the witness from confinement." <u>Grand Jury Reform: Hearings on H.R. 94 Before the Subcomm. On Immigration, Citizenship, and International Law of the House Comm on the Judiciary</u>, 95th Cong., 1st Sess. 713 n. 1 (1977) (statement of Asst. Atty. Gen. Civiletti).

The burden rests with the contemnor to convince the judge of her intransigence, and the district judge retains "virtually unreviewable discretion." Nevertheless, all relevant rulings have made clear that such deference can be extended "only if it appears that the judge has assessed the likelihood of a coercive effect upon the particular contemnor. *There must be an individualized decision, rather than application of a policy*[.]" <u>Simkin</u> at 37. <u>See also</u> <u>In re Cocilovo</u>, 618 F.Supp. 1378 (S.D.N.Y. 1985); <u>In re Papadakis</u>, 613 F.Supp. 109 (S.D.N.Y. 1985); <u>U.S.v. Buck, U.S. v. Shakur</u>, 1987 WL 15520 (S.D.N.Y. 1987); <u>United States v. Whitehorn</u>, 808 F.2d 836 (4th Cir. 1986); <u>In re</u>

Cueto, 443 F. Supp. 857 (S.D.N.Y. 1978). The judge's virtually unreviewable discretion therefore "detracts in no way from our duty to follow the clear pronouncements of a higher court…[which] compels a finding" that a truly intransigent witness, "ready, willing, and able to persist in [his] defiance," be set free. In re Dorie Clay, 1985 WL 1977 (S.D.N.Y. 1985).

Several factors play into the individualized determination of a witness's intransigence. These include the length of confinement, the witness's connection with the activity under investigation and continued need for the witness's unique evidence, the articulated moral basis for the refusal, the witness's perception of community support, and the witness's conduct and demeanor. These are factors that have been used as the basis for judges' individualized assessments, although the weight, or even the presence of each factor in any given inquiry appears to be entirely at the discretion of the judge. See, generally, In re Cueto, 443 F.Supp. 857 (S.D.N.Y.)(two women working for Episcopal Church released after ten months, based on "humane factors" as well as their unwavering belief, supported by the church, that they were suffering religious persecution); In re Dohrn, 560 F.Supp. 179 (S.D.N.Y. 1983) (Witness released despite Judge's antipathy, based on the intransigence of her beliefs and the diminished need for her cooperation); Clay, supra, at 4, (Contemnor released based on her intransigence, *despite* the need for her unique and relevant testimony: "To infer that a [grand jury resister] is likely to remain silent … does not require a great leap of logic. That she is wrong is beside the point." at 2.); Buck, supra, (contemnors' motions granted *prior to confinement* based on the strength of their convictions); Cocilovo, (contemnor released after ten months with no indication that he would yield); In re Thomas, 614 F.Supp. 983 (S.D.N.Y. 1985)

(contemnor released based on her articulated principles, strengthened by her awareness of "the collective disapproval that would follow a decision to testify" at 984); In re Grand Jury Proceedings, 994 F. Supp. 2d 510, 519 (S.D.N.Y. 2014) (contemnor released after eight months based on judge's determination that witness was "fully inculcated with the partisan zeal of one who is often in error but never in doubt [and so] governed by different incentives that will cause him to remain in contempt even if this motion is denied").

Cases dismissing as insufficient the 'mere assertion' of incoercibility do not countervail so much as confirm the underlying theory that the contemnor must in all actuality be able to show that they are incoercible. Papadakis, *supra*, (Finding that the contemnor's desire to "obtain the fruits of his friends' criminal activity," however ignoble, precluded the possibility of his ever testifying); In re Grand Jury Proceedings, 2001 WL 527401 (E.D.N.Y. 2001) (release denied; sole evidence was contemnor's "bald assertion" that he would not cooperate); S.E.C. v. Princeton Economic International, Ltd., 152 F.Supp.2d 456 (S.D.N.Y. 2001) (release denied because contemnor's desperate and disingenuous paper-shuffling convinced the Judge only that the witness was in fact susceptible to the coercive effects of incarceration).

Furthermore, unlike a criminal case in which a defendant might be persuaded that they have run out of viable legal options, "judicial process is never truly 'exhausted' for a civil contemnor because […] the Court has a continuing obligation to assess the efficacy of confinement. […] There will thus never come a time for [a contemnor] where his only remaining option is to cooperate." In re Grand Jury Proceedings, 994 F. Supp. 2d 510, 519 (S.D.N.Y. 2014).

The overwhelming majority of relevant law stems from the Second Circuit. However, the Simkin/Sanchez rule has been endorsed and adopted by courts in the 1st, 3d, 4th, 6th, 7th, 9th, and 11th Circuits. See In re Grand Jury Proceeding, 13 F.3d 459 (1st Cir. 1994); In re Impounded, 178 F.3d 150 (3d Cir. 1999); United States v. Whitehorn, et al, 808 F.2d 836 (4th Cir. 1985); United States v. Adams, 2012 WL 2953075 (N.D.W.V. 2012); United States v. Hallahan, 768 F.2d 754 (6th Cir. 1985); United States v. Jones, 880 F.2d 987, 989 (7th Cir. 1989); Matter of Crededio, 759 F.2d 589, 592 (7th Cir. 1985); United States v. Clough, 946 F.2d 899 (9th Cir. 1991); In re Grand Jury Proceedings, 877 F.2d 849 (11th Cir. 1989).

Since the law requires an individualized assessment of a contemner's susceptibility to coercion, denials of motions for release have been made on the basis of the contemnor's failure to convince the court that confinement is no longer coercive. For example, some contemnors appear to submit no more than a bare claim, unsupported by evidence, that they will not cooperate. In re Grand Jury Proceedings, 2001 WL 527401 (E.D.N.Y. 2001). In one case, release was denied due to the fact that the witness' "decision not to testify [appeared] not to be a matter of absolute principle, but a reflection of [his] view that it [was] not yet in his personal interest to testify." United States v. Salerno, 632 F.Supp. 529 ( S.D.N.Y. 1986). Release has been denied where a contemnor's desperation resulted in profligate and ever-stranger requests for relief, leading the Court to conclude that confinement was in fact having precisely the desired effect. S.E.C. v. Princeton Economic International, Ltd, 152 F.Supp.2d 456 (S.D.N.Y. 2001).

On the other hand, where a moral basis for the refusal was clearly articulated, the Court determined that release was no less than mandatory under the law, notwithstanding

the judge's florid anger at what he considered a perverse outcome. <u>In re Grand Jury Proceedings</u>, 994 F.Supp 2d 510 (S.D.N.Y. 2014) (stating that notwithstanding his objections to <u>Simkin</u>, courts are "bound by it [and] if the court concludes that further confinement would not induce [the witness] to testify, then he must be released."), <u>see also</u> <u>In re Duran</u>, No. 12-GJ-149 (W.D. Wash., 2013).

The state of the law with respect to civil confinement is clear: the sole lawful purpose of civil confinement is to exert a coercive effect upon a recalcitrant witness. In the absence of a reasonable expectation of coercing testimony, coercive confinement has exceeded its lawful scope, and must be terminated.

This is the impasse at which we have arrived.

Chelsea Manning is known globally for being a person who acts on principle, even at great harm to herself. She is a public figure precisely because she not only takes risks, but accepts full personal responsibility for all her actions, as well as the consequences that flow from those risks. This is core to her identity, and she has quite publicly persisted in her various stances in the face of opprobrium, severe punishment, and profound disruptions to her daily life, including her instant incarceration.

Ms. Manning has well-founded reasons to doubt the propriety of this particular subpoena, and believes that she does in fact have just cause for her refusal to testify. But beyond these legal issues, she is convinced that to cooperate with this grand jury would be a betrayal of her beliefs about the grand jury process in general, and this Grand Jury in particular. She has always been prepared to suffer the consequences for her beliefs in this regard, and in light of her history, it should surprise nobody to find that she has the courage of her convictions.

Ms. Manning has publicly reiterated and explained her objections to the grand jury at every turn, making herself accountable to her friends and political community, with the full knowledge that while her career, social, and political life are being radically disrupted by her incarceration, they would be more devastated by her capitulation. She reiterated her refusal to cooperate with the grand jury process before this Court, and has now reiterated that refusal every day for more than eleven months. There is no reason to believe she will at this late date experience a change of heart; there is a profusion of evidence that she will not.

Evidence of her incoercibility includes, but is not limited to the fact that she has now been confined for more than 60% of the maximum allowable time; her articulated moral basis for refusing to testify, as set forth in the declaration annexed hereto and attached as Exhibit A; the expert report of Dr. Sara Boyd, who analyzed both the likelihood that Ms. Manning could be dissuaded from her conviction and the ways in which her confinement is causing her harm, annexed hereto as Exhibit B; the November 1, 2019 letter of U.N. Special Rapporteur on Torture Nils Melzer, challenging the lawfulness of coercive sanctions, annexed hereto as Exhibit C; and the petition, signed by more than 60,000 people, calling for Ms. Manning's immediate release, annexed hereto as Exhibit D.

The above evidence, and the factors to be considered in determining whether a witness is incoercible such that coercive sanctions must be lifted, are discussed in turn below.

A.   The witness's connection with the activity under investigation and continued need for the witness's unique evidence

As a preliminary matter, Ms. Manning's involvement with a single infamous constellation of federal offenses is not in dispute. She has however long maintained that she is no longer possessed of any evidence not already known to the United States. The investigation leading up to her court martial was the largest forensic investigation of its kind, and any evidence Ms. Manning was ever in a position to disclose has since been fully in possession of the government. Not only did she give detailed statements at her own court martial, experts of many kinds, from both the government and the defense, concurred in their assessments of much of the evidence. Given the pendency of 18 counts against the target, there is little credence to the notion that Ms. Manning's refusal to testify is in any manner a hindrance to the government's ability to carry out its prosecution.

B.    Length of confinement

The instant case is not comparable to those where "[p]rior to confinement, many recalcitrant witnesses have said and may have conscientiously believed that they would never testify… [and incarceration] has caused [them] to change their minds." Matter of Parrish, 782 F.2d 325, 328 (2d Cir. 1986).

Prior to this matter Ms. Manning was confined for more than seven years. Her confinement included eleven months in solitary confinement while awaiting court martial, and another month in isolation at Alexandria Detention Center after the March 2019 finding of civil contempt. Her long confinement at Fort Leavenworth involved a protracted, painful, and very public struggle for gender affirming healthcare. Her confinement from March to May 2019 required her to put her delicate post-surgical

regimen in the hands of her jailers, a choice she made unflinchingly, despite grave misgivings.

When deciding not to testify to the Grand Jury seated in May, Ms. Manning had already endured not only years of punitive confinement, but public scrutiny and institutional suspicion, derision, and threats on the basis of her conduct as well as her gender. She had already struggled for years to access basic necessary gender-affirming health care, and to build a life and identity under unimaginably difficult conditions. This is to say: Ms. Manning knew full well what the consequences of her refusal would be, and she refused anyway. She has endured eleven months of purportedly coercive confinement. It should now be clear that neither confinement nor any other sanction will have such an effect.

This is not to say that these sanctions are without consequence. Indeed, as noted in the letter of United Nations Special Rapporteur on Torture, Nils Melzer, annexed hereto as Exhibit C: "victims of prolonged coercive confinement have demonstrated post-traumatic symptoms and other severe and persistent mental and physical health consequences." See Ex. C, p. 2. Likewise, as outlined in the report of Dr. Sara Boyd, Ms. Manning is showing symptoms that would tend to validate S.R. Melzer's expressed concerns in this regard. See Ex. B, p. 17, ("[I]n my opinion, she is being harmed via her adaptation to the incarceration setting, and the more she adapts, the more she is harmed.").

Courts have routinely found recalcitrant witnesses to be incoercible, and ordered them released, based on evidence of their ability to withstand confinement for a few months. See e.g.: In re Cueto, *supra* (witness released after ten months); In re Duran,

*supra* (witnesses released after no more than four months); <u>U.S. v. Buck, Shakur</u>, *supra* (contemnors' motions granted *prior to confinement)*; <u>Cocilovo</u>, *supra* (witness released after six months); <u>In re: Koch</u>, *supra* (witness released after eight months), <u>In re Thomas</u>, *supra* (witness released after six months).

Counsel has been unable to find a case involving any other witness who has endured the kind of hardships Ms. Manning has endured, let alone for the length of time she has endured them, prior to release. Having now endured eleven months of confinement that she could ostensibly have ended at any time, there can no longer remain any serious doubt regarding the ruthlessness with which she will hew to her convictions.


C.     <u>The articulated moral basis for the refusal</u>

At the urging of your Honor to reflect upon her feelings about the grand jury as an institution, Ms. Manning wrote a detailed letter to the Court explaining the social and historical bases for her belief. In the letter, she pointed out that the governments of nearly all other nations long ago replaced the grand jury with public adversarial proceedings; that scholars of law and history agree that the grand jury is not necessary to criminal prosecution; that there is a well-documented history of grand jury abuse and the selective enforcement of sanctions against those perceived as dissidents; and that the form and function of the grand jury contemplated by the US Constitution bears no resemblance to the institution in place today. (Dkt. 14-1).

Her letter set forth her knowledge of the grand jury process, its history, evolution, and political use, and the careful reasoning that led to her firm decision not to participate in it. In the intervening months, Ms. Manning's perception of contempt sanctions as a

selectively enforced political tool has been further entrenched by the public flouting of

court orders by members of the executive branch, the punishment of government officials

who have complied with such subpoenas, and the unvarnished exercise of Executive

pressure on the Department of Justice.[1]

Ms. Manning's position has been further bolstered by no less an authority than the United

Nations. On November 1, 2019, Nils Melzer, the United Nations Special Rapporteur on torture

and other cruel, inhuman, or degrading treatment, sent a letter to Secretary of State Pompeo,

inquiring into the practice of coercive detention outlined by 28 U.S.C. §1826, and into the

confinement of Ms. Manning in particular. In the letter, S.R. Melzer sets forth a clear and

accurate understanding of the Recalcitrant Witness statute as authorizing the "deprivation of

liberty for civil contempt [which] involves the intentional infliction of ... mental and emotional

suffering for the purposes of coercion... at the order of judicial authorities." See Ex. C, p. 2.

S.R. Melzer identifies coercive confinement as "an open-ended, progressively

severe measure of coercion fulfilling all the constitutive elements of torture..." as defined

under Article 1 of the Convention Against Torture ("CAT"), to which the United States is

a signatory. He concludes that it is "incompatible with the international human rights

obligations of the United States under, *inter alia*, Article 1, 2, 15, and 16 of the CAT, as

---

[1] House Panel Approves Contempt for Barr After Trump Claims Privilege Over Full Mueller Report, The New York Times, Nicholas Fandos, May 8, 2019, *available online at*: https://www.nytimes.com/2019/05/08/us/politics/trump-executive-privilege-mueller-report.html, last visited February 17, 2020; Trump tells ex-White House counsel McGahn not to appear before Congress, Reuters, Sarah N. Lynch et al, *available online at*: https://www.reuters.com/article/us-usa-trump-mcgahn-idUSKCN1SQ206, last visited February 17, 2020; Meet Alexander Vinman, the Colonel Who Testified on Trump's Phone Call, The New York Times, October 29, 2019; updated February 7, 2020, *available online at*: https://www.nytimes.com/2019/10/29/us/politics/who-is-alexander-vindman.html, last visited February 17, 2020; Devos held in contempt for violating order on student loans, USA Today, Savannah Behrmann, October 25, 2019, *available online at* https://www.usatoday.com/story/news/education/2019/10/24/betsy-devos-contempt-violating-order-student-loans/4091621002/, last visited February 17, 2020; February 11, 2020 Tweet of @realDonaldTrump, *available online at*: https://twitter.com/realDonaldTrump/status/1227407106652897280 last visited February 17, 2020.

well as under Article 2, 7, and 9 of the International Covenant on Civil and Political Rights, ratified by the United States of America in 1994 and 1992, respectively." Ultimately, he emphasizes, coercive confinement should be "abolished without delay." See Ex. C, p. 2, 5-6.

S.R. Melzer also firmly recommends Ms. Manning's immediate release. His recommendation is based not only on his analysis that the continued use of coercive confinement constitutes a violation of this nation's treaty obligations or an irreparable harm to Ms. Manning. In light of the purely coercive purpose of civil confinement, he says, Ms. Manning must be immediately released, because sanctions will not act coercively upon her.[2] See Ex. C, page 3.

In the wake of the letter from S.R. Melzer, several celebrities have recorded videos calling for Ms. Manning's release. A petition calling for her release, sponsored by civil liberties organizations, has garnered over 60,000 signatures, serving to further vindicate her perceptions. See Ex. D.

However, even in the absence of such salient supports, Ms. Manning's beliefs and decisions would not be susceptible to change.

The report of Dr. Sara Boyd, annexed hereto as Exhibit B, is not only illuminating but dispositive in this regard, providing a clinical exploration of Ms. Manning's personality, habits of mind, and motivators. Among other things, Dr. Boyd notes that Ms. Manning "provided a lengthy account of her views on the grand jury process and her belief that the process is morally wrong," and finds that Ms. Manning "did not waver in her characterization of her stance and her

---

[2]For the same reason he recommends that she be relieved of all fines levied against her disproportionate to the gravity of any *offence* she may have committed.

decision-making with respect to grand jury testimony". She notes further that those who know

Ms. Manning were "unanimous in their assertions that Ms. Manning would be extremely

unlikely to change her mind… given her personality, past behavior with regard to decision-

making, and the importance she placed on her political and ethical values." Ex. B, p. 11. Based

on two standardized personality assessment instruments, Dr. Boyd indicates that Ms. Manning is

someone who tends "to act according to their own moral and ethical values." Ex. B, p. 13. Dr.

Boyd further observes that Ms. Manning is "consistently described … as principled, thoughtful,

and deliberative with regard to her decision-making, but immovable once she had made a

considered decision about an issue related to her personal beliefs and values." Id., p. 14.

Ultimately, Dr. Boyd concludes:

> "Ms. Manning exhibits longstanding personality features that relate to her
> scrupulousness, her persistence and dedication, and her willingness to endure social
> disapproval as well as formal punishments. She also has a tendency to see issues in
> black and white terms with regard to ethical and values-based judgment. These
> personality features are not likely to be modified by any intervention. … Ms.
> Manning has a history of continuing to pursue her… values even when faced with
> serious … negative consequences. … she has not wavered in this decision-making
> regarding cooperation for the past [eleven] months and she did not make any
> statements indicating that… there was any information that could be provided to her
> that would change her mind." Id. pgs. 15-16.

While Ms. Manning is open to feedback from those she regards as sharing her values, she

is not susceptible to pressure from people or institutions who hold values she sees as morally

inconsistent with her own. Her already strong internal moral code is intrinsically rigid, and she

feels that current events vindicate her perceptions of the grand jury. The firmness of her

conviction, moreover, is compounded and reinforced by the support of her personal,

professional, and political communities the world over, which continually reaffirms the righteousness of her position, and her sense of public accountability to that decision.

D.  <u>Perception of community support</u>

Ms. Manning's clearly expressed, thoughtful, and consistent statements about the grand jury have lent her credibility with the public, and her readiness for self-sacrifice gives credence to the widespread public understanding that she is incoercible. Ms. Manning's community support is global, and was earned in the crucible of deciding — repeatedly, and at great cost — to subsume her own self-interest to history and the common good. Ms. Manning understands that her public credibility would diminish precipitously were she to act with less than her characteristic integrity. The world over, Ms. Manning is recognized by both her supporters and detractors as being true to her word, and she in turn perceives herself as accountable to that reputation.

As discussed in the report of Dr. Boyd, with or without external support, Ms. Manning would very likely have taken all the same decisions regardless of consequences and censure, based only on her rigid adherence to her internal moral code. However, she has *also* now come to be regarded by some as an international hero, a person of principle who was willing to sacrifice everything in the public interest. Now, her moral compass and the support she receives from her various communities function to mutually reinforce each other.

That she is supported by so many, for so many disparate reasons, further cultivates her sense that she is responsible to huge swaths of the public. The fact of her previous incarceration was abhorrent to huge numbers of people who were outraged by the government's willingness to punish the disclosure, but not the commission of

government misdeeds. She has become a figurehead of the movement for transgender equity. Amnesty International, the ACLU, the Freedom of the Press Foundation, and many other organizations have publicly stated their support for her refusal to cooperate in this grand jury, and have called for her release. She has been written about sympathetically by scholars and the press. Her actions are viewed as noble by widely-respected philosophers like Noam Chomsky, historical figures such as Daniel Ellsberg, and her many friends.

Her reincarceration on the basis of this subpoena is seen by many as retaliation for President Obama's commutation, and as an end-run around the principles of double jeopardy. Her resistance to the grand jury is understood by historical and legal experts as part of a contribution to a long history of principled resistance to government secrecy and political repression. See Cueto, supra, where the support of those people whose approval most mattered to contemnors was deemed a significant factor for their release; Clay, supra, in which the support of the contemnor's community played a part in her release; and a contemnor whose "status as a hero" militated against his further confinement. Matter of Ford 615, F.Supp. 259 (S.D.N.Y. 1985); In re Grand Jury Proceedings, 994 F Supp 2d 510, 517 (SDNY 2014) ("Regardless of how breathtakingly misinformed many of these people are about both the law and the facts at hand, it seems clear that Koch would lose their admiration and fellowship should he abandon his obstinacy and testify before the grand jury).

Like those contemnors released on the basis of their rigid unwillingness to cooperate, Ms. Manning is supported in her beliefs by the people about whose opinion

she cares. To agree to cooperate would be to betray her not only own principles, but her reputation, as well as the millions of people who have supported her over the years.

Her integrity is so established as to seem to many self-evident. In his letter to Secretary of State Pompeo, in addition to challenging the lawfulness of coercive confinement, S.R. Melzer accurately summarized the principle that U.S. law permits coercive sanctions only where they exert a coercive effect, and called for Ms. Manning's immediate release. The implication of his analysis relied on the understanding that any purportedly coercive sanctions, as applied to Ms. Manning, are necessarily futile, and thus impermissible under our own legal standards.

Since the publication of S.R. Melzer's letter, more than 60,000 people have signed a petition voicing their conviction that Ms. Manning cannot be coerced. Organizations dedicated to civil liberties and other causes have sponsored the petition. Ms. Manning's participation in a New Year's Eve Twitter meme, summing up the decade from 2010-2020 as "...100% being true to myself no matter what; 0.00% backing down", was viewed almost three million times. The public support she receives is overwhelming, and critical to her identity and wellbeing. Significantly, she understands that this community support, however widespread, is contingent. It would be withdrawn were she to compromise her repeated public embrace of her community's shared moral code.

E.     The witness's conduct and demeanor

Ms. Manning has made very clear that she is prepared to remain in jail and suffer under any sanctions imposed. As is made clear in Ms. Manning's declaration, she sees the negative impacts of sanctions as being greatly outweighed by the strength of her commitment to her

principles, and no amount of suffering will change her mind. *See* Declaration of Chelsea Manning annexed hereto as Exhibit A.

Just as Ms. Manning is not motivated by the approval of authority figures, neither is she motivated by negative attention-seeking. She has resigned herself to a subdued existence at the Alexandria Detention Center for the last eleven months and is prepared to continue on in this way. She has not been outside since her confinement on May 16, 2019, and is almost certainly suffering from under-stimulation. Nevertheless, she has adapted, as noted by Dr. Boyd, to an unhealthy degree.

The Report of Dr. Boyd repeatedly refers to the ways in which she is being harmed by her confinement. Dr. Boyd describes Ms. Manning as "practical" and "rational." Ex. B, p. 16. She notes that the harm is "taking the form of what is often called institutionalization, but is also manifesting as anxiety about returning to the community… I have serious concerns about her health and well-being…" Ex. B, p. 17. The harms to which Ms. Manning is now exposed are very real, but because of her unique coping mechanisms, they are not impacting her decisions or behavior in any way. That is, she intellectualizes these harms, and isolates herself, but is not moved and cannot be provoked to cooperate with the government in order to alter the harmful conditions of her life.

F.      Summary of evidence regarding Ms. Manning's incoercibility

When a contemnor's confinement lacks a coercive effect, continued confinement is transformed to a punishment in violation of due process, and the witness must be released. Matter of Parrish, 782 F.2d 325, 328 (2d Cir. 1986). Ms. Manning has suffered

tangible punitive harms, without breaking her resolve. As mentioned above she is facing insurmountable fines, which will make return to the community exceedingly difficult. Additionally, Ms. Manning's repeated and protracted incarceration has left her so acclimated to institutional life that she no longer has any affirmative desire to be released, and thus no motivation to cooperate in order to secure her liberty.

Ms. Manning's articulated moral basis for her refusal to testify, along with the expert report of Dr. Sara Boyd, outlining Ms. Manning's intelligence, modes of thinking, and institutionalization, stand in stark contrast to the self-serving or unsupported statements of a contemnor who merely seeks the most expedient route home. All evidence suggests that she is a deeply principled woman, who has suffered, expects to suffer, and is prepared to suffer for her principles, whether she is in or out of jail. Whatever one may make of her beliefs, it is evident that they are inflexible, robust, and sincerely held. She will cleave to them as her most trustworthy touchstone.

Neither confinement, nor fines, nor any other sanction will convince Ms. Manning to participate in the grand jury. At this point, sanctions simply reinforce her perception that she is taking a necessary and righteous stand against abusive institutions. The impact of these sanctions is limited exclusively to exacting a cost from Ms. Manning; they will never have any coercive effect. The sanctions have therefore exceeded their lawful scope, and must be terminated.

II.     The financial sanctions imposed against Ms. Manning are punitive, and enforcement is unconscionable.

A.     <u>A financial sanction should not be imposed after a finding that confinement has failed.</u>

As with any civil sanction, a fine must be reasonably calculated to exert a coercive but not a punitive effect, lest it outgrow its lawful bounds. During the May 16, 2019 contempt hearing, this Court determined that confinement alone had not worked to coerce Ms. Manning, and imposed fines of $500 per day for each of the first thirty days she continued to refuse to cooperate, and $1000 per day thereafter. The district court has wide discretion in fashioning a contempt remedy. However, this discretion is not unlimited. Because sanctions for civil contempt are designed to coerce the contemnor into compliance with the court's mandate and to remedy past non-compliance, they should be remedial and compensatory, not punitive. When it becomes obvious that sanctions are not going to compel compliance, they lose their remedial characteristics and take on more of the nature of punishment. Soobzokov v CBS, Inc., Quadrangle/New York Times Book Co., Inc., 642 F2d 28, 31 (2d Cir 1981) quoting In re Grand Jury Investigation, 600 F.2d 420, 423-24 (3d Cir. 1979); Lambert v. State of Montana, 545 F.2d 87, 89-91 (9th Cir. 1976).

The aim of the Court was presumably to compound the coercive effect of confinement with a financial sanction. However, Ms. Manning has not been, and cannot be moved by threats of financial ruin, any more than she has been moved by her eleven month confinement. To impose the less harsh sanction of fines after concluding that the harsher sanction of confinement has failed may be legally permissible, but is practically counterproductive. It is still less reasonable to imagine that the concurrent imposition of fines and confinement could be construed as merely coercive where a witness is prepared to endure both for sixteen months. That is, once the witness proves themself incoercible, all sanctions are shown to have been merely punitive. These fines, assessed without any meaningful evaluation of Ms. Manning's financial wherewithal, are particularly punitive.

B.    Ms. Manning can neither testify nor pay the financial sanction.

As discussed above, Ms. Manning is constitutionally incapable of cooperating with the institution of the grand jury. Equally, she cannot pay these fines. The limited financial records provided to the Court in July and August did not reflect that she has any financial capacity now, or any prospect of earning anywhere near the half a million dollars that could accrue by the end of her confinement. She has already been fined orders of magnitude more money than she currently has, and she is not expected to earn, or even to be able to earn enough money to pay these fines even were she to relinquish ten percent of her salary over the course of forty-five years.

Just as a court should not impose a contempt on a party when compliance with a court order is impossible, neither should they impose sanctions a contemnor is unable to satisfy. United States v. Rylander, 460 U.S. 752, 757,(1983). Although the burden rests with the contemnor to show inability to comply, they must have an opportunity to show that they cannot, and to demonstrate the degree to which they *could* comply. This inquiry never took place. Such an inquiry must now be held, and it will show unambiguously that Ms. Manning, despite being a public figure, is not a wealthy person.

The fines are wildly disproportionate to Ms. Manning's income. Even at her highest earning point, Ms. Manning never earned close to $1000 per day. Her earning potential is largely speculative. She has spent very little of her adult life not in prison. Her primary marketable skill is in being Chelsea Manning, and while she is a person of intrigue and interest, the documentary made about her has not made enough money for her to have benefitted financially at all, and the

autobiography she is supposed to write has been so disrupted by her incarceration that there is reason to think that whatever earnings it might yet yield diminish by the day. These fines are absolutely disproportionate to her financial wherewithal, are not a fine for any offense she has committed, have not coerced her to testify, and cannot be enforced against her in any practicable way.

In the same way that enforcing an impracticable contract is unconscionable, so would it be unconscionable to reduce the nearly half a million dollars in fines to a judgment enforceable against Ms. Manning, once it has become clear that she cannot be coerced. Furthermore, there is no injured party. The government has not been prevented from obtaining multiple indictments regarding the only events about which Ms. Manning could possibly testify. She has not profited in any manner from her refusal, and likewise, the government has not suffered in any manner as a result of her refusal.

As she cannot be coerced into testifying, and as these fines were never calculated to exert a coercive, but not a punitive impact on her, they have functioned as a penalty in violation of due process. They must be vacated.

## Conclusion

Chelsea Manning has shown unwavering resolve consistently throughout her life, even in the face of excruciating consequences. Her declaration (Exhibit A) articulates her perceptions and the moral basis for her recalcitrance. Her solemn patience during eleven months in jail without having been accused, let alone convicted of a crime, speaks for itself. The report of Dr. Sara Boyd (Exhibit B) identifies and explains the characterological attributes from which Ms. Manning's persistence and morals spring, and those attributes that function to entrench and fortify those morals. The letter of Nils Melzer (Exhibit C) not only casts serious doubt on the

permissibility of coercive sanctions, but provides profound moral support for Ms. Manning's self-perception. The petition signed by 60,000 people (Exhibit D) is compelling evidence of Ms. Manning's wide social support, and the kind of impact the withdrawal of that support would have on Ms. Manning, were she to change her position. No realistic possibility remains that continued confinement or other sanctions will bring about Ms. Manning's testimony. Further confinement cannot attain its stated coercive purpose, and therefore will be not simply futile, but impermissibly punitive.

Ms. Manning's recalcitrance and fortitude have only solidified with each new challenge and each passing day. Her incarceration is not serving its only permissible purpose. For that reason, the motion should be granted in its entirety.


Respectfully Submitted,

By Counsel


Dated: February 19, 2020
Alexandria, Va


/s/ Moira Meltzer-Cohen
MOIRA MELTZER-COHEN
(pro hac vice)
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

/s/ Sandra Freeman
SANDRA C. FREEMAN (VSB# 78499)
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

/s/ *Chris Leibig*
CHRISTOPHER LEIBIG (VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-4310
chris@chrisleibiglaw.com

/s/ Vincent J. Ward
VINCENT J. WARD
*(pro hac vice pending)*
Freedman Boyd Hollander Goldberg Urias & Ward, P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com